IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

DONALD GRIFFIN,

                Plaintiff,

v.

                        Civil Action No.
                        9:09-CV-1334 (TJM/DEP)

GEORGE ALEXANDER, Chairman,
New York State Division of Parole,

                Defendant.

APPEARANCES:

FOR PLAINTIFF:                OF COUNSEL:

DONALD GRIFFIN, *Pro Se*
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN      JUSTIN C. LEVIN, ESQ.
Office of Attorney General           Assistant Attorney General
State of New York
The Capitol
Litigation Bureau
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT, RECOMMENDATION AND ORDER

*Pro se* plaintiff Donald Griffin, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983, alleging that the defendants have deprived him of his civil rights during the period of his incarceration.  In his complaint, plaintiff maintains that his right to freely exercise his religion  under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLIUPA"), 42 U.S.C. § 2000cc *et seq.*, and the First Amendment to the United States Constitution was violated when he was denied parole based upon his refusal to sign an acknowledgment accepting responsibility for the conduct that resulted in his criminal conviction, precluding his participation in a sex offender treatment program and, according to plaintiff, resulting in the denial of parole.  As relief, plaintiff seeks a judgment declaring that defendant's parole denial constituted a violation of the RLIUPA and the First Amendment as well as a mandatory injunction directing his release on parole and precluding the defendant from using his refusal to sign the treatment and acknowledgment form as a basis to deny parole.[1]

---

[1]    Plaintiff's second amended complaint also requests that the court issue a temporary restraining order and preliminary injunction, presumably for the same relief. With the filing of his original complaint, plaintiff also sought a preliminary injunction. Dkt. No. 4.  That request, as well as plaintiff's subsequent application for interim

Currently pending before the court is defendant's motion to dismiss plaintiff's complaint on the grounds that 1) plaintiff has failed to state a claim upon which relief may be granted, 2) his claims are barred by *Heck v. Humphrey*,[2] 3) plaintiff has failed to allege defendant's personal involvement in the statutory and constitutional violations asserted, and 4) the defendant is entitled to qualified immunity from suit.  For the reasons set forth below, I recommend that defendant's motion be granted, and that plaintiff's complaint be dismissed in its entirety.

I.    <u>BACKGROUND</u>[3]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS") (formerly known as the New York State Department of

_____

injunctive relief, filed on July 27, 2010, Dkt. No. 16, was denied.  See Dkt. Nos. 8 and 33.

[2]      512 U.S. 477, 114 S. Ct. 2364 (1994).

[3]      When addressing defendant's motion I have considered the contents of plaintiff's complaint and deemed the material allegations of that complaint to be true.  *See Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (*citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007).  I have also considered and incorporated into the background description facts derived from the exhibits attached to the plaintiff's complaint, which may also be properly considered in connection with the dismissal motion.  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S. Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

Correctional Services, or the "DOCS").  *See generally* Second Amended

Complaint (Dkt. No. 13).  At times relevant to his claims plaintiff was

designated to the Gowanda Correctional Facility ("Gowanda"), located in

Gowanda, New York, for the purpose of participating in a Sex Offender

Counseling and Treatment Program ("SOCTP").  *See id.*

According to plaintiff's second amended complaint, which is the

operative pleading in this action, on August 11, 2008, while at Gowanda,

plaintiff spoke with a corrections counselor regarding a pre-sentence

report prepared in connection with Griffin's criminal conviction, advising

the corrections counselor that the report falsely accused him of sexually

assaulting a particular victim.  Second Amended Complaint (Dkt. No. 13)

p. 3.  Griffin informed the counselor that he could not admit committing the

act referenced in the pre-sentence report because he would be lying, in

contravention of his religious beliefs as a Jehovah's Witness.  *Id.*  During

the conversation, plaintiff showed the corrections counselor an excerpt

from his daily religious scriptures warning against the sin of lying.  *Id.*

Plaintiff claims that his participation in the SOCTP would require that he

violate this religious belief because in order to progress to the third level in

the program he would have to sign a "Limits of Confidentiality, Partial

4

Waiver of Confidentiality and Acknowledgment Form", which, according to Griffin, would "on its face direct[ him] to demonstrate acceptance of responsibility for conduct [he] and Jehovah God knows [he] is not guilty of."  Second Amended Complaint (Dkt. No. 13) p. 3.

Plaintiff further recounts that the corrections counselor agreed with Griffin that he would have to admit to the alleged sex offense in order to complete the SOCTP, and provided plaintiff with a program refusal form, which he signed in the presence of the counselor.  *Id.*  In that form, a copy of which is attached to plaintiff's complaint, Griffin indicated that he was refusing to participate in the SOCTP in light of its incompatibility with his religious beliefs.  *Id.* at Exh. A-1.  In signing the form plaintiff specifically acknowledged that his refusal could result in a negative decision by the Parole Board, among other things, as well as his awareness that he could change his mind and inform program staff if he wished to participate in the treatment program.  *See id.*  The specific reason stated for his refusal was listed as "[d]ue to current religion beliefs I/M Griffin unable to participate (ie. 'to not violate his conscientious [sic] by lying')."  *Id.*

Griffin appeared before representatives of the New York State Parole Board on October 28, 2008 and was questioned regarding his

refusal to participate in the SOCTP.  Second Amended Complaint (Dkt.

No. 13) p. 4.  He informed the Board that he could not successfully

complete the program because it would require him to lie, in violation of

his religious beliefs as a Jehovah's Witness.  *Id.*  At the conclusion of the

hearing, the Board issued a decision denying plaintiff release to parole

supervision based, in part, on his refusal to participate in the SOCTP.  *Id.;*

*see also* Complaint (Dkt. No. 1) Exh. 1.[4]

Plaintiff timely appealed the parole denial decision; his appeal,

however, was effectively denied by the failure of the Parole Board appeals

unit to respond.  Second Amended Complaint (Dkt. No. 13) p. 4.  As a

result, on June 30, 2009, plaintiff filed a petition against the defendant in

this action with the New York State Supreme Court pursuant to Article 78

of the New York Civil Practice Law and Rules, asserting that the decision

of the Parole Board should be annulled on essentially the same grounds

he now advances in this lawsuit.  Second Amended Complaint (Dkt. No.

_____

[4]     While plaintiff's second amended complaint is the operative pleading and the
object of defendant's motion, superceding all earlier filed complaints, *see Harris v. City
of New York*, 186 F.3d 243,249 (2d Cir. 1999), plaintiff's initial and first amended
complaints are properly considered by the court when evaluating the plausibility of his
claims.  *Hale v. Rao*, No. 9:08-CV-1612, 2009 WL 3698420, at *3 n.8 (N.D.N.Y. Nov.
3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a
motion to dismiss, it is appropriate for the court to consider materials outside the
complaint to the extent they are consistent with the allegations in the complaint.)

13) p. 4; *see also* Complaint (Dkt. No. 1) Exh. 2.  In response to plaintiff's

Article 78 petition, the defendant proposed and secured the issuance of

an order, over plaintiff's opposition, granting Griffin a *de novo* hearing on

the grounds that the Parole Board had considered erroneous information

in denying his release.[5]  Complaint (Dkt. No. 1) Exh. 4.   Specifically, in

consenting to a new parole hearing, the Board admitted that it had relied,

in part, on the erroneous information to the effect that Griffin had been

found guilty of a serious disciplinary rule violation.  *Id.*  It appears that

plaintiff was again denied parole on rehearing.[6]

---

[5]     Plaintiff opposed the proposed order because he specifically sought a
determination that the respondent infringed upon his First Amendment rights.  *See*
Complaint (Dkt. No. 1) Exh. 5.  In light of the respondent's consent in that proceeding
to "the maximum relief which the Court could grant . . . a *de novo* parole interview[,]"
the state court found plaintiff's opposition to the proposed order to be without merit.
*See id.* at Exh. 6.  The state court's determination is consistent with the principle that
"[a] prisoner who successfully challenges a denial of parole is entitled to a rehearing,
not release."  *See Jones v. Giambruno*, No.05-CV-0008, 2009 WL 1362847, at *11
(W.D.N.Y. May 14, 1999) (citing *Wilkinson v. Dotson*, 544 U.S. 74, 82, 125 S. Ct. 1242
(2005)).

[6]     Attached to plaintiff's opposition to defendant's motion to dismiss is a document
identified as "Inmate Status Report for Parole Board Appearance."  Although it is not
completely clear, it appears that plaintiff's *de novo* hearing was conducted in
December 2009 and that he again was denied release, and additionally that he was
scheduled to reappear on November 2010.  *See* Dkt. No. 29.  Information publicly
available on the DOCCS inmate look-up, http://nysdocslookup.docs.state.ny.us/,
(screen shot attached) reveals that plaintiff's last reappearance was, in fact, in
November 2010, and that his next scheduled parole hearing is in November 2012.

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff filed his complaint in the action, along with an application to proceed *in forma pauperis*, and a motion for preliminary injunction, on November 30, 2009.  Dkt. Nos. 1, 2, and 4.  In his complaint Griffin names a single defendant, George Alexander, the former Chairman of the New York State Division of Parole,[7]  and claims interference with his right of free religious exercise under both the First Amendment and the RLIUPA in association with the October 28, 2009 parole denial.

On December 14, 2009, before the court had completed its initial review of those submissions, plaintiff filed an amended complaint.  Dkt.

_____

[7]    As of June 8, 2009, Andrea W. Evans assumed the position of Chair of the New York State Division of Parole.  *See* https://www.parole.state.ny.us/welcome.html (site last visited Aug. 25, 2004).  Because plaintiff's claims against the defendant are limited to official capacity claims, seeking only declaratory and injunctive relief, I will direct the clerk to substitute Ms. Evans as the named defendant in this action.  *See Zuk v. Gonzalez*, No. 5:07-cv-732, 2007 WL 2163186, at *2 (N.D.N.Y. July 26, 2007) (Scullin, S.J.) (adding a proper defendant, *sua sponte*, in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* Fed. R. Civ. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker*, No. 97-cv-3584, 2006 WL 5893295, at *7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a defendant in a FTCA claim brought by a *pro se* plaintiff); *Ciancio v. Gorski*, No. 98-cv-714E(SC), 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999) (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

No. 5.  By decision and order dated February 16, 2010, the court

concluded that plaintiff's amended complaint failed to state a claim upon

which relief may be granted.  Dkt. No. 8.  In its decision the court noted,

*inter alia*, that plaintiff's request for release from incarceration is not a form

of relief available in this action, that he was afforded a *de novo* parole

hearing after it was discovered that information regarding plaintiff's

disciplinary history relied upon by the Parole Board was incorrect, and that

plaintiff's claims regarding the SOCTP were not cognizable against the

only defendant named in this action, Chairman Alexander.  *Id*. at 2-7.

Plaintiff appealed the court's dismissal of the action to the United

States Court of Appeals for the Second Circuit.  Dkt. No. 11.  By decision

issued by the court on June 7, 2010, the dismissal was vacated, and the

matter was remanded to this court for further proceedings.  *See* Dkt. No.

16.  In its decision the Second Circuit found plaintiff's "*pro se* complaint . .

. insufficiently particular to allow [it] to ascertain whether the underlying

claim is frivolous", observing also that this court "analyzed [plaintiff's] First

Amendment claim as a due process claim, and without adequately

considering whether personal involvement is a prerequisite to liability

under [RLIUPA]."  *Id.*  Accordingly, the court directed that the plaintiff be

afforded an opportunity to file another amended complaint specifying both the features of the SOCTP program that would require him to violate the tenets of his religion and the religious beliefs tenets that would be violated.  *See id.*

Following that remand, plaintiff submitted the second amended complaint, which was accepted by the court for filing.  *See* Dkt. Nos. 13 and 17.  In response to plaintiff's most recent complaint, defendant has moved seeking its dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[8]  Dkt. No. 27.  Plaintiff has since responded in opposition to defendant's motion, Dkt. No.  29, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading

---

[8]   Defendant also seeks, and plaintiff does not oppose, a stay of discovery pending resolution of this motion.

standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S.

at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

B.    Merits of Defendant's Motion

In his motion defendant challenges the sufficiency of plaintiff's religious exercise claims under the First Amendment and the RLUIPA on a variety of grounds, arguing that plaintiff's claims must fail because 1) the complaint contests the October 28, 2008 parole decision, which is no

longer controlling; 2) they are barred by the principles of res judicata

based upon his state court conviction for first-degree sexual abuse; 3) the

claims are precluded under *Heck v. Humphrey*; and, 4) plaintiff's sole

federal remedy to challenge the fact or duration of his imprisonment is by

way of a habeas corpus proceeding.

       1.   <u>Mootness</u>

Defendant is correct in his assertion that the only action challenged

in plaintiff's complaint is the October 28, 2008 parole denial which, plaintiff

claims, was impermissibly premised in part on his religion–based refusal

to participate in the SOCTP.  By plaintiff's own admission, however, that

determination was vacated by the New York Supreme Court, and it

appears that plaintiff subsequently was afforded a *de novo* hearing which

similarly did not result in his release on parole.  Yet, plaintiff's complaint

makes no mention of and does not challenge that later determination, or

any other subsequent determination that may have since occurred.

Though not characterized by the defendant as such, the essence of his

argument seems to be that the claims alleged in plaintiff's complaint are

moot.

Article III of the United States Constitution confers upon federal

courts the authority to decide actual cases and controversies. *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001); *see also Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249, 1253 (1990); *Powell v. McCormack*, 395 U.S. 486, 496, 89 S. Ct. 1944, 1950-51 (1969). Consequently, a federal court presented with an action in which no live controversy exists may not exert jurisdiction, but instead must order dismissal of the plaintiff's claims as moot. *Catanzano*, 277 F.3d at 107. Addressing the concept of mootness, the Second Circuit has noted that

> [t]he hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.

*Martin-Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983).[9]

While application of the mootness doctrine is constitutionally mandated, a court may relieve a party from its application when presented with a matter that is "capable of repetition, yet evading review." *Olmstead v. Zimring*, 527 U.S. 581, 594 n.6, 119 S. Ct. 2176, 2184 n.6 (1999). An otherwise moot question falls under the "capable of repetition" doctrine when 1) the challenged condition was too brief in duration to permit

---

[9]     Under New York Law, a challenge to a parole board hearing must be dismissed if the petitioner is reconsidered for parole. *Graziano v. Lape*, No. 9:04-CV-84, 2008 WL 2704361, at *4 (N.D.N.Y. Jul. 02, 2008) (Kahn, J.) (citations omitted).

litigation prior to its cessation or expiration, and 2) there is a reasonable expectation that the complaining party will be subjected to the same action again.  *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S. Ct. 347, 349 (1975).  "The central question [presented in determining mootness *vel non*] . . . is constant – whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties."  13B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3533 (3d ed. 2008).

Since plaintiff seeks a declaration that the October 2008 parole determination violated his rights and an injunction precluding defendant from denying plaintiff parole based upon his religious beliefs, and that determination has since been vacated by the state court, his claims in this action appear to be moot.  Additionally, plaintiff has not suggested that the time within which to challenge any subsequent denials on that basis was too short, or, more importantly, that any subsequent parole denial was premised upon his failure to participate in the SOCTP.  For these reasons, the claims set forth in plaintiff's complaint are subject to dismissal as moot.

2.  Res Judicata

In his motion defendant also argues that plaintiff's claims are precluded by res judicata based upon Griffin's criminal conviction which, defendant maintains, establishes his guilt of sexual misconduct and effectively precludes him from arguing that participation in the SOCTP would require him to lie.[10]

Both the Full Faith and Credit Clause of the United States Constitution, *see* U.S. Const. art. IV, § 1, and the corresponding Full Faith and Credit statute, 28 U.S.C. § 1738, require that a federal court accord a state court judgment the same preclusive effect which it would merit under the law of the state from which it originated.  *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984);

---

[10]      The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.t. 2161, 2171(2008).  While under claim preclusion a final judgment forecloses successive litigation of the very same claim regardless if relitigation of the claim raises the same issues as in the prior suit, issue preclusion bars successive litigation of an issue of fact or law actually litigated and resolved by a court, even if the issue recurs in a different context in a new claim.  *Taylor,* 553 U.S. at 892, 128 S. Ct. at 2171(citing *New Hampshire v. Maine,* 532 U.S. 742, 748-49, 121 S. Ct. 1808, 1814 (2001)).  Both doctrines protect against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions" while precluding parties from bringing claims they have already had a full and fair opportunity to litigate. *Montana v. United States*, 440 U.S. 147, 153-54, 99 S. Ct. 970, 973-74 (1979). Succinctly stated, "[t]he doctrine of *res judicata* . . . was established as a means to promote legal economy and certainty."  *Expert Electric, Inc. v. Levine*, 554 F.2d 1227, 1232 (2d Cir.), *cert. denied*, 434 U.S. 903, 98 S. Ct. 3000 (1977).

*Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466, 102 S. Ct. 1883, 1889-90 (1982); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  This principle applies fully to claims brought pursuant to 42 U.S.C. § 1983. *Migra*, 465 U.S. at 84-85, 104 S. Ct. at 897-98; *Allen v. McCurry*, 449 U.S. 90, 103-04, 101 S. Ct. 411, 419-20 (1980); *Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir. 1996).

The interplay between plaintiff's religious freedom claims and defendant's res judicata argument raises intriguing issues.  The allegations set forth in plaintiff's second amended complaint and attachments do little more than present a purely speculative claim on his part that his participation in the SOCTP would require him to lie concerning his role in criminal conduct.  It is true that literature associated with the program suggests that a participant must be prepared to fully discuss the particulars of the criminal conduct underlying his or her conviction, noting the following:

> I understand that the primary purpose of the program is reduce the likelihood of re-offending by assisting me to control my chain of behaviors that lead to sexual offending.  I also understand that I am not required to admit the commission of a particular crime, whether it resulted in the present commitment or not.
>
> Rather, for successful program participation, I may discuss my

> behavior in general terms without providing the full names of
> victims, without disclosing the exact dates, times, and places
> of various sexual offending behavior, and without admitting to
> any specific crime or the violation of any specific section of the
> Penal Law.  Nonetheless, I must openly and honestly discuss
> the behavior that resulted in my incarceration and referral to
> the program, demonstrate acceptance of responsibility for the
> conduct that resulted in my criminal conviction and
> demonstrate an understanding of the sexual offending
> behavior and cycle of abuse.

Second Amended Complaint (Dkt. No. 13) Exh. C-1.  Plaintiff never tested

this provision, however, in order to definitively ascertain whether it would

require him to lie, in violation of his religious rights, instead blanketly

refusing to participate in the program after being advised that the refusal

could have a negative effect on any parole proceedings.  *Id.* at Exh. A-1.

Of course, at this early procedural juncture, I must only determine whether

a plausible religious exercise claim has been stated under the First

Amendment and/or RLUIPA, and for purposes of defendant's motion, I will

now make this determination.

Turning to Alexander's defense, I note initially that the record now

before the court, limited as it is to the four corners of plaintiff's complaint

as well as any attachments, contains only minimal information concerning

Griffin's conviction.  It is true that in plaintiff's submission in opposition to

defendants' motion he attaches a document which suggests that he was

convicted and sentenced on January 9, 1987 for first degree sexual

abuse.  *See* Plaintiff's Opposition (Dkt. No. 29) Exh. 1.  Nothing more is

known concerning that conviction, however.  At this early procedural

juncture I am unable to conclude with certainty that if the plaintiff was

convicted, as asserted by defendant, the conviction would necessarily

preclude participation in the SOCTP would require him to lie in violation of

his religious beliefs.  Consequently, at this early stage, I recommend

rejection of defendant's res judicata argument.

  3. *Heck v. Humphrey*

   Defendant next contends that plaintiff's claim under section 1983 is

precluded by the Supreme Court's decision in *Heck*.  In that case the

Supreme Court adopted a "favorable termination rule", to the effect that an

action brought under section 1983 based upon an alleged constitutional

violation arising of or relating to a conviction cannot be maintained where

a favorable outcome would necessarily undermine the validity of that

conviction unless the conviction is first overturned through customary

channels.  *Heck,* 512 U.S. at 478-79, 114 S. Ct. 2364.  At issue in that

case was an action for damages under section 1983 against a prosecutor

and a criminal investigator alleging that the plaintiff's conviction was

unconstitutional.  The Court concluded that because a favorable finding in the section 1983 action would necessarily undermine the validity of the conviction, the plaintiff, though seeking only monetary damages, in essence was attacking the fact or length of confinement, a challenge which under *Preiser v. Rodriguez*, 411 U.S. 475, 93 S. Ct. 1827 (1973), may only be maintained through petition for habeas relief, and not under section 1983.  *Id.* at 481-82, 114 S. Ct. 2364; *see also Peralta v. Vasquez,* 467 F.3d 98, 102 (2d Cir. 2006).

Plaintiff's claims in this case at least indirectly implicate the rule in *Heck.*  At the heart of plaintiff's religious freedom claim is his contention that he would be forced to lie when participating in the SOTCP by admitting criminal conduct in which he did not engage.  The conduct about which he would be asked, presumably, is the conduct which formed the basis for his criminal conviction.  Thus, although this does not present the typical situation addressed in such cases as *Heck* and the Second Circuit's later decision in *Peralta*, it nonetheless involves an indirect challenge to a criminal conviction which has not been reversed or otherwise set aside and therefore presents the type of claim which is precluded by the rule in *Heck*.

4.    Appropriate Use of Section 1983 Claim to Effectuate the Relief Sought

As was previously noted, plaintiff's complaint, though lodged under section 1983, does not seek monetary damages.  Instead, the relief requested includes an order directing that Griffin be released to parole supervision.  *See* Second Amended Complaint (Dkt. No. 13) at p. 7.  When a prison inmate seeks to challenge the fact or duration of his imprisonment, the "sole federal remedy is a writ of habeas corpus." *Preiser*, 411 U.S. at 500, 93 S.Ct. at 1841; *see also Channer v. Mitchell*, 43 F.3d 786 (2d Cir. 1994).  To the extent that plaintiff seeks to challenge the rejection of his release to parole, it should have been brought as a habeas petition.  *Duemmel v. Fischer*, No. 9:08-CV-1006, 2009 WL 174364, at * 2 (N.D.N.Y. Jan. 23, 2009) (McAvoy, S.J.), *aff'd*, 368 Fed. App'x 180 (2d Cir. 2010).

One potential means for rectifying this fatal procedural defect would be to simply convert plaintiff's complaint to a habeas petition under 28 U.S.C. § 2254.  Since the filing of habeas petition, however, has certain potentially adverse consequences, a court should not unilaterally convert a plenary complaint to a section 2254 petition without first offering the petitioner the opportunity to withdraw the petition rather than have it so

21

recharacterized.

In *Adams v. United States*, 155 F.3d 582 (2d Cir. 1998), the Second Circuit recognized that because the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), places stringent limits on a prisoner's ability to bring a second or successive habeas petitions, the *sua sponte* conversion of pleadings to habeas petition might be "extraordinarily harmful to a prisoner's rights." *Adams,* 155 F.3d at 583-84 (addressing a motion for relief under 28 U.S.C. § U.S.C. § 2255.  The Second Circuit went on to hold in *Adams* that

> district courts should not recharacterize a motion purportedly made under some other rule as a motion made under § 2255 unless (a) the movant, with knowledge of the potential adverse consequences of such recharacterization, agrees to have the motion so recharacterized, or (b) the court finds that, notwithstanding its designation, the motion should be considered as made under § 2255 because of the nature of the relief sought, and offers the movant the opportunity to withdraw the motion rather than have it so recharacterized.

*Id*. at 584.  The holding in *Adams* was later extended to recharacterization of § 2254 petitions.  *See Cook v. N. Y. Div. of Parole*, 321 F.3d 274, 282 (2d Cir. 2003) (recognizing that the problem arising from conversion of a pleading to a section 2254 petition is the same as encountered when

converting a pleading to a section 2255 motion).  Thus, in the event

defendant's motion to dismiss on other grounds is denied, the plaintiff

should be afforded the opportunity to withdraw this action before it is

converted to a section 2254 petition.[11]

     5.    <u>Sufficiency of Plaintiff's Amendment and RLUIPA Claims</u>

Defendant's motion does not directly address the merits of plaintiff's

First Amendment and RLUIPA claims.  Nonetheless, it is doubtful that

under the circumstances now presented plaintiff could assert a plausible

claim under either of those provisions, even assuming all of the other

above-noted deficiencies could be cured.

     6.    <u>First Amendment</u>

The First Amendment to the United States Constitution guarantees

the right to free exercise of religion.[12]  U.S. CONST. AMEND. I; *Cutter v.*

---

[11]    Although New York law is clear that once a prisoner is reconsidered for parole,
any legal challenge to an earlier denial is rendered moot, "the case law is not settled
on whether a subsequent parole hearing renders moot a federal habeas petition to
review an earlier parole denial."  *Graziano*, 2008 WL 2704361, at *5 (citations omitted).
Plaintiff is advised, however, that  "to the extent that a New York State inmate has any
liberty interest in parole that is protected by the Due Process Clause of the Fourteenth
Amendment, that interest extends only to not being denied a parole release 'arbitrarily'
or 'capriciously,' for example, based on an inappropriate consideration of a protected
classification (such as race, religion, gender, economic status, etc.) or an 'irrational
distinction.' "  *Standley v. Dennison*, No. 05 Civ. 1033, 2007 WL 2406909, at *9
(N.D.N.Y. Aug. 21, 2007) (Sharpe, J. and Lowe, M.J.).

[12]    That amendment provides, in pertinent part, that "Congress shall make no law
respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S.

*Wilkinson*, 544 U.S. 709, 719, 125 S. Ct. 2113, 2020 (2005). As is true

with regard to the First Amendment generally, the free exercise clause

applies to prison inmates, subject to appropriate limiting factors. *Ford v.*

*McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been

understood to retain some measure of the constitutional protection

afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v.*

*Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974)). Thus, for

example, under accepted free exercise jurisprudence inmates are

guaranteed the right to participate in congregate religious services under

most circumstances. *See*, *e.g.*, *Salahuddin v. Coughlin*, 993 F.2d 306,

308 (2d Cir. 1993) (citing cases).

The right of prison inmates to exercise their religious beliefs,

however, is not absolute or unbridled, but instead is subject to valid

penological concerns, including those relating to institutional security.

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404

(1987); *Salahuddin*, 993 F.2d at 308. A determination of whether the

refusal to permit attendance at a religious service, for example, has

abridged an inmate's constitutional rights hinges upon the balancing of the

---

CONST. AMEND. I.

24

inmate's First Amendment free exercise right against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right . . . is 'reasonably related to legitimate penological interests.'" *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987)), *cert. denied*, 498 U.S. 951, 111 S. Ct. 372 (1990).

Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief;[13] and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.1988)

––––––––––––––––––––––

[13]    "In *Salahuddin*, the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been 'substantially burdened.'" *Pilgrim v. Artus*, No. 9:07-CV-1001, 2010 WL 3724883, at * 13 n.10 (N.D.N.Y. 2010) (Treece, M.J.) (citing *Salahuddin*, 467 F.3d at 274-75 n. 5 and *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n. 10 (S.D.N.Y.2008) (noting that the Second Circuit has twice declined to answer the question)), *report and recommendation adopted*, 2010 WL 3724881 (N.D.N.Y. Sep 17, 2010) (Sharpe, J.).

(citations omitted).

Here, liberally construing plaintiff's complaint, the court must infer

from the pleadings that lying is a practice that is prohibited by the religious

tenets of Jehovah's witnesses and that plaintiff's beliefs in this religion are

sincerely held.  As to whether the requirement that plaintiff take

responsibility for his actions substantially burdens his religious beliefs, on

the face of his pleading it seems that Griffin cannot show that it does.

Plaintiff admits to committing one sexual offense, stating that he has "long

since admitted his guilt for the robberies. . . and [one of] the sexual abuse

charges against him", but denies the other.  He purportedly objects to

signing the Limits of Confidentiality, Partial Waiver of Confidentiality and

Acknowledgment form and to participating in the SOCTP because it would

require that he admit guilt for an offense that he did not commit.  The form

at issue provides, however,

> I understand that the primary purpose of the program is to
> reduce the likelihood of re-offending by assisting me to control
> my chain of behaviors that lead to sexual offending.  I also
> understand that *I am not required to admit the commission of a*
> *particular crime, whether it resulted in the present commitment*
> *or not.*
>
> Rather, for successful program participation, *I may discuss my*
> *behavior in general terms without providing the full names of*
> *victims, without disclosing exact dates, times, and places of*

*various sexual offending behavior, and without admitting to
any specific crime or violation of any specific section of the
Penal Law.*  Nonetheless, I must openly and honestly discuss
the behavior that resulted in my incarceration and referral to
the program, demonstrate acceptance of responsibility for the
conduct that resulted in my criminal conviction and
demonstrate an understanding of my sexual behavior and
cycle of abuse.

Second Amended Complaint (Dkt. No. 13) Exh. C-1 (emphasis added).

Given that there appears to be no requirement that plaintiff admit the

specific conduct that he claims not to have engaged in, it follows that

plaintiff would not necessarily be required to "lie" and violate his religious

beliefs.  The burden that this acknowledgment or participation in the

SOCTP would impose upon plaintiff's religious beliefs therefore is not

apparent from his complaint, and it seems clear that plaintiff cannot

sufficiently plead the existence of such a burden.

In light of the foregoing, even assuming that plaintiff's complaint with

the October 2008 parole board determination were not moot, plaintiff's

pleading demonstrates that he was not required to admit guilt with regard

to any specific act.  Accordingly, he has failed to allege that the SOCTP

has imposed a burden on his sincerely religious beliefs and has failed to

state a plausible First Amendment claim.[14]

### 7. RLUIPA

Turning to the second claim included in plaintiff's complaint, the

RLUIPA provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person – 1) is in furtherance of

---

[14]   Courts often look to the following four factors in determining the reasonableness of a prison regulation; including 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.  *Turner v. Safley*, 482 U.S. at 89-91 (citations omitted).

The Supreme Court has recognized that, "[t]here is clearly a compelling governmental interest in the treatment of sex offenders before they rejoin the general public so that the incidence of recidivism can be reduced for the benefit of the public as well as the offenders."  *Schnitzler v. Reisch*, No. CIV 06-4064, 2008 WL 895843, at *1 (D. S.D. Mar. 31, 2008) (citing *McKune v. Lile*, 536 U.S. 24, 33, 122 S. Ct. 2017, 2024 (2002)); *see also McKune*, 536 U.S. at 33, 122 S. Ct. at 2024 ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault. *See id.*, at 27; U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997).  States thus have a vital interest in rehabilitating convicted sex offenders.").  Even more, at least one other district court in this circuit has concluded that there is a rational connection between the SOCTP requirement that prisoners take responsibility for the their crimes and the DOCCS' legitimate penological interest in rehabilitating sex offenders and also that there is no alternative method of accommodating a prisoner's complaint that the admission of guilt would violate a religious belief that prohibits lying. *Bush v. Goord*, No. 03-CV-7595, 2009 WL 790358, at *4-6 (W.D.N.Y. Mar. 25, 2009) (citing *Donhauser v. Goord*, 314 F. Supp. 2d 119, 135 (N.D.N.Y. 2004); *Searcy v. Simmons*, 299 F.3d 1220, 1228 (10th Cir. 2002); and *Schnitzler*, 518 F. Supp. 2d at 1118).

a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The familiar principles which inform the analysis of plaintiff's free exercise claim are similar to those applicable to the potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks.  *See Salahuddin*, 467 F.3d at 274. Like the First Amendment's free exercise clause, the RLUIPA prohibits governmental entities subject to its reach from imposing a substantial burden on religion even where it stems from a generally applicable law, practice, or policy.[15]

To establish a violation of the RLUIPA a plaintiff must prove that prison officials, through their actions, have substantially burdened his or her religious exercise through actions not found to promote a compelling

---

[15]     It should also be noted that although there is not uniformity on this issue, the weight of authority appears to be that under the RLUIPA does not allow for recovery of damages against defendants, either individually or in their official capacities.  *Singh v. Goord,* No. 05 Civ. 9680 (SCR)(LMS), 2010 WL 1875653, at * 6 (S.D.N.Y. March 9, 2010), *report and recommendation adopted*, 2010 WL 1903997 (May 10, 2010); *Sweeper v. Taylor*, No. 906-CV-379, 2009 WL 815911, at *9 (N.D.N.Y. Mar. 27, 2009) (Mordue, C.J.), *aff'd*, 383 Fed. App'x 81 (2d Cir. 2010); *Pugh,* 571 F. Supp. 2d at 503; *but see Hankins v. New York State Dep't of Corr.*, No. 07 CV 408, 2008 WL 2019655, at *6 (N.D.N.Y. Mar. 10, 2008) (Lowe, M.J.) (concluding in *dicta*, that by accepting federal funds New York effectively has waived its sovereign immunity thereby allowing for damages against defendants in their official capacities).  Since plaintiff makes clear that he does not seek damages in this case, further discussion of this issue is not necessary in this case.

governmental interest advanced through the least restrictive means.

*Pilgrim v. Artus*, 2010 WL 3724883, at *10.  The RLUIPA places a higher

burden on the defendants than does the First Amendment, which requires

only a burden that is "reasonably related to legitimate penological

interests".  *Id.*

Despite these differences, for the same reasons that I have

indicated that plaintiff's complaint, even if not moot, does not state a

cognizable First Amendment claim, I conclude that plaintiff's complaint

fails to state RILUPA claim that it plausible on its face.

C.    Personal Involvement

In support of dismissal defendant further contends that he cannot be

held liable for the misconduct alleged because he was not personally

involved in the determination to deny plaintiff parole.

Personal involvement of defendants in alleged constitutional

deprivations generally is a prerequisite to an award of damages under

section 1983.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing

*Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and

*McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*,

434 U.S. 1087, 98 S. Ct. 1282 (1978)).  However, district courts in this

circuit have not required personal involvement where a plaintiff seeks only declaratory or injunctive relief against a defendant named solely in an official capacity.  *Jones-Soderman v. Executive Sec'y of the State Bd.*, No. 08 CV 4716(SJF)(LB), 2010 WL 3800908, at *7 (E.D.N.Y. May 21, 2010) (citing *Hall v. Marshall*, 479 F. Supp. 2d 304, 318 (E.D.N.Y.2007))*, report and recommendation adopted*, 2010 WL 3780989 (E.D.N.Y. Sep 20, 2010); *Marinaccio v. Boardman*, No. 1:02 CV 831, 2005 WL 928631, at *9 (N.D.N.Y Apr. 19, 2005) (collecting cases) (McCurn, S.J.). "[A]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Davidson v. Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001) (quotation and citations omitted).  The standard espoused by defendant in this action is therefore inapplicable given plaintiff's clear intention to sue the defendant only in his official capacity as Parole Board Chairman.

At the time in question, defendant Alexander was the Chairman of the Parole Board with overall responsibility for overseeing for that state body.  Defendant argues that a DOCCS policy is at issue in this case, and not a policy of the Division of Parole.  To be sure, plaintiff complains of the

SOCTP requirements, which apparently fall within the purview of the

DOCCS.  The heart of plaintiff's claim, however, is that his refusal to

participate in SOCTP based upon his religion should not have been

considered by the Parole Board in rendering its determination.  Liberally

construing plaintiff's complaint, that decision clearly was made by the

Parole Board, which was within Alexander's purview, and it is plausible

that plaintiff's claim implicates a policy of the Division of Parole.  As such,

if a statutory or constitutional violation were found based upon an

infringement of plaintiff's religious rights, it seems that defendant would be

in a position to implement any prospective relief that may be granted

plaintiff in this action.  *See Pilgrim*, 2010 WL 3724883, at * 14.  For these

reasons, I recommend denial of defendant's motion insofar as it is

premised upon defendants' lack of personal involvement.

    D.    <u>Qualified Immunity</u>

In the final point of his motion, defendant seeks a finding that he is

shielded from suit based upon qualified immunity.  This argument,

however, is misguided as it apparently misperceives the nature of

plaintiff's claims and the relief sought.

Qualified immunity shields government officials performing

discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted).   In general, governmental officials sued for damages "are entitled to qualified immunity if (1) their actions did not violated clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law."  *Warren v. Keane*, 196 F.3d 330, 332 (2d Cir. 1999) (citation omitted).  "Qualified immunity does not apply to suits against individuals in their official capacities."  *Pilgrim*, 2010 WL 372883, at * 16 (citing *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S. Ct. 3099, 3105-06 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.")) (emphasis in original).

Plaintiff has sued the defendant only in his official capacity, and the relief requested is limited to declaratory and injunctive relief.  Accordingly, qualified immunity does not preclude plaintiff's claims.  *Pilgrim,* 2010 WL 372883, at *16.

> E.   <u>Whether to Grant Leave to Amend</u>

If the recommendations contained in this report are adopted plaintiff's complaint will be dismissed.  The next issue to be addressed, then, is whether plaintiff should be afforded an opportunity to further amend his complaint to assert additional facts demonstrating the existence of plausible constitutional claims.

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"). Notwithstanding the familiar and well-accepted precept that leave to amend should be granted freely and is typically permitted, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion then permitting amendment would be an act of futility which should not be sanctioned.  *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F. Supp. 120, 124 (E.D.N.Y. 1996); *In re Boesky Sec. Litig.,* 882 F. Supp. 1371, 1379 (S.D.N.Y. 1995).  "In considering whether to grant a motion for leave to amend, the court may properly take into account the futility associated with the newly added claims or defenses."

*Clarke v. Max Advisors, LLC,* 235 F. Supp.2d 130, 151 (N.D.N.Y. 2002)

(citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962)).

"Quite sensibly, a court may properly deny leave to amend when the claim

or defense sought to be added would not withstand a likely motion to

dismiss for failure to state a legally cognizable claim or defense." *Clarke,*

235 F. Supp. 2d at 151 (citing *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d

243, 259 (2d Cir. 2002)). Stated differently, "[w]here it appears that

granting leave to amend is unlikely to be productive, . . . it is not an abuse

of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987

F.2d 129, 131 (2d Cir. 1993) (citations omitted); *accord Brown v. Peters*,

95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler,

J.) ("[T]he court need not grant leave to amend where it appears that

amendment would prove to be unproductive or futile.") (citation omitted),

*aff'd*, 175 F.3d 1007 (2d Cir. 1999).

    In this instance, plaintiff has already twice amended his complaint.

Moreover, the defects discerned, including the mootness of plaintiff's

claims and, more significantly, the fact that they are precluded by the rule

in *Heck* and in any event should have been asserted in a habeas petition

and not a section 1983 complaint, suggest that amendment in this case

would be futile, at least absent plaintiff's agreement to reconfigure his complaint in this action as a habeas petition.  In deference to his *pro se* status, however, and the fact that plaintiff seeks release from confinement I recommend that plaintiff be granted leave to convert, that the plaintiff be required to advise the court within thirty days from the date of any order adopting this report and recommendation whether he wishes to convert the complaint to a habeas petition brought pursuant to 28 U.S.C. § 2254, and if so, that he be given leave to amend in order to attempt to cure the other deficiencies noted above.

    F.    <u>Stay of Discovery</u>

Defendant also moves order pursuant to Federal Rule of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of his motion to dismiss.  Rule 26(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed. R. Civ. P. 26(c)(1); *see also Spencer Trask Software and Information*

*Services, LLC v. RPost Int'l Ltd.*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002)

(granting stay of discovery pending determination of motion to dismiss

where court found defendants presented "substantial arguments" for

dismissal of many if not all of the claims in the lawsuit); *United States v.*

*Cnty. of Nassau*, 188 F.R.D. 187, 188-89 (E.D.N.Y. 1999) (granting stay of

discovery during the pendency of a motion to dismiss where the "interests

of fairness, economy and efficiency . . . favor[ed] the issuance of a stay of

discovery,"  and where the plaintiff failed to claim prejudice in the event of

a stay.).  Plaintiff does not oppose defendant's request.

   In light of my recommendation that the court dismiss plaintiff's

complaint, and plaintiff's consent to the entry of a stay of discovery, I find

the existence of good cause to issue an order protecting the defendants

from the burden of engaging in discovery until after a determination is

made on this report and recommendation and it is determined as to how

this action will proceed.[16]

## IV.   SUMMARY AND RECOMMENDATION

   In this civil rights action plaintiff complains that his rights under the

_____

[16]      In the event of a conversion of plaintiff's complaint to a habeas petition under 28
U.S.C. § 2254, no discovery will likely take place in action.  *Bracy v. Gramley*, 520 U.S.
899, 904, 117 S. Ct. 1793, 1796-97 (1999).

RLIUPA and the First Amendment were violated when he was denied parole at an appearance before the Parole Board in October of 2008 as a result of his refusal to participate in the SOCTP, and as relief seeks a declaratory judgment and his immediate release to parole.  Upon plaintiff's successful state court challenge to that Parole Board determination, plaintiff was granted a rehearing, and later appeared before the Parole Board yet again; both times he was apparently denied release to parole, though neither of those determinations is the subject of plaintiff's current complaint.  Having concluded that plaintiff's challenge to the October 2008 denial of parole is both moot and precluded under *Heck,* and in any event because the relief now sought – his immediate release from prison – may not be obtained by way of a civil rights complaint, I have determined that plaintiff has failed to state a cognizable civil rights claim, and therefore recommend dismissal of the complaint in its entirety, with leave to convert his complaint to a habeas petition and to amend the petition to cure the other substantive deficiencies noted.

Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion to dismiss plaintiff's complaint (Dkt. No. 27) be GRANTED, and that plaintiff's complaint be

DISMISSED in its entirety, with leave to convert his complaint to a habeas petition; and it is further

RECOMMENDED that plaintiff be given thirty (30) days from the date of any order adopting this report and recommendation to advise the court if he wishes the court to convert the complaint to a habeas corpus petition brought pursuant to 28 U.S. C. § 2254, and if so, to file a petition curing the deficiencies noted in this report.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993); and it is further

ORDERED that Andrea W. Evans, as the current Chair of the New York State Division of Parole, be substituted as the named defendant in the place of George Alexander; and it is further

ORDERED that discovery in this action is STAYED until a determination is made with regard to this report and recommendation, and it is determined how this action will proceed; and it is further

ORDERED that the clerk is also serve a copy of the report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 25, 2011
            Syracuse, NY

# Department of Corrections and Community Supervision

SKIP TO CONTENT

Google™ Custom Search

**About DOCS**
- DOCS Home Page
- Find a Facility
- Contact DOCS

**Inmate Info**
- Inmate Lookup
- Inmate Info
- Family Guide
- Guía para la Familia
- Program Services
- PREA

**Victim Services**
- Victim Services
- Servicios Victima

**News**
- News Room
- Reports/Publications
- Jobs Available
- Directives
- Rules & Regulations
- Contracts

**Related Info**
- Related Links
- Corcraft
- Criminal Justice

DOCS

## Inmate Population Information Search

Please specify one or more of the following:

- Use Name alone or in combination with birth year. More on Name Search
- DIN or NYSID are meant to be used alone - not in combination with name or birth year. More Detailed Instructions

Who's Listed Here? | About Youthful Offenders | Hours of Operation for Inmate Lookup

**Last Name:**

**First Name:**

**Middle Init:**

**Name Suffix:**        (SR, JR, etc.)

**Birth Year:**          (Optional, see above)

**DIN:**        -      -         (Department ID Number, format 99-A-9999, example 95-A-9876)

**NYSID:**              -      (For Criminal Justice Use Only; New York State ID Number)

For comments or questions about the inmate lookup capability, please visit the Contact Us page.

Home      Privacy Policy      Accessibility Information      Contact DOCS      Disclaimer



Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John HALE, Plaintiff,
v.
Jadow RAO; J. Ireland; Mack/s/Revell; R. Furnia; J.
Silver; John Doe # 1; John Doe # 2; Jane Doe # 1; Jane
Doe # 2; Jane Doe # 3; and Jane Doe # 4, Defendants.
**No. 9:08-CV-612.**

Nov. 3, 2009.

John Hale, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Richard Lombardo, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, John Hale, brought this civil rights action in
March 2008, pursuant to 42 U.S.C. § 1983. By
Report-Recommendation dated September 29, 2009, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motions to dismiss
(Docket No. 27) be granted in part and denied in part as
follows: (1) the motion to dismiss should be granted to the
extent that plaintiff asserts claims for money damages
against defendants in their official capacities; and (2) the
motion should be denied to the extent that defendants
moved to dismiss plaintiff's Eighth Amendment claim
against defendant Rao, and moved to dismiss the
complaint against defendant Rao on the ground of
qualified immunity. The Magistrate Judge further
recommended that the motion to dismiss for failure to

prosecute, or in the alternative for an order compelling
plaintiff's responses (Docket No. 36), be denied. No
objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Lowe, the
Report-Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss (Docket No. 27) is
GRANTED IN PART and DENIED IN PART;

    a. The motion to dismiss is GRANTED to the extent
that plaintiff asserts claims for money damages against
defendants in their official capacities; and

    b. The motion is DENIED to the extent that
defendants moved to against defendant Rao on the
ground of qualified immunity;

2. Defendants' motion to dismiss for failure to prosecute,
or in the alternative, for an order compelling plaintiff's
responses (Docket No. 36) is DENIED;

3. This matter is referred back to the Magistrate Judge for
any further proceedings.

IT IS SO ORDERED.

***REPORT-RECOMMENDATION AND ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court.

Currently pending is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c), seeking dismissal of the complaint in its entirety against Defendant Dr. Jadow Rao and against Defendants J. Ireland, R. Furnia, Mack Reyell, J. Silver, and Rao in their official capacities. Dkt. No. 27. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

Also pending is a Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. Dkt. No. 36. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

For the reasons discussed below, I recommend that the Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) be granted, in part, and denied, in part. I also recommend that the Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff's responses be denied.

## I. MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND 12(c)

### A. BACKGROUND

**\*2** Plaintiff John Hale alleges that eleven employees ("Defendants") of the New York State Department of Correctional Services ("DOCS") violated his rights under the Eighth Amendment when (1) in or around May of 2006, Defendants Ireland, Revell, Furnia, and Silver physically assaulted and injured him without provocation at Clinton Correctional Facility ("C.F."), and (2) between May of 2006 and February of 2008, the remaining seven Defendants (Dr. Rao, John Does 1-2, and Jane Does 1-4)

were deliberately indifferent to his resulting serious medical needs at Clinton, Southport, Elmira and Attica C.F.s. Complaint at ¶¶ 16-27.

Plaintiff states that he has exhausted his administrative remedies. Complaint at ¶ 29. Plaintiff has submitted copies of decisions from the Central Office Review Committee of the Inmate Grievance Program. Dkt. No. 5, Exhibits. Plaintiff also included a copy of a decision from the Superintendent of Attica C.F. *Id.*

### B. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[FN1] or (2) a challenge to the legal cognizability of the claim.[FN2]

> FN1. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr .S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN2. *See Swierkiewicz v. Sorema N.A.,* 534 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12(b)(6)'s requirement of stating a cognizable claim and Rule 8(a)'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN3] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN4] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN5]

FN3. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v.*

*Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (citation omitted).

FN4. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN5. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

**\*3** It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN6 "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"FN7 In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN6. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN7. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.FN8 Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN9 Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN10 Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.FN11 In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."FN12

> FN8. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering plaintiff's response affidavit on motion to dismiss)). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN9. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

> FN10. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

> FN11. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN12. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN13] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN14] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN15] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN16]

FN13. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") (internal quotation marks and citation omitted); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN14. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ); *accord,*

*Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN15. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN16. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

Defendants also move pursuant to Fed.R.Civ.P. 12(c). Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)." [FN17]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

FN17. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) (citations omitted) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

## C. ANALYSIS

### 1. Eighth Amendment

Reading the complaint generously, Plaintiff alleges that he complained to Defendant Rao, Health Services Director at Attica C.F., about his "medical problems," which included (1) the injuries he sustained during the alleged May 2006 incident, such as persistent vomiting of blood and urinating of blood, (2) surgical staples in his stomach, and (3) swollen ribs.[FN18] Complaint at ¶ ¶ 16-27. Plaintiff alleges that in response, Dr. Rao stated that he did not believe Plaintiff's complaints, consistently "denied" Plaintiff's complaints, and called Plaintiff " 'crazy.' " *Id.* at ¶¶ 26, 27. Plaintiff claims that as a result, he has endured pain, suffering, and injuries. *Id.*

FN18. Specifically, Plaintiff states, "It should be noted that *Plaintiff has been complaining about all of the above medical problems* [which include the injuries sustained during the alleged assault, the surgical staples, and swollen ribs] to medical staff here at Attica C.F. *including Defendant Dr. Rao* ... and ever since he was beaten by the Defendant Officers Ireland, Reyell, Furnia, and Silver *he has been throwing up blood and urinating blood yet the Defendants consisting* [sic] *denied his complaints;* resulting in Plaintiff's pain and suffering, and further injuries." Complaint at ¶ 27 (emphasis added).

**\*4** Defendants argue that Plaintiff has made an insufficient showing of an Eighth Amendment claim against Defendant Rao. Dkt. No. 27-2 at pp. 3-6.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

medical condition is sufficiently serious." *Id.* A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

**\*5** If the claim is that treatment was provided but was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment claim, the defendant's behavior must be "wanton." Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,*

143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

Regarding the objective component, the complaint alleges that Defendant Rao provided Plaintiff with inadequate or no medical care after learning of Plaintiff's physical complaints, including persistent vomiting of blood and urinating of blood. Vomiting of blood and urinating of blood are indications of serious medical needs. *See Morgan v. Maass,* No. 94-35834, 1995 WL 759203, at *2 (9th Cir. Dec. 26, 1995) (finding that vomiting blood constituted a serious medical need); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926, at *3 (M.D.Fla. Oct. 4, 2006) (finding that "[e]ven to a lay person, it is obvious that blood in the urine is an indication of a serious medical need."). Thus, the allegations in the complaint satisfy the objective component.

**\*6** Regarding the subjective component, the complaint alleges that Defendant Rao was aware that Plaintiff had serious medical needs, but consciously and intentionally disregarded or ignored those needs. Dkt. No. 1. Thus, the allegations in the complaint satisfy the subjective component.

Defendants argue that Plaintiff's complaint is conclusory and fails to contain specific allegations of fact indicating

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

a deprivation of rights as against Defendant Rao. Dkt. No. 27-2, at p. 5. The Court disagrees. Plaintiff specifically stated that he informed Defendant Rao about his "medical problems," which included vomiting of blood and urinating of blood, but that Dr. Rao expressed disbelief, consistently "denied" Plaintiff's complaints, and stated that Plaintiff was "crazy." Complaint at ¶ 27. Plaintiff has set forth more than a simple conclusory allegation.

In light of the foregoing, the Court declines to conclude at this stage that Plaintiff has failed to state a claim for deliberate medical indifference against Defendant Rao.[FN19] Accordingly, the motion to dismiss the Eighth Amendment claim against Defendant Rao should be denied.

> FN19. *See Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657, at *7 (E.D.N.Y. Aug. 21, 2008) (citing *Chance,* 143 F.3d at 703-04 (reversing district court's dismissal of medical indifference claim at 12(b)(6) stage because "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.... It may be that Chance has no proof whatsoever of this improper motive, and that lack of proof may become apparent at summary judgment. But even if we think it highly unlikely that Chance will be able to prove his allegations, that fact does not justify dismissal for failure to state a claim, for Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations ....") (citations and quotation marks omitted) (other citations omitted); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 559 (S.D.N.Y.2008) (finding that amended complaint plausibly alleged that doctors knew that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of prescribed course of treatment was ineffective, and declined to do anything to attempt to improve plaintiff's situation besides re-submitting MRI request forms) (citing *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616, at *23 (S.D.N.Y. Apr. 3, 2008) (despite plaintiff's sparse allegations as to defendant's conduct, at the 12(b)(6) stage plaintiff sufficiently alleged facts supporting a plausible claim that defendant

was deliberately indifferent to plaintiff's medical needs)).

**2. Qualified Immunity**

Defendant Rao asserts that he is entitled to dismissal on the ground of qualified immunity. Dkt. No. 27-2 at pp. 6-8.

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68-69 (2d Cir.2004) (citations omitted), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962 (1992).[FN20] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169-70 (2d Cir.2007) (citations omitted). [FN21] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).[FN22] As the Supreme Court has explained,

> FN20. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v.. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN21. *See also Anderson v. Creighton,* 483 U.S. 635, 639 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (citation omitted); *Davis v. Scherer,* 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN22. *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

**\*7** [T]he qualified immunity defense ... provides ample

protection to all but the plainly incompetent or those who knowingly violate the law.

... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[FN23]

> FN23. *See also Hunter v. Bryant,* 502 U.S. 224, 299 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

Here, after liberally reviewing the complaint, accepting all of its allegations as true, and construing them in Plaintiff's favor, the Court declines to conclude that Defendant Rao is entitled to qualified immunity at this stage. As noted, Plaintiff alleges that he informed Dr. Rao of his "medical problems," including persistent vomiting of blood and urinating of blood, but Dr. Rao stated that he did not believe Plaintiff's complaints, consistently denied Plaintiff's complaints, and called Plaintiff " 'crazy,' " which resulted in pain, suffering, and injuries. Complaint at ¶¶ 26-27. Therefore, the motion to dismiss the complaint on the ground of qualified immunity should be denied.[FN24]

> FN24. *See Beeks,* 2008 WL 3930657, at *9 (citing *See McKenna,* 386 F.3d at 437-38 (affirming district court's denial of qualified immunity at motion to dismiss stage on deliberate indifference claim, "[h]owever the matter may stand at the summary judgment stage, or perhaps at trial....") (other citations omitted)).

**3. Eleventh Amendment**

Defendants Ireland, Furnia, Reyell, Silver, and Rao argue

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

that to the extent the complaint seeks damages against them in their official capacities, the claim is barred by the Eleventh Amendment. Dkt. No. 27-2 at pp. 8-9.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U .S. 139, 142-47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN25] Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

> FN25. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages

against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.").

**\*8** Here, each of the represented Defendants has an official position with DOCS. Therefore, any claims for money damages against these Defendants in their officials capacities are barred by the Eleventh Amendment and should be dismissed.

## II. MOTION TO DISMISS FOR LACK OF PROSECUTION, OR IN THE ALTERNATIVE, FOR AN ORDER COMPELLING RESPONSES

Defendants argue that the complaint should be dismissed on the ground that Plaintiff has failed to prosecute this action. Dkt. No. 36. Defendants argue that in the alternative, Plaintiff should be compelled to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. *Id.*

### A. ANALYSIS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

Rule 41 of the Federal Rules of Civil Procedure provides, "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed.R.Civ.P. 41(b). As a result, Fed.R.Civ.P. 41(b) may be fairly characterized as providing for two independent grounds for dismissal on motion or on the Court's own initiative: (1) a failure to prosecute the action, and (2) a failure to comply with the procedural rules, or any Order, of the Court. *Id.*

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN26] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute under Rule 41(b):

> FN26. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN27]

> FN27. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41(b) dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) (citation and internal quotation marks omitted).

As a general rule, no single one of these five factors is dispositive.[FN28] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for

dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN29]

> FN28. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

> FN29. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 WL 567961, at *1 (N.D.N.Y. Sept. 11, 1997)* (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ( "Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

## 1. Address Changes

As to the first factor (the duration of Plaintiff's "failures") Defendants argue that Plaintiff was transferred to several different facilities, but failed to update the Court and defense counsel of his changes of address. Dkt. No. 36-2, Lombardo Decl., at ¶¶ 4-5, 7-12 & Dkt. Nos. 49, 50. Defendants argue that the action should be dismissed for this reason alone. Dkt. No. 36-8.

**\*9** Plaintiff has failed at times to update the Court and defense counsel as to his address changes. His most recent failure occurred on July 6, 2009 when he was transferred from Green Haven C.F. to Auburn C.F., and subsequently to Wende C.F., where he now remains. Dkt. No. 50-2, Stachowski Decl., at ¶¶ 3-5. Plaintiff failed to update the Court and defense counsel as to these changes. Thus, Plaintiff's failure to provide an updated address has persisted since July 6, 2009 (less than three months). Generally, it appears that durations of this length (i.e., less than four months) are not long enough to warrant dismissal.[FN30]

> FN30. N.D.N.Y. L.R. 41.2(a) ("[P]laintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution.");

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

*Georgiadis v. First Boston Corp.*, 167 F.R.D. 24, 25 (S.D.N.Y.1996) (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

The Court notes that Plaintiff has been subject to frequent transfers. Since August 7, 2008, Plaintiff was transferred on seven occasions. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 4-11; Dkt. No. 50-2, Stachowski Decl. at ¶¶ 4-5. Three of the transfers occurred within a span of six days. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 7-11.

Moreover, whether Plaintiff was mentally and physically capable of providing written updates of all of his address changes is unclear. Plaintiff noted in his opposition papers that he was diagnosed as suffering from schizophrenia; has "borderline intellectual" functioning;[FN31] and is unable to read or write; therefore Plaintiff's submissions to the Court are written by others. Dkt. No. 39. Plaintiff also stated that at times he has been "prohibited from possessing any type of writing utensil." Dkt. No. 41. Plaintiff further stated that while at Central New York Psychiatric Center, "any legal work whatsoever" was discouraged and "not facilitate[d]." *Id.* In light of the foregoing, I find that the first factor weighs against dismissal of Plaintiff's complaint.

> **FN31.** Plaintiff submitted copies of medical records indicating that he was diagnosed as suffering from, *inter alia,* schizophrenia, paranoid type; has borderline intellectual functioning; and has an IQ of 71. Dkt. No. 5.

As to the second factor (whether plaintiff had received notice that further delays would result in dismissal), I find that Plaintiff has received notice that his failure to provide his current address may result in dismissal. *See* Dkt. No. 12 at 4 *(Order stating that "Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action")* (emphasis in original); N.D.N.Y. L.R. 41.2(b) (stating, "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action.") [FN32] As a result, I find that the second factor weighs in favor of dismissal of Plaintiff's

complaint.

> **FN32.** I note that, to assist *pro se* litigants, the Clerk of the Court for the Northern District of New York has provided to all correctional facilities in New York State copies of the Northern District's Local Rules of Practice and *Pro Se* Manual.

Regarding the third factor (whether defendants are likely to be prejudiced by further delay), I am unable to find, based on the current record, that Defendants are likely to be prejudiced by a delay in the proceedings. While any delay that occurs theoretically impairs the Defendants' memories, the preservation of evidence, and the ability to locate witnesses,[FN33] Defendants have not argued that any delay has occurred due to Plaintiff's failure to update his address. As a result, I find that the third factor weighs against dismissal of Plaintiff's complaint.[FN34]

> **FN33.** *See, e.g., Georgiadis v. First Boston Corp.*, 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

> **FN34.** *See Cruz v. Jackson*, No. 94 Civ. 2600, 1997 WL 45348, at *2 (S.D.N.Y. Feb. 5, 1997) (declining to dismiss action for failure to prosecute or failure to comply with court orders where plaintiff had failed to meet discovery deadlines, and noting that the fact that plaintiff "has been in lock-down and transferred to another facility during the pendency of this action also counsels leniency toward [the plaintiff's] delays") (citing *Jones v. Smith*, 99 F.R.D. 4, 14-15 (M.D.Pa.1983) (granting *pro se* plaintiff final opportunity to comply with orders of court, despite repeated wilful, dilatory and contumacious tactics), *aff 'd* 734 F.2d 6 (3d Cir.1984)).

*10 Regarding the fourth factor (striking the balance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

between alleviating court calendar congestion and
protecting a party's right to due process and a fair chance
to be heard), I find that Plaintiff's right to receive a further
chance to be heard in this matter, at this point, outweighs
the need to alleviate congestion on the Court's docket.
Moreover, Defendants point to no delay caused by
Plaintiff's failure to update his address. As a result, I find
that the fourth factor weighs against dismissal of Plaintiff's
complaint.

With regard to the fifth factor (whether the judge has
adequately assessed the efficacy of lesser sanctions), I find
that a strong reminder to Plaintiff of his obligation to
provide a current address might be effective and is
warranted. Plaintiff, who alleges that he suffers from
schizophrenia and is unable to read and write, Dkt. No. 39,
has been responsive to prior Orders from the Court,[FN35]
and has shown an interest in prosecuting this action. *See*
Dkt. Nos. 39, 41 (Plaintiff's Opposition Papers). As a
result, I find that the fifth factor weighs against dismissal
of Plaintiff's complaint.

> FN35. *See* Dkt. Nos. 7-11
> (Report-Recommendation and Order; Plaintiff's
> Inmate Authorization Forms; Application to
> Proceed *In Forma Pauperis;* and Signed Last
> Page of Complaint).

Weighing these five factors together, I conclude that they
tip the scales against dismissing Plaintiff's complaint (one
of the factors weighing in favor of such dismissal and four
of the factors weighing against such dismissal).[FN36]
Dismissal based on a lack of prosecution is a harsh remedy
to be used only in extreme situations. The Court does not
currently view the present case to be in such a situation.
For these reasons, I recommend that Defendants' Motion
to Dismiss based on Plaintiff's failure to provide a current
address (Dkt. No. 36) be denied.

> FN36. *Minnette v. Time Warner,* 997 F.2d 1023,
> 1027 (2d Cir.1993); *see also Jacobs v. County of
> Westchester,* Dkt. No. 02-0272, 2005 WL
> 2172254, at * 3 (2d Cir. Sept. 7, 2005)
> (remanding case to district court to make further
> factual findings concerning the plaintiff's lack of
> responsiveness and concerning his confinement

in a prison psychiatric ward where district court
dismissed for failure to prosecute).

**2. Responses to Scheduling Order**

Defendants argue that if the Court does not dismiss the
complaint for a failure to prosecute, the Court should issue
an order requiring Plaintiff to respond to paragraphs
I(A)(1)(b) and (c) of the Court's mandatory pretrial
discovery and scheduling order dated November 18, 2008
("Scheduling Order"). Dkt. No. 36-8, Memo. of Law at
pp. 3-4.

The Scheduling Order provided, in relevant part, as
follows:

**I. Discovery**

**A. *Documents.*** Within sixty (60) days of the date of this
order:

**1. *Plaintiff(s)*** shall provide to counsel for defendant(s)
copies of all:

**a.** Documents and other materials which plaintiff(s) may
use to support the claims in the complaint;

**b.** Correspondence, grievances, grievance appeals, and
other documents relating to requests for administrative
remedies or the inability or failure to exhaust such
remedies; and

**c.** Complaints and petitions filed by plaintiff(s) in any
other cases in any court relating to the same issues
raised in the complaint in this action or, if such
documents are not within the possession of plaintiff(s),
plaintiff(s) shall provide to counsel for defendant(s) a
list of any such legal proceedings stating the court in
which the proceeding was filed, the caption of the case,
and the court number.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**\*11** Dkt. No. 26, at pp. 1-2.

Defendants admit that they received "what purported to be plaintiff's response to paragraph I(A)(1) of the [Scheduling Order]" in a letter to defense counsel from Plaintiff. Dkt. No. 36-2, Lombardo Decl., at ¶ 19 & Dkt. No. 36-6, Ex. C. In that letter, Plaintiff asserted the following:

> Pursuant to paragraph I(A) of the court's mandatory pretrial discovery and scheduling order dated Nov. 18, [20]08[:]

> a. Documents and materials which plaintiff will use to support the claims in this complaint is [sic] the complete Medical Records for the period of June 14, 2006 to present, and current Tier III documents and pictures surrounding the incident which you forwarded to me pursuant to mandatory pretrial discovery, in addition enclosed please find Lab work report of specimen done on plaintiff which will also be use[d].

> Plaintiff has complied with the court's mandatory pretrial discovery and scheduling order pursuant to paragraph I(A) so your office no longer has to seek dismissal of the complaint for failure to prosecute.

Dkt. No. 36-6, Ex. C.

Defendants view this letter as being nonresponsive to paragraphs I(A)(1)(b) and (c). However, regarding paragraph I(A)(1)(b), Plaintiff specifically stated in the above-quoted letter that he "will use the complete medical records for the period of June 14, 2006 to present, and *current Tier III documents and pictures surrounding the incident which you forwarded to me.*" Dkt. No. 36-6, Ex. C at p. 1 (emphasis added). Moreover, Plaintiff stated in his March 23, 2009 letter to defense counsel that he filed grievances while in Attica C.F., but that he was no longer "in possession of those grievances" because his property was lost while he was at Central New York Psychiatric Center. [FN37] Dkt. No. 39 at p. 2. Plaintiff also stated that he has "no money in his account," therefore he has been unable to obtain copies of his grievances, as well as medical records. *Id.* Accordingly, Plaintiff has responded

to paragraph I(A)(1)(b). He stated that he no longer possesses the grievances he filed at Attica C.F.; he is unable to afford copies; and he intends to use the documents that defense counsel sent to him. To the extent that defense counsel is arguing that Plaintiff must provide copies of the same documents defense counsel has already provided Plaintiff, Dkt. No. 36-7, Ex. D at p. 2, this argument is unavailing.

> [FN37.] Plaintiff also asserts that he no longer has a copy of the complaint in this action. Dkt. No. 41, at ¶ 8. Accordingly, the Clerk will be directed to provide a copy of the complaint to Plaintiff.

Regarding paragraph I(A)(1)(c), Plaintiff stated in his March 23, 2009 opposition letter that "[t]here is no other complaints or petitions filed by plaintiff in any other cases in any other court [sic]." Dkt. No. 39, at p. 2. Plaintiff reiterated this response in a supplemental opposition letter dated March 31, 2009 by stating that "there are no other known complaints, petitions, etc. filed by plaintiff in any other court with regards to the claims raised in [this case]." Dkt. No. 41,[FN38] at ¶ 6. Accordingly, Plaintiff has responded to paragraph I(A)(1)(c).

> [FN38.] To the extent that Plaintiff is seeking permission to amend his complaint via his supplemental opposition letter, (Dkt. No. 41), Plaintiff's request must be in the form of a motion. *See* N.D.N.Y. Local Rule 7.1.

**\*12** In light of the foregoing, Defendants' request for an order compelling responses to paragraphs I(A)(1)(b) and (c) of the Scheduling Order should be denied as moot.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) (Dkt. No. 27) be GRANTED in part and DENIED in part. The motion to dismiss should be granted to the extent that Plaintiff asserts claims for money damages against Defendants in their official capacities. The motion should be denied to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

the extent that Defendants moved to dismiss Plaintiff's Eighth Amendment claim against Defendant Rao, and moved to dismiss the complaint against Defendant Rao on the ground of qualified immunity; and it is further

**RECOMMENDED** that the Motion to Dismiss for Failure to Prosecute or in the alternative for an Order compelling Plaintiff's responses (Dkt. No. 36) be DENIED; and it is further

**ORDERED,** *that Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action;*

**ORDERED,** that the Clerk update Plaintiff's address to reflect that he is currently incarcerated at Wende Correctional Facility; [FN39] and it is further

> **FN39.** Defendants' letter to the Court dated August 21, 2009 indicates that Plaintiff is now incarcerated at Wende C.F. Dkt. No. 50.

**ORDERED,** that the Clerk serve (1) copies of the electronically-available-only opinions cited herein; [FN40] (2) a copy of the Complaint (Dkt. No. 1); and (3) a copy of this Report-Recommendation and Order on Plaintiff.

> **FN40.** Those decisions include *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878 (S.D.N.Y. Nov. 17, 1997); *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119 (E.D.N.Y. Oct. 24, 2002); *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864 (2d Cir. Aug. 12, 2008); *Morgan v. Maass,* No. 94-35834, 1995 WL 759203 (9th Cir. Dec. 26, 1995); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926 (M.D.Fla. Oct. 4, 2006); *Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657 (E.D.N.Y. Aug. 21, 2008); *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616 (S.D.N.Y. Apr. 3, 2008); *Robinson v. Middaugh,* 95-CV-0836, 1997 WL

567961 (N.D.N.Y. Sept. 11, 1997); *Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348 (S.D.N.Y. Feb. 5, 1997); and *Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254 (2d Cir. Sept. 7, 2005).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Hale v. Rao
Slip Copy, 2009 WL 3698420 (N.D.N.Y.)

END OF DOCUMENT



Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Daniel JONES, Petitioner,
v.
Michael E. GIAMBRUNO, Respondent.
No. 05-CV-0008(Sr).

May 14, 2009.
West KeySummary**Constitutional Law 92** 🗝 **4838**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)12 Other Particular Issues and
Applications
92k4838 k. Parole. Most Cited Cases
**Pardon and Parole 284** 🗝 **46**

284 Pardon and Parole

284II Parole
284k45 Authority or Duty to Grant Parole or
Parole Consideration
284k46 k. Parole as Right or Privilege. Most
Cited Cases
Since inmate did not have a protected liberty interest
in early release or parole, his rights were not violated
when the parole commissioners allegedly penalized him
for exercising his privilege against self-incrimination.
Inmate, a convicted sex offender, was repeatedly denied
parole in part for his failure to participate in a sex offender
treatment. Inmate was not entitled to early release since
the State parole scheme did not grant him a legitimate
expectancy of release. U.S.C.A. Const.Amend. 14; 28
U.S.C.A. § 2241; 7 N.Y.C.R.R. § 260.2; McKinney's
Executive Law § 259-i(2)(c)(A).
Daniel Jones, Attica, NY, pro se.

Darren Longo, NYS Attorney General's Office, Buffalo,
NY, for Respondent.

*DECISION AND ORDER*

H. KENNETH SCHROEDER, JR., United States
Magistrate Judge.
**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have
consented to have the undersigned conduct any and all
further proceedings in this case, including entry of final
judgment. Dkt. # 21.
Petitioner Daniel Jones commenced this action on or
about January 5, 2005, pursuant to 28 U.S.C. § 2241
(subsequently re-characterized as filed pursuant to 28
U.S.C. § 2254) maintaining that he remained in the
custody of the New York State Department of
Correctional Services because of the unconstitutional
denials of parole by the New York State Parole Board.
Dkt.1 and 20. Currently before this Court is respondent's
motion (Dkt.# 27) for summary judgment seeking
dismissal of the amended petition (Dkt.# 20) and
petitioner's motion for appointment of counsel (Dkt.# 40).
For the following reasons, respondent's motion for
summary judgment is granted and petitioner's motion for
appointment of counsel is denied as moot.

*PROCEDURAL BACKGROUND*

Petitioner Daniel Jones (hereinafter "Jones"),
proceeding *pro se,* commenced this action on or about
January 5, 2005, pursuant to 28 U.S.C. § 2241. Dkt. # 1.
In his petition, Jones argued that he remained in the
custody of the New York State Department of
Correctional Services ("DOCS") by reason of the
unconstitutional denials of parole by the New York State
Parole Board on or about January 16, 2002 and January
15, 2004. *Id.* By Decision and Order filed May 18, 2005,
United States District Judge William M. Skretny ordered
that the petition originally filed pursuant to 28 U.S.C. §
2241 be re-characterized as having been filed pursuant to
28 U.S.C. § 2254.FNI Dkt. # 4.
FN1. On January 24, 2005, District Judge
Skretny advised petitioner of the Court's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

intention to re-characterize the petition filed pursuant to 28 U.S.C. § 2241 as one filed pursuant to 28 U.S.C. § 2254. Dkt. # 3. In the Order, District Judge Skretny provided Petitioner with the opportunity to withdraw his petition filed pursuant to 28 U.S.C. § 2241. *Id.* Petitioner was further advised that his failure to advise the Court of his intention to withdraw the petition by February 19, 2005 would result in the re-characterization of the petition. *Id.*

On March 18, 2005, plaintiff Daniel Jones (hereinafter "Jones") filed a complaint pursuant to 42 U.S.C. § 1983 (Western District of New York Case No. 05-CV183) against defendants Glenn S. Goord, Michael Giambruno and an unspecified number of "John Does" (the "Time Allowance Committee"), challenging the denial of his "good time" allowance or credit based on his refusal/failure to participate in a sex offender program. (Case No. 05-CV-183, Dkt. # 1). Specifically, Jones alleged that participation in the sex offender treatment program would have required him to acknowledge guilt for a crime which, at the time, he was seeking to have overturned on appeal. *Id.* By Decision and Order filed August 2, 2005 in Case Nos. 05-CV-0008 and 05-CV-183, District Judge Skretny found that the relief sought in the complaint filed in 05-CV-183 could be sought only in a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 because it raised the question of the duration of Jones' confinement. Dkt. # 8 (in both cases). Consequently, District Judge Skretny ordered that the complaint in 05-CV-183 be construed as a motion to amend the petition for habeas corpus relief filed in 05-CV-0008 and District Judge Skretny provided Jones with the opportunity to address the Court's intention to treat the complaint filed in 05-CV-183 as a motion to amend or supplement the petition filed in 05-CV-0008. *Id.* Specifically, District Judge Skretny's Order provided Jones until August 23, 2005 to file a response. *Id.* On August 25, 2008, Jones filed, in both actions, a motion for reconsideration of the Court's Order treating the complaint filed in 05-CV-183 as a motion to amend the habeas corpus petition filed in 05-CV-0008 (05-CV-0008, Dkt. # 14 and 05-CV-183, Dkt. # 10). Also on August 25, 2008, Jones filed an amended complaint filed in 05-CV-183 (Dkt.# 12).

**\*2** On October 14, 2005, counsel for respondent in 05-CV-0008 filed a motion for an Order: (1) striking the amended complaint filed in 05-CV-183; (2) denying the motion to amend the petition filed in 05-CV-0008 (the complaint filed in 05-CV-183); and (3) enlarging the time within which to respond to the petition. Dkt. # 10. Thereafter, Jones filed an affidavit in opposition to respondent's October 14, 2005 motion. Dkt. # 12.

On January 23, 2006, District Judge Skretny, by Decision and Order filed in both cases, ordered that counsel for respondent in 05-CV-0008 and counsel for defendants in 05-CV-183 file a response to Jones' motion for reconsideration on or before February 13, 2006 and in such response to specifically address whether the Court properly construed the complaint in 05-CV-183 and whether the Court should have re-characterized the complaint as a motion to amend the habeas corpus petition in 05-CV-0008. (05-CV-0008, Dkt. # 13; 05-CV-183, Dkt. # 14.) As required and consistent with District Judge Skretny's January 23, 2006 Decision and Order, counsel for respondent and defendants filed memoranda on February 6, 2006 (Dkt. # 15 in both cases). Thereafter, Jones filed memoranda on February 21, 2006 (Dkt. # 16 in both cases).

By Decision and Order filed on March 31, 2006, District Judge Skretny: (1) denied Jones' motion for reconsideration (05-CV-0008, Dkt. # 14 and 05-CV-183, Dkt. # 10); (2) ordered that the amended complaint initially filed in 05-CV-183 (Dkt.# 12) shall be deemed and docketed as a motion to amend the habeas corpus petition in 05-CV-0008; (3) ordered that the motion to amend the habeas corpus petition docketed in 05-CV-0008 (see above) be granted; (4) ordered that Jones file an amended petition in 05-CV-0008 by May 15, 2006; (5) ordered that respondent's motion to strike the complaint filed in 05-CV-183 be denied and ordered that Jones' "putative" motion to amend the petition in 05-CV-0008 be denied; (6) ordered that respondent's motion to enlarge the time in which to respond to the petition filed in 05-CV-0008 be granted and (7) ordered that respondent shall have 45 days from the filing of Jones' amended petition to file an answer and a memorandum of law in response to the amended petition. [FN2] Consistent with

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

District Judge Skretny's March 31, 2006 Decision and Order, an amended petition was filed on May 11, 2006. Dkt. # 20. Thereafter, respondent filed the instant motion to dismiss the petition. Dkt. # 27.

FN2. District Judge Skretny's Decision and Order further provided that respondent's memorandum of law shall include a discussion of what impact, if any, the injunction entered by District Judge Hurd in the Northern District of New York in *Donhauser v. Goord* will have on this case. *Donhauser v. Goord,* 317 F.Supp.2d 160 (N.D.N.Y.2004). In *Donhauser,* District Judge Hurd granted a preliminary injunction to an inmate and enjoined "defendants and persons acting under their direction and/or control ... from depriving a prisoner of good time credits because of the prisoner's refusal to divulge a history of sexual conduct, including illegal acts for which no criminal charges have been filed, in order to be eligible for the Sexual Offender Counseling Program."*Donhauser,* 317 F.Supp.2d at 161. As will be discussed in greater detail below, the Second Circuit vacated Judge Hurd's order and remanded the case for further proceedings. *Donhauser v. Goord,* 181 Fed.Appx.11 (2d Cir.2006). Accordingly, it is respondent's position that *Donhauser v. Goord* has no bearing on the instant proceedings.

### FACTUAL BACKGROUND

Jones is presently serving an aggregate sentence of 10 to 20 years after having been convicted in 1992 of: (1) Attempted Rape in the First Degree, Burglary in the Second Degree, Sexual Abuse in the First Degree, and Endangering the Welfare of a Child in connection with breaking into a home and attempting to engage in sexual intercourse with an eight-year-old girl on January 8, 1992; and (2) Burglary in the Second Degree, Sexual Abuse in the First Degree and Endangering the Welfare of a Child in connection with unlawfully entering another home and subjecting a six-year-old girl to illegal sexual contact on February 27, 1991. Dkt. # 28, ¶ 1; Dkt. # 30, p. 1. Jones' convictions were unanimously upheld on direct appeal. *People v. Jones,* 236 A.D.2d 846, 654 N.Y.S.2d 495 (App.Div.), *lv. den.,* 90 N.Y.2d 859, 661 N.Y.S.2d 186,

683 N.E.2d 1060(1997). At all times relevant to the allegations in the amended petition, Jones was in the custody of the New York State Department of Correctional Services ("DOCS") and was housed at the Wyoming Correctional Facility ("Wyoming"). Dkt. # 5. United States District Judge William M. Skretny previously dismissed Jones' federal habeas challenge to his conviction and denied Jones a certificate of appealability and by mandate dated January 6, 2006, the United States Court of Appeals for the Second Circuit denied leave to appeal. Dkt. # 28, ¶ 2; *see also, Jones v. Giambruno,* 01-CV-0440 (Skretny, J., W.D.N.Y.). Jones' application for state post-conviction review pursuant to New York Criminal Procedure Law § 440.30 was similarly denied. *People v. Jones,* 307 A.D.2d 721, 761 N.Y.S.2d 928 (App.Div.), *lv. den.,* 1 N.Y.3d 574, 775 N.Y.S.2d 791, 807 N.E.2d 904 (2003).

**\*3** In his Amended Petition, Jones challenges the determinations rendered by the Parole Board in 2002, 2004 and 2006. Dkt. # 20. In addition, Jones challenges the alleged withholding of good time credits by the Wyoming Time Allowance Committee. *Id.*

### *2002 Parole Hearing*

Jones first became eligible for parole in 2002 and the New York State Division of Parole declined to release Jones, stating,

Parole is denied. You are presently serving terms for attempted rape 1st, 2 counts burglary and 2 counts sexual abuse. They relate to you illegally entering homes on 2 separate occasions and sexually molesting 2 little girls. We note a prior conviction for sex abuse 1st. You have a positive institutional program and discipline record, however, you have not been able to adequately benefit from a sex offender treatment program. These factors demonstrate that you present a serious threat to community safety and welfare and belie discretionary release to community supervision.

Dkt. # 1 Exhibits, p. 12. The Division of Parole further ordered that Jones be held for 24 months. *Id.* Division of Parole regulations provide a prisoner eligible for parole four months to appeal a parole determination by filing an appeal with the Division's Appeals Unit. Dkt. # 28, ¶ 4, *citing* 9 N.Y.C.R.R. § 8006.2(a) and (b). Jones

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

filed an administrative appeal on January 24, 2002, but did not file his administrative briefs until May 2, 2002, just two weeks prior to the four-month deadline. Dkt. # 28, ¶ 5, *citing* Dkt. # 20, ¶ 2. The Division's Appeals Unit then had four months to issue a determination. Dkt. # 28, ¶ 6. Because the Appeals Unit failed to issue a determination, Jones' administrative remedies were deemed to have been exhausted pursuant to 9 N.Y.C.R.R. § 8006.4(c). *Id.* at ¶ 7, 775 N.Y.S.2d 791, 807 N.E.2d 904.

Jones filed an Article 78 proceeding pursuant to New York's Civil Practice Law & Rules challenging the Parole Board's denial of parole. Dkt. # 28, ¶ 7. Jones alleges in his amended petition that "[o]n January 2003, Erie County Supreme Court Judge (Tills, J.) denied the Article 78 petition." Dkt. # 20, ¶ 3. Jones filed a Notice of Appeal and re-submitted his application to proceed on appeal as a poor person; Jones' application to proceed as a poor person was granted on May 2, 2003. *Id.* at ¶ 4, 775 N.Y.S.2d 791, 807 N.E.2d 904. A dispute concerning the record on appeal ensued, causing a further three month delay. Dkt. # 28, ¶ 11. In addition, Jones' failure to timely file his appellate brief in connection with his appeal resulted in his appeal being dismissed. *Id.* at ¶ 12, 775 N.Y.S.2d 791, 807 N.E.2d 904. Jones succeeded in vacating the dismissal and filed his appellate brief on December 23, 2003. *Id.* at ¶ 13, 775 N.Y.S.2d 791, 807 N.E.2d 904. Thereafter, the Appellate Division, Fourth Department dismissed Jones' appeal holding,

This appeal must be dismissed as moot because the determination expired during the pendency of this appeal, and the Parole Board denied petitioner's subsequent request for parole release ... In any event, [sic] Supreme Court properly dismissed the petition. Contrary to the contention of petitioner, the Parole Board properly considered his failure to participate in a sex offender treatment program and the seriousness of the offenses in making its determination.

**\*4** *Jones v. NYS Div. of Parole,* 8 A.D.3d 1098, 1099, 778 N.Y.S.2d 357 (4th Dept.2004) (internal citations omitted). The New York Court of Appeals denied Jones' leave to appeal. *Jones v. NYS Div. of Parole,* 3 N.Y.3d 609, 786 N.Y.S.2d 811, 820 N.E.2d 290 (2004).

***2004 Parole Hearing***

On January 15, 2004, the New York State Division of Parole again declined to release Jones, stating

Parole is once again denied. Your interview and record have been duly considered and accordingly we decline to grant you a release at this time. The instant offenses demonstrate that you are a dangerous sexual predator. You were involved in two sets of criminal transactions wherein two different little girls were victimized and sexually assaulted. Your record includes similar conduct, again involving sexual contact to [sic] a young female. In light of the foregoing this panel concludes that if released you would pose a clear and present danger to community safety. Accordingly, we decline to assume that risk.

Dkt. # 1 Exhibits, p. 38. The New York State Appellate Division, Third Department, affirmed the 2004 denial of parole holding that,

Our review of the record reveals that the Board complied with the requirements of Executive Law § 259-I, thus its determination is not subject to further judicial review. While the Board's decision emphasizes the seriousness of the crimes and petitioner's criminal history, the hearing transcript demonstrates that the Board also considered petitioner's institutional record, educational accomplishments and release plans. Contrary to petitioner's contention, the record does not indicate that the Board used his refusal-on the basis that it would require him to admit his guilt-to participate in a sex offender counseling program against him in reaching its determination. In any event, the Board may consider a petitioner's continued lack of remorse when making a parole determination, even where the petitioner has maintained his or her innocence following conviction.

Nor does the record support petitioner's contention that the Board's decision was affected by "irrationality bordering on impropriety" because certain documents in the record erroneously reflect that petitioner was convicted of attempted rape in the first degree pursuant to subdivision (1) rather than subdivision (3) of Penal Law § 130.35. Other documents upon which the Board relied contain the correct information and petitioner was able to address and resolve any misconception at the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

hearing.

Finally, in light of petitioner's criminal history of committing sex crimes against children and the fact that his present convictions are violent felony offenses, we conclude that each of the challenged special conditions imposed by the Board in the event that petitioner is granted conditional release is rationally related to preventing his commission of further offenses.

*Jones v. New York State Div. of Parole,* 24 A.D.3d 827, 828-29, 804 N.Y.S.2d 485 (3d Dept.2005). Thereafter, the New York Court of Appeals dismissed as moot Jones' motion for leave to appeal because the Division of Parole again denied Jones parole on January 18, 2006. Dkt. # 28, ¶ 18.

### 2005 Time Allowance Committee

**\*5** On March 25, 2005, Jones appeared before the Time Allowance Committee at Wyoming. Dkt. # 20, ¶ 19. In his Amended Petition, Jones alleges that "the Chairperson informed petitioner that as he had refused to participate in the SOTP they were recommending lost [sic] of all his good time credits." *Id.* Thereafter, Jones alleges that the decision of the Time Allowance Committee was "confirmed" by the Superintendent on March 25, 2005 and "affirmed" by the Commissioner of the Department of Corrections on April 5, 2005. *Id.* Jones commenced an Article 78 proceeding in Supreme Court, Albany County challenging the denial of good time credits. Dkt. # 30, p. 6. The Supreme Court, Albany County dismissed the Article 78 petition and further denied Jones' motion to re-argue. *Id.* Jones filed a Notice of Appeal with the New York State Appellate Division, Third Department. *Id.* The Appellate Division, Third Department affirmed the dismissal of the petition and dismissed the appeal. *Jones v. Goord,* 35 A.D.3d 951, 824 N.Y.S.2d 575 (3d Dept.2006). The New York Court of Appeals denied Jones leave to appeal; the United States Supreme Court denied certiorari. *Jones v. Goord,* 8 N.Y.2d 808, 202 N.Y.S.2d 24, 168 N.E.2d 255, *cert. denied,* 128 S.Ct. 488 (2007). On or about April 4, 2007, Jones submitted a letter to the Court claiming that he had exhausted his state court remedies with respect to his claim concerning his good time credits. Dkt. # 37, ¶ 3. Respondent concedes that

Jones exhausted his claim concerning his good time credits. Dkt. # 37, ¶ 6.

On January 8, 2009, Jones filed an affidavit in further opposition to respondent's motion for summary judgment. Dkt. # 41. In his affidavit, Jones states that after exhausting his state remedies, he filed a petition for writ of certiorari with the United States Supreme Court on June 25, 2007. *Id.* at ¶ 5. In his petition, Jones asked the Supreme Court to "review whether the denial of his god [sic] time by Corrections, for his failure to complete a se [sic] offender Treatment Program violated his right against self-incrimination under the Fifth Amendment, and his right under the First, Sixth, Fourteenth and Ex Post Facto Clause (Article I § 9, cl.3) of the United States Constitution." *Id.* Jones further claims,

Respondent initially waived the right to file a response to the petition. The U.S. Court nevertheless directed that a response be filed. After being granted an extension filed timely briefs by October 1, 2007. Contained within Respondent's brief they articulated that there was not an adequate evidentiary or decisional record for the Court to provide a resolution of the Fifth Amendment issue. That because the claim was pending in a federal habeas proceeding, any facts and issues relating will be addressed there. Thus, there was no need of concern that any arguably substantial Fifth Amendment issue will go unresolved. Respondent failed to mention that they had filed for summary dismissal as the petition failed to state a claim.

**\*6** Dkt. # 41, ¶¶ 6-7. The United States Supreme Court denied Jones' petition for writ of certiorari on October 29, 2007. *Id.* at ¶ 8; *see Jones v. Goord,* --- U.S. ----, 128 S.Ct. 488, 169 L.Ed.2d 343 (2007).

### 2006 Parole Hearing

On January 18, 2006, the New York State Division of Parole again denied Jones parole holding,

Parole denied. On two occasions you illegally entered private residences and encountered young females. On one occasion, while wearing a stocking on your head, you put your hand over the eight-year-old female's mouth, removed some of her clothing and then inserted your penis into her vagina. You then wiped between her

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

legs with a towel and left. Approximately, six weeks later you touched a six-year-old female in the vaginal area while she was in her bedroom.

Your criminal history reflects a felony term of probation for the conviction of sexual abuse first degree. That matter involved you sexually abusing your thirteen year old stepdaughter.

While incarcerated you have refused sex offender programing. There has been a recommended loss of all your good time credit.

Your behavior is predatory and directed at extremely defenseless victims. You are a significant threat to the public an [sic] inappropriate for Parole at this time.

Dkt. # 29, p. 24. Jones administratively appealed the January 18, 2006 denial of parole on or about March 7, 2006. Dkt. # 30, p. 4; Dkt. # 33, p. 4.

### 2008 Parole Hearing

In a letter dated January 24, 2008, Jones advised this Court that he appeared before the Parole Board on January 16, 2008 and was again denied parole. Dkt. # 39. In his letter, Jones requested this Court "to likewise consider the facts surrounding the denial of the 2008 parole hearing as I faced the same procedures and standards at that hearing." *Id.* Jones subsequently advised this Court that he had administratively appealed the January 2008 denial of parole and that that matter was pending as of January 8, 2009. Dkt. # 41, ¶ 9.

### DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations

omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

**\*7** Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

### First Amendment, Fifth Amendment and Due Process Claims

In his Amended Petition, Jones alleges that the state procedures available to him to challenge the Parole Board's and the Time Allowance Committee's determinations are ineffective and futile and deny him meaningful access to due process and the courts. Jones further maintains that his rights under the First and Fifth Amendments to the United States Constitution were violated "when the Parole Commissioners [and the Time Allowance Committee] penalized him for exercising his privilege against self-incrimination." Dkt. # 20, pp. 7-14 and pp. 24-30. In addition, Jones alleges that his due process rights were violated "when the Parole Board relied on inaccurate information in denial of parole release." *Id.* at pp. 14-17. Finally, Jones asserts that because the Parole

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

Board's determinations were arbitrary, capricious, irrational and an abuse of their discretion, his due process rights were violated. *Id.* at pp. 17-24. Each of the legal theories presented in Jones' amended petition are premised on the erroneous proposition that a prisoner has a protected constitutional interest in early release.

It is well-settled that a prisoner does not have a constitutional or inherent right to be released before the expiration of a valid sentence. *Barna v. Travis,* 239 F.3d 169, 170-71 (2d Cir.2001); *Klos v. Haskell,* 48 F.3d 81, 86 (2d Cir.1995); *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Wolf v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "Good behavior allowances are in the nature of a privilege to be earned by the inmate and no inmate has the right to demand or to require that any good behavior allowance be granted to him." 7 N.Y.C.R.R. § 260.2. A prisoner may have an interest in parole that is protected by the Due Process Clause, if he has a legitimate expectancy of release that is grounded in the state's statutory scheme. *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001); *see also, Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 11-13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Berard v. State of Vt. Parole Bd.,* 730 F.2d 71, 75 (2d Cir.1984); *Boothe v. Hammock,* 605 F.2d 661, 663 (2d Cir.1979). "Neither the mere possibility of release, nor a statistical probability of release gives rise to a legitimate expectancy of release on parole." *Barna,* 239 F.3d at 171.

**\*8** The New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release. The statute provides,

[d]iscretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law.

N.Y. Exec. Law § 259-i(2)(c)(A). Thus, "[i]t is

apparent that New York's parole provisions ... do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist.... [N]o entitlement to release is created [by the parole provisions]." *Boothe v. Hammock,* 605 F.2d at 664. Accordingly, because Jones does not have a protected liberty interest in early release/parole, Jones' claims of violations of his First Amendment and Fifth Amendment rights must fail as a matter of law.

***Donhauser v. Goord***

As directed by District Judge Skretny in his March 31, 2006 Decision and Order, in his memorandum of law filed in support of respondent's motion for summary judgment, counsel for the respondent addressed what impact, if any, the injunction entered by District Judge Hurd in *Donhauser v. Goord* has on the instant case. Notably, respondent contends that the injunction entered by Judge Hurd has no impact on the instant case. Notwithstanding the subsequent procedural history wherein the Second Circuit Court of Appeals vacated Judge Hurd's Order and remanded the matter to Judge Hurd for further proceedings, Jones endeavors to rely on *Donhauser* and urges this Court to follow the legal reasoning in *Donhauser* concerning a Fifth Amendment violation. Dkt. # 33, p. 9. As reflected in the foregoing discussion concerning Jones' claims of violations of his First and Fifth Amendment rights in connection with the denials of parole and good time credits, such claims fail as a matter of law. Accordingly, this Court need not and declines to further consider Jones' arguments concerning any alleged First and Fifth Amendment violations.

***Ex Post Facto Argument***

Jones claims that the Parole Board violated the *"ex post facto* law" by reason of its continuous denial of parole. Specifically, Jones alleges,

[b]ased on the new policy instituted by the Parole Board in granting parole release, by placing more emphasis on public safety fundamentally altered the Board's process for reviewing parole applications, when applied retroactively. Petitioner was entitled to have the Board decide his application based on factors in use by the Board at the time of his conviction and commutation. The negative impact requirement for finding an ex post facto violation was satisfied since the likilihood [sic] of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

parole release existed at the time of petitioner's conviction which has now been reduced.

**\*9** Dkt. # 20, ¶ 83. Notably, except for the speculative, conclusory allegation in Jones' amended petition (cited above), Jones offers no evidence to support this claim. In support of his motion for summary judgment, respondent explains that the Second Circuit has previously found that New York State's Sex Offender Registration Act ("SORA"), also known as Megan's Law, which placed severe limitations on an offender's freedoms and rights even if the offender committed his crimes before the enactment of the statute, did not violate the *ex post facto* clause. See *Doe v. Pataki,* 120 F.3d 1263 (2d Cir.1997). In reliance on the finding that New York's SORA did not violate the *ex post facto* clause, respondent argues that "[g]iven the severity of the requirements which may constitutionally be retroactively imposed upon sex offenders under SORA, plaintiff [Jones] cannot argue that an alleged new stinginess in the awarding of parole release somehow violates his right to be protected from *ex post facto* laws." Dkt. # 30, p. 17.

As discussed above, a prisoner does not have a constitutionally protected right to be granted early release. Moreover, although a prisoner may have an interest in parole that is protected by the Due Process Clause if he has a legitimate expectancy of release that is grounded in the state's statutory scheme, such is not the case here. *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001); *see also, Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 11-13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Berard v. State of Vt. Parole Bd.,* 730 F.2d 71, 75 (2d Cir.1984); *Boothe v. Hammock,* 605 F.2d 661, 663 (2d Cir.1979). New York's statutory scheme does not create an entitlement to release. See *Boothe,* 605 F.2d at 664. Accordingly, this Court finds that Jones' claim that the Parole Board, in continually denying him parole, violated the *ex post facto* clause is without merit and must fail as a matter of law.

**Inaccurate Information in File**

Jones next claims that his file contained inaccurate information upon which the Parole Board relied in making its determinations, thereby violating his due process rights.

Dkt. # 20, ¶¶ 48-60. Specifically, Jones complains that his "criminal rap sheet, sentence and commitment paper, and other documents were inaccurate" and "showed that he had been convicted of the wrong charges after a jury trial." *Id.* at ¶ 49. According to Jones, the inaccurate papers to which he is referring state that he was convicted of "forcible compulsion." Jones' assertion that reliance on such "inaccurate information" by the Parole Board and the Time Allowance Committee violated his due process rights is premised on his claim that he was denied parole only because he had been convicted of using force to molest young children. In other words, Jones claims that had the Parole Board understood that Jones had not used force, it would have released him. With the exception of Jones' allegations in the amended petition, the record before this Court is devoid of any evidence to support Jones' claim that the Parole Board "was laboring under a misapprehension regarding petitioner's criminal acts." Dkt. # 30, p. 18.

**\*10** As discussed above, at the conclusion of each Parole Board hearing, the Parole Board issued a written determination setting forth the basis for its denial of parole. Notably, the 2002, 2004 and 2006 written Parole Board determinations do not in any way suggest that the Parole Board believed that Jones had been convicted of forcible compulsion. To the contrary, each written Parole Board determination correctly summarizes Jones' convictions as follows: 2002-"[y]ou are presently serving terms for attempted rape 1st, 2 counts burglary and 2 counts sexual abuse. They relate to you illegally entering homes on 2 separate occasions and sexually molesting little girls."; 2004-"[t]he instant offenses demonstrate that you are a dangerous sexual predator. You were involved in two sets of criminal transactions wherein two different little girls were victimized and sexually assaulted."; 2006-"[o]n two occasions you illegally entered private residences and encountered young females. On one occasion, while wearing a stocking on your head, you put your hand over the eight-year-old female's mouth, removed some of her clothing and then inserted your penis into her vagina. You then wiped between her legs with a towel and left. Approximately, six weeks later you touched a six-year-old female in the vaginal area while she was in her bedroom." See Dkt. # 1 Exhibits, pp. 12 and 38; Dkt. # 28, p. 24. Moreover, in connection with Jones' appeal of the dismissal of his Article 78 proceeding commenced

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

following the 2004 denial of parole, the Appellate Division, Third Department stated, in part,

> Nor does the record support petitioner's contention that the Board's decision was affected by "irrationality bordering on impropriety" because certain documents in the record erroneously reflect that petitioner was convicted of attempted rape in the first degree pursuant to subdivision (1) rather than subdivision (3) of Penal Law § 130.35. Other documents upon which the Board relied contain the correct information and petitioner was able to address and resolve any misconception at the hearing.

> *Jones v. New York State Div. of Parole,* 24 A.D.3d 827, 828-29, 804 N.Y.S.2d 485 (3d Dept.2005).

Accordingly, Jones' claim that his due process rights were violated because the Parole Board relied on inaccurate information is belied by the undisputed evidence from each Parole Board hearing. Even if, however, there had been evidence of inaccurate information, it is not the province of this Court to correct errors of fact. "Federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Thus, for the foregoing reasons, Jones' claim that his due process rights were violated because of inaccurate information in his file must fail as a matter of law.

*2002, 2004 and 2006 Denials of Parole*

Respondent argues that by reason of the 2006 denial of parole, Jones' claims concerning the 2002 and 2004 denials of parole must fail as a matter of law because they are moot. Dkt. # 30, p. 7. Conversely, Jones asserts that "[a]ccording to the mootness doctrine, one may challenge an alleged error by the Parole Board, notwithstanding having already received a new hearing, if the error is 'capable of repetition, yet evading review.' " Dkt. # 33, p. 13 (internal citation omitted). For the following reasons, this Court agrees with respondent that Jones' claims concerning the 2002 and 2004 denials of parole are indeed moot and accordingly, fail as a matter of law.

**\*11** A prisoner who successfully challenges a denial of parole is entitled to a rehearing, not release. *See Wilkinson v. Dotson,* 544 U.S. 74, 82, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005). New York law is well settled, "any challenge to a parole board hearing must be dismissed if petitioner is reconsidered for parole." *Graziano v. Lape,* No. 9:04-CV-84, 2008 WL 2704361, at * 4 (N.D.N.Y. July 2, 2008), *citing Boddie v. New York State Division of Parole,* 285 F.Supp.2d 421, 427 (S.D.N.Y.2003); *see also, Robles v. Dennison,* No. 05-CV-0428, 2007 WL 2187303, at *1 (W.D.N.Y. July 30, 2007); *Aviles v. Travis,* 282 A.D.2d 787, 722 N.Y.S.2d 426 (3d Dept.2001); *Jhang v. Travis,* 285 A.D.2d 874, 727 N.Y.S.2d 361 (3d Dept.2001).

Jones first appeared before the Parole Board in January 2002 and was denied parole at that time. Dkt. # 1, p. 12. The Division of Parole further ordered that Jones be held for 24 months. *Id.* Jones administratively appealed the Parole Board's determination and commenced an Article 78 proceeding which he pursued to the New York Court Appeals. In October 2004, the New York Court of Appeals denied Jones' leave to appeal. *Jones v. NYS Div. of Parole,* 3 N.Y.3d 609, 786 N.Y.S.2d 811, 820 N.E.2d 290 (2004). If, however, Jones had successfully challenged the 2002 denial of parole, he would have been entitled to a rehearing, which rehearing he received at his next appearance before the Parole Board in January 2004.

Jones was again denied parole in January 2004. Dkt. # 1, p. 38. The Appellate Division, Third Department affirmed the 2004 denial of parole. *Jones v. New York State Div. of Parole,* 24 A.D.3d 827, 828-29, 804 N.Y.S.2d 485 (3d Dept.2005). Thereafter, the New York Court of Appeals dismissed as moot Jones' motion for leave to appeal because the Division of Parole again denied Jones parole on January 18, 2006. Dkt. # 28, ¶ 18. Following the same reasoning discussed above, if Jones had successfully challenged the 2004 denial of parole, he would have been entitled to a rehearing, which rehearing he received in January 2006. In a letter dated January 24, 2008, Jones advised this Court that he appeared before the Parole Board on January 16, 2008 and was again denied parole. Dkt. # 39. In his letter, Jones requested this Court "to likewise consider the facts surrounding the denial of the 2008 parole hearing as I faced the same procedures

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

and standards at that hearing." *Id.* Again, had Jones been successful in his challenge to the 2006 denial of parole, his relief would have been a rehearing, which rehearing he received in January 2008. Therefore, Jones has already received the same relief he would have received had his challenges to the 2002, 2004 and 2006 denials of parole been successful. Accordingly, Jones' claims concerning the 2002, 2004 and 2006 denials of parole are moot and fail as a matter of law.

**Failure to Exhaust 2006 Denial of Parole**

As discussed above, Jones advised this Court that he again appeared before the Parole Board in January 2008 and was again denied parole. Accordingly, for the foregoing reasons, Jones' claim concerning his 2006 denial of parole must fail because it is moot. Alternatively, Jones' claim concerning his 2006 denial of parole must fail because he failed to exhaust his state court remedies.

*12 Before a federal court can address the merits of any federal issue contained in a petition for a writ of habeas corpus, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see* O'Sullivan v. Boerckel, 526 U.S. 838, 843-44, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). "Exhaustion of state remedies requires presentation of the claim to the highest state court from which a decision can be obtained." Hogan v. Ward, 998 F.Supp. 290, 293 (W.D.N.Y.1998), *citing* Daye v. Attorney General of the State of New York, 696 F.2d 186, 190 n. 3 (2d Cir.1982); *see* O'Sullivan, 526 U.S. at 839-40 ("a state prisoner must present his claims to a state supreme [i.e., highest] court in a petition for discretionary review in order to satisfy the exhaustion requirement."). The same concerns that bar federal habeas review of unexhausted claims also bar federal habeas review of claims that have been procedurally defaulted in state court. *See* Coleman v. Thompson, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.").

Where a state prisoner has failed to exhaust or has

procedurally defaulted a claim by failing to raise it on direct review before the state court, federal habeas review is barred "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The scope of this exception is very limited and the burden of proof very heavy. Spence v. Superintendent, Great Meadow Correctional Facility, 219 F.3d 162, 171-72 (2d Cir.2000), *citing* Sawyer v. Whitley, 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In order to succeed in being excused from the exhaustion requirement, a petitioner must demonstrate that "no state corrective procedure exists or there exist circumstances rendering such process ineffective to protect [his] rights." Simmons v. Reynolds, 898 F.2d 865, 867 (2d Cir.1990), *citing* 28 U.S.C. § 2254(b).

There is nothing in the record before this Court to suggest that Jones made any attempt to exhaust his state court remedies with respect to the 2006 denial of parole. In fact, in opposition to the instant motion for summary judgment, Jones seemingly concedes that he did not exhaust his state court remedies concerning the 2006 parole denial. Specifically, Jones ignores respondent's argument that his 2006 claim must fail because he did not exhaust his state remedies. Instead, Jones seeks to avoid dismissal by arguing, "[h]e is not challenging the specific circumstances that occurred at each Parole hearing as the bases [sic] for denial," rather, he is challenging the "legal standard by which the Parole board made its decision." Dkt. # 33, p. 14. Additionally, Jones contends that because he is raising the same claims as he raised with respect to the prior parole determinations, the issue to be decided is mootness not exhaustion. *Id.* While Jones is correct that reconsideration for parole is tantamount to the relief granted if a prisoner is successful on a challenge to a parole denial, *to wit,* a rehearing, in order to proceed with his 2006 claim, Jones must have exhausted his state court remedies.

*13 Finally, in an apparent attempt to be excused from the exhaustion requirement, Jones argues that the appellate process afforded is futile because it takes two years to complete the appellate process and he has

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

(Cite as: 2009 WL 1362847 (W.D.N.Y.))

received a new parole hearing before he can obtain a final decision on appeal. As noted in respondent's memorandum of law in support of the instant motion and as discussed above, the delays associated with the appellate process in connection with Jones' appeal of the 2002 denial of parole were delays caused in large part by Jones. Dkt. # 30, p. 11. With respect to Jones' appeal of the 2004 denial of parole, Jones offers no description of the procedural history of that appeal and thus, has presented nothing to this Court to demonstrate that the system was inadequate to protect his rights. *Id*. Based on the foregoing, Jones has failed to demonstrate that he should be Pexcused from the exhaustion requirement. Accordingly, Jones' 2006 claim fails as a matter of law because he has failed to exhaust his state court remedies.

### *Motion for Appointment of Counsel*

On or about January 8, 2009, Jones filed a motion seeking the appointment of counsel. Dkt. # 40. Because this Decision and Order grants respondent's motion for summary judgment, there is no reason for this Court to address Jones' motion for an appointment of counsel. Accordingly, Jones' motion for appointment of counsel is denied as moot.

### *CONCLUSION*

For the foregoing reasons, respondent's motion for summary judgment (Dkt.# 27) is **GRANTED** and plaintiff's motion for appointment of counsel (Dkt.# 40) is **DENIED** as moot.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

W.D.N.Y.,2009.

Jones v. Giambruno
Slip Copy, 2009 WL 1362847 (W.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2163186 (N.D.N.Y.)

(Cite as: 2007 WL 2163186 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Vladimir ZUK, Plaintiff,
v.
Esteban GONZALEZ, Captain, Onondaga County
Justice Center; Vincent Wasilewski, Assistant Chief,
Onondaga County Justice Center; Kevin Brisson,
Captain, Onondaga County Justice Center; Thomas
Metz, Lieutenant-Personnel Section; Anthony Callisto,
former Chief-Custody Division (Retried June, 2006);
Richard Carbery, Chief-Custody Division, Onondaga
County Justice Center; Kevin Walsh, Sheriff of
Onondaga County; and Warren Darby, Undersheriff of
Onondaga County, Defendants.
No. 5:07-CV-732 (FJS/DEP).

July 26, 2007.
Vladimir Zuk, Syracuse, NY, pro se.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge.
**I. INTRODUCTION**
*1 There Clerk of the Court has sent Plaintiff's
complaint to the Court for its review. *See* Dkt. No. 1.
Plaintiff filed his complaint pursuant to Title VII of the
Civil Rights Act of 1964, as amended and codified at 42
U.S.C. § 2000e *et seq.,* and he has paid the filing fee for
this action.

In his complaint, Plaintiff alleges, among other things,
that, while he was an employee of Onondaga County at the
Onondaga County Justice Center, Defendants
discriminated against him in the course of his employment,
denied him promotion, and retaliated against him on the
basis of his national origin. [FN1]

FN1. Plaintiff attached to his complaint a copy of
the right-to-sue letter that the Equal Employment
Opportunity Commission ("EEOC") issued

regarding the above allegations of
discrimination. *See* Dkt. No. 1 at 19. Plaintiff
alleges that he received the letter on April 13,
2007. *See id.* at 17.

**II. DISCUSSION**

Plaintiff names Esteban Gonzalez, Vincent
Wasilewski, Kevin Brisson, Thomas Metz, Anthony
Callisto, Richard Carbery, Kevin Walsh, and Warren
Darby as Defendants. However, it is well-established that
Title VII does not create individual liability for
violations of its terms. *Tomka v. Seiler Corp.,* 66 F.3d
1295, 1313-17 (2d Cir.1995). Only the employer may
be held liable, and is in fact held vicariously liable for
a hostile work environment created by a supervisor with
immediate or successively higher authority over the
victimized employee. *Burlington Indus., Inc. v. Ellerth,*
524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633
(1998); *Faragher v. Boca Raton,* 524 U.S. 775, 807,
118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

*Linder v. City of N.Y.,* 263 F.Supp.2d 585, 594-95
(E.D.N.Y.2003).

Therefore, the Court dismisses the above-named
Defendants from this action in their personal capacity.

The question remains, however, whether Plaintiff may
sue the aforesaid Defendants in their "official" capacity as
representatives of the County of Onondaga.

"[T]he Second Circuit has left open the question
whether [Title VII] suits may be maintained against
employees in their 'official capacity[.]' " *Guzman v.
Round Hill Country Club, Inc.,* No. 3:03CV0851, 2003
WL 23212750, at *1 (D.Conn. Jan. 30, 2003) (citing
*Hafez v. Avis Rent A Car System, Inc.,* No. 99-9459,
2000 WL 1775508, *2 (2d Cir. Nov. 29, 2000)).
However, "most circuits either have rejected such suits
outright, on the ground that employees cannot incur
personal liability under Title VII, or have treated such
suits as an action against the employer." *Id.* (footnote

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2163186 (N.D.N.Y.)

(Cite as: 2007 WL 2163186 (N.D.N.Y.))

and citations omitted). This has been the "trend" in the district courts within the Second Circuit as well. *See id.* at *1, n. 4 (citing *McBride v. Routh,* 51 F.Supp.2d 153, 156-57 (D.Conn.1999) (citing cases)).

 *Simpson v. N.Y. State Dep't of Civil Serv.,* No. 02-CV-1216, 2005 WL 545349, *9 (N.D.N.Y. Mar. 1, 2005).

 For example, in *Bottge v. Suburban Propane,* 77 F.Supp.2d 310 (N.D.N.Y.1999), the court held "that [the Second Circuit's] individual liability bar applies to individual defendants in their official capacities, as well as to situations where the plaintiff seeks prospective injunctive relief against such individuals, under ... Title VII[.]" *Id. at 313.* The court explained further that "[t]he official/personal capacity distinction seems misplaced since it would place this Court in the position of holding someone liable without providing Plaintiff with a remedy at law." *Id.; see also Gray v. Shearson Lehman Bros., Inc.,* 947 F.Supp. 132, 136 (S.D.N.Y.1996) (dismissing Title VII claims against individuals sued in their official capacities). The Court finds the courts' reasoning in *Simpson* and *Bottge* persuasive and, therefore, dismisses Plaintiff's Title VII claims against the individual Defendants in their official capacities as well.

 **\*2** Since the Court has dismissed all of the claims against all of the individual Defendants, no Defendant remains. Nonetheless, to the extent that Plaintiff has named the individual Defendants in their official capacities, he has in essence named Onondaga County-his actual employer-as a Defendant. [FN2] *See Ciancio v. Gorski,* No. 98-CV-0714E, 1999 WL 222603, *1 (W.D.N.Y. Apr. 14, 1999) (holding that because the county employer would pay any judgment in an official capacity suit, the county employer was the proper defendant). Construing Plaintiff's complaint liberally in light of his *pro se* status, *see Haines v. Kerner,* 404 U.S. 519, 520 (1972), and in the interest of judicial economy, the Court will *sua sponte* substitute Onondaga County as the sole Defendant in place of the individually named Defendants. *See Ciancio,* 1999 WL 222603, at *1 (citing [Fed.R.Civ.P.] 21 ("[p]arties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Cimemotion NV v.*

*Lorimar-Telepictures Corp.,* 1989 WL 120083, *6 (S.D.N.Y. Oct. 5, 1989) (non-party over whom court could exercise personal jurisdiction would be added as defendant *sua sponte* under [Federal Rule of Civil Procedure] 21 "in the interest of the efficient administration of justice")).

 FN2. Onondaga County, as the employer, is the proper defendant in a Title VII action. *See* 42 U.S.C. §§ 2000e and 2000e-2.

### III. CONCLUSION

 After carefully reviewing the entire file in this case and the applicable law, and for the reasons stated herein, the Court hereby

 **ORDERS** that Esteban Gonzalez, Vincent Wasilewski, Kevin Brisson, Thomas Metz, Anthony Callisto, Richard Carbery, Kevin Wash, and Warren Darby are dismissed as Defendants in this action; and the Court further

 **ORDERS** that Onondaga County is *sua sponte* substituted as a Defendant in this action in place of the individual Defendants pursuant to Rule 21 of the Federal Rules of Civil Procedure; and the Court further

 **ORDERS** that the Clerk of the Court shall add "Onondaga County" as a Defendant to the docket of this action; and the Court further

 **ORDERS** that the Clerk of the Court shall issue a summons and forward it to Plaintiff, along with a packet containing General Order 25, which sets forth this District's Civil Case Management Plan. The Court advises Plaintiff that it is his responsibility to serve Defendant immediately with the summons, a copy of his complaint, and a packet containing General Order 25 in accordance with the Federal Rules of Civil Procedure; and the Court further

 **ORDERS** that Defendant or its counsel shall file a formal response to Plaintiff's complaint as provided for in the Federal Rules of Civil Procedure subsequent to service of process on Defendant; and the Court further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2163186 (N.D.N.Y.)

(Cite as: 2007 WL 2163186 (N.D.N.Y.))

**ORDERS** that Plaintiff shall immediately serve a copy of this Order upon any Defendant whom he has already served with process in this action; and the Court further

**ORDERS** that the parties must accompany any paper that they send to the Court or to the Clerk of the Court with a certificate setting forth the date on which they mailed a true and correct copy of the same to all opposing parties or their counsel. The Clerk of the Court shall return to the party who sent it any letter or other document that the Court or the Clerk of the Court receives that does not include a certificate of service that clearly states that the party served an identical copy on all opposing counsel. Plaintiff shall also comply with any requests of the Clerk's Office for any documents that are necessary to maintain this action. All motions shall comply with this District's Local Rules; and the Court further

**\*3 ORDERS** that the Clerk of the Court shall serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2007.

Zuk v. Gonzalez
Not Reported in F.Supp.2d, 2007 WL 2163186 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Jasper L. DOCKERY, Plaintiff,
v.
Nathan TUCKER, et al., Defendants.
No. 97-CV-3584 (ARR).

Sept. 6, 2006.
Jasper Lloyd Dockery, Atlanta, GA, pro se.

Gail A. Matthews, United States Attorneys Office, Brooklyn, NY, for Nathan Tucker.

E. David Woycik, Sanders Sanders & Block, P.C., Mineola, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

ROANNE L. MANN, United States Magistrate Judge.

**\*1** Currently pending before this Court, on a referral from the Honorable Allyne R. Ross, are two sets of defense motions to dismiss or for summary judgment with respect to the Third Amended Complaint ("3d Am. Compl.") of *pro se* plaintiff Jasper Dockery ("Dockery" or "plaintiff"). One set of motions was filed by Special Agent Nathan Tucker ("Tucker"), and the other by defendants the District of Columbia ("the District"), Pamela Reed ("Reed"), Phineas Young ("Young"), Alan Dreher ("Dreher"), and Larry Soulsby ("Soulsby") (collectively, "the D.C. defendants"). Plaintiff has cross-moved for summary judgment on all claims against both sets of defendants. For the reasons detailed below, this Court recommends that defendants' motions be granted in part and denied in part, and that plaintiff's cross-motions for summary judgment be denied in their entirety.

### *PROCEDURAL HISTORY*

The present action arises out of two attempts by various law enforcement officers to arrest plaintiff and return him to the District of Columbia to face criminal charges. According to allegations in plaintiff's original complaint ("Orig.Compl."), on February 6, 1996, Special Agent Tucker of the Federal Bureau of Investigation ("FBI"), and Detectives Reed and Young of the Washington, D.C. Metropolitan Police Department ("D.C.Police"), wielding high powered guns and accompanied by dogs, "invaded plaintiff's family's [apartment] building" at 2127 Pitkin Avenue, Brooklyn, New York ("the Premises"), without announcing their presence, demanding admission, or presenting a warrant. Orig. Compl. ¶¶ IV(1-3). In the process of arresting plaintiff, the agent and officers allegedly cut padlocks off the door to the downstairs grocery store, broke down the building's main door with a sledgehammer, shot a dog with a tranquilizer gun, and broke into plaintiff's grocery store and apartment, as well as the apartments of three neighboring tenants. *Id.* ¶¶ IV(1-2). Plaintiff also claimed, among other things, that his arrest was false and "pretextual," *id.* ¶ IV(2, 4), and that, as a result of defendants' actions, he sustained property damage and loss of income and liberty, and his family suffered psychological damage. *Id.* ¶¶ IV(1-2, 4, 9). Plaintiff demanded damages in the amount of $5,000,000, plus $800 per day of his confinement. *Id.* ¶ IV(12).

After defendants Reed and Young filed answers and Tucker and several other defendants (since dismissed from the case) filed dispositive motions, plaintiff moved for leave to amend his original complaint. The first amended complaint ("1st Am. Compl." [# 21] ) <u>FN1</u> concerned an earlier incident that took place on October 23, 1995, also at the Premises.<u>FN2</u> That pleading alleged that during the earlier search, defendants Tucker, Reed, Young, and John Doe defendants-unnamed FBI agents, D.C. detectives, and police officers with the New York City Police Department ("NYPD")-engaged in an illegal search of the Premises. *See id.* ¶¶ 4-17. In particular, plaintiff asserted that the defendants: (1) searched the grocery store, plaintiff's apartment, and the other apartments in the Premises, from which assorted items were later found to be missing, *see id.* ¶¶ 9-16; (2) broke down doors, cut padlocks, and severely damaged walls, ceilings, electrical wiring, and plumbing throughout the Premises, *see id.;* (3) "set a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

police attac[k] dog loose" in plaintiff's apartment, terrorizing plaintiff's family, *see id.* ¶ 11; (4) forced plaintiff's family out of their apartment during a four-hour search, *see id.* ¶ 13; (5) tear-gassed the property, *see id.* ¶ 17; and (6) intentionally left the Premises unsecured upon their departure, *see id. ad damnum* clause. Charging defendants with having perpetrated an illegal search (in violation of the Fourth Amendment), and having deprived plaintiff of his personal property without due process of law (in violation of the Fifth and Fourteenth Amendments), *see id.* ¶¶ 18-19, plaintiff sought, in his first amended complaint, a declaratory judgment, as well as $73,490 in property damage, $80,000 in damages from each defendant for his daughter's emotional distress, and $280,000 in punitive damages from each defendant. *See id. ad damnum* clause.

> FN1. For clarity, court filings will be identified in this opinion by their corresponding numbers on the docket sheet. Where the parties have not paginated their submissions, citations will be to the page numbers assigned through Electronic Case Filing.

> FN2. The first amended complaint vaguely asserted that the search occurred from "October through November of 1995." 1st Am. Compl. ¶¶ 3-10. The specific date-October 23, 1995-emerged in discovery and plaintiff has included that date in his third amended complaint ("3d Am. Compl." [# 154] ). *See* 3d Am. Compl. at 4-7; Transcript of 8/18/99 Deposition Testimony of Jasper Dockery ("Dockery Dep.") at 64-65 (submitted as Exhibit E to Declaration of Assistant U.S. Attorney Gail A. Matthews in Support of Agent Tucker's Motion to Dismiss or for Summary Judgment on All Claims in the Third Amended Complaint ("Matthews Decl." [# 219] ).

**\*2** On September 24, 1998, Judge Ross dismissed most of plaintiff's claims from the original complaint, including the false imprisonment and false arrest claims against Tucker, Reed, and Young. *See* 9/24/98 Opinion & Order [of Judge Allyne R. Ross] ("9/24/98 Op." [# 44] ) at 31-32. She also granted Tucker's motion for summary

judgment on all claims against him. *See id.* at 32. Accordingly, "[t]he only remaining claims [from] plaintiff's original complaint are his Fourth Amendment claims against Detectives Reed and Young." *See id.* FN3

> FN3. Plaintiff's three amended complaints added claims relating to the October 1995 search but did not replead the Fourth Amendment claims asserted in his original complaint and arising out of the February 1996 search. In allowing plaintiff to file his third amended complaint, the Court directed plaintiff to specify whether he still wished to pursue the only outstanding claim from his original complaint-his Fourth Amendment claim against Reed and Young for the 1996 search. 4/28/05 Memorandum and Order ("4/28/05 M & O" [# 207] ) at 15-16. On May 14, 2005, plaintiff wrote the Court requesting that this claim be considered in conjunction with his third amended complaint. *See* Notice to Court to Keep Claims against Reed and Young Active [# 221]. Accordingly, contrary to the D.C. defendants' assumption (*see* Memorandum of Law of Defendants District of Columbia, Pamela Reed, Phineas Young, Larry Soulsby and Alan Dreher in Support of their Motion to Dismiss or Alternatively for Summary Judgment ("D.C. Mem." [# 227] ) at 3), the illegal search claim against Reed and Young arising out of the events of February 1996 is still in the case.

In that same opinion, Judge Ross granted plaintiff permission to file his first amended complaint (concerning the events of October 23, 1995). *See id.* at 31-32. Following discovery, plaintiff submitted a proposed second amended complaint ("2d Am. Compl." [# 81] ), dated July 26, 1999, and sought permission to assert new claims on behalf of his children for damages that they allegedly suffered as a result of the searches. Plaintiff also requested leave to replead certain claims against Tucker, Reed, and Young, and to add several defendants to the action, including the District and D.C. police officials Dreher and Soulsby. *See generally* 2d Am. Compl. FN4 In an Opinion and Order dated June 18, 2003 ("6/18/03 Op." [# 152] ), Judge Ross adopted this Court's 3/26/03 Report and Recommendation ("3/26/03 R & R" [# 148] ) and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

granted plaintiff permission to amend his complaint to assert claims against the District, as well as against Dreher and Soulsby in their official capacities, and otherwise denied plaintiff's motion to further amend his complaint.

> FN4. Dreher is the former Commander of the D.C. Police's Homicide Division; Soulsby is the former Chief of Police. D.C. Mem. [# 227] at 7.

Thereafter, this Court reopened discovery for the limited purpose of permitting plaintiff to serve discovery demands on Dreher and Soulsby. *See* 6/27/03 Memorandum and Order ("6/27/03 M & O" [# 155] ). Prior to the close of this supplemental discovery period, plaintiff moved to amend his complaint for a third time, and submitted a proposed third amended complaint, which, liberally construed, contains the following new allegations concerning the October 1995 search: (1) a demand for damages for loss of business income, *see* 3d Am. Compl. at 17-18 [# 154]; FN5 (2) common law tort claims FN6 against Tucker, Reed, Young, and the District, *see id.* at 8, 10; (3) claims against Dreher and Soulsby, in their individual capacities, for violations of the Fourth Amendment and plaintiff's due process rights, *see id.* at 1, 12-16; and (4) due process claims against Dreher and Soulsby in their official capacities and against the District, *see id.* at 13-14, 15-16. Plaintiff also sought to replead the claims already asserted in his first two amended complaints, concerning the 1995 search: his Fourth Amendment and his due process claims against Tucker, Reed, and Young, *see* 3d Am. Compl. at 9-12; his Fourth Amendment claim against the District pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *see* 3d Am. Compl. at 12-15; and his Fourth Amendment official capacity claims against Dreher and Soulsby, *see id.* at 12, 14. All defendants opposed the filing of the proposed third amended complaint or portions thereof.FN7

> FN5. Unless otherwise indicated, references to the third amended complaint are to pages, not paragraphs.

> FN6. *See infra* note 13.

> FN7. While plaintiff's motion to amend his

complaint for the third time was still pending, plaintiff also filed multiple dispositive motions and applications against defendants with respect to their alleged discovery practices, all of which were denied by this Court. *See generally* 3/4/05 Report and Recommendation [# 200]; 3/7/05 Memorandum and Order [# 202]; 3/30/05 Memorandum and Order [# 206].

**\*3** On April 28, 2005, this Court granted plaintiff's motion to amend his complaint for the third time. Noting that defendants had not opposed several of plaintiff's proposed claims, the Court permitted plaintiff to proceed with his individual capacity claims against Dreher and Soulsby; tort claims against Tucker, Reed, Young, and the District; and due process claims against Dreher, Soulsby, and the District. The Court also permitted plaintiff to proceed with his claim for loss of business, over defendants' objection. *See* 4/28/05 M & O [# 207] at 9-15. In response to defendants' concern that plaintiff's loss of business claim would unduly prejudice the defense and prolong litigation through potentially costly discovery, the Court set a briefing schedule for dispositive motions with respect to those claims for which discovery was complete, and deferred discovery on the loss of business claims until the resolution of any dispositive motions related to the third amended complaint. *Id.* at 13, 19.FN8

> FN8. During the pendency of plaintiff's motion to amend his complaint for the third time, the D.C. defendants filed a procedurally defective dispositive motion, which this Court declined to address; the D.C. defendants were granted leave to file a revised motion. *See* 4/28/05 M & O [# 207] at 16-19.

On May 27, 2005, Tucker again moved to dismiss or for summary judgment. *See generally* Defendant Special Agent Nathan Tucker's Memorandum of Law in Support of His Motion to Dismiss or in the Alternative for Summary Judgment on All Claims Asserted in the Third Amended Complaint ("Tucker Mem." [# 215] ). The D.C. defendants' motion to dismiss or for summary judgment was filed soon after, on May 31, 2005. *See generally* D.C. Mem. [# 227].FN9 Plaintiff thereafter opposed the motions filed by Tucker and the D.C. defendants, adding

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

cross-motions for summary judgment against both sets of defendants. *See generally* Plaintiff Dockery's Opposition to Defendant Tucker's Motion for Summary Judgment and [ ] Cross-Motion for Summary Judgment on Complaint, filed 8/3/05 ("Pl.Mem.(Tucker)" [# 241] ); Plaintiff Dockery['s] Opposition to Defendants, District of Columbia[,] Larry Soulsby, Alan Dreher, Pamela Reed, and Phineas Young's Motion for Summary Judgment and Plaintiff['s] Cross-Claim against Adverse Party Defendants, for Summary Judgment, filed 8/18/05 ("Pl.Mem.(D.C.)" [# 246] ). On September 8 and 9, 2005, respectively, both sets of defendants replied to plaintiff's submissions. *See generally* Reply Memorandum of Defendants, District of Columbia, Pamela Reed, Phineas Young, Larry Soulsby and Alan Dreher to Plaintiff Dockery's Opposition Papers and in Further Support of their Motion to Dismiss or Alternatively for Summary Judgment, dated September 8, 2005 ("D.C. Reply" [# 257] ); Defendant Special Agent Nathan Tucker's Reply Memorandum of Law in Further Support of Motion to Dismiss or in the Alternative for Summary Judgment on All Claims Asserted in the Third Amended Complaint, dated September 9, 2005 ("Tucker Reply" [# 258] ).

> FN9. The D.C. defendants' memorandum of law was submitted twice electronically and appears as docket entries # 227 and # 228.

On November 9, 2005, this Court provided plaintiff with a (second) copy of its Local Civil Rules and directed him to comply with Local Rule 56.1 by submitting statements of undisputed facts in response to those offered by Tucker and the D.C. defendants. *See* 11/9/05 Order [of Judge Mann] [# 261] at 3; Defendant Special Agent Nathan Tucker's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Tucker 56.1" [# 216] ); D.C. Defendants Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("D.C. 56.1" [# 224] ). Plaintiff submitted the requested Rule 56.1 Statements on December 9 and 22, 2005, respectively. *See* Plaintiff's Statement of Material Facts in Issue in Response to Statement of Material Facts to Which Defendant Tucker Contends There Is No Genuine Dispute, dated 11/28/05 ("Pl. 56.1 (Tucker)" [# 264] ); Plaintiff's Response to Statement of Material Facts as to Which DC[ ] Defendants Contend[ ] There Is No Genuine Issue and/or Undisputed

Facts, dated 11/28/05 ("Pl. 56.1 (D.C.)" [# 265] ).

### FACTUAL OVERVIEW

**I. Defendants' Version**

**\*4** Defendants proffer evidence of the following sequence of events. On August 12, 1995, D.C. Detective Phineas Young filed an affidavit in support of an arrest warrant alleging that plaintiff had obstructed justice by intimidating and threatening to kill the family of a grand jury witness who was expected to testify about plaintiff's involvement in the April 1995 murder of one Melvin Jones. *See* Affidavit of Phineas Young in Support of Motion to Dismiss ("Young Aff." [# 225] ) ¶ 2; Affidavit in Support of an Arrest Warrant [# 217] (submitted as Exhibit B to the Declaration of Special Agent Nathan Tucker in Support of Summary Judgment Motion ["Tucker Decl."] ). A warrant for plaintiff's arrest on this charge was issued by the D.C. Superior Court on August 12, 1995, and was reapproved on August 14, 1995. *See* Tucker 56.1 [# 216] ¶ 6; D.C. 56.1 [# 224] ¶ 2; Tucker Decl. [# 217] Ex. B.

On October 18, 1995, the FBI's Washington Field Office forwarded to the FBI's New York Division a lead referencing the obstruction of justice warrant and setting forth plaintiff's suspected whereabouts. *See* [FBI Lead] (Tucker Decl. Ex. A [# 217] ). The lead listed as enclosures a photograph of plaintiff and the 1995 warrant, and further advised that plaintiff "may be located in the vicinity of '3 Star Grocery,' 2127 Pitkin Avenue, Brooklyn, New York, telephone numbers 718-495-4730 and 800-881-4730." *Id.*

On October 23, 1995, on the basis of the lead and following a request by Detective Reed that the FBI conduct a "turn-up" for Dockery at the Brooklyn address on file (*see* Affidavit of Pamela Reed in Support of Motion to Dismiss ("Reed Aff." [# 226] ¶¶ 3-4; [Trial Testimony of Pamela Reed] (Ex. J. to Pl. Mem. (Tucker) [# 241] at 78)), an FBI Fugitive Task Force-comprised of seven agents including Tucker and Sam Alston-commenced surveillance at the Pitken Avenue address, "where Dockery was suspected of dwelling." Tucker Decl. [# 217] ¶ 7. Reed and Young deny that they were in New York. Reed Aff. [# 226] ¶ 4; Young Aff. [# 225] ¶ 4. During the course of this surveillance, Tucker claims to have seen plaintiff with a woman, later identified

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

as Denise Sutton, in the window of a second-floor apartment. *See* Tucker Decl. [# 217] ¶ 8; [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (attached to Plaintiff's Motion in Opposing Defendant [L]egal [A]id Attorney Motion [....] ("Mot. Opposing Legal Aid" [# 32] )) at 222.

After announcing their purpose and authority and being denied entry by Sutton, the FBI Task Force forced entry into the building with a battering ram. Tucker Decl. [# 217] ¶ 9; Affidavit of Denise Sutton ("Sutton Aff.") (Matthews Decl. [# 219] Ex. H) ¶ 3. Upon entry, the agents encountered a pit bull and sought the assistance of the New York Police Department's Emergency Services Unit ("NYPD-ESU") in controlling the animal. Tucker Decl. [# 217] ¶ 9. NYPD-ESU officers thereafter commenced a search of the basement, grocery store, and residential apartments that comprised the Premises. *Id.* ¶ 10. During this search, the officers cut holes in the ceiling of a third-floor apartment and placed tear gas inside to render the area safe for inspection. *Id.* ¶ 11; [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (Mot. Opposing Legal Aid [# 32] ) at 225-26. Inside the crawl space, the officers located identification belonging to plaintiff. Tucker Decl. [# 217] ¶ 11. Having failed to locate Dockery, the Task Force and NYPD-ESU discontinued their surveillance and search. *Id.* Prior to leaving the Premises, Tucker, accompanied by Agent Alston, entered the Premises for the first time to ensure that Dockery was not there. *Id.* ¶ 12.

**\*5** Following the search, the Task Force provided Sutton with padlocks and keys to replace the locks that had been removed from the grocery store's door by the NYPD-ESU, as well as a phone number with instructions stating how the landlord could report and make a claim for any damage to the property. *Id.* ¶ 13. Following the search, Michael Barrett, an acquaintance of Sutton's, replaced the front door of the building. Sutton Aff. ¶ 9 (Matthews Decl. [# 219] Ex. H). Defendants maintain that, as a consequence of the search, there was minimal damage to the front door and damage to the ceilings of a third-floor apartment. *See id.* ¶ 7; Tucker 56.1 ¶¶ 20, 23. Defendants deny that any other property was damaged or caused to be missing as a result of the conduct of law enforcement officers at the scene. Sutton Aff. ¶ 7; Tucker

56.1 [# 216] ¶¶ 65-67.

On February 6, 1996, another FBI Task Force, including Tucker, conducted surveillance of the Premises. Tucker Decl. [# 217] ¶¶ 15-16. Tucker observed plaintiff standing in the doorway, but Denise Sutton again refused to open the door. *Id.* ¶ 16. Following another forcible entry and search, plaintiff was eventually located in a hiding space beneath a dresser and carpet between the floorboards of the second floor and the ceiling of the first floor, and he was placed under arrest. *Id.* ¶¶ 17-18; *see* [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (Mot. Opposing Legal Aid [# 32] ) at 231-34. Plaintiff was then taken to the FBI's Manhattan Office, where he was questioned by D.C. Detectives Reed and Young. *See* Reed Aff. [# 226] ¶ 5; Young Aff. [# 225] ¶ 5. Following plaintiff's arrest, the Clerk of the D.C. Superior Court was notified that the August 1995 warrant for plaintiff's arrest could be vacated. *See* Declaration of Assistant U.S. Attorney Kenneth Kohl in Support of Special Agent Tucker's Motion for Summary Judgment on the Third Amended Complaint ("Kohl Decl." [# 218] ) ¶ 14. The Clerk thereafter placed an "X" in red ink across the face of the warrant and wrote the word "VACATE" upon it. *Id.*

## II. Plaintiff's Version

Plaintiff, relying in part on hearsay, disputes the defense version of events. He maintains that the warrant and the FBI lead on which defendants rely for the 1995 entry into and search of the Premises were either falsely obtained or fraudulently manufactured after the search. *See* Plaintiff['s] Affidavit in Support of Cross-Motion for Summary Judgment ("Pl. Aff." [# 242] ) ¶ 4; Pl. Mem. (Tucker) [# 241] at 10-11. Plaintiff further contends that he was not at the Premises during the 1995 incident and, thus, disputes that Tucker's sighting of him justified defendants' forcible entry. *See* Pl. 56.1 (Tucker) [# 264] ¶ 16; Dockery Dep. [# 219] at 45-46 (Matthews Decl. Ex. E). Dockery likewise challenges defendants' description of the search as one performed exclusively by the NYPD. Specifically, plaintiff argues that Tucker, Reed, and Young were personally involved in the 1995 forced entry into and search and destruction of the Premises, as evidenced by Reed and Young's own alleged admissions during a conversation with plaintiff following his arrest in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

February 1996. *See* Pl. 56.1 (D.C.) [# 265] ¶ 11; 7/5/01 Affidavit of Plaintiff ("7/5/01 Pl. Aff." [# 241] ) at 2-3. While claiming not to have been present during the 1995 search, Dockery also disputes the degree of damage caused by the search, and contends that defendants broke several interior apartment doors and two toilets, and intentionally left the doors of the Premises unsecured, resulting in looting by third parties and the loss of plaintiff's personal and business property. *See* 3d Am. Compl. at 4-8. Dockery denies that Sutton was provided with keys and locks to secure the store. *See* Pl. 56.1 (Tucker) [# 264] ¶ 22.

### PENDING MOTIONS

**\*6** Liberally construing plaintiff's third amended complaint, this Court has identified the following claims against Tucker, all relating to the 1995 incident: a common law tort claim; a claim for unauthorized search and seizure in violation of the Fourth Amendment; and a claim for deprivation of property without due process of law. *See* 3d Am. Compl. at 8-10. Tucker seeks dismissal of the tort and due process claims for failure to state a claim upon which relief may be granted and lack of subject matter jurisdiction, and seeks summary judgment on the Fourth Amendment claim.

Plaintiff also asserts a Fourth Amendment claim against Reed and Young for unauthorized search and seizure in connection with the events of 1996, [FN10] in addition to the following claims against the D.C. defendants for the events of 1995: common law tort claims against Reed, Young, and the District; claims under 42 U.S.C. § 1983 against Reed and Young for unauthorized search and seizure in violation of the Fourth Amendment; section 1983 claims against Reed and Young for deprivation of property without due process of law; and claims against Dreher and Soulsby (in both their individual and official capacities), and a *Monell* claim against the District, for deprivation of property without due process, and violations of the Fourth Amendment. *See* 3d Am. Compl. at 10-16. The D.C. defendants move for dismissal of the official capacity claims against Dreher and Soulsby; for dismissal or summary judgment on the *Monell* claims against the District; [FN11] and for summary judgment on the due process, Fourth Amendment, and common law tort claims against the individual D.C. defendants for the events of 1995. [FN12]

FN10. As previously noted, *see supra* note 3, the D.C. defendants erroneously assume that plaintiff has abandoned his claim pertaining to the 1996 search, and they thus have not moved against that claim.

FN11. Defendants seek dismissal or, in the alternative, summary judgment on the *Monell* claims against the District. *See* D.C. Mem. [# 227] at 8-13. As plaintiff cannot survive a motion for summary judgment on the *Monell* claims, *see infra* pp. 54-57, this Court will assume that those claims are adequately pled.

FN12. The D.C. defendants also argue that the Court lacks personal jurisdiction over them. *See infra* note 29.

### DISCUSSION

**I. *Defendants' Motions to Dismiss***

In evaluating whether to grant a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all material factual allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the plaintiff. *See* Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994). Dismissal is warranted "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (internal quotation marks and citation omitted). Where, as here, a *pro se* plaintiff alleges civil rights violations, "[t]his standard is applied with even greater force ...." Hernandez, 18 F.3d at 136.

**A. Tucker's Jurisdictional Defense**

Tucker moves for dismissal of the common law tort claims against him for lack of subject matter jurisdiction. [FN13] *See* Tucker Mem. [# 215] at 2-8. This Court agrees that the state law claims against Tucker should be dismissed on this basis.

FN13. As noted in this Court's 4/28/05 Memorandum and Order, these claims appear to be brought under three possible theories of tort liability: conversion, trespass to chattels and/or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

trespass to lands. *See* 4/28/05 M & O [# 207] at 5-6 n. 5.

"Under the Federal Tort Claims Act [ ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680], "Government employees enjoy absolute immunity against common law tort claims, and the only proper federal institutional defendant is the United States." *Marsden v. Fed. Bureau of Prisons,* 856 F.Supp. 832, 836 (S.D.N.Y.1994) (citing, *inter alia, United States v. Smith,* 499 U.S. 160, 161-65, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991)). In order to obtain the protection of absolute immunity, a federal employee must establish that, at the time of the alleged act, he "was acting within the scope of his office or employment ...." 28 U.S.C. § 2679(d)(1); *see also Smith,* 499 U.S. at 161. Here, plaintiff's pleading alleges that Tucker "was [an] employee and/or agent of the Federal Bureau of Investigation, at all times pertinent to the claims asserted ...," 3d Am. Compl. at 3, and that "[a]t the time Defendant Tucker committed [the alleged torts] ... [h]e was acting within the scope of his employment with[ ] ... the Federal Bureau of Investigation ...." *Id.* at 8. Thus, plaintiff should have brought his common law tort claims against the United States pursuant to the FTCA. *See Hightower v. United States,* 205 F.Supp.2d 146, 154 (S.D.N.Y.2002) ("Because the complaint expressly alleges that the individual defendants were each federal employees ... acting within 'the scope of their employment,' ... any state law torts claims based on their conduct would be cognizable, if at all, only as a suit against the United States under the FTCA.").[FN14]

FN14. The fact that plaintiff sued Tucker only in his individual capacity, *see* 3d Am. Compl. at 1, does not destroy Tucker's immunity under the FTCA because Tucker was alleged to have acted within the scope of his employment. *See Smith,* 499 U.S. at 163 n. 3 & 173 (FTCA was designed to prevent federal employees from being sued in their personal capacities for torts committed while acting within the scope of their employment); *accord Wilson v. Drake,* 87 F.3d 1073, 1076 (9th Cir.1996); *Konarski v. Brown,* 293 F.Supp.2d 70, 72 (D.D.C.2003); *Ramirez v. Obermaier,* No. 91 Civ. 7120(RPP), 1992 WL 320985, at *7 (S.D.N.Y. Oct.28, 1992); *Llarena*

*v. Womble,* No. 90 CIV. 0592(JSM), 1990 WL 165738, at *2 (S.D.N.Y. Oct.18, 1990).

Nor does plaintiff's allegation that Tucker "committed an improper performance of his duties," 3d Am. Compl. at 8, deprive Tucker of the protection of the FTCA. "The question of whether the act was wrongful is a different one from whether the act occurred while the employee was acting within the scope of his employment." *Rivera v. United States,* 928 F.2d 592, 608 (2d Cir.1991). In language particularly apt here, the Second Circuit held in *Rivera* that, regardless of whether federal law enforcement officers "performed wrongful acts, such as entering unannounced to execute ... warrants or using excessively intrusive means of executing the warrants, the execution of the warrants was nonetheless within the scope of their employment." *Id.* at 608-09.

**\*7** As neither party disputes that Tucker was acting in the scope of his employment at the time of the alleged acts, *see* Tucker Mem. at 2-3; 3d Am. Compl. at 8, the Court should substitute the United States as the proper defendant to plaintiff's tort claims, *see* 28 U.S.C. § 2679(b)(1) (providing that suit against the United States under the FTCA is the exclusive damages remedy for common law torts committed by a federal employee acting within the scope of his employment); *Harbury v. Hayden,* Civil Action No. 96-438(CKK), 444 F.Supp.2d 19, 2006 WL 2212696, at *6 (D.D.C. Aug.1, 2006) ("[U]pon challenge or a *sua sponte* inquiry, the federal court may determine independently whether [an] employee acted within the scope of employment and, therefore, whether to substitute the federal government as the proper defendant."), and to dismiss these claims as against Tucker. *See Rivera v. Morris Heights Health Ctr.,* No. 05 Civ. 10154, 2006 WL 345855, at *2 (S.D.N.Y. Feb. 14, 2006); *Asto v. Mirandona,* 372 F.Supp.2d 702, 710-11 (E.D.N.Y.2005).[FN15]

FN15. Plaintiff's argument that Tucker waived his objection to subject matter jurisdiction (*see* Pl. Mem. (Tucker) [# 241] at 4-6) is without merit, as challenges to subject matter jurisdiction

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

may be raised at any time, and indeed may be raised by the Court *sua sponte. See* Fed.R.Civ.P. 12(h)(3).

Although plaintiff maintains that Tucker's actions were performed within the scope of his employment, he argues that his claim is, nevertheless, not governed by the FTCA because Tucker's actions fall outside the scope of the FTCA's "discretionary function exception" ("DFE") to liability. Pl. Mem. (Tucker) [# 241] at 9-12. Under the DFE, the United States cannot be found liable with respect to "[a]ny claim ... based upon the exercise or performance ... [of] a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

Plaintiff misconstrues the DFE, which carves out an exception to governmental liability where the conduct complained of involved discretionary functions, but does not create liability on the part of federal officers for acts not encompassed within the DFE. Thus, even assuming that Tucker's acts were nondiscretionary or contrary to FBI policy, the unavailability of the DFE would merely remove one impediment to a claim against the United States, but would not allow a tort claim against Tucker himself. *See Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 546-47, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Leone v. United States,* 690 F.Supp. 1182, 1188 (E.D.N.Y.1988); *see also Wilson v. United States,* 959 F.2d 12, 15 (2d Cir.1992) (stating that, when an exception to the FTCA does not apply, "the *federal government* remains liable for the intentional torts of [its] officers.") (emphasis added).

Even allowing for this substitution, however, this Court lacks jurisdiction over the tort claim asserted here,

given plaintiff's noncompliance with the exhaustion requirement of the FTCA. Federal law provides that an individual may not institute an action in tort against the United States based on the acts or omissions of a federal employee, "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675; *see also* 28 U.S.C. § 2401 ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues ...."). "This requirement is jurisdictional and cannot be waived." *Celestine v. Mt. Vernon Neighborhood Health Ctr.,* 403 F.3d 76, 82 (2d Cir.2005) (citing *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (affirming the dismissal of a *pro se* plaintiff's complaint for failure to comply with the FTCA's exhaustion requirement), and *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994)); *see also Millares Guiraldes de Tineo v. United States,* 137 F.3d 715, 720 (2d Cir.1998).

Plaintiff does not (and indeed cannot) contend that he sought in writing and obtained an administrative disposition of his claim from the FBI before filing the instant action. *See generally* Declaration of Richard M. Walsh (Matthews Decl. [# 219] Ex. J). Thus, as this Court previously concluded (*see* 3/26/03 R & R [# 148] at 15-16), plaintiff cannot now maintain an action in tort against the United States.[FN16] Accordingly, plaintiff's tort claim against the United States, like that against Tucker, should be dismissed for lack of subject matter jurisdiction.[FN17]

FN16. Plaintiff complains that, following the 1995 search of the Premises, Tucker left inadequate instructions regarding plaintiff's administrative remedies. *See* Pl. Mem. (Tucker) [# 241] at 2. The burden is on plaintiff to plead and prove that he timely complied with the statutory exhaustion requirement. *See In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 210, 214 (2d Cir.1987). Where, as here, the plaintiff invokes the doctrine of equitable tolling to excuse his dereliction, he must allege and establish (1) "extraordinary circumstances 'beyond his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

control' " that prevented him from timely filing his administrative claim, and/or (2) affirmative conduct on defendant's part that concealed defendant's status as a federal actor and thus the applicability of the FTCA. *See Valdez ex rel. Donely v. United States,* 415 F.Supp.2d 345, 349-50 (S.D.N.Y.2006); *Bowman v. U.S. Postal Serv.,* No. 02 Civ. 6138(SHS), 2003 WL 1395821, at *3-4 (S.D.N.Y. Mar.20, 2003); *see generally Celestine,* 403 F.3d at 83-84 (explaining the limited applicability of the equitable tolling doctrine in FTCA cases). Plaintiff's allegation of inadequate instructions is insufficient to warrant equitable tolling. *See, e.g., Valdez,* 415 F.Supp.2d at 349-51 (rejecting plaintiff's claim for equitable tolling where plaintiff failed to set forth any facts in support of his claim that defendants fraudulently concealed or kept plaintiff from learning of his cause of action against them); *Van Eck v. Cimahosky,* 329 F.Supp.2d 265, 269 (D.Conn.2004) (holding that equitable tolling was not warranted on the basis of defendant's allegedly improper notice of administrative decision); *Bowman,* 2003 WL 1395821, at *4-5 (rejecting *pro se* plaintiff's claim that equitable tolling was warranted where (1) several agencies had failed to assist him with his claim; (2) he was unable to obtain certain medical records pertaining to his claim, and (3) he was blind in one eye); *see also Fuentes v. Park,* No. 03 Civ. 2660(RMB), 2005 WL 911442, at *2-3 (S.D.N.Y. Apr.18, 2005) (dismissing *pro se* plaintiff's claim for lack of subject matter jurisdiction where, due to his ignorance of exhaustion requirement, plaintiff had failed to exhaust his administrative remedies under the FTCA).

FN17. In 1988, Congress enacted the Federal Employees Liability Reform and Tort Compensation Act ("the Westfall Act"), Pub.L. 100-694, 102 Stat. 4563 (1988), which amended the FTCA to "expressly provide[ ] that while the administrative-exhaustion requirement would apply to all actions, *even those removed from state court,* plaintiffs would be given an opportunity, after the removal, to exhaust those remedies." *Celestine,* 403 F.3d at 83. Specifically, the Westfall Act provides, in relevant part, that where the United States is substituted as a defendant, the plaintiff has an additional 60 days to exhaust his administrative remedies, provided his "claim would have been timely had it been filed on the date the underlying civil action was commenced." 28 U.S.C. § 2679(d)(5).

As neither plaintiff nor Tucker has addressed whether the Westfall Act applies in non-removal cases and, if so, its impact on plaintiff's tort claims, those issues are not now before the Court. *See generally Rivera,* 2006 WL 345855, at *3 n. 1.

**B. Standing**

At least one aspect of plaintiff's Fourth Amendment claims is subject to dismissal. Liberally construing plaintiff's pleading, he appears to allege that the constitutional rights of third parties were violated by defendants' "unauthorized" entry into and search of the second-floor apartment of Ilma Davis (Apartment # 2R) [FN18] and ground-floor apartment of plaintiff's children (Apartment # 1RR). *See generally* 3d Am. Compl. at 6-7.[FN19] Citing this Court's Report and Recommendation of March 26, 2003 (*see* 3/26/03 R & R [ # 148] at 5-7), Tucker contends that plaintiff lacks standing to assert the constitutional rights of others, including his children. *See* Tucker Mem. [ # 215] at 11-12.

FN18. In his third amended complaint, plaintiff references Davis as "Elma Davis." 3d Am. Compl. at 7. In her affidavit, Davis identifies herself as "Ilma Davis." *See generally* Affidavit [of Ilma Davis] (Pl.Mem. (Tucker) [ # 241] Ex. P).

FN19. For example, plaintiff states in his third amended complaint:

It is not known to Mr. Dockery what was missing from Ms. Davis['] apartment and the matter is left open for the parties to [ ] argue when Dockery provide[s] more evidence from

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

Ms. Davis. Therefore any damage and loss of property from Ms. Davis['] apartment is not waive[d] by plaintiff, due [to] defendants['] conduct in leaving Ms. Davis['] front door unfix[ed] and unsecured.

3d Am. Compl. at 7.

**\*8** It is well established that "[t]he right of a third party not named in [an] arrest warrant to the privacy of his home may not be invaded without a search warrant[.]" *United States v. Underwood,* 717 F.2d 482, 484 (9th Cir.1983) (en banc) (citation and emphasis omitted). Importantly, however, "this right is personal to the home owner and cannot be asserted vicariously by the person named in the arrest warrant." *Id.* at 484; *accord Rakas v. Illinois,* 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.") (internal quotation marks and citations omitted); *United States v. Haqq,* 278 F.3d 44, 47 (2d Cir.2002). Accordingly, plaintiff cannot assert Fourth Amendment claims on behalf of his children or Davis based on the entries into and searches of their apartments. *See also* 3/26/03 R & R [# 148] at 5-7 (non-attorney *pro se* party is not permitted to represent the interests of others, including his children). [FN20]

> [FN20.] Plaintiff claims that, after he purchased the building with his own funds, title was transferred to his two daughters, but that he remained "the sole managerial agent of the aforesaid premises" and, as such, has standing to challenge all "unauthorized general searches and seizure[s] of the apartments ...." 3d Am. Compl. at 7. The Court need not resolve the separate question of whether plaintiff had a reasonable expectation of privacy in portions of the Premises other than his own apartment-for example, his children's apartment, Davis's apartment, the basement, and the newly renovated third-floor apartments-as the parties have not raised or briefed this issue.

**C. Official Capacity Claims Against Dreher and Soulsby**

Plaintiff sues D.C. officials Dreher and Soulsby in their official capacities, as well as the District itself, for violations of plaintiff's Fourth Amendment rights in connection with the 1995 search. *See* 3d Am. Compl. at 12-15. Dreher and Soulsby seek dismissal of the claims against them on the ground that "a suit against them in their official capacities is akin to a suit against the [District] itself." D.C. Mem. [# 227] at 8.

"Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Thus, where both a municipality and an official in his official capacity are sued for the same acts under 42 U.S.C. § 1983, the claims are redundant, and the municipality may be substituted for the officials. *See Booker v. Bd. of Educ.,* 238 F.Supp.2d 469, 475 (N.D.N.Y.2002) (dismissing official capacity claims against individual defendants as redundant of *Monell* claims against municipality); *Snall v. City of New York,* No. 97-CV-5201 (ILG), 1998 WL 960296, at *4 (E.D.N.Y. Dec.7, 1998) (same); *Rini v. Zwirn,* 886 F.Supp. 270, 281-82 (E.D.N.Y.1995) (same); *Orange v. County of Suffolk,* 830 F.Supp. 701, 706-07 (E.D.N.Y.1993) (same). Here, plaintiff's official capacity claims against Soulsby and Dreher are coextensive with his municipal liability claims against the District. It is therefore appropriate to grant Dreher and Soulsby's request that the official capacity claims against them be dismissed.

**II. *Defendants' Motions For Summary Judgment***

**\*9** All of the defense motions for summary judgment concern the claims arising out of the October 1995 search. Each defendant moves for summary judgment on plaintiff's Fourth Amendment claim, as well as on plaintiff's demand for damages; Reed and Young and the District also move for summary judgment on plaintiff's common law tort claims. [FN21] Further, as each defendant also challenges plaintiff's due process claims, and consideration of evidence beyond the complaint is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

necessary to resolve this matter, defendants' motions on these claims will be reviewed under the summary judgment standard. [FN22]

FN21. Defendants Soulsby and Dreher are not named in the common law tort claims.

FN22. Although the D.C. defendants move to dismiss plaintiff's due process claims and, in the alternative, seek summary judgment on them (*see* D.C. Mem. [# 227] at 14-18), Tucker inartfully articulates his challenge to these claims as a motion to dismiss, albeit citing extra-pleading materials. *See* Tucker Mem. [# 215] at 8-11; *but see id.* at 25. As plaintiff likewise relies upon evidence outside the pleadings, this Court will, for the purposes of the present inquiry, convert Tucker's motion into one for summary judgment, as permitted by Fed.R.Civ.P. 12(b).

**A. Summary Judgment Standard**

Summary judgment may be granted only where the pleadings and evidence in the record "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed.R.Civ.P. 56(c). Where, as here, a defendant seeks "summary judgment against [the] party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see Celotex,* 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."); *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once the moving party has made the requisite showing, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations

omitted). In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *See id.* at 255. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000).

**B. Due Process Claims**

Plaintiff's latest pleading alleges that, "[i]n breaking into Mr. Dockery's premises, apartments, grocery store, and basement[;] ... conduct[ing] an unauthorized search[ ] and seizure of private property[;] destr[oying] ... [his] private premises[;] and [causing a] loss of [his] business ... [Tucker] violated the Fifth Amendment to the United States Constitution. As a result of such violation, Mr. Dockery was denied his protected property interest an[d] [ ]appropriate level of process ...." 3d Am. Compl. at 9-10. The pleading similarly alleges that defendants Reed and Young violated plaintiff's right to due process under the Fifth Amendment [FN23] by breaking into and searching plaintiff's property, and by leaving it "unsecured, without door and locks," thereby depriving him of a "protected property interest." *Id.* at 11-12. Plaintiff further claims that Dreher and Soulsby are responsible for these due process violations, based on their having established a policy or practice of such misconduct and having failed to properly train and supervise their homicide officers. *Id.* at 13-16. While it is not clear whether these allegations are intended to support procedural or substantive due process claims, under either theory plaintiff's claims fail as a matter of law. Therefore, defendants' motions with respect to plaintiff's due process claims should be granted.

FN23. Plaintiff specifically alleges a denial of his "right to due process of law as protected by the *Fourteenth Amendment* ...." 3d Am. Compl. at 14 (emphasis added); *see also id.* at 11, 16. However, it is the Fifth (not the Fourteenth) Amendment that protects individuals from deprivations of property without due process by the District of Columbia and its employees. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954) ("The Fifth Amendment ... is applicable in the District of Columbia ....").

**1. Procedural Due Process**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

**\*10** To state a procedural due process claim, a plaintiff must allege that he was deprived of a protected property or liberty interest by governmental action and that such deprivation occurred without adequate process. *See Rosa R. v. Connelly,* 889 F.2d 435, 438 (2d Cir.1989); *Parsons v. Pond,* 126 F.Supp.2d 205, 214-15 (D.Conn.2000).* "When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996).*

If a plaintiff can successfully prove that the deprivation of his property was the result of an "established state procedure," liability for a procedural due process violation may attach, despite the existence of post-deprivation remedies to address the harm alleged. *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990) ("[T]he existence of independent state relief does not defeat a *Section 1983* claim where the deprivation complained of results from the operation of established state procedures."). Where, however, the acts alleged are "random" and "unauthorized," pre-deprivation procedures are not required, "since the [government] cannot know when such deprivations will occur." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (internal quotation marks omitted). Accordingly, a deprivation of property will "not constitute a violation of the procedural requirements of the Due Process Clause ... until and unless [the government] ... refuses to provide a suitable postdeprivation remedy." *Id.*

### a. Tucker

The FTCA, which permits an action against the United States for torts cognizable under state law that are committed by federal employees acting within the scope of their employment, provides an adequate remedy for the property torts plaintiff alleges were committed by Tucker. 28 U.S.C. § 2679(b)(1). As plaintiff's property damage and seizure claims sound in conversion and trespass to chattels-causes of actions that are recognized under New York law, *see Mosseri v. Fed. Deposit Ins. Corp.,* 95 Civ. 723(BSJ), 97 Civ. 969(BSJ), 1999 WL 694289, at \*20 (S.D.N.Y. Sept. 8, 1999) (noting the cognizability of a conversion cause of action under New York law)-plaintiff could have sought relief administratively and then under the FTCA. Having failed to avail himself of these procedures, plaintiff has not alleged and cannot establish a procedural due process violation. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 323 (2d Cir.2002) ("[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies.") (quoting *New York State Nat'l Org. For Women v. Pataki,* 261 F.3d 156, 169 (2d Cir.2001) (emphasis omitted)); *Estes-El v. New York,* 552 F.Supp. 885, 889 (S.D.N.Y.1982) (holding that New York procedures for remedies for governmental taking of property-including suits for common law torts such as trespass to property, "appear adequate"; "[u]ntil plaintiff can demonstrate that he has availed himself of these procedures, and that they do not provide due process, he cannot prove his property was taken without due process."). [FN24]

> **FN24.** Plaintiff acknowledges the existence of post-deprivation remedies for the injuries he alleges, but challenges the adequacy of such relief. *See* Pl. Mem. (Tucker) [# 241] at 1-2. Specifically, plaintiff contends that the information provided to him for making a damage report to the FBI was insufficient, in that the number provided by the agency went unanswered during several calls by plaintiff and Denise Sutton over a three-month period. *See id.* at 2. Plaintiff additionally denies that he or Sutton was provided with instructions about how to make a claim to the FBI (Pl. 56.1 (Tucker) ¶ 24) and thus claims that he was unaware of the requirements of the FTCA and his rights thereunder. Pl. Mem. (Tucker) at 2. Plaintiff does not aver that he ever filed a formal, written complaint with the FBI, the District of Columbia, the D.C. Police Department, or the individual defendants.
>
> Neither plaintiff's professed ignorance of the law nor the FBI's allegedly ineffective telephone contact information is sufficient to establish a procedural due process violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

Plaintiff's unawareness of his post-deprivation remedies under federal and state tort law does not render the remedies inadequate to address the harms alleged. *See Fox v. Van Oosterum, 987 F.Supp. 597, 605-06 (W.D.Mich.1997)* (plaintiff failed to prove the inadequacy of post-deprivation remedies despite his "insufficient education, lack of knowledge of the law, indigency and incarceration"). In any event, because plaintiff failed to comply with the procedural requirements of the FTCA, which requires that a plaintiff submit *written* notice of claim to the relevant federal agency before commencing a civil action against the same, *see 28 C.F.R. § 14.2* ("For purposes of the ... [FTCA], a claim shall be deemed to have been presented when a Federal agency receives from a claimant ... written notification of an incident, accompanied by a claim for money damages in a sum certain ...."), it is of no constitutional consequence that the FBI's telephone procedure, whatever its purpose, was inoperable or ineffective.

### b. D.C. defendants

**\*11** Plaintiff similarly alleges that the D.C. defendants deprived him of due process through the intentional and malicious acts of Reed and Young, and the deliberate indifference of Soulsby and Dreher. *See 3d Am. Compl. at 10-16.*

As the State of New York, where the injury was allegedly inflicted, provides a remedy for such acts in the form of a common law tort action, *see Sch. of Visual Arts v. Kuprewicz, 3 Misc.3d 278, 771 N.Y.S.2d 804, 807 (Sup.Ct. N.Y. County 2003); Capital Distribs. Servs., Ltd. v. Ducor Express Airlines, Inc., No. 04 CV 5303(NG)(VVP), 2006 WL 2041574, at \*10 (E.D.N.Y. July 21, 2006),* plaintiff must seek relief through those state law remedies, not the federal due process clause. *See Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)* (stating that in determining whether a violation of procedural due process has occurred, "it is necessary to ... examine ... any remedies for erroneous deprivations provided by statute or tort law."); *Parratt v. Taylor, 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d*

*420 (1981)* ("Although the [state's tort] remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under *§ 1983,* that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process."), *overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); Strong v. Torres,* No. 03 C 292, 2004 WL 626144, at \*5 (N.D.Ill. Mar.26, 2004) ("[Plaintiff] has recourse within the Illinois State courts and, therefore, no federal claim."). Plaintiff does not contest the availability or adequacy of the post-deprivation remedies for the alleged misconduct of the D.C. defendants. Indeed, by adding common law tort claims against Reed, Young, and the District of Columbia to his third amended complaint, plaintiff acknowledges the existence of such remedies. *See* 3d Am. Compl. at 10-11.

Moreover, to the extent that plaintiff argues that a procedural due process violation resulted from the D.C. defendants' established "custom, policy, or practice" of permitting unauthorized and destructive searches by its employees, this claim is unsupported by the record. Despite his having requested and received discovery on the policies and practices of the District of Columbia, plaintiff points to no evidence that the injuries he alleges were the product of an official policy or custom. *See infra* pp. 54-57. In the absence of such evidence, plaintiff cannot prove a procedural due process violation.

### 2. Substantive Due Process

In the event that plaintiff is seeking to hold defendants liable under a substantive due process theory of liability, such a claim cannot survive, given the existence of an explicit textual source of constitutional protection-the Fourth Amendment-for the injuries plaintiff alleges. "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claim under that explicit provision and 'not the more generalized notion of "substantive due process." '" *Conn v. Gabbert, 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)* (quoting *Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); see Boroff v. Van West*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

City Bd. of Educ., 220 F.3d 465, 471 (6th Cir.2000) ("[T]he Supreme Court has repeatedly emphasized that substantive due process is not to be used as a fallback constitutional provision when another provision or amendment ... directly addresses the subject.").

**\*12** Plaintiff's allegations that defendants destroyed and seized his property by unlawfully entering into and searching the Premises, and by "maliciously" and "intentionally" leaving the Premises unsecured, *see* 3d Am. Compl. at 8, 10, assert the kinds of harms that are cognizable under the Fourth Amendment, which protects against unreasonable searches and seizures by the government. U.S. Const. am. IV; *see Fox v. Van Oosterum,* 987 F.Supp. 597, 607 (W.D.Mich.1997) ("[W]here property damages are the result of a seizure by state officials, plaintiff may state a Fourth Amendment claim ....") (citing *Bonds v. Cox,* 20 F.3d 697, 702 (6th Cir.1994)). Even where a search is conducted pursuant to a valid warrant, "there exists a clearly established right not to incur unreasonable property damage during" the course of that search, *Foreman v. Beckwith,* 260 F.Supp.2d 500, 505 (D.Conn.2003); *see also Bonds,* 20 F.3d at 702 (plaintiff could assert claim under Fourth Amendment for property damage that occurred during execution of search warrant), and all searches are therefore "subject to judicial review as to [their] reasonableness." *Tarpley v. Greene,* 684 F.2d 1, 8 (D.C.Cir.1982) (citing *Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)). Furthermore, since "[a] 'seizure' of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property,' " *Soldal v. Cook County,* 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)), damage to or destruction of property may constitute a seizure under the Fourth Amendment. *See Heidorf v. Town of Northumberland,* 985 F.Supp. 250, 257 (N.D.N.Y.1997) ("[T]here can be no question that the demolition of plaintiff's Church amounted to a seizure within the meaning of the Fourth Amendment."); *see also Fuller v. Vines,* 36 F.3d 65, 67 (9th Cir.1994) ("The destruction of property is meaningful interference constituting a seizure under the Fourth Amendment ....") (internal quotation marks and citations omitted); *Newsome v. Erwin,* 137 F.Supp.2d 934, 943 (S.D.Ohio 2000) (shooting of pet lioness could amount to unreasonable seizure under the Fourth Amendment).

Because plaintiff's destruction of property claims are cognizable under the Fourth Amendment, they should be analyzed under that constitutional provision, and not as substantive due process claims. *See Heidorf,* 985 F.Supp. at 257. Therefore, assuming that plaintiff seeks recovery under a substantive due process theory of liability, these claims should be dismissed. *See id.* (holding that because plaintiff's claim that the defendants unreasonably demolished his church "fits squarely within the contours of the Fourth Amendment[ ] ... his substantive due process claim must be dismissed.").

**C. Personal Involvement Requirement Under Section 1983 and *Bivens***

Claiming constitutional deprivations, plaintiff seeks relief from the District and the individual D.C. defendants under 42 U.S.C. § 1983, and from Tucker under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *see* 3d Am. Compl. at 2, 11-16. In relevant part, section 1983 provides:

**\*13** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "By its terms ... the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion); *accord Bartlett v. City of New York,* No. CV0319161CPS, 2005 WL 887112, at \*5 (E.D.N.Y. Feb.11, 2005). Further, although the statute explicitly provides for relief against state or D.C. employees, it does not authorize suit against their federal counterparts. In recognition of this limitation, the Supreme Court held in *Bivens* that "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court

Page 15

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

despite the absence of any statute conferring such a right." *Carlson v. Green,* 446 U.S. 14, 18, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). "Though more limited in some respects ..., a *Bivens* action is the federal analog to suits brought against state officials under ... 42 U.S.C. § 1983." *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 1700 n. 2, 164 L.Ed.2d 441 (Apr. 26, 2006).

In order to maintain an action against a federal or state officer or official under *Bivens* or section 1983, a plaintiff must establish specific facts demonstrating that defendant's personal involvement in the constitutional violations alleged. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."); *Lonegan v. Hasty,* No. 04 CV 2743(NG)(VVP), 2006 WL 1707258, at *18 (E.D.N.Y. June 22, 2006) ("In an action seeking damages for a constitutional deprivation pursuant to *Bivens,* as in an action pursuant to Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, ... personal involvement is a prerequisite to liability."); *Grullon v. Reid,* No. 97 CIV. 7616(RWS), 1999 WL 436457, at *7 (S.D.N.Y. June 24, 1999).

A plaintiff may demonstrate the requisite personal involvement either by proof of the defendant's direct participation in the alleged violation, or by that defendant's having acted as a supervisory official who either: (a) failed to remedy the violation once it was reported to him; (b) created a policy or custom that gave rise to the constitutional violation or permitted it to endure; or (c) demonstrated gross negligence in managing the subordinates at whose hands the violation occurred. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). The Second Circuit has construed the phrase "direct participation" to include "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001) (citations omitted). In this regard, liability may be found against "a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect'...." *Id.*

On review of a motion for summary judgment or judgment as a matter of law,[FN25] "the issue is whether, viewing the evidence in the light most favorable to [plaintiff], a reasonable juror could have concluded that [defendant's] conduct satisfied any one of [the enumerated] criteria." *Id.* at 154.

> FN25. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56.").

**1. Personal Involvement of Tucker**

**\*14** Tucker contends that he was not personally involved in the acts of which plaintiff complains. *See* Tucker Mem. [# 215] at 19. Specifically, Tucker avers that, during the October 23, 1995 search, "FBI Special Agent Sam Alston was the case agent for surveillance"-that is, Alston, not Tucker, was in charge of the October 1995 operation at the Premises. Tucker Decl. [# 217] ¶ 7. Tucker does, however, attest to his membership in the seven-agent FBI Task Force operating at the scene. *Id.* Without detailing his precise role in the surveillance, Tucker maintains that "Task Force agents observed Dockery and Denise Sutton through the second floor apartment window of the building[ ]" and that "[t]he agents announced their purpose and authority." *Id.* ¶ 8. He further attests that after waiting approximately twenty minutes for Sutton to open the door, "FBI agents forced the building door open with a battering ram [,]" *id.* ¶ 9, at which time NYPD Emergency Services Unit officers proceeded to search the Premises. *Id.* ¶¶ 9-10. After the NYPD's search, Tucker and Alston entered the building for the first time to verify that plaintiff was not inside. *Id.* ¶ 12.

While plaintiff concedes that Tucker may not have been the agent in charge of the October 1995 search, he argues that Tucker, acting with "numerous Federal Agent[s] conduct[ed] a General warrantless, nonexigent and nonconsensual entry" into the building. Pl. 56.1 (Tucker) [# 264] ¶ 18. Citing Tucker's testimony at Dockery's criminal trial, plaintiff argues that Tucker was in fact involved in the search.[FN26]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

FN26. Tucker testified at trial: "We searched ... the location from room to room and we looked at all the obvious hiding places, and we didn't have any luck in discovering him." Pl. 56.1 (Tucker) [# 264] ¶ 21 (citing [7/30/98 Testimony of Special Agent Nathan Tucker, D.C. Superior Court] at 711 (attached as Ex. 5 to Plaintiff Dockery's Memorandum of Points and Authorities in Opposition to Defendant Tucker's Memorandum Opposing Plaintiff's Third Amended Complaint to Conform with His Evidence, dated 9/9/03 [# 172] )); *see also* [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (attached to Mot. Opposing Legal Aid [# 32] ) at 223 (conceding that he entered the building and "found a pit bull when we got inside the main entrance ...."); [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (attached to Pl. Mem. (Tucker) [# 241] as Ex. 221) at 224 ("Well, after speaking with [Denise Sutton] repeatedly and trying to get her to open the door, we had no choice but to knock it down.").

Even accepting Tucker's contention that his role in the search was secondary to that of the NYPD and Agent Alston, his admitted participation in the FBI Task Force and his descriptions at trial of the acts at the scene are sufficient evidence upon which a reasonable juror could conclude that Tucker was personally involved, even if indirectly, in the search that is the subject of plaintiff's claims.[FN27] *See Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129-30 (2d Cir.1997) (reversing an award of summary judgment where material issue of fact remained as to defendant's personal involvement in fabrication of confession); *but cf. Djonbalic v. City of New York,* No. 99 CIV. 11398 SHSAJP, 2000 WL 1146631, at *11 (S.D.N.Y. Aug.14, 2000) (granting summary judgment based on lack of personal involvement where defendant agent "was not inside the building and therefore was not in a position to 'remedy the wrong' alleged ....") (citation omitted); *Howard v. Schoberle,* 907 F.Supp. 671, 681 (S.D.N.Y.1995) (granting summary judgment to an FBI officer; "[a]lthough [defendant] accompanied the

search team, she was not involved to any substantial degree with either Plaintiffs' arrests or the apartment search."). Therefore, Tucker is not entitled to summary judgment for lack of personal involvement in the search complained of.

FN27. Indeed, Tucker's testimony at Dockery's criminal trial could be construed to indicate his direct involvement in the search.

**2. Personal Involvement of Reed and Young**

**\*15** Plaintiff also seeks to hold Reed and Young liable for their alleged violation of plaintiff's Fourth Amendment rights through their participation in the search of the Premises on October 23, 1995. Reed and Young deny that they were present in New York during the 1995 search and thus deny responsibility for any violations related to the events in question. *See* Reed Aff. [# 226] ¶ 4; Young Aff. [# 225] ¶ 4.

In support of his claim, plaintiff provides an affidavit summarizing a conversation he claims to have had with Reed and Young in which they allegedly admitted their participation in the 1995 search.[FN28] Whatever the implausibility of Dockery's assertion, the Court is constrained, on this motion for summary judgment, to construe the facts in the light most favorable to the non-moving party. Viewed through this lens, the alleged admissions by defendants Reed and Young create a material issue of fact with respect to their personal involvement in the events of October 1995. *See Ricciuti,* 124 F.3d at 129-30. Accordingly, they are not entitled to summary judgment on this ground.[FN29]

FN28. Plaintiff states, in pertinent part, that, during his interrogation by Reed and Young following his arrest on February 6, 1996, "Reed and Young expressed their knowledge, and concern that, they too were inside the Three Star[ ] Grocery Store and the apartments helping the FBI and New York City police officers looking for Dockery." 8/18/05 Pl. Aff. (attached to Pl. Mem. (D.C.) [# 246] ) ¶ 5. In another affidavit, plaintiff elaborates: "Reed expressed her knowledge of being inside the Three Star [ ] Grocery Store and the apartments looking for

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

Mr. Dockery, because agents who she was with said they thought they saw Dockery inside the second floor window, so ... Reed and the FBI searched the entire premises, but Dockery was lucky he escaped that time." 7/5/01 Pl. Aff. (attached to Pl. Mem. (Tucker) [# 241] ) at 2.

Plaintiff has also submitted excerpts from Reed's testimony at plaintiff's criminal trial. In particular, plaintiff cites Reed's statement that prior to Dockery's arrest in February 1996, she had, on an earlier occasion, requested "a turn-up to locate Mr. Dockery at an address in Brooklyn." [Trial Testimony of Pamela Reed] (Ex. J. to Pl. Mem. (Tucker) [# 241] ) at 78. Contrary to plaintiff's assumption, a request by a police officer for law enforcement assistance outside his or her geographic jurisdiction does not, without more, establish the requesting officer's personal involvement in alleged misconduct occurring in the other jurisdiction.

FN29. The D.C. defendants alternatively assert that this Court lacks personal jurisdiction over them with respect to the 1995 search of the Premises because they "did not have any contact with the State of New York on the subject date." D.C. Mem. at 5. Plaintiff argues that the D.C. defendants have waived their challenge to the Court's jurisdiction by failing to interpose this defense in their earlier answers and moving papers. See Pl. Mem. (D.C.) at 3-4 (citing Fed.R.Civ.P. 12(g)).

Although the D.C. defendants previously moved against the third amended complaint, the defendants' earlier motion was not accepted, as it was procedurally defective. See 4/28/05 M & O [# 207] at 16-19. Thus, the instant motion, which (like their answer to the first amended complaint) includes an objection to personal jurisdiction as to each of the D.C. defendants, is the D.C. defendants' first responsive motion or pleading to the operative complaint. See D.C. Mem. at 5-6; D.C. Reply Mem. at 4-7. Accordingly, the D.C. defendants

have not waived their challenge to personal jurisdiction.

Nevertheless, Reed and Young are not entitled to summary judgment on this ground, as the very basis of their defense-that they were not present in New York during the 1995 entry and search-is disputed by the parties. See D.C. 56.1 [# 224] ¶ 11; Pl. 56.1 (D.C.) [# 265] ¶ 11; Pl. Aff. (attached to Pl. Mem. (Tucker) [# 241] ) at 2-3. Accordingly, as with Reed and Young's claim that they were not personally involved in the acts at the Premises for purposes of section 1983, the Court cannot determine whether Reed and Young had sufficient contacts with New York to establish personal jurisdiction over them.

As will be established, however, Dreher and Soulsby are entitled to dismissal of the claims against them, in light of plaintiff's failure to prove that they created or enforced a municipal policy or custom with respect to the 1995 acts. See infra pp. 37-39, 54-57. Because plaintiff fails to adduce any other facts to establish that Dreher and Soulsby had sufficient contacts with New York to justify personal jurisdiction over them, see, e.g., Ashi Metal Indus. Co. v. Superior Ct. of Cal., 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (O'Connor, J., plurality); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), plaintiff's claims against these defendants should also be dismissed for lack of personal jurisdiction.

**3. Personal Involvement of Dreher and Soulsby**

Plaintiff's Fourth Amendment claims against defendants Dreher and Soulsby, in their individual capacities, stand on a different footing.[FN30] Dreher and Soulsby challenge these claims on the ground that a suit against them in their individual capacities must be interpreted in this case as a claim against them in their official capacities, and thus, as against the District. D.C. Mem. [# 227] at 7; D.C. Reply [# 257] at 8-9. Citing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

*Monell* as authority, Dreher and Soulsby thus maintain that plaintiff's individual capacity claims should be dismissed. FN30. As mentioned in this Court's Report and Recommendation of March 26, 2003, "[s]ince neither the original complaint nor the first amended complaint named Soulsby or Dreher, a suit against them in their individual capacity under 42 U.S.C. § 1983, would be time-barred by the ... three-year statute of limitations ...." 3/26/03 R & R at 16 n. 17. However, as Dreher and Soulsby failed to interpose a statute of limitations defense in either their opposition to plaintiff's motion to amend his complaint for the third time or in their pending motions, *see, e.g.,* 4/28/05 M & O [# 207] at 8-9, the Court will not raise that defense *sua sponte.*

In *Kentucky v. Graham,* the Supreme Court clarified that while claims against a government officer in his official capacity "generally represent only another way of pleading an action against an entity of which the agent is an officer," 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), a suit against an officer in his personal or individual capacity is distinct in that relief comes not from governmental assets but instead from the officer's own personal assets. *Kentucky v. Graham,* 473 U.S. at 166. Because plaintiff seeks through his individual capacity claims against Dreher and Soulsby to hold these officials personally liable for actions they allegedly took under the color of D.C. law, plaintiff's claims are not, in a legal sense, duplicative of his official capacity claims against the officers or of his claims against the District of Columbia.

Defendants' argument is, however, not without force. Under section 1983, a plaintiff may establish individual liability against an official by showing that "the official, acting under the color of state law, caused the deprivation of a federal right." *Kentucky v. Graham,* 473 U.S. at 166 (citing *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). In the instant case, plaintiff fails to establish that Dreher and Soulsby "caused the deprivation" of his Fourth Amendment rights: plaintiff provides no admissible evidence that creates a material issue of fact with respect to whether Dreher and Soulsby (1) were

directly involved in the acts alleged; (2) "failed to remedy the wrong[s]" after being informed of them; (3) "created a policy or custom under which constitutional practices occurred, or allowed the continuance of such a policy or custom"; (4) were "grossly negligent in supervising subordinates"; or (5) demonstrated "deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873 (internal quotation marks and citations omitted).

**\*16** Plaintiff does not and cannot claim that Dreher and Soulsby were directly involved in the 1995 search or that they even had knowledge of the events at issue, either before or after they occurred. Instead, plaintiff alleges that Dreher and Soulsby "established a Municipal policy, practice, or custom that violate[d] the Fourth Amendment ...." 3d Am. Compl. at 12, 14-15. However, as detailed in the section of this opinion addressing his *Monell* claims, FN31 plaintiff produces no admissible proof of the existence or creation of such a policy. FN32 Because plaintiff thus presents no material issue of fact with respect to the individual liability of Dreher and Soulsby, their motion for summary judgment on plaintiff's constitutional claims should be granted. *See, e.g., Tricoles v. Bumpus,* No. 05CV3728(JFB)(JO), 2006 WL 767897, at \*4 (E.D.N.Y. Mar. 23, 2006) (dismissing as "too vague and conclusory to state a claim" plaintiff's allegations that the Commissioner of the N.Y.S. Office of Children and Family Services had failed to train/supervise subordinates and/or established a custom/policy that caused plaintiff's injury, where plaintiff offered "no specific allegations of personal involvement by the Commissioner"); *Lewis v. Meloni,* 949 F.Supp. 158, 163-65 (W.D.N.Y.1996) (granting summary judgment in favor of Sheriff where plaintiff had failed to demonstrate the existence of material issues of fact with respect to the defendant's failure to supervise or train his subordinates, or defendant's deliberate indifference to the false arrests alleged); *Washington Square Post No. 1212 v. City of New York,* 720 F.Supp. 337, 345-47 (S.D.N.Y.1989) (granting summary judgment in favor of Police Commissioner in the absence of proof of personal involvement in warrantless and allegedly illegal search), *rev'd on other grounds,* 907 F.2d 1288 (2d Cir.1990).

FN31. *See infra* pp. 54-57.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

FN32. Indeed, plaintiff does not purport to have specific facts linking Dreher and Soulsby to the acts in question and asserts only that "[t]he identification of [a] municipal policymaker is solely a question of law for the Court." Pl. Mem. (D.C.) [# 246] at 12.

**D. Unlawful Entry and Destruction of Property in 1995**[FN33]

FN33. Claims against Tucker arising out of the February 1996 incident were previously dismissed, and Reed and Young have not moved against the original complaint, which contains the claims relating to 1996. *See supra* note 3.

Plaintiff alleges that in entering the Premises on October 23, 1995, defendants lacked the authority of an active warrant and, thus, violated plaintiff's Fourth Amendment rights by unlawfully entering (1) the apartment building, (2) the basement, (3) plaintiff's grocery store, (4) plaintiff's second-floor apartment (Apartment # 2F), (5) the Davis apartment (Apartment # 2R), (6) the apartment of plaintiff's daughters (Apartment # 1RR), and (7) two newly renovated apartments (Apartments # 3F and 3R). *See* 3d Am. Compl. at 5-7, 9, 11. Plaintiff additionally claims that defendants unreasonably destroyed entryways and fixtures in the building, and caused the loss of personal and business property by intentionally leaving the Premises unsecured, all in violation of the Fourth Amendment. *See id.* at 5-9, 11. The Court will first consider whether the entry was authorized by a valid warrant and will then examine the reasonableness of the 1995 search under the Fourth Amendment.

**1. Validity of the August 1995 Arrest Warrant**

*17 Consistent with the Fourth Amendment, the arrest of an individual in his home must be supported by "either: 1) a warrant; or 2) the existence of both probable cause and an exception to the warrant requirement." *Hogan v. Caputo,* No. 02-CV-1040(LEK/RFT), 2004 WL 1376395, at *6 (N.D.N.Y. June 21, 2004) (citing *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *Anthony v. City of New York,* 339 F.3d 129,

135 (2d Cir.2003)). When an officer has reason to believe that a suspect is at the suspect's residence,[FN34] an arrest warrant, like a search warrant, is sufficient to authorize the officer's entry into the suspect's home to effect his arrest. *See United States v. Lauter,* 57 F.3d 212, 214 (2d Cir.1995) (citing, *inter alia, Payton,* 445 U.S. at 603); *see also Steagald v. United States,* 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) ("Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home.").

FN34. *See* cases cited *infra* pp. 45-46.

In the instant case, plaintiff contends that the August 1995 arrest warrant on which defendants rely in support of their motion is a forgery, and that the other defense evidence concerning the warrant is either unverified or falsely manufactured. *See* Plaintiff['s] Affidavit in Support of Cross-Motion for Summary Judgment ("Pl. Aff." [# 242] ) ¶ 4; Pl. Mem. [# 241] at 10-11.

The validity and active nature of the warrant in question have already been judicially determined, albeit in a different action.[FN35] As the D.C. Superior Court upheld the 1995 arrest warrant in connection with plaintiff's underlying criminal case,[FN36] plaintiff is collaterally estopped from relitigating this issue. *See Doe v. Pfrommer,* 148 F.3d 73, 80-81 (2d Cir.1998) (upholding a court's right to invoke collateral estoppel *sua sponte* in the interest of the "strong public policy in economizing the use of judicial resources by avoiding relitigation ....").

FN35. Tucker argues that this issue was determined by Judge Ross in a prior opinion in this case. However, in the decision in question, dated September 24, 1998, Judge Ross reviewed the four warrants outstanding at the time of the *1996* search of the Premises, noting that "there is no question as to [the warrants'] validity," 9/24/98 Op. [# 44] at 23, but cautioning that "the active nature of one of the warrants is open to debate ...." *Id.* at 22. The referenced arrest warrant, dated August 12, 1995 and reapproved on August 14, 1995, "bears a large 'X' on its face, accompanied by the word 'VACATE'

Page 20

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

without any indication of when it was vacated." *Id.* at 22 n. 11. Thus, while concluding that the 1996 entry was authorized, Judge Ross did not rule that the August 1995 warrant was active at the time of the 1995 search. *See id.* at 22, 23 & n. 11.

> FN36. *See* 1/14/02 Memorandum Opinion and Order Denying § 23-110 Motion ("1/14/02 Mem." [# 270] ), *United States v. Jasper Dockery,* Docket No. F-536-96.

Under the Full Faith and Credit Act, 28 U.S.C. § 1738, the decisions of any state court "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738.[FN37] Accordingly, pursuant to D.C. law, the Court in this action may not consider an issue previously presented to the D.C. court where that issue is "one that was actually litigated and decided in the prior case, by a final and valid disposition on the merits, after a full and fair opportunity for litigation by the same parties or their privies, [and] where the issue was necessarily decided in disposing of the first action, and not mere dictum." *Smith v. Jenkins,* 562 A.2d 610, 617 (D.C. Ct. of App.1989) (citing WRIGHT, MILLER & COOPER, *FEDERAL PRACTICE & PROCEDURE: JURISDICTION,* § 4416 (1981)); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). "Principles of collateral estoppel may bar relitigation in a subsequent civil rights action in federal court of an issue that was determined in a state court criminal proceeding." *Owens v. Trader,* 873 F.2d 604, 606 (2d Cir.1989).

> FN37. The District of Columbia is considered a state for purposes of section 1738. *See* 28 U.S.C. § 1738 (referencing the judicial proceedings and legislative acts of "any State, Territory, or Possession of the United States"); *Synanon Church v. United States,* 579 F.Supp. 967, 974 (D.D.C.1984), *aff'd,* 820 F.2d 421

(D.C.Cir.1987); *Washington Gas Light Co. v. Hsu,* 478 F.Supp. 1262, 1263-64 (D.Md.1979).

**\*18** Plaintiff's challenge to the 1995 warrant, which he presented to the D.C. Superior Court through a collateral attack on his criminal conviction, has already been litigated and decided. Specifically, plaintiff asserted that his trial counsel was ineffective in having failed to move to suppress testimony concerning the 1995 search of the Premises.[FN38] D.C. Superior Court Judge Mary Ellen Abrecht rejected Dockery's ineffectiveness claim. *See* 1/14/02 Mem. [# 270] at 5-6. The court held that Dockery had "proffer[ed] no reason for the Court to have found the October search unlawful, *given the existence at the time of a valid felony arrest warrant for obstruction of justice...." Id.* (emphasis added). The D.C. court also rejected Dockery's claim that Tucker and the D.C. officers had lied at plaintiff's criminal trial about the existence of the warrant and of National Crime Information Center ("NCIC") records documenting its issuance. *Id.* at 17-19. Specifically, Judge Abrecht explained, "Superior Court records corroborate [Reed and Tucker's] testimony about the existence of an obstruction of justice warrant before the October 1995 search .... No confusion or absence of record keeping over faxes or NCIC printouts ... erases the fact that law enforcement officials had been commanded by the Superior Court to arrest Dockery." *Id.* at 20.

> FN38. Plaintiff's motion before the D.C. Superior Court is referenced in that court's opinion but is not part of the record in the instant action.

Thus, the validity and active nature of the August 1995 warrant were actually litigated and decided in the post-conviction proceeding, at which plaintiff had a full and fair opportunity to press the argument.[FN39] In these circumstances, the ruling is entitled to preclusive effect under D.C. law. *See District of Columbia v. Gould,* 852 A.2d 50, 55 (D.C. Ct. of App.2004) ( "Under the doctrine of collateral estoppel ... once an issue of fact or law has been actually and necessarily determined against a party by a court of competent jurisdiction, that determination is conclusive on that party in any subsequent proceeding against that party based on a different cause of action."). *A fortiori,* plaintiff is collaterally estopped from relitigating in federal court his challenge to the 1995

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

warrant, notwithstanding his *pro se* status. *See Conte v. Justice,* 996 F.2d 1398, 1400 (2d Cir.1993); *Bonilla v. Brancato,* No. 99 Civ. 10657 LTSJCF, 2002 WL 31093614, at *5 (S.D.N.Y. Sept.18, 2002) ("A plaintiff's status as a *pro se* litigant does not, by itself, preclude barring a claim under the doctrine of collateral estoppel, but it is relevant to a determination of the fairness of his prior opportunity to be heard.").[FN40]

> **FN39.** Judge Abrecht's decision is a final one, as Dockery filed a notice of appeal to the D.C. Court of Appeals but then failed to perfect it. *See Dockery v. United States,* 853 A.2d 687, 691 n. 5 (D.C. Ct. of App.2004) (reviewing plaintiff's three consolidated appeals).

> **FN40.** Judge Ross previously declined to give preclusive effect to a different ruling by the D.C. Superior Court, concerning the validity of a 1996 bench warrant. However, there the status of the 1996 warrant was not central to the D.C. court's resolution of the matter at hand–to wit, a motion to dismiss the indictment for lack of jurisdiction. *See* 9/24/98 Op. [# 44] at 18-19. Here, by contrast, the determination of the validity of the 1995 warrant was necessary to the resolution of Dockery's ineffective assistance of counsel claim predicated on his attorney's failure to challenge the October 1995 search. *See Bigelow v. Knight,* 737 F.Supp. 669, 671 (D.D.C.1990) (plaintiff's motion alleging ineffective assistance of trial counsel was entitled to preclusive effect in subsequent federal action).

Even assuming it did not merit preclusive effect, Judge Abrecht's decision, together with other evidence in the record, establishes that the August 1995 warrant was both valid and active at the time of the October 1995 search. Specifically, Tucker proffers the declaration of Assistant United States Attorney Kenneth Kohl, who participated in the preparation of the August 1995 warrant. *See generally* Kohl Decl. [# 218]. Kohl attests that the warrant was not vacated until after Dockery's arrest in February 1996,[FN41] at which time the clerk of the D.C. Superior Court was notified that it could be withdrawn and thereafter marked an "X" and the word "VACATE" on the

face of the warrant. *Id.* ¶ 14. Additionally, Tucker produces an FBI lead, dated October 18, 1995–five days before the challenged 1995 search–that bears the words "ARMED AND DANGEROUS" and states, in pertinent part, that "[a]n arrest warrant was issued for captioned subject [Dockery] by the District of Columbia Superior Court on 8/14/05, for Obstruction of Justice." Tucker Decl. Ex. A [# 217] at 1. The lead lists as enclosures a copy of the August 1995 arrest warrant and a photograph of Dockery. *Id.* This evidence supports Tucker's contention that the warrant was active at the time of the October 1995 search.

> **FN41.** It is undisputed that plaintiff was arrested by an FBI Fugitive Task Force at the Premises on February 6, 1996.

**\*19** Plaintiff's challenge to this evidence is unavailing. As support for his suggestion that the 1995 warrant was fraudulently manufactured after the October 1995 search, plaintiff offers a printout from the NCIC, dated March 15, 2000, that lists no warrant dated August 12, 1995, and, for the years 1995 and 1996, includes only a bench warrant dated February 2, 1996. *See* [NCIC Report] (attached to Pl. Mem. (Tucker) [# 241] as Ex. 29). Plaintiff erroneously assumes that the NCIC database is a cumulative record of every warrant ever in existence for a particular individual. *See* Pl. Mem. (Tucker) [# 241] at 13-14. In fact, warrants are regularly removed from the database once they have been satisfied or when other official law enforcement action has been taken in a case. *See Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (reviewing a defense motion to suppress evidence on the ground that the evidence was seized through an unlawful arrest based on a quashed warrant that had erroneously remained in the computerized database of the Sheriff's Office); *id.* at 26 (Ginsburg, J., dissenting) (discussing NCIC database). Consequently, a warrant that was satisfied and vacated in February 1996 would ordinarily not appear on an NCIC printout from March 2000.

With the exception of the NCIC printout, plaintiff provides only conclusory allegations of the arrest warrant's invalidity. In light of the defense's factual showing, these allegations do not present a material issue of fact as to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

existence of a valid active warrant for plaintiff's arrest at the time of the October 1995 search. *See Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone.").

**2. Reasonableness of the 1995 Entries**

The inquiry does not end here. It is well settled that a law enforcement officer seeking to enter a suspect's home pursuant to an arrest warrant must have "reason to believe that the suspect is present." *Lauter,* 57 F.3d at 215; *accord United States v. Lovelock,* 170 F.3d 339, 344 (2d Cir.1999); *United States v. Big Apple Bag Co.,* 317 F.Supp.2d 181, 186 (E.D.N.Y.2004) (stating that the reasonable belief standard "has been interpreted to 'require[ ] a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling.' ") (quoting *United States v. Magluta,* 44 F.3d 1530, 1533 (11th Cir.1995)). This standard has been interpreted in this Circuit as "less stringent than a probable cause standard." *Bartlett,* 2005 WL 887112, at *5 (citing, *inter alia, Lauter,* 57 F.3d at 215). Importantly, an officer's belief, although reasonable, need not be correct; thus, reasonable mistakes as to a suspect's presence or address will not give rise to a Fourth Amendment violation. *See Anderson v. United States,* 107 F.Supp.2d 191, 196 (E.D.N.Y.2000) (citing *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), and *Lovelock,* 170 F.3d at 342).

**\*20** Tucker contends that, at the time of the October 1995 search, he had a reasonable belief both that plaintiff resided in the Premises and that plaintiff was then present at the scene. *See* Tucker Mem. [# 215] at 14-16. Reed and Young, who deny that they were at the Premises at the time of the search, argue, in the alternative, that even assuming they were at the Premises, their behavior-like that of Tucker-would have been both reasonable and lawful. D.C. Mem. [# 227] at 4.[FN42] Accordingly, in reviewing the reasonableness of the October 1995 entry and search, this Court will assume that Tucker's beliefs were shared by Reed and Young.

FN42. Those three defendants also assert a

defense of qualified immunity from liability for any violations of the Fourth Amendment. Tucker Mem. [# 245] at 21-24; D.C. Mem. [# 227] at 17-18. The qualified immunity defense is discussed *infra* pp. 51-54.

Tucker attests that he was aware of an August 1995 FBI lead that advised that plaintiff "may be located in the vicinity of '3 Star Grocery,' 2127 Pitkin Avenue, Brooklyn, New York," and that provided two telephone numbers for him. Tucker Mem. [# 215] Ex. A at 1.[FN43] Tucker further attests that surveillance was commenced at the Premises, "where Dockery was suspected of dwelling." Tucker Decl. [# 217] ¶ 7. Additionally, in connection with plaintiff's criminal prosecution in the D.C. Superior Court, Tucker testified that, prior to the search, he had learned that plaintiff owned the building at 2127 Pitkin Avenue and, moreover, believed that plaintiff's apartment was located on the second floor, "but it could have been anywhere in the building since he was the owner." [Testimony of Special Agent Nathan Tucker, D.C. Superior Court] [FN44] (Ex. 6 to Plaintiff's Motion with New Facts for Appointment of Counsel ["Mot. to Appoint Counsel"] [# 141] ) at 732; *see* attachment to Mot. Opposing Legal Aid [# 32] at 220) (testifying that plaintiff's residence was "the entire building"). According to Tucker, before entering the building to serve the arrest warrant, he determined which apartment was plaintiff's residence "by seeing him in the window on the second floor." Mot. to Appoint Counsel, Ex. 6 [# 141] at 732.

FN43. Multiple portions of the FBI lead submitted by Tucker have been redacted.

FN44. The Court is unable to ascertain whether the excerpted transcript is from plaintiff's criminal trial or from a related hearing.

If credited, the information in Tucker's affidavit and his trial testimony would ordinarily be sufficient to establish Tucker's reasonable belief that plaintiff resided in Apartment # 2F and that he could be found there upon entry. However, while plaintiff admits, in various sworn statements, that he resided in the building in Apartment # 2F, he denies that he was on the Premises at the time of the October 1995 entry and search, and he thus disputes

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

that Tucker saw him in the window of a second-floor apartment. *See* Dockery Dep. (Matthews Decl. [# 219] Ex. E) at 45. Apart from the disputed fact of Dockery's sighting in an apartment window, the defense cites no other evidence of plaintiff's suspected presence at the Premises. While plaintiff's denial is dubious at best,[FN45] the Court nevertheless must, for purposes of this summary judgment motion, construe the facts in the light most favorable to plaintiff as the non-moving party. Even assuming that defendant reasonably believed that plaintiff resided somewhere on the Premises, a material issue of fact exists with respect to the reasonableness of Tucker's belief that plaintiff would be found there at the time of the October 1995 search.

> FN45. That plaintiff was probably hidden in the Premises may be inferred from the fact that his identification was found in a crawl space during that search and that, in February 1996, he was located in the Premises, concealed in a specially constructed shelter between the floorboards of the second floor and the ceiling of the first floor. *See* Mot. Opposing Legal Aid [# 32] at 231-34.

**\*21** In the absence of uncontested evidence suggesting plaintiff's presence at the Premises, this Court cannot conclude that the ensuing entries alleged by plaintiff-to wit, Tucker's entry into the second-floor apartment in which plaintiff concededly resided, the basement, the grocery store, the two newly renovated apartments, and plaintiff's children's apartment-were reasonable as a matter of law.[FN46] *See Washington Square Post,* 720 F.Supp. at 351 n. 10 ("[I]f the entry was illegal, the subsequent searches ... would be tainted by this illegal entry.").

> FN46. Relying on *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the defense contends that law enforcement officers "had the right, based on the authority of the arrest warrant, to search anywhere in the house that [the suspect] might have been found ...." Tucker Mem. [# 215] at 16 (quoting *Buie,* 494 U.S. at 330); *see* D.C. Mem. [# 227] at 17. However, in *Buie,* in contrast to this case, the lawfulness of the entry itself was not in issue, as

a police department secretary had verified, by calling Buie's house, that Buie was present. *See Buie,* 494 U.S. at 328.

Moreover, in affirming the authority of the police, armed with an arrest warrant, "to search anywhere in [the suspect's] house" to effect his arrest, the Supreme Court in *Buie* did not address the authority of the police to search an entire multi-unit dwelling. Presumably, a judicial determination as to the reasonableness of police entries into different units of an apartment building would involve a series of separate analyses. In this case, the only stated basis for Tucker's belief that plaintiff was then on the Premises is the disputed proof of Tucker's having spotted Dockery in the window; hence, the Court need not address whether a showing short of "reasonable basis" would be sufficient to justify the police entry into portions of the Premises that were not Dockery's personal residence. It bears noting, however, that the level of justification mandated under *Payton* with respect to police entries into spaces other than a suspect's own residence "can be no greater than the 'reasonable basis' that would have been required had [the officers] arrested [the suspect] in his own home." *Big Apple Bag Co.,* 317 F.Supp.2d at 186 (Garaufis, J.) (citing *Payton,* 445 U.S. at 583-89 (discussing the sanctity of the home in contrast to other spaces), and *United States v. Haqq,* 278 F.3d 44, 54 (2d Cir.2002) (Meskill, J., concurring) ("While we are protected from unreasonable government intervention in our business, automobiles and in public, the protection we enjoy in these situations is far less than the ultimate protection we receive in our homes.")); *accord United States v. Elkins,* 300 F.3d 638, 646 (6th Cir.2002).

Whether plaintiff had a reasonable expectation of privacy in areas other than his own apartment is an issue not before this Court. *See supra* note 20.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

### 3. Destruction of Property Claims

Plaintiff contends that defendants engaged in an unreasonable search in violation of the Fourth Amendment by destroying fixtures in and portions of the Premises and by failing to secure the doors thereto, thus enabling looting by third parties. *See* 3d Am. Compl. at 5-9, 11. Plaintiff claims damages and losses in the amount of: $27,650 in missing personal property belonging to plaintiff, his children and his common-law wife; $32,300 in lost grocery stock; $2,300 in missing cash; $7,940 in damage to various doors; $5,600 in damage to the structure of the building and various fixtures; and $5,800 in missing electrical parts, supplies and wiring. *See id.* at 5-8. Tucker maintains that the search was reasonable under the Fourth Amendment and, moreover, that his conduct was consistent with 18 U.S.C. § 3109, which authorizes law enforcement officers to force entry under certain circumstances. Tucker Mem. [# 215] at 16-19. Reed and Young disclaim involvement in the entry into and search of the Premises, but again, in the alternative, adopt the version of events stated by Tucker. D.C. Mem. [# 227] at 5-6, 14-18.

Congress has recognized that in certain circumstances, law enforcement officers, in the course of their duty, may be constrained to force entry into various dwellings and spaces in order to execute warrants. Thus, pursuant to section 3109 of Title 18 of the United States Code, an officer is authorized to "break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance ...." 18 U.S.C. § 3109; *see also Cody v. Mello,* 59 F.3d 13, 16 (2d Cir.1995) ("[I]t is well recognized that 'officers executing search warrants on occasion may damage property in order to perform their duty.' ") (quoting *Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)). While explicitly referencing only search warrants, the statute has been interpreted to apply to a "valid arrest pursuant to an arrest warrant in a residence ...." *Bartlett v. City of New York,* No. CV031961CPS, 2005 WL 887112, at *7 (E.D.N.Y. Feb.11, 2005) (quoting *United States v. Alejandro,* 368 F.3d 130, 133 (2d Cir.2004)) (other citations omitted). Importantly, contrary to Tucker's suggestion (*see* Tucker Mem. [# 215] at 17-18), an officer's compliance with

section 3109 in effecting a forced entry does not guarantee that the scope of the ensuing search will be deemed reasonable: "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant. [Accordingly,] [e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful ...." *United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (internal citations omitted).[FN47]

FN47. *See* cases cited *supra* pp. 28-29.

**\*22** As previously discussed, the reasonableness of Tucker's entry turns on a material issue of fact with respect to plaintiff's presence on the day of the search.[FN48] This same disputed fact is also key to determining the reasonableness of the scope and manner of the resulting searches and any attendant destruction of property.[FN49] Accordingly, a material issue of fact exists as to whether the manner of executing the search violated the Fourth Amendment.[FN50]

FN48. *See supra* pp. 45-49.

FN49. For example, it appears that Tucker's claim that he saw Dockery through the window constitutes the defense justification for breaking down the door and for cutting holes in ceilings within the Premises.

FN50. In light of his claim that he was not present at the time of the 1995 search, and thus his resulting lack of personal knowledge regarding the condition of the Premises following the search, plaintiff will likely face an uphill battle in substantiating most of his alleged damages. Plaintiff belatedly proffers affidavits from various individuals concerning the alleged property damage. *See, e.g.,* Affidavit [of Ilma Davis], dated 2/22/00; Affidavit [of Everton Agustos], dated 11/10/03; Affidavit of George Crawford, dated 3/3/04; Affidavit [of Geanette Dunning], dated 6/19/04; Affidavit [of Creola Dunning], dated 6/26/04; and Affidavit of Tiara Bullock, dated 3/26/05 (all attached as exhibits

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

to Pl. Mem. (Tucker) [# 241] ); [Affidavit of Harris A. Harding], dated 6/14/01 (Ex. B5 to [Plaintiff's 9/5/05 Letter to Judge Mann] [# 259] ). Notably, however, several of these affidavits were submitted after the close of discovery, thereby unfairly depriving the defense of an opportunity to depose the affiants. *See* Tucker Reply [# 258] at 11-13. Others were submitted by individuals who, like plaintiff, lack personal knowledge of defendants' involvement in the acts alleged, as they were not present at the Premises. The Court need not now resolve defendants' motion to strike those affidavits; even if the challenged affidavits are disregarded in connection with the pending dispositive motions, the defense is not entitled to summary judgment on the Fourth Amendment claims. The admissibility of the affiants' testimony at trial may, however, be an appropriate subject for an *in limine* motion.

**4. Qualified Immunity**

Tucker and the D.C. defendants further argue that even if a Fourth Amendment violation had occurred in connection with the 1995 search, they are entitled to summary judgment on qualified immunity grounds. Specifically, they contend that they may not be held liable because a reasonable officer at the scene would have viewed a forced entry and unannounced search of the Premises as objectively reasonable in light of the circumstances then confronting him. *See* Tucker Mem. [# 215] at 23-24; D.C. Mem. [# 227] at 14-18.[FN51]

FN51. In *Harlow v. Fitzgerald,* the Supreme Court announced the often-invoked standard for qualified immunity. The Court explained that qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Under the *Harlow v. Fitzgerald* standard, a government official sued in his individual capacity is entitled to qualified immunity in any of three circumstances: (1) if the

conduct attributed to him is not prohibited by federal law; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct; or (3) if the defendant's action was 'objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken.' " *X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65-66 (2d Cir.1999) (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (other internal citations omitted).

In reviewing a summary judgment motion, a court should ordinarily grant the motion based on qualified immunity where " 'no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (alteration in original) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)); *see also Bartlett,* 2005 WL 887112, at *10. Summary judgment based on immunity should not be granted, however, where material issues of fact frustrate the Court's review of the reasonableness of the actions in question. *See, e.g., Breen v. Garrison,* 169 F.3d 152, 153 (2d Cir.1999) (per curiam) (reversing finding of qualified immunity in light of material differences in the parties' versions of the facts regarding plaintiff's excessive force claim); *Armstead v. Township of Upper Dublin,* No.Civ.A. 03-CV-3608, 2004 WL 2743451, at *4 (E.D.Pa. Nov.23, 2004).

"The question of qualified immunity is independent from the merits of the underlying action and must be examined independently of the underlying claims." *Bartlett,* 2005 WL 887112, at *9 (citing *Saucier v. Katz,* 533 U.S. 194, 207, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Accordingly, this Court's earlier determination that a material question of fact exists as to the lawfulness of the 1995 search does not necessarily foreclose entry of summary judgment based on qualified immunity. Nevertheless, such relief is inappropriate in the instant

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

case, as the qualified immunity defense is based upon the same disputed facts as the defense to the underlying Fourth Amendment claims.

The defendants do not dispute that the Fourth Amendment law governing plaintiff's unlawful entry and destruction of property claims was clearly established at the time of the October 1995 search. To the contrary, the defense argues that the search of the Premises-even if forced and destructive to plaintiff's property-was lawful in light of the attendant circumstances. *See* Tucker Mem. [# 215] at 23-24. However, contrary to the premise of the defense motion, defendants' argument is predicated on a set of facts that in fact are disputed by plaintiff. Indeed, because a material issue of fact exists as to whether plaintiff was seen at the Premises just before the entry, it cannot be determined whether a reasonable officer in Tucker's position would have believed that urgent and forcible action was necessary to prevent plaintiff's escape. Accordingly, summary judgment on the basis of qualified immunity is not appropriate in this case. *See Breen,* 169 F.3d at 152; *Arum v. Miller,* 331 F.Supp.2d 99, 110-11 (E.D.N.Y.2004) (denying qualified immunity to police officers on plaintiff's excessive force claim in light of the "significant dispute" as to the conduct of the officers during the arrest); *see also Hudson v. New York City,* 271 F.3d 62, 66 (2d Cir.2001) (noting that Judge Ross had properly denied a defense motion for summary judgment on qualified immunity grounds where "the key facts surrounding the question of whether there was sufficient basis upon which a reasonable officer might find probable cause to enter [plaintiff's] apartment [ ] remain in dispute.").

**E. *Monell* Claims**

**\*23** In his *Monell* claims, plaintiff seeks to hold the District liable for the actions of Reed and Young based on an alleged "Municipal policy, practice or custom that violated the Fourth Amendment ...," and on the District's alleged "failure to adequately train, d[i]scipline and supervise [ ] its homicide Officers in matters of extrajurisdictional searches, seizure, and arrest[.]" 3d Am. Compl. at 12-13; *see id.* at 14-15. Plaintiff also asserts *Monell* claims based on the District's alleged violation of plaintiff's due process rights.3d Am. Compl. at 13-14,

15-16.[FN52] Plaintiff's *Monell* claims should not be permitted to survive summary judgment.

> FN52. Plaintiff's due process claim against Reed and Young is discussed *supra* pp. 26-30.

In recognition of the unique burdens that litigation poses to municipalities, whose liability for damages is paid by taxpayer dollars, the Supreme Court has limited municipal liability to those cases in which the government officials or officers may be said to have been executing municipal custom or policy that "actually caused" the alleged violations. *City of Canton v. Harris,* 489 U.S. 378, 385-91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Thus, a plaintiff may sustain a claim against a municipality under section 1983 if she proves the existence of a municipal custom or policy the enforcement of which was "the moving force behind the constitutional violation." *Id.* at 389 (internal quotation marks omitted).

Dockery alleges that the District is liable for his injuries on account of its failure to train, discipline and supervise its homicide officers.3d Am. Compl. at 12-14. Even assuming *arguendo* that plaintiff's allegations have been adequately pled, *see generally* Fed.R.Civ.P. 8(a)(2); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 167-68, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Walker v. City of New York,* 974 F.2d 293, 297-99 (2d Cir.1992), they have not been substantiated by admissible evidence. Despite having obtained discovery from the District,[FN53] plaintiff fails to point to a specific policy, custom, practice, decision or ordinance, or any training or supervising deficiency, that caused his constitutional rights to be violated. *See, e.g., Monell,* 436 U.S. at 694; *City of Canton,* 489 U.S. at 388 (a mere failure to supervise employees or to provide proper training is not actionable unless the failure is so severe as to constitute "deliberate indifference" to the deprivation of plaintiff's rights). Instead, plaintiff relies upon an array of newspaper articles and judicial decisions discussing general police misconduct, and he assumes from this that there existed a pattern of misconduct that was or should have been "so obvious" to the District as to put it on notice that future violations were likely to occur absent remedial action. Pl. Mem. (D.C.) [# 246] at 14-22; *see City of Canton,* 489 U.S. at 390 n. 10. Plaintiff misconstrues the value and admissibility of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

information proffered.

FN53. Earlier in this case, this Court bifurcated discovery and trial on plaintiff's *Monell* claims against the District. *See* 1/27/00 Memorandum and Order [# 120] at 6-7. The District nevertheless did not object to plaintiff's discovery demands regarding municipal policies and training programs, and instead provided the disclosure sought. *See, e.g.,* Defendants Pam Reed's and Phineas Young's Response [to] Plaintiff's First Set of Request[s] for the Production of Documents (attached as Ex. D to Pl. Mem. (D.C.) [# 246]). In light of this exchange, the Court reopened discovery on June 27, 2003 "for the limited purpose of allowing plaintiff to serve discovery demands on defendants Soulsby and Dreher." 6/27/03 M & O [# 155]. As plaintiff sought and obtained discovery on his *Monell* claims, he will not be unfairly prejudiced by the Court's consideration of the District's challenge to those claims.

The cases upon which plaintiff relies address a wide range of police conduct, from car ride-alongs and stops to false arrest, the majority of which is inapposite to the conduct at issue in this case. *See* Pl. Mem. (D.C.) [# 246] at 15-17. Further, although plaintiff maintains that the very existence of the cited cases demonstrates the District's failure to investigate claims made against its officers, *see id.* at 17-18, no conclusion may reasonably be drawn from most of the cases as to the extent of any investigation by the District into alleged misconduct or as to the existence of any disciplinary action. Plaintiff erroneously assumes from the facts alleged by the plaintiffs in those cases that the police engaged in misconduct. In fact, the existence of the lawsuits cited by plaintiff establishes "no more than notice to the city that allegations had been made." *Carter v. District of Columbia,* 795 F.2d 116, 123 (D.C.Cir.1986). Plaintiff's reliance on a *Washington Post* newspaper article, *see* Unmarked Ex. to Pl. Mem. (D.C.) [# 246], which described a suit charging police misconduct in connection with mass arrests of protesters at a demonstration in 2002, is likewise unavailing, as the alleged misconduct bears no resemblance to the allegations in this case and, moreover, occurred more than six years after the events at issue here.

**\*24** For purposes of a *Monell* claim, the "catalog of disquieting events [submitted by plaintiff] is not sufficient to demonstrate a pervasive pattern of police officer indulgence in [unreasonable searches and seizures], persisting in the District because of the [D.C. Police Department's] tacit approval." *Carter,* 795 F.2d at 123. Indeed, "[i]f the evidence plaintiff [ ] presented here were adequate to make out a § 1983 case, then practically every large metropolitan police force, it would seem, could be targeted for such liability." *Id.; see generally Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004) (affirming grant of summary judgment where plaintiffs, in an action against a town for failure to train its police force, had "neglected to offer any evidence ... as to the purported inadequacies in the Town's training program and the causal relationship between those inadequacies and the alleged constitutional violations."); *Hudson,* 271 F.3d at 66, 67 n. 6 (affirming Judge Ross' granting of defense motion for summary judgment on *Monell* claim on the ground that plaintiff "had not adduced evidence that any of the City's practices or policies contributed to, or caused, the allegedly unconstitutional search."); *Sagendorf-Teal v. County of Rensselaer,* 100 F.3d 270, 276-77 (2d Cir.1996) (affirming grant of summary judgment in favor of County where "the trial court was not presented with any evidence or allegation of an official policy" pursuant to *Monell* ); *Washington Square Post,* 720 F.Supp. at 343-45 (granting the City summary judgment on *Monell* claims).

As plaintiff has failed to present any evidence from which a reasonable juror could conclude that the District was the moving force behind any violation of his constitutional rights, the District's motion for summary judgment on the *Monell* claims should be granted.

**F. Tort Claims against Reed, Young, and the District for 1995 Search**

Plaintiff alleges that, following their unreasonable and unauthorized search of the Premises, Reed, Young and the District "intentionally and maliciously" failed to replace doors and locks to the Premises, thereby causing the "loss of [plaintiff's] business and private property." 3d Am. Compl. at 10. Liberally construing plaintiff's complaint, he appears to assert common law claims against those D.C.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

defendants based on the tort theories of trespass to chattels, trespass to land, and conversion. *See id.;* 4/28/05 M & O at 5-6 n. 5. The D.C. defendants seek summary judgment on these claims, on the ground that plaintiff fails to establish any wrongful conduct on their part, falsely alleges that defendants left the Premises unsecured, and, further, cannot prove "the origin or value of the allegedly lost property." D.C. Mem. [# 227] at 18-20.

Under New York law, which would appear to apply to plaintiff's common law tort claims arising out of acts occurring in New York,[FN54] a plaintiff may establish trespass to land where he proves "an unauthorized entry upon private property." *Rager v. McCloskey,* 305 N.Y. 75, 79, 111 N.E.2d 214 (1953). "To state a claim for trespass to chattels under New York law, plaintiffs must establish that defendants 'intentionally, and without justification or consent, physically interfered with the use and enjoyment of personal property in [plaintiffs'] possession,' and that plaintiffs were thereby harmed." *In re Jetblue Airways Corp. Privacy Litig.,* 379 F.Supp.2d 299, 327 (E.D.N.Y.2005) (citing *Kuprewicz,* 771 N.Y.S.2d at 807). Finally, " '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.' " *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 2006 WL 2391162, at *3 (2d Cir. Aug.21, 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.,* 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (internal quotation marks omitted)).

FN54. New York is the state with the strongest interest in adjudicating alleged torts committed against its citizens within the state's boundaries. *See AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992) ("In tort actions [presenting choice of law questions], New York applies a so-called interest analysis .... Under such an analysis, the law of the jurisdiction having the greatest interest in the litigation applies.") (internal citations omitted). "[T]he significant factors for this analysis are the parties' domiciles, and the locus of the tort." *Lee v. State of New York Dep't of Corr. Servs.,* No. 97 Civ. 7112(DAB), 1999 WL 673339, at *3 (S.D.N.Y. Aug.30, 1999).

**\*25** In the present case, for the same reasons that apply to the Court's Fourth Amendment analysis of the reasonableness of defendants' entries into and searches of the Premises,[FN55] summary judgment is inappropriate with respect to plaintiff's tort claims against Reed, Young and the District. Because the parties' dispute over plaintiff's presence at the Premises poses material issues of fact as to the lawfulness of defendants' entry, the Court cannot find as a matter of law that defendants' forced entry and search, which resulted in damage to plaintiff's real property, was "authorized" and, thus, was not a trespass. *See Voskerchian v. United States,* No. 98-CV-0335E(M), 1999 WL 66709, at *4 (W.D.N.Y. Feb.10, 1999) ("New York cases support the proposition that a law enforcement officer's privilege [to trespass pursuant to a warrant] remains limited to constitutional searches and seizures.") (citing *1090 Jericho Corp. v. Elias,* 164 A.D.2d 852, 559 N.Y.S.2d 358, 361 (2d Dep't 1990) (affirming the denial of law enforcement officers' motion to dismiss trespass claim premised upon a search executed pursuant to an allegedly invalid warrant), and *People v. Johnson,* 66 N.Y.2d 398, 414, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985) (Titone, J., concurring).[FN56] Summary judgment dismissing the tort claims against these defendants is thus inappropriate at this juncture.[FN57]

FN55. *See supra* pp. 45-51.

FN56. However, as discussed in the next section of this opinion, plaintiff's tort claims and constitutional claims all suffer from the same flaw with respect to plaintiff's demand for damages for loss of business. In addition, because real property and the fixtures attached thereto cannot properly be characterized as chattels or personal property, *see Roemer & Featherstonhaugh, P.C. v. Featherstonhaugh,* 267 A.D.2d 697, 699 N.Y.S.2d 603 (3d Dep't 1999) ("[Where] the property claimed to have been converted is real property ... conversion will not lie."), plaintiff cannot state a claim for either trespass to chattels or conversion with respect to the damage he alleges was caused to the doors and ceilings of his building, or to other fixtures.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

FN57. As defendants have neither raised nor briefed the issue, the Court will not here opine on the cognizability of a tort claim against defendants for the criminal acts of third parties in allegedly looting the Premises.

## G. Damages for Loss of Business

In his third amended complaint, plaintiff suggests that defendants caused a loss of business profits by unlawfully entering and searching his grocery store, and by leaving the entrance doors to it unreplaced, thereby allowing looting by third parties and damage to plaintiff's business. *See* 3d Am. Compl. at 5, 17-18. Plaintiff estimates his losses at $563,942 in past profits and $1,800,000 in future profits. *See id.*FN58 Defendants challenge plaintiff's demand for damages, denying that their conduct was tortious or unlawful and further asserting that plaintiff has failed to provide any evidence in support of his claim for damages. *See* Tucker Mem. [# 215] at 19-21; D.C. Mem. [# 227] at 18-19.FN59 Even assuming that plaintiff could prove that defendants' conduct was unlawful, he still could not recover damages for lost profits, as the losses he alleges are entirely speculative.FN60

FN58. Plaintiff's pleading asserts that the loss of "private property and destruction of private premises" totals $40,800 for the grocery store and $37,690 for "the premises and apartments ...." 3d Am. Compl. at 18. Plaintiff miscalculates the sum of these figures as $78,690 in damages for loss of property.

FN59. Defendants maintain in the alternative that if plaintiff's lawsuit is permitted to proceed, additional discovery in the form of records from the State of New York will be required to verify plaintiff's ownership of the Three Star Grocery store. *See* Tucker Mem. [# 215] at 18; [D.C.'s] Affirmation in Opposition to Plaintiff's Motion for Third Amended Complaint to Conform with Evidence [# 169] at 6-7; 4/28/05 M & O [# 207] at 13.

FN60. To the extent that plaintiff attempts to base his demand for lost profits on his continued imprisonment, this demand is futile, as plaintiff may not challenge his conviction and prison sentence in this proceeding.

A plaintiff who seeks to recover for lost profits or business income must first demonstrate that the damages alleged "result as the natural consequences of a breach of contract or the commission of a tortious act." *Levine v. Am. Fed. Group, Ltd.,* 180 A.D.2d 575, 580 N.Y.S.2d 287, 288 (1st Dep't 1992) (citation omitted); *see Merlite Indus., Inc. v. Valassis Inserts, Inc.,* 12 F.3d 373, 376 (2d Cir.1993) (citing *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 260, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986)); *Media Logic Inc. v. Xerox Corp.,* 261 A.D.2d 727, 689 N.Y.S.2d 762, 766 (3d Dep't 1999) ("[Plaintiff's] ... failure to prove the causal relationship between defendant's conduct and the alleged damage necessitated a dismissal of this damage claim.") (internal citations omitted). Additionally, the plaintiff must prove damages with "sufficient certainty," such that damages are not merely "speculative or contingent." *Levine,* 580 N.Y.S.2d at 288; *see Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (reviewing a breach of contract claim and stating that damages alleged must not be "speculative" and must be calculated with "reasonable certainty"); *Caulfield v. Barristers Abstract Corp.,* No. 91 CV 5155, 1996 WL 382633, at *1 (E.D.N.Y. July 2, 1996) (declining to award damages to plaintiff under the federal RICO statute, 18 U.S.C. § 1964(c), "[b]ecause plaintiff ha[d] not furnished the Court with any evidentiary support for the Court to begin calculating any damage award ...."); *Ashland Mgmt. v. Janien,* 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) ("The law does not require that [damages] be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation."). As part of this burden, a plaintiff must also provide a reasonable means of and basis for calculating damages. *See Mehta v. New York City Dep't of Consumer Affairs,* 162 A.D.2d 236, 556 N.Y.S.2d 601, 602 (1st Dep't 1990). New businesses face a "higher evidentiary burden in satisfying this standard 'for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.' " *Kidder, Peabody & Co. v. IAG Int'l,* 28 F.Supp.2d 126, 131 (S.D.N.Y.1998) (quoting *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234). Indeed, New York courts have held that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

lost profits ordinarily will not be awarded unless the business is "firmly established and in operation for a definite period of time." *Sam & Mary Housing Corp. v. Jo/Sal Mkt. Corp.,* 121 Misc.2d 434, 468 N.Y.S.2d 294, 301 (Sup.Ct. Queens County 1983).

**\*26** In the instant case, plaintiff arrives at his lost past and future profits by extrapolating from the $18,877 in profits he allegedly earned during the first six months of the store's operation in 1994.3d Am. Compl. at 17. Plaintiff further calculates a 10 percent rate of growth from his estimated yearly profit totals to state annual profits ranging from $41,529 to $89,021 for the years 1995 through 2003. *Id.* As the sole evidence in support of his proposed method of calculation, plaintiff submits a tax return for 1994 stating his profits as $18,877. *See* [1994 Tax Return] (attached to 3d Am. Compl. [# 154] ).[FN61] Plaintiff fails, however, to prove that his loss was the "natural consequence[ ]" of defendants' constitutional or common law torts.   *Levine,* 580 N.Y.S.2d at 288.

> FN61. As pages of the transcript from plaintiff's deposition have been omitted from Tucker's submissions to this Court, it is unclear from the record whether this tax return was filed with the Internal Revenue Service.

In calculating his lost profits, plaintiff ignores the fledgling nature of his business. Because plaintiff's store-which at most reported only six months of profits in 1994 and apparently no profits in 1995 [FN62] -can in no way be deemed "firmly established," plaintiff cannot meet the high evidentiary burden that attends his demand for lost profits. *Sam & Mary Housing Corp.,* 468 N.Y.S.2d at 301; *see Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234. Indeed, the conclusion that the store's profits are incapable of prediction with "reasonable certainty" is supported by plaintiff's own submissions. For example, plaintiff testified at his deposition that he closed the store for at least part of 1995 while he applied for business licenses and insurance, and addressed other problems. *See* Dockery Dep. [# 219] at 34, 80-81 (Matthews Decl. Ex. E); *see also* 8/18/05 Pl. Aff. [# 246] ¶ 3 ("On October 23, 1995, the Three Star[ ] Grocery Store was operable, but it was closed to the public when the police [broke in], because ... plaintiff had to go and

take care of other business."). This interruption in business is not, however, reflected in plaintiff's lost profits estimate. Even more importantly, in forecasting the store's earnings, plaintiff overlooks the potentially detrimental impact of his extended incarceration and absence from the store, to say nothing of market conditions or competition.[FN63]

> FN62. Although the 1995 search did not occur until the end of October, plaintiff has proffered no evidence as to the store's profits during the first nine months of that year.

> FN63. Contrary to defendants' characterization of the record, plaintiff acknowledges the existence of various receipts for stock and purchases related to his grocery store. *See* Pl. Dep. [# 219] at 80-81. Plaintiff maintains, however, that he cannot provide defendants with these receipts, as they were seized by law enforcement officers during an August 1995 search of plaintiff's Maryland residence. *Id.;* 7/5/01, 699 N.Y.S.2d 603 Pl. Aff. (attached as Ex. L to Pl. Mot. Appt. of Counsel [# 141] ) at 1 ("On August 10, 1995, numerous FBI agents, D.C. police officers and Maryland State Police conducted a search at 4165 Southern Avenue, Apt # T2, and seized all [of plaintiff's] personal business documents for his Three Star[ ] Grocery Store .... [Plaintiff] ... made numerous motions in Court [seeking the] return of his property business documents, but all his efforts were without success."). Because the disputed receipts and business documents would not alter the Court's conclusion that the grocery store has an insufficient record of past earnings from which to calculate lost profits, the Court need not address plaintiff's contention that potential documentary evidence was wrongfully seized from him.

On this record, no rational fact-finder could calculate with "reasonable certainty" the profits that would be owed to plaintiff as a result of any wrongful conduct by defendants. Accordingly, this Court recommends that defendants be granted summary judgment with respect to plaintiff's damages claim for lost profits. *See Schonfeld v. Hilliard,* 218 F.3d 164, 172-73 (2d Cir.2000) (affirming

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)

(Cite as: 2006 WL 5893295 (E.D.N.Y.))

### III. *Plaintiff's Cross-Motions for Summary Judgment*

Plaintiff, without legal argument, cross-moves, in the concluding paragraphs of his opposition papers, for summary judgment on all claims asserted in his third amended complaint. *See* Pl. Mem. (Tucker) [# 241]; Pl. Mem. (D.C.) [# 246]. Although plaintiff was not required to provide further affidavits in support of his cross-motion,[FN64] he submitted two additional affidavits summarizing his version of the events in question. *See* 8/18/05 Affidavit of Jasper Dockery in Support of Cross Motion for Summary Judgment on Complaint (unmarked exhibit to Pl. Mem. (D.C.)); 8/3/05 Plaintiff Affidavit in Support of Cross-Motion for Summary Judgment (unmarked exhibit to Pl. Mem. (Tucker)). These affidavits are largely redundant of plaintiff's earlier submissions in this case and add little, if anything, to the record before the Court. Moreover, when read in tandem with plaintiff's briefs opposing defendants' dispositive motions, plaintiff's affidavits merely underscore the disputed nature of the material facts underlying his Fourth Amendment and common law tort claims.

> FN64. *See* Fed.R.Civ.P. 56(a) ("A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may ... move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.").

**\*27** Most importantly, each of the claims that are the subject of plaintiff's cross-motion have already been addressed in this opinion and are either without merit, are worthy of summary judgment in favor of defendants, or are attended by material issues of fact that preclude summary judgment in favor of either party. For the aforesaid reasons, plaintiff's cross-motions should be denied in their entirety.

### *CONCLUSION*

For the reasons set forth above, it is the recommendation of this Court that defendants' motions to dismiss and for summary judgment on plaintiff's third amended complaint be granted in part and denied in part, and that plaintiff's cross-motions for summary judgment be denied in their entirety.

Specifically, this Court recommends dismissal of plaintiff's tort claim against Tucker, his claims concerning the constitutional rights of his children and Ilma Davis, and his official capacity claims against Dreher and Soulsby. This Court further recommends that defendants be granted summary judgment with respect to plaintiff's due process claims, his demand for lost profits, his individual capacity claims against Dreher and Soulsby, and his *Monell* claims, but that defendants be denied summary judgment with respect to plaintiff's Fourth Amendment claims against Tucker, Reed, and Young, and the common law tort claims against Reed, Young and the District. Finally, plaintiff's cross-motions should be denied in their entirety.

Any objections to the recommendations contained herein must be filed with the Honorable Allyne R. Ross on or before September 19, 2006. Failure to file objections in a timely manner may waive a right to appeal the District Court order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to docket and file this Order via ECF, and to mail a copy to plaintiff (# 39631053) at U.S. Penitentiary, P.O. Box 2099, Pollock, LA 71462.

**SO ORDERED.**

E.D.N.Y.,2006.

Dockery v. Tucker
Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 222603 (W.D.N.Y.)

(Cite as: 1999 WL 222603 (W.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Christine CIANCIO, Plaintiff,
v.
Dennis GORSKI, Erie County Executive, Deborah Merrifield, Commissioner of DSS, Joan Guarino, 1st Deputy Commissioner of DSS, Richard Angrisano, Chief Personnel Supervisor Erie County Dept. Personnel, Frank DeCarlo, Special Investigator (SID), Kevin Duggan, Director of Heap and Energy, Marcia Olszewski, Caseworker/Section President Local 815, and Valarie Redden, Energy Crisis Worker # 2 Heap, Defendants.
No. 98-CV-0714E(SC).

April 14, 1999.
Judge John T. Elfvin, Pro Se, Kenmore, for the Plaintiff.

Olszewski-Timothy Connick, Esq., c/o CSEA, Inc., Albany, Remaining Defendants-Kristin Klein Wheaton, Esq., Asst. County Attorney, Buffalo, for the Defendant.

MEMORANDUM and ORDER

ELFVIN, S.D.J.

*1 Plaintiff Ciancio, proceeding *pro se,* commenced this action November 12, 1998 by filing a Complaint containing claims under Title VII of the Civil Rights Act of 1964. Presently before this Court are Olszewski's December 14, 1998 motion to dismiss the Complaint as to her and the remaining defendants' January 5, 1998 motion to dismiss the Complaint as to them, each of which is brought pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("FRCvP"). For the reasons hereinbelow stated, Olszewski's motion will be granted and the others' will be granted in part and denied in part.

According to the Complaint and attachments thereto, Ciancio was denied promotion by the County of Erie to two positions at the County's Department of Social Services in October 1997. Complaint, at 6-7 & Charges of Discrimination attached thereto.[FN1] Previously, she had filed a charge with the Equal Employment Opportunity Commission ("the EEOC") in

May of 1997 alleging discrimination by the County. *Id.* at 3. It is unclear what had been the subject of the earlier charge and whether and/or how it had been resolved. Ciancio filed the charge from which this action stems on January 16, 1998 claiming that the County's and/or the Department's failure to promote her constituted retaliation for her previous filing of an EEOC charge; she amended that charge February 5, 1998 to add a claim of race discrimination based upon the same events. After having received a right-to-sue letter from the EEOC on August 15th, Ciancio timely commenced this action, claiming that the failure to promote her was motivated by retaliatory animus and/or by discrimination on the basis of her race, color, national origin, age and/or an unspecified disability. *Id.* at 4.

All defendants contend that the Complaint should be dismissed because individuals may not be sued under Title VII-*see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313-1317 (2d Cir.1995)-and Ciancio has named only individuals as defendants herein. This Court agrees, except with respect to defendant Gorski, who is sued herein as "Erie County Executive," and defendant Merrifield, who is sued as Commissioner of Social Services. Construing the Complaint liberally in light of the plaintiff's *pro se* status-*see Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam)-, this Court finds that the plaintiff's naming of Gorski and Merrifield sufficiently names the County and the Department and brings such entities before this Court as defendants. *See Kentucky v. Graham,* 473 U.S. 159, 165-167 (1985) (discussing "official-capacity" suits).[FN2] Accordingly, the plaintiff's Title VII claims against Gorski and Merrifield in their official capacities will not be dismissed for that reason. Although such defendants have not addressed the question, it is not clear that an official-capacity suit is the proper vehicle for recovery under Title VII. *See, e.g., Gray v. Shearson Lehman Bros., Inc.,* 947 F.Supp. 132, 136 (S.D.N.Y.1996) (finding that official-capacity suits are not proper under Title VII) (citing cases). The County, of course, may properly be made a defendant in a Title VII suit-42 U .S.C. § 2000e(a, b)-and any recovery against the Department (assuming that it is a separate, suable entity) would doubtless be paid by the County. Therefore, in the interest of eliminating undue complication without affecting the substantial rights of the parties, this Court will *sua sponte* substitute the County as the defendant in this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 222603 (W.D.N.Y.)

(Cite as: 1999 WL 222603 (W.D.N.Y.))

action in the place and stead of Gorski and Merrifield. FRCvP 21 ("[p]arties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Cimemotion NV v. Lorimar-Telepictures Corp.,* 1989 WL 120083, *6 (S.D.N.Y. Oct. 5, 1989)* (non-party over whom court could exercise personal jurisdiction would be added as a defendant *sua sponte* under FRCvP 21 "in the interest of the efficient administration of justice").

**\*2** However, to the extent that Ciancio seeks to advance claims against CSEA Local 815 by naming Olszewski, she must fail. Such union was not named as a respondent in her EEOC charge and the plaintiff has not demonstrated that the union had an identity of interest with her employer which might warrant disregarding the failure to have raised any charge against it before the EEOC. *See Vital v. Interfaith Medical Center,* 168 F.3d 615, 1999 WL 76804, *3–*4 (2d Cir. Feb. 19, 1999).[FN3] There is also no evidence that the union had known about Ciancio's EEOC charge or had participated in any investigation or conciliation effort that may have ensued. Furthermore, construing the Complaint to assert a claim for breach of the union's duty of fair representation pursuant to section 301 of the Labor Management Relations Act would be futile, as such a claim would be barred by the applicable six-month limitations period. *Id.* at *4.

The individual employees and representatives of the County also seek to strike "any reference to punitive damages in plaintiff's complaint." Defendants' Memorandum of Law filed January 5, 1998, at 5. This Court finds no reference in the Complaint to punitive damages-the form complaint utilized by Ciancio states that appropriate "injunctive orders, damages, costs and attorney's fees" are requested-, but Ciancio strongly opposes such aspect of the defendants' motion, arguing that "bla[t]ant discrimination with malic[ious] intent can not be taken lightly." Affidavit of Christine Ciancio sworn to January 26, 1999, at 6. However, under the Civil Rights Act of 1991, punitive damages are not available against a municipal entity that has violated Title VII, regardless of the egregiousness of such defendant's (or its agent's) discriminatory or retaliatory conduct. 42 U.S.C. § 1981a(b)(1). Therefore, to the extent that Ciancio seeks to recover the same, she is precluded therefrom.

Finally, this Court lacks jurisdiction over the plaintiff's claims premised upon alleged discrimination on the basis of

national origin, age and disability because Ciancio did not include such in either her original administrative charge or the amended charge and because those claims are not "reasonably related" to the claims raised therein. *See Butts v. City of New York Dept. of Housing,* 990 F.2d 1397, 1402-1403 (2d Cir.1993). Furthermore, age and disability discrimination are not actionable under Title VII-such are within the purview of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, and the Americans with Disabilities Act, 42 U.S .C. §§ 12101-12213, respectively.[FN4] However, the Court finds that Ciancio's claim of discrimination on the basis of her color is sufficiently similar to her race discrimination claim that the exercise of jurisdiction over that claim is appropriate.

Accordingly, it is hereby *ORDERED* that defendant Olszewski's motion to dismiss is granted, that the remaining defendants' motion to dismiss is granted in part and denied in part, that all claims in the Complaint are dismissed except for the plaintiff's claims under Title VII of the Civil Rights Act of 1964 for discrimination on the basis of race and/or color and for retaliation against defendants Gorski and Merrifield in their official capacities, that the County of Erie is substituted in the place and stead of Gorski and Merrifield, that the County shall serve and file an Answer within 30 days of the entry of this Order and that the caption in this action shall be amended to read:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 222603 (W.D.N.Y.)

(Cite as: 1999 WL 222603 (W.D.N.Y.))

"CHRISTINE CIANCIO,

Plaintiff,

-vs-

COUNTY OF ERIE,

Defendant."

FN1. The plaintiff now states that only one position is at issue because the second position was temporary in nature. Affidavit of Christine Ciancio sworn to January 26, 1999, at 2.

FN2. The Court notes that the individual representatives and employees of the County, including Gorski and Merrifield, are represented herein by the County Attorney.

FN3. The plaintiff argues that this Court may consider communications to EEOC officials in which she had identified allegedly unlawful conduct which had not been included in the administrative charge. *See Barone v. Hackett,* 602 F.Supp. 481, 484 (D.R.I.1984) (defendant who was identified and alleged to have discriminated against plaintiff in an EEOC Intake Questionnaire but not in the charge could be sued under the circumstances of that case). Whether or not such proposition is correct, Ciancio has presented nothing that would indicate that she had identified to the EEOC any conduct by the union or Olszewski which is alleged to have been unlawful.

FN4. This Court notes that the defendants also argue that individuals are not liable under the Age Discrimination in Employment Act or the Americans with Disabilities Act. While that contention need not be addressed, the undersigned disapproves of their having relied primarily upon and cited the Court to the unpublished decision of our Court of Appeals in *Martin v. Chemical Bank,* 129 F.3d 114 (Table), 1997 WL 701359 (Nov. 10, 1997), which-pursuant to section 0.23 of the Rules of the Second Circuit-"shall not be cited or otherwise used in unrelated cases before this or any other court." The parties are

admonished to comply with such rule in the future and with similar rules in other Circuits.

W.D.N.Y.,1999.

Ciancio v. Gorski
Not Reported in F.Supp.2d, 1999 WL 222603 (W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Peter GRAZIANO, Petitioner,
v.
William LAPE, Respondent.
No. 9:04-CV-84 (LEK/GJD).

July 2, 2008.
Peter Graziano, pro se.

Alyson J. Gill, Assistant Attorney General for Respondent.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on May 13, 2008 by the Honorable Gustave J. DiBianco, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 25). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Petitioner Peter Graziano, which were filed on May 23, 2008. Objections (Dkt. No. 26).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 25) is **APPROVED** and **ADOPTED** in its

**ENTIRETY;** and it is further

**ORDERED,** that the Petition for Writ of Habeas Corpus (Dkt. No. 1) is **DENIED** and **DISMISSED** in its entirety; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

PETER GRAZIANO, Petitioner,

vs.

WILLIAM LAPE, Superintendent of Marcy Correctional Facility Respondent.

### REPORT-RECOMMENDATION

GUSTAVE J. Di BIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a denial of parole by the New York State Board of Parole.

In 1986, a jury convicted petitioner of Murder, Second Degree. Petitioner was sentenced to an indeterminate term of imprisonment of fifteen years to life. Petitioner has been incarcerated since June 1986. Petitioner first became eligible for parole in 2001. Parole was denied after a hearing. The Parole Board set petitioner's next hearing date for February 2003. While in custody at the Marcy Correctional Facility, petitioner filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Dkt. No. 1) ("Petition").

Petitioner raises four grounds in support of his petition:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

1. The Division of Parole and the New York State court system deprived petitioner of due process and equal protection because they failed to correct a defect in the February 2001 parole decision (Petition ¶ 9(A));

2. Petitioner was "granted" parole in February 2001, and has been deprived of his "liberty right to such release" (Petition ¶ 9(B));

3. Petitioner was denied due process and "the right to redress his grievances" by the Board of Parole and the New York State courts (Petition ¶ 9(C));

**\*2** 4. Petitioner claims that prisoners are systematically denied due process and equal protection by the New York State courts (Petition ¶ 9(D)).

Petitioner has filed a memorandum of law and appendix in support of his application. (Dkt. No. 4). Respondent has filed his answer, together with a memorandum of law and the pertinent State Court Records ("S.C.R.").[FN1] (Dkt. No. 10). For the following reasons, this court will recommend denying the petition.

> FN1. State Court Records are listed on the second page of respondent's answer. (Dkt. No. 10). The State Court Records submitted by respondent are "Bates-stamped." However, it appears that two consecutive pages have been stamped with the number "51". The court will cite these pages as 51 and 51(A).

## DISCUSSION

### 1. Facts and Procedural Background

In 1986, petitioner was convicted by a jury of Second Degree Murder after shooting a man to death at a pizzeria. (S.C.R.2-3)[FN2]. Petitioner was sentenced to an indeterminate term of incarceration of fifteen years to life. (Dkt. No. 4 at 1).

> FN2. The first nine pages of the State Court Records are the transcript of petitioner's February 2001 Parole Board hearing.

Petitioner became eligible for parole in 2001, and a Parole Board hearing was conducted by three commissioners on February 27, 2001. (S.C.R.1). The

commissioners asked petitioner about the circumstances of his crime, his post-release plans, and the programs in which petitioner participated while incarcerated. (S.C.R.2-7). At the conclusion of the hearing, parole was denied, and another hearing was recommended for February 2003. (S.C.R.8). The transcript of the 2001 hearing includes questions and comments from all three commissioners, but only Commissioner Roslyn Block read the Board's decision denying parole into the record. (S.C.R.2-7, 8). A written version of the decision was issued on March 5, 2001, also stating that parole had been denied. (S.C.R.19).

Petitioner appealed the denial of parole to the Appeals Unit of the New York State Division of Parole. (S.C.R.11-27). Petitioner argued that the verbal decision on February 27, 2001 and the written decision that he received after the hearing reflected two different decisions by the Parole Board because the language was not exactly the same in both instances. (S.C.R.15-16). Petitioner also argued that because the transcript of the February 2001 hearing did not show that either of the other two commissioners concurred in Commissioner Block's verbal denial of parole, the remaining commissioners' votes should be construed as voting in favor of granting parole. (S.C.R.17-18). Petitioner submitted excerpts from the transcripts of other inmates' parole denials, showing that when a commissioner read a decision into the record, at least one other commissioner "concurred" in the decision. (S.C.R.22-27). On December 31, 2001, the Appeals Unit wrote a letter to petitioner, stating that the Appeals Unit was unable to render a decision, and that petitioner's administrative remedy was, thus, "deemed" exhausted. (S.C.R.28).

In December 2001, petitioner appealed the decision of the Parole Board by filing a petition for habeas corpus in the Oneida County Supreme Court. (S.C.R.29-39). Petitioner argued that only one of the commissioners at his parole hearing voted to deny him parole, and that "[t]he failure of the Three Commissioner Panel to provide a quorum or majority in their denial of parole entitles [petitioner] to immediate release to parole supervision." (S.C.R.33). In January 2002, the Oneida County Supreme Court denied petitioner's application *sua sponte* as unexhausted.[FN3,FN4] (S.C.R.40-41).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

FN3. The respondent in petitioner's Oneida County Supreme Court case was not ordered to answer petitioner's application. In an appendix submitted to this court by petitioner, a letter from the office of the New York Attorney General explained that the Oneida County Supreme Court "denied the writ and dismissed the petition without notice to, or ordering service upon, the named respondent ... Thus, respondent was not served and did not appear in the proceeding below." (Dkt. No. 4, Appendix, Exhibit Q). Because the respondent had not been served in the Oneida County Supreme Court, the respondent also did not appear in the Appellate Division, Fourth Department.

FN4. Petitioner filed his petition for habeas corpus in the Oneida County Supreme Court prior to receiving the letter from the Appeals Unit.

*3 In February 2002, petitioner made a motion to renew and reargue his habeas corpus application in the Oneida County Supreme Court. (S.C.R.42-51). Petitioner submitted evidence that the Appeals Unit had deemed his appeal exhausted. (S.C.R.49). Petitioner also clarified his argument regarding the commissioners' votes. (S.C.R.45-48). Petitioner argued that all three commissioners were present, but that the silence of two of the commissioners should be construed as affirmative votes in favor of granting parole. (S.C.R.47). In March 2002, Oneida County Supreme Court granted the motion for renewal and reargument, but ultimately denied petitioner's application for habeas corpus. (S.C.R.51(A)-53). The court found that petitioner had exhausted his appeal at the administrative level, but that petitioner had not supplied a legitimate legal basis to construe the two commissioners' silence as votes in favor of parole. FN5 (S.C.R.52). In June 2003, the Appellate Division, Fourth Department affirmed the Oneida County Supreme Court's decision. FN6 (S.C.R.54-56). In September 2003, the New York Court of Appeals denied leave to appeal. (S.C.R.57).

FN5. Petitioner cited a case, *Heimbach v. State,*

for the proposition that silence on a vote would be construed as an affirmative vote. The case involved the counting of votes in the New York State Senate, and the Oneida County Supreme Court found that the practice in the state senate did not bind the Parole Board. (S.C.R.52).

FN6. As stated above, respondent did not file any papers in the matter before the Appellate Division because he had not been a party to the proceeding in Oneida County Supreme Court. (Dkt. No. 4, Appendix, Exhibit Q).

Petitioner filed this case in January 2004. (Dkt. No. 1). Respondent filed his response with a memorandum of law in June 2004. (Dkt. No. 10). Respondent's memorandum of law raises three arguments, including an argument that the petition for habeas corpus is moot because petitioner was afforded another parole hearing on July 8, 2003. (Dkt. No. 10 at 4). In July 2004, petitioner made a motion to amend his petition to include the 2003 denial of parole. (Dkt. No. 11). This court denied the motion as premature, because petitioner had a pending Article 78 petition challenging the 2003 parole denial. (Dkt. No. 11). In July 2004, petitioner appealed this court's decision to United States District Judge Lawrence E. Kahn.FN7 (Dkt. No. 12). In February 2005, Judge Kahn affirmed this court's decision. (Dkt. No. 17). Petitioner then made a motion for reconsideration of Judge Kahn's February 2005 decision. (Dkt. No. 18). In May 2005, Judge Kahn denied petitioner's motion for reconsideration. (Dkt. No. 22).

FN7. As of July 2004, when petitioner filed the appeal of this court's decision, his appeal of the July 2003 parole denial was still pending in state court. (Dkt. No. 12, ¶ 6). It is unclear when the appeal was finally resolved. Petitioner has not filed a motion to amend his complaint subsequent to the resolution of the appeal of the July 2003 parole denial.

In an affidavit in support of the motion for reconsideration, petitioner stated that he appeared for a third Board of Parole hearing on February 1, 2005. (Dkt. No. 19 at 2). Petitioner submitted documentation showing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

that parole was denied, and that his next appearance would be in February 2007. (Dkt. No. 19 at 5). Petitioner also submitted documents indicating his intention to challenge the February 2005 denial of parole in state court. (Dkt. No. 19 at 6). The status of petitioner's Article 78 proceedings related to the 2003 denial of parole and his appeal of the 2005 denial is unclear. The court also does not have any information related to petitioner's February 2007 parole hearing, though it appears from the New York State Department of Correctional Services website that petitioner remains in custody at Marcy Correctional Facility. *See* http://nysdocslookup.docs.state.ny.us/.

**2. Mootness**

**\*4** This petition challenges **only** the 2001 denial of parole. Petitioner did not move to amend the petition when the appeal of the 2003 denial of parole was completed in state court. It is unclear whether petitioner appealed the 2005 denial of parole, but to the extent that he did appeal, petitioner has not moved to include any claims related to that appeal in this case. It is also unclear from the papers whether or not a parole hearing occurred in 2007. Respondent argues that since petitioner "reappeared before the Parole Board ... the petition is moot and must be dismissed." (Dkt. No. 10 at 4). Petitioner has had at least two Parole Board hearings since the 2001 denial.

Petitioner's central claim is that because two of the commissioners did not put their vote on the record during the oral decision on February 27, 2001, their silence should be construed as votes in favor of parole. Therefore, according to petitioner, he "was granted parole release by a majority vote" despite the oral decision read into the record by one of the three commissioners. Petitioner argues that the denial of parole was error, and that he is currently incarcerated in violation of the Constitution in light of the previous "grant" of parole, and despite the Parole Board's later denials of parole.

"A case becomes moot when it no longer satisfies the 'case or controversy' requirement of Article III, Section 2 of the Constitution. In order to satisfy the case-or-controversy requirement, a party must, at all stages of the litigation, have an actual injury which is likely to be redressed by a favorable judicial decision." *United States v. Mercurris,* 192 F.3d 290, 293 (2d Cir.1999) (citing

*Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). Generally, "if an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, we must dismiss the case." *United States v. Blackburn,* 461 F.3d 259, 261 (2d Cir.2006).

A case is not moot where the questions presented are "capable of repetition, yet evading review." *Sosna v. Iowa,* 419 U.S. 393, 400, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (internal citations omitted); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (citations omitted). To show that a case falls within this exception, a party must demonstrate that " '(1) the challenged action was in duration too short to be fully litigated prior to its cessation or expiration, and (2) there was reasonable expectation that the same complaining party would be subjected to the same action again.' " *Granato v. Bane,* 74 F.3d 406, 4111 (2d Cir.1996) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)).

It is well settled under New York law that "any challenge to a parole board hearing must be dismissed if petitioner is reconsidered for parole." *Boddie v. New York State Division of Parole,* 285 F.Supp.2d 421, 427 (S.D.N.Y.2003). *See also, Robles v. Dennison,* 2007 U.S. Dist. LEXIS 55061, *4, 2007 WL 2187303 (N.D.N.Y. July 30, 2007); Aviles v. Travis,* 282 A.D.2d 787, 722 N.Y.S.2d 436 (3d Dep't 2001); *Jhang v. Travis,* 285 A.D.2d 874, 727 N.Y.S.2d 361 (3d Dep't 2001). While New York law is clear, "the case law is not settled on whether a subsequent parole hearing renders moot a federal habeas petition to review an earlier parole denial." *Siao-Pao v. Mazzuca,* 442 F.Supp.2d 148, 153 (S.D.N.Y.2006) (internal citations omitted). *See also, Boddie,* 285 F.Supp.2d at 427; and *Robles v. Dennison,* 2007 U.S. Dist. LEXIS 55061, *4-6, 2007 WL 2187303 (N.D.N.Y. July 30, 2007).

**\*5** This court need not decide whether this petition has been rendered moot by the subsequent parole hearings. *Siao-Pao,* 442 F.Supp.2d at 153; *Boddie,* 285 F.Supp.2d at 427-28. Where a petitioner's claims are clearly without merit, "potentially complex and difficult issues about the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit." *Boddie,* 285 F.Supp.2d at 428 (*quoting Brown v. Thomas,* 2003 U.S. Dist. LEXIS 3396, 2003 WL 941940, No. 02 Civ. 9257, *1 (S.D.N.Y. March 10, 2003)). *See also, Robles,* 2007 U.S. Dist. LEXIS 55061 at *6, 2007 WL 2187303.

**3. Exhaustion**

Before the court reaches the merits, the court must point out that petitioner failed to exhaust any of his claims in state court. Section 2254(b)(1) requires that a petitioner exhaust all of his available state court remedies prior to filing an application for habeas relief. *See also Pena v. Ellis,* 07-CV-2736, 2007 U.S. Dist. LEXIS 93957, *8, 2007 WL 4565032 (E.D.N.Y. Dec. 21, 2007). In order to exhaust a denial of parole under New York law, the inmate must first file an administrative appeal with the Division of Parole Appeals Unit, and if that application is denied, the inmate must seek relief in State court pursuant to N.Y. CIV. PRAC. L. & R., Article 78. *See also Robles v. Williams,* 02 Civ. 6102, 2007 U.S. Dist. LEXIS 62052, *6, 2007 WL 2403154 (S.D.N.Y. Aug. 22, 2007). If the Article 78 petition is denied, petitioner must appeal that denial to the highest court capable of reviewing it. *Pena, supra.*

In this case, petitioner exhausted his remedies at the Division of Parole level, however, he did not bring an Article 78 proceeding. Instead, petitioner brought a petition for state habeas corpus, raising the first two issues that he raises in this petition. Petitioner now appears to argue that the Oneida County Supreme Court judge failed to convert petitioner's state habeas petition into an Article 78 proceeding in violation of petitioner's right to due process. (Dkt. No. 4, Memorandum of Law at 11-12).

Because petitioner never brought the appropriate state court challenge to his parole denial, it is arguable that he did not raise any of his current claims in state court.[FN8] However, the court notes that the Oneida County Supreme Court judge did ultimately decide petitioner's first two grounds for relief on the merits, and petitioner did appeal those claims to the highest court available. Thus, petitioner could have exhausted his first two claims. Petitioner has never raised his last two grounds in any state court, and thus, at best, he presents this court with a

"mixed petition," containing both exhausted and unexhausted claims.[FN9]

> **FN8.** Petitioner appears to have had a specific reason for failing to bring an Article 78 proceeding in State court. In his state court habeas application, petitioner claimed that he was bringing the habeas petition because a favorable decision in an Article 78 proceeding would only result in a "new hearing," while a favorable decision in a habeas corpus application could result in petitioner's immediate release. Petitioner has always argued, albeit improperly, that immediate release and not a new hearing is the appropriate relief in his case.

> **FN9.** Respondent has not raised petitioner's failure to exhaust as a defense in this case, however, the court would note that the federal habeas statute provides that the state does not waive the exhaustion requirement unless counsel "expressly" waives it. 28 U.S.C. § 2254(b)(3).

The habeas statute provides that an application for habeas corpus may be denied on the merits notwithstanding the failure to exhaust state court remedies. 28 U.S.C. § 2254(b)(2). After a review of petitioner's claims, this court finds that whether petitioner failed to exhaust any or all of his claims, they may **all be dismissed on the merits.**

**\*6** Although the Second Circuit has not specifically articulated a standard for this type of dismissal, lower courts have discussed two standards to determine whether a claim should be dismissed on the merits, notwithstanding the failure to exhaust. *See Hernandez v. Conway,* 285 F.Supp.2d 266, 273 n. 4 (W.D.N.Y.2007) (citing cases). A majority of the lower courts use the "patently frivolous" standard, while a minority of the courts use a "non-meritorious" standard, dismissing a claim when it is "perfectly clear that the [petitioner] does not raise even a colorable federal claim." *Id.* (citing *inter alia Naranjo v. Filion,* 02 Civ. 5449, 2003 U.S. Dist. LEXIS 6287, *30, 2003 WL 1900867 (S.D.N.Y. April 16, 2003) (patently frivolous standard); *Basnight v. Keane,* 99-CV-5907, 2001 U.S. Dist. LEXIS 11155, *14-15 & n. 1, 2001 WL 901139

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

(E.D.N.Y. July 31, 2001) (non-meritorious standard)).

In finding that a non-meritorious standard applied, the court in *Basnight* cited the Supreme Court decision in *Duncan v. Walker,* 533 U.S. 167, 183, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). In *dicta* from *Duncan,* the Supreme Court stated that "the AEDPA gives a district court the alternative of simply denying a petition containing **unexhausted but unmeritorious claims."** *Id.* (emphasis added). In this case, the court finds that petitioner's claims may be dismissed on the merits under either standard.[FN10]

> **FN10.** The court would also point out that even if the court were to consider petitioner's claims under the AEDPA standard for dismissal (which is more deferential to the state court), petitioner's claims would still be dismissed. The AEDPA standard states that in order for a habeas petitioner to succeed, the state court must have decided the federal claim on the merits, and that decision must have resulted in an unreasonable application of clearly established federal law, or must have been based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(d)(2). *See Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**4. Grounds One and Two**

Petitioner's first two claims are interrelated. He claims that he was denied due process and equal protection because there was a "defect" in petitioner's 2001 parole hearing. Petitioner claims that this "defect" resulted in a decision in favor of granting petitioner's parole, and that he should have been released as a result.

In conducting habeas review, a federal court is limited to determining whether the petitioner's rights have been violated under the Constitution, laws, or treaties of the United States. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state law questions." *Id.* at 68. Errors of state law do not entitle a petitioner to federal habeas relief. *Id.*

In this case, petitioner states that he has been deprived of his Fourteenth Amendment rights to due process and equal protection, but his claims are based only upon his erroneous view that there was an error in the procedure used at his 2001 parole hearing. Petitioner claims, relying upon a state court case, that because only one Commissioner read the decision denying parole into the record, the other two Commissioners must have voted in favor of granting parole. Thus, in petitioner's view, he should have been released. Petitioner then argues that the Oneida County Supreme Court agreed with petitioner that his "parole hearing was not decided by a majority of the panel,"[FN11] but that the lower court as well as the appeal courts failed to remedy the violation.

> **FN11.** Petitioner misstates the decision of the Oneida County Supreme Court. The court summarized petitioner's argument, and then found no legal basis for his claim. (S.C.R.52). The Supreme Court Judge did not "agree" with petitioner.

**\*7** "There is no constitutional or inherent right of a convicted person to be conditionally released prior to the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). "Federal habeas review of New York parole decisions is limited to the question of whether the Parole Board acted 'for arbitrary or impermissible reasons.' " *Siao-Pao,* 442 F.Supp.2d at 156 (internal citation omitted). Petitioner's argument in state court was purely procedural. He did not claim that the **substantive** reasons for the denial of parole were arbitrary or unreasonable. His only claim was that the "silence" of the two Commissioners should have been interpreted as votes in favor of parole. To the extent that petitioner is attempting to make an argument based upon the parole regulations and state law, there is simply no federal question to decide.

The court would also point out that petitioner's claim is completely frivolous in any event. The regulations governing the parole hearing or parole "interview" provide that "the parole release interview shall be conducted by a panel of at least **two** members of the Board of Parole."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

N.Y. CODES RULES & REGS. (N.Y.CRR), tit. 9, § 8002.2 (emphasis added). Parole release decisions are governed by N.Y. CODES RULES & REGS. (N.Y.CRR), tit. 9, § 8002.3. This regulation provides for the factors to be considered in release decisions. This section also provides that "[i]f parole is not granted, the inmate shall be informed in writing, within two weeks of his interview, of the factors and reasons in detail for such denial." 9 N.Y.C.R.R. § 8002.3(d). There is *no requirement* that the denial of parole be decided by any particular vote or even by a "majority" vote, regardless of the fact that there may have been more than two Commissioners present at a particular hearing.

This rationale is supported by the fact that the regulations provide that the "appeal" of a parole decision "shall be considered by three members of the Board of Parole." 9 N.Y.C.R.R. § 8006.4(d). The regulation specifically requires that "[t]he appeal shall be decided by *a majority of the three board members who review the appeal." Id.* (emphasis added). A well-established principle of statutory and regulatory interpretation states that if the Board of Parole explicitly included a provision for a majority vote in the appeals section of the regulations, it must have meant to exclude such a requirement in the section governing parole release. *See State Farm Mut. Ins. Co. v. Mallela,* 2002 U.S. Dist. EXIS 25187, *30-32 (E.D.N.Y. Nov. 21, 2002) (discussing the interpretation of New York statutes and regulations) (quoting *Presbyterian Hosp. v. Md. Cas. Co.,* 90 N.Y.2d 274, 284-85, 660 N.Y.S.2d 536, 683 N.E.2d 1 (1997)). This interpretation is clearly consistent with the language of section 8002.2 which requires at least two Commissioners at a parole release interview but no provision for a "vote" of any kind. Thus, petitioner's argument that his parole decision was faulty because there was no "majority" is frivolous.

**8** Petitioner also attempted to argue that because two of the Commissioners were "silent" on the record, they should have been counted as voting in favor of parole. In his state court habeas corpus application, petitioner cited *Heimbach v. State,* 89 A.D.2d 138, 454 N.Y.S.2d 997 (2d Dep't 1982), *aff'd,* 59 N.Y.2d 891, 465 N.Y.S.2d 936, 452 N.E.2d 1254 (1983). As noted by the Oneida County Court judge, petitioner's reliance upon *Heimbach* was

misplaced. (S.C.R.52). The court in *Heimbach* was determining the propriety of a "fast roll call" in the New York State Senate. The issue was whether a senator who had declared himself present, but later left the room, could be considered as having voted "in the affirmative" during a "fast roll call" when he did not respond. *Id.* 89 A.D.2d at 147-48, 454 N.Y.S.2d 993. The court cited a "general principle[ ]" of parliamentary law that Senators who are present in the chamber and who are not recorded as voting are "presumed to have voted in the affirmative." *Id.* at 147, 454 N.Y.S.2d 993.

There is absolutely no basis for applying this rule of "parliamentary" law to the Parole Board or to petitioner's case. It is clear that petitioner was denied parole. The decision was read into the record, and petitioner received a written decision within the appropriate amount of time. Petitioner has submitted the transcripts of other inmates' parole hearings in which the Commissioners' individual concurrences were noted on the transcript. The fact that in other cases, the record reflected concurrences by other Commissioners does not convert this claim into one for an "equal protection" violation and does not affect this court's decision in any way.

**5. Grounds Three and Four**

Petitioner alleges in his third and fourth grounds that the Parole Board and the New York State Courts have denied him the "right to redress his grievances," (Petition ¶ 9(C)), and that the courts are violating his rights to Due Process and Equal Protection by failing to release petitioner (Petition ¶ 9(D)). Plaintiff appears to claim that he is being denied his constitutional rights because the courts to which he appealed his denial of parole did not overturn the decision. As stated above, petitioner has never brought either of these claims in State court.

Since this court has found that plaintiff's central claim is completely meritless, the failure of the appeals courts to grant petitioner an evidentiary hearing or to overturn the denial cannot rise to the level of a constitutional violation. Petitioner has already had three more parole hearings since 2001, and has been denied each time. Clearly, the Commissioners did not intend to release him at the 2001 hearing, and petitioner's attempt to turn what he believes is a "technicality" into a vote for release is frivolous.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)

(Cite as: 2008 WL 2704361 (N.D.N.Y.))

"[F]ederal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." *Jones v. Duncan,* 162 F.Supp.2d 204, 217 (S.D.N.Y.2001). *See also Fuzia v. Lewin,* 05-CV-773, 2006 U.S. Dist. LEXIS 26732, *11-12, 2006 WL 1229080 (E.D.N.Y. April 21, 2006). Petitioner's allegation of due process and equal protection violations by the State failing to convert his habeas petition to an Article 78 proceeding and their alleged failure to grant him evidentiary or other hearings on his claims are not independent grounds for relief in a federal habeas petition. Thus, petitioner's third and fourth grounds may be dismissed.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED and DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Graziano v. Lape
Not Reported in F.Supp.2d, 2008 WL 2704361 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 174364 (N.D.N.Y.)

(Cite as: 2009 WL 174364 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Thomas DUEMMEL, Plaintiff,
v.
Brian FISCHER; New York State Department of
Correctional Services; David A. Paterson; Robert
Dennison; Susan O'Connell, Defendants.
No. 9:08-CV-1006 (TJM).

Jan. 23, 2009.
Thomas Duemmel, Rome, NY, pro se.

**DECISION AND ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Background**

**\*1** Currently before the Court for review is plaintiff
Thomas Duemmel's amended complaint. Dkt. No. 7.
Plaintiff submitted the amended complaint in compliance
with the Decision and Order of this Court filed on October
23, 2008. Dkt. No. 5 ("October Order"). The October
Order granted plaintiff's *in forma pauperis* application. *Id.*

**II. Discussion**

Section 1915(e) (2)(B) of Title 28 of the United
States Code, which governs proceedings *in forma
pauperis,* directs, in pertinent part, that "the court shall
dismiss the case at any time if the court determines that-...
(B) the action ...-(i) is frivolous or malicious; (ii) fails to
state a claim on which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from
such relief." 28 U.S.C. § 1915(e)(2)(B). It is the court's
responsibility to determine whether a plaintiff may
properly maintain his complaint in this District before the
court may permit a plaintiff to proceed with an action *in
forma pauperis. See* 28 U.S.C. § 1915(e)(2).

Moreover, under 28 U.S.C. § 1915A, the Court must
review any complaint in a civil action in which a prisoner
seeks redress from officers or employees of a

governmental agency and "identify cognizable claims or
dismiss the complaint, or any portion of the complaint, if
the complaint ... is frivolous, malicious, fails to state a
claim upon which relief may be granted or seeks monetary
relief from a defendant who is immune from such relief."
28 U.S.C. § 1915A(b); *see also Carr v. Dvorin,* 171 F.3d
115, 116 (2d Cir.1999) (per curiam). An action is
frivolous as a matter of law when, *inter alia,* it is based on
an "indisputably meritless legal theory"-that is, when it
"lacks an arguable basis in law ... or [when] a dispositive
defense clearly exists on the face of the complaint."
*Livingston v. Adirondack Beverage Co.,* 141 F.3d 434,
437 (2d Cir.1998).

The gravamen of plaintiff's amended complaint is that
he has been denied parole release in violation of his
constitutional rights. Dkt. No. 7. Plaintiff also alleges that
defendants denied him the right to participate in SOP in a
timely manner.[FN1] *Id.* Plaintiff seeks his immediate release
from custody and an "examination by the Court" of the
denial of programming and parole. *Id.* For a more
complete statement of plaintiff's claims, refer to the
amended complaint.

> FN1. Plaintiff appears to be referring to the Sex
> Offender Counseling & Treatment Program,
> which is a comprehensive program of counseling
> and treatment for sex offenders. *See*
> h t t p : / / w w w . d o c s .
> state.ny.us/ProgramServices/guidance.html#
> soctp. Plaintiff did enroll in SOP and eventually
> completed the program on January 29, 2006.
> Dkt. No. 7 at 10-11.

**A. Defendants**

Plaintiff has not named "New York State Department
of Correctional Services," "David Paterson," or "Susan
O'Connell" as defendants in his amended complaint.
Accordingly, "New York State Department of
Correctional Services," "David Paterson," or "Susan
O'Connell" are dismissed as defendants in this action.

**B. No right to parole or programming**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 174364 (N.D.N.Y.)

(Cite as: 2009 WL 174364 (N.D.N.Y.))

In order to proceed with his claim that he was denied parole in violation of his constitutional rights, it must appear that plaintiff enjoyed a protected liberty interest under New York State's statutory scheme for determining whether to grant or deny an application for parole. *See Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) (per curiam). It is well-settled, however, that "the New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release," and that, as a result, prisoners in New York state are not entitled to the safeguards afforded by federal due process with respect to parole release determinations. *Barna, supra,* 239 F.3d at 171; *Boothe v. Hammock,* 605 F.2d 661, 663-64 (2d Cir.1979).[FN2] Rather, any alleged violations of procedural requirements "are matters for consideration by the state courts." *Boothe,* 605 F.2d at 665.

> FN2. The decision of the Supreme Court in *Wilkinson v. Dotson,* 544 U.S. 74 (2005), allowing a § 1983 action by Ohio prisoners challenging the constitutionality of that state's parole process, is not applicable to this case. The *Wilkinson* Court "did not create or comment on any constitutional entitlements relating to parole." *Standley, supra,* 2007 WL 2406909 at *1 quoting *Yourdon v. Johnson,* 01-CV-812E, 2006 WL 2811710 at *2 (W.D.N.Y. Sept. 28, 2006). The Court also notes that plaintiff does not claim that defendants acted "arbitrarily or capriciously." *See Standley v. Dennison,* No. 9:05-CV-1033, 2007 WL 2406909 *1 (N.D.N.Y. Aug. 21, 2007); *Bottom v. Pataki,* No. 9:03-CV-0835, 2006 WL 2265408 at *6 (N.D.N.Y. Aug. 7, 2006).

*2 It is also clear that inmates do not enjoy a constitutionally protected right to participate in particular programs or to parole release. *Allen v. New York,* 9:05-CV-1613, 2006 U.S. Dist. LEXIS 72646, at *3 (N.D.N.Y. Oct. 5, 2006) (Mordue, C.J.) (citing *Lee v. Governor of New York,* 87 F.3d 55, 58-59 (2d Cir.1996); *Grant v. Ahern,* 2005 U.S. Dist. LEXIS 43274, No. 03-CV-0539, 2005 WL 1936175 *5 (N.D.N.Y.) (Magnuson, V.J.)).[FN3]

> FN3. In *Allen,* as in this case, plaintiff alleged

that DOCS had a practice of withholding an inmate's participation in the Sexual Offender Counseling Program until an inmate was within one year of his conditional release date; as a result of this practice, the inmate may not have completed this program prior to his or her initial appearance before the parole board, resulting in denial of parole release. *See Allen,* 2006 U.S. Dist. LEXIS 72646, at *2-3. The *Allen* court found that these allegations did not state a claim upon which relief may be granted. *Id.*

**C. Release from custody**

To the extent that plaintiff seeks his immediate release from custody, he is advised that such relief may only be obtained by way of a habeas corpus petition brought pursuant to 28 U.S.C. § 2254. *See id.; Preiser v. Rodriguez,* 411 U.S. 475, 490 (1973) ("[c]ongress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity" of their underlying criminal conviction); *see also Channer v. Mitchell,* 43 F.3d 786, 787 (2d Cir.1994) ("habeas corpus-not a § 1983 action-provides the sole federal remedy where a state prisoner challenges the fact or duration of his imprisonment ....") (citing *Preiser* ).

**III. Conclusion**

Because plaintiff has failed to establish that he enjoyed a protected liberty interest in parole release or programming, the alleged deficiencies in the consideration of his parole application or the delay in providing programming do not state a claim upon which relief can be granted under 42 U.S.C. § 1983. Moreover, to the extent that plaintiff seeks his immediate release from custody, such relief may only be obtained by way of a habeas corpus petition brought pursuant to 28 U.S.C. § 2254. The amended complaint is therefore dismissed.

WHEREFORE, it is hereby

ORDERED, that "New York State Department of Correctional Services," "David Paterson," or "Susan O'Connell" are dismissed as defendants in this action; and it is further

ORDERED that this action is **dismissed** pursuant to 28 U.S.C. §§ 1915(e) and 1915A for failure to state a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 174364 (N.D.N.Y.)

(Cite as: 2009 WL 174364 (N.D.N.Y.))

claim upon which relief may be granted, and it is further

ORDERED, that the Clerk of the Court serve a copy of this Decision and Order on plaintiff.

N.D.N.Y.,2009.

Duemmel v. Fischer
Slip Copy, 2009 WL 174364 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
John STANDLEY, Plaintiff,
v.
Robert DENNISON, Terrence X. Tracy, Vanessa Clarke, Marietta Gailor, Smith Jr., Vernon Manley, Patricia Tappan, Debra Loomis, Roslyn Block, John Capacci, Edward Mevec and Livio Lazzari, Defendants.
No. 9:05-CV-1033 (GLS/GHL).

Aug. 21, 2007.
John Standley, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General, Christopher W. Hall, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***MEMORANDUM-DECISION AND ORDER***

GARY L. SHARPE, U.S. District Judge.

***1** After John Standley filed a § 1983 action alleging violations of his Fourteenth Amendment rights,[FN1] *see Dkt. No. 4; see also* 42 U.S.C. § 1983, his complaint was referred to Magistrate Judge George H. Lowe for report and recommendation. *See* 28 U.S.C. § 636(b)(1)(A), (B); N.D.N.Y. R. 72.3(c); Gen. Order No. 12, § D(1) (G). Subsequently, Judge Lowe issued a report recommending that Standley's motion for summary judgment be denied, and defendants' cross-motion for summary judgment be granted in its entirety. *See Report-Recommendation ("R & R"), Dkt. No. 45.*[FN2]

> FN1. Standley chiefly asserts that his due process were violated when the recommendation of the sentencing court was not considered during his parole hearing. *See Dkt No. 4.*

> FN2. The Clerk is directed to append Judge Lowe's Report-Recommendation to thisdecision, and familiarity is presumed. *See Dkt. No. 45.*

Broadly construing the complaint, Judge Lowe concluded the following: (1) Standley did not have a protected liberty interest in his parole proceedings, and therefore failed to establish a due process claim, and (2) Standley's equal protection claim fails to allege a protected class, and is therefore also deficient.

Standley has now filed timely objections to Judge Lowe's report. *See Dkt. No. 47.* Since he specifically objects to Judge Lowe's legal and factual findings, his objections will be reviewed *de novo. See Almonte v. N.Y. State Div. of Parole,* 9:04-CV-484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006). Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirey.

Standley specifically objects to Judge Lowe's failure to consider the Supreme Court's holding in *Wilkinson v. Dotson* in determining his due process claim. *See Wilkinson v. Dotson,* 544 U.S. 74, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005). He argues that *Wilkinson* permits prisoners to bring a § 1983 action to challenge the constitutionally of parole proceedings. The court will review this objection *de novo.*

While *Wilkinson* provides a viable § 1983 cause of action for prisoners seeking redress for state procedures, New York state prisoners have no constitutionally protected liberty interest in parole. *See Yourdon v. Johnson,* 01-CV-812E, 2006 WL 2811710, at *2 (W.D.N.Y. Sept.28, 2006). The *Yourdon* court noted:

> [t]he plaintiffs in *Wilkinson* were state prisoners in Ohio seeking declaratory and injunctive relief claiming that Ohio's state parole procedures were unconstitutional. The Supreme Court's ruling therein was narrow in that it only allowed a state prisoner who challenges the constitutionality of the state parole procedures to bring a claim under 42 U.S.C. § 1983 for declaratory and injunctive relief 'where success in the action would not necessarily spell immediate or speedier release for the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

prisoner' and did not create or comment on any constitutional entitlements relating to parole. Clearly, Wilkinson did not address whether discretionary parole in New York imparts a constitutional liberty interest in an inmate within the New York State Corrections System thereby entitling him to due process under the United States Constitution.

*Yourdon,* 2006 WL 2811710, at *2 (citing *Wilkinson,* 544 U.S. at 8182). Therefore, Standley's reliance on *Wilkinson* is misplaced. As Judge Lowe noted, Standley's complaint fails to state a due process claim because he has no liberty interest in parole and no constitutional due process rights in the parole process in New York.[FN3] Therefore, Standley's motion for summary judgment on this ground is denied, and defendants' motion on the basis of due process is granted.

> FN3. Since Standley does not have a protected liberty interest, to state a claim for relief he must allege that defendants acted "arbitrarily or capriciously." *See Bottom v. Pataki,* 03-CV-835, 2006 WL 2265408, at *6 (N.D.N.Y. Aug.7, 2006). Standley has not demonstrated that defendants acted either arbitrarily or capriciously, and therefore his due process claim must fail.

*2 Standley also objects to the use of internet citations throughout Judge Lowe's report since he does not have access to Lexis or Westlaw. The court will review this objection *de novo.* The Supreme Court has recognized that access to the courts under the First Amendment entitles prisoners to adequate law libraries. However, this does not translate into an abstract, free-standing right to a law library or legal assistance. *See Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Here, Standley does not argue that the Correctional Facility where he is housed does not have an adequate law library. Instead, he claims that does not have access to all the cases cited by Judge Lowe. Reviewing Judge Lowe's report, the cases cited for major tenets of law are reported in volumes presumably available to Standley. Therefore, to the extent that some peripheral cases were not available to him, Standley has not been

unduly prejudiced. For the reasons stated, Standley's motion for summary judgment is denied, and defendants' cross-motion is granted. Accordingly, the court adopts Judge Lowe's report in its entirety.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Lowe's March 30, 2007 Report-Recommendation (**Dkt. No. 45**) is accepted and adopted in its entirety; and it is further

**ORDERED** that Standley's motion for summary judgment (**Dkt. No. 24**) is **DENIED;** and it is further

**ORDERED** that defendants' cross-motion for summary judgment (**Dkt. No. 30**) is **GRANTED,** and the complaint (**Dkt. No. 4**) is **DISMISSED IN ITS ENTIRETY;** and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Generally, in this *pro se* civil rights action brought under 42 U.S.C. § 1983, New York State Inmate John Standley ("Plaintiff") alleges that twelve employees of the New York State Division of Parole-Robert Dennison, Terrence X. Tracy, Venessa Clarke, Marietta Gailor, Walter Smith, Jr., Vernon Manley, Patricia Tappan, Debra Loomis, Roslyn Block, John Capacci, Edward Mevec, and Livio Lazzari ("Defendants")-violated Plaintiff's due process and equal protection rights under the Fourteenth Amendment by, *inter alia,* failing to consider his sentencing minutes during four separate parole hearings on July 22, 2003, July 27, 2004, January 10, 2005, and July 19, 2005. (*See generally* Dkt. No. 4 [Plf.'s Am. Compl.].)

Currently before the Court are Plaintiff's motion for summary judgment and Defendants' cross-motion for summary judgment. (Dkt.Nos.24, 30.)[FN1] For the reasons

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

discussed below, I recommend that Defendants' cross-motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied as moot, procedurally deficient, and/or without merit. In the alternative, I recommend that Plaintiff's *in forma pauperis* status be revoked as having been improvidently granted due to Plaintiff's lack of candor with the Court, and that his Amended Complaint be dismissed without prejudice to refiling.

> [FN1.](#) I note that service of Plaintiff's Complaint was not effected on Patricia Tappan due to the fact that she is no longer employed by the New York State Division of Parole. (Dkt.Nos.18, 32.) However, the analysis and conclusions set forth in this Report-Recommendation apply to all Defendants, including Defendant Tappan.

## I. BACKGROUND

**\*3** In his Amended Complaint, Plaintiff alleges as follows. At Plaintiff's first parole hearing, on **July 22, 2003,** Defendants **Tappan, Clarke** and **Gailor** denied Plaintiff parole. (Dkt. No. 4, ¶ 33 [Plf.'s Am. Compl.].) This hearing was improper in two ways: (1) Defendants **Tappan, Clarke** and **Gailor** should not have considered "sealed criminal information" contained in Plaintiff's pre-sentence report, and (2) Defendants **Tappan, Clarke** and **Gailor** failed to consider Plaintiff's "sentencing minutes," which contained "the recommendation from the sentencing judge [Judge Goodman] that plaintiff's release to parole after the completion of twenty years was entirely depend[ent] upon his record of rehabilitation," which record had been exemplary. (*Id.* at ¶¶ 25-35, 37, 40, 89.) On or about **February 12, 2004,** Defendant **Loomis** participated in the decision to affirm this hearing decision. (*Id.* at ¶¶ 37, 38.)

At Plaintiff's second parole hearing, on **July 27, 2004,** Defendants **Loomis, Block** and **Capacci** denied Plaintiff parole. (*Id.* at ¶¶ 41, 47.) This hearing was improper in five ways: (1) Defendant **Loomis** should not have participated in the hearing since, on June 18, 2004, the New York State Supreme Court, Albany County, had ruled that the hearing must be a *de novo* hearing before members of the New York State Division of Parole other than the members who decided the prior parole

proceeding; (2) Defendant **Loomis** should not have participated in the hearing since "her statutory right to act as a parole commissioner expired on June 18, 2004"; (3) Defendants **Loomis, Block** and **Capacci** should have reviewed Plaintiff's sentencing minutes and the recommendation of Judge Goodman before they conducted the hearing, as ordered by the New York State Supreme Court, Albany County, on June 18, 2004; (4) instead, Defendants **Loomis, Block** and **Capacci** based their decision on "their own personal opinions as to the appropriate penalty" to impose on Plaintiff, and not on any evidence; and (5) Defendant **Tracy** should have ensured that Defendants Loomis, Block and Capacci reviewed those documents before they conducted the hearing, since Plaintiff had, before the hearing, written to Defendant Tracy expressing concern that those three Defendants would not review the documents. (*Id.* at ¶¶ 17-19, 36, 38-48, 51, 90, 95.) Subsequently, this hearing was affirmed by a panel that included Defendants **Gailor** and **Loomis** improperly (since Defendant Gailor had participated in the first hearing and Defendant Loomis had participated in deciding the appeal from the first hearing). (*Id.* at ¶¶ 68-69, 86.) Furthermore, at some point after **October 27, 2004,** Defendant **Tracy** failed to remedy these errors after being notified of them by Plaintiff. (*Id.* at ¶ 52.)

At Plaintiff's third parole hearing, on **January 18, 2005,** Defendants **Mevec, Manley** and **Smith** denied Plaintiff parole. (*Id.* at ¶¶ 59, 62.) This hearing was improper in three ways: (1) it was ordered without Plaintiff having been previously provided a written decision expressing the findings reached at the previous parole hearing or the findings reached by the appeals unit that had ordered the new hearing; (2) Defendants **Mevec, Manley** and **Smith** should have reviewed Plaintiff's sentencing minutes and the recommendation of Judge Goodman before they conducted the hearing; and (3) Defendant **Tracy** should have ensured that Defendants Mevec, Manley and Smith reviewed those documents before they conducted the hearing, since Plaintiff had, before the hearing, written to Defendant Tracy expressing concern that those three Defendants would not review the documents. (*Id.* at ¶¶ 54, 57-64, 66-67, 91, 95.) Furthermore, at some point after **February 5, 2005,** Defendant **Tracy** failed to remedy these errors after being

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

notified of them by Plaintiff. (*Id.* at ¶ 70.) In addition, at some point, Defendant **Tracy** failed to provide Plaintiff with "written reasons as to why he was granted a *second de novo* hearing," as requested by Plaintiff. (*Id.* at ¶ 72.)

**\*4** At Plaintiff's fourth parole hearing, on **July 19, 2005,** Defendants **Lazzari, Manley** and **Capacci** denied Plaintiff parole. (*Id.* at ¶¶ 73, 84.) This hearing was improper in four ways: (1) Defendants **Lazzari, Manley** and **Capacci** should have reviewed Plaintiff's sentencing minutes and the recommendation of Judge Goodman before they conducted the hearing; (2) Defendants **Lazzari, Manley** and **Capacci** "coerced" Plaintiff into agreeing to proceed with the hearing without the benefit of his sentencing minutes, by threatening to otherwise postpone the hearing for three months, and by misrepresenting to Plaintiff that it was his burden to provide such minutes to the Division of Parole; (3) Defendant **Lazzari** considered "sealed criminal information" contained in Plaintiff's pre-sentence report, despite the June 18, 2004, order of the New York State Supreme Court, Albany County, to not consider such information, and to "blackout" such information; and (4) Defendant **Capacci** deprived Plaintiff of his right "to be heard on the record" by "cut[ting] him off in mid sentence[ ] and in a hostile manner" when Plaintiff was attempting to respond to Defendant Capacci's question, "[W]hy did you decide to stab and kill [your victim]?" (*Id.* at ¶¶ 73-84, 92-94.)

Finally, Plaintiff alleges that Defendant **Dennison** is liable by failing "to ensure that plaintiff [was] accorded a proper Parole Board hearing by guaranteeing that the sentencing minutes would be submitted for review and consideration by the defendants prior to any parole determination," and failing to "ensure that the enumerated provisions of Criminal Procedure Law § 160.50 and Executive Law § 296(16), and the previous court's Memorandum and Judgment, [were] complied with by the removal of all statutorily sealed criminal information from plaintiff's parole file ...." (*Id.* at ¶ 95 [emphasis removed].)

## II. APPLICABLE LEGAL STANDARD

### A. Motion for Summary Judgment Under Rule 56

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN3]

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[FN4] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." [FN5] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN6]

> FN4. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN5. *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

**\*5** When deciding a motion for summary judgment, the facts set forth in a movant's Rule 7.1(a)(3) Statement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN7] and are not specifically controverted by the non-movant.[FN8] Once a movant has filed a Rule 7.1 Statement, the opposing party must file a Rule 7.1 Response.[FN9] This Rule 7.1 Response "shall mirror the movant's [Rule 7.1 Statement] by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." [FN10] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN11] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN12] (Here, I note that Plaintiff's Amended Complaint is verified.)

*FN7.* See *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a) (3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

*FN8.* See N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

*FN9.* See N.D.N.Y. L.R. 7.1(a)(3).

FN10. (*Id.*)

FN11. See *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN12. See *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [FN13] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN14] In addition, such an affidavit (or verified complaint) must not be conclusory.[FN15] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

general.<sup>FN16</sup> Moreover, "[a]n affidavit must not present legal arguments." <sup>FN17</sup>

> FN13. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

> FN14. See *Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.' ... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that is is based on personal knowledge *or* upon information and belief .... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

> FN15. See Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

> FN16. See, e.g., *Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

> FN17. N.D.N.Y. L.R. 7.1(a)(2).

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." <sup>FN18</sup>

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

FN18. *See, e.g.,* Jeffreys v. City of New York, 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit's application of its Local Rule § 0.23). *See, infra,* note 24 of this

Report-Recommendation.

**B. Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)**

To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based entirely on the complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b) (6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-274 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

To prevail on a motion to dismiss for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the defendant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) [citations omitted].[FN19] A defendant may base this motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a) (2);[FN20] or (2) a challenge to the legal cognizability of the claim.[FN21]

FN19. *See also* Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") [internal quotations and citation omitted].

FN20. *See* 5C Wright & Miller, *Federe* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN21. *See Swierkiewicz,* 534 U.S. at 514 ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b] [6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim.") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,*

01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

**\*6** Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a)(2) does not require a pleading to state the elements of a prima facie case,[FN22] it does require the pleading to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47).[FN23] The purpose of this rule is to "facilitate a proper decision on the merits." *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley,* 355 U.S. at 48). A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, C.J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion).[FN24]

FN22. *See Swierkiewicz,* 534 U.S. at 511-512, 515.

FN23. *See also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

FN24. Consistent with the Second Circuit's application of its Local Rule § 0.23, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose,

Page 9

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ); *U.S. v. Casado,* 303 F.3d 440, 449 n. 5 (2d Cir.2002) (citing, for similar purpose, unpublished table opinion of *U.S. v. Terry,* 927 F.2d 593 [2d Cir.1991] ); *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.,* 290 F.3d 98, 114 (2d Cir.2002) (citing, for similar purpose, unpublished table opinion of *Zitz v. Pereira,* 225 F.3d 646 [2d Cir.2000] ); *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 57 (2d Cir.2001) (citing, for similar purpose, unpublished table opinion of *Herman Miller, Inc. v. Worth Capitol,* 173 F.3d 844 [2d Cir.1999] ); *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A. G.,* 215 F.3d 219, 226 (2d Cir.2000) (citing, for similar purpose, unpublished table opinion of *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.,* 895 F.2d 1410 [2d Cir.1989] ); *Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 586 (2d Cir.2000) (citing, for similar purpose, unpublished table opinion of *Planned Parenthood Fed'n of Am. v. Bucci,* 152 F.3d 920 [2d Cir.1998] ). Moreover, I cite *Gonzales* to show a "a well-reasoned district court disposition of a similar case," as did the Second Circuit with regard to another case in a similar circumstance in *Carvey v. LeFevre,* 611 F.2d 19, 22 & n. 2 (2d Cir.1979).

The Supreme Court has characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has rejected judicially established pleading requirements that exceed this liberal requirement. *See Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake."). However, even this liberal notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003); *see, e.g., Dura Pharm.,* 125 S.Ct. at 1634-1635 (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004).[FN25]

FN25. Several other decisions exist from the Second Circuit affirming the Rule 12(b)(6) dismissal of a complaint due to its insufficiency under Rule 8(a)(2) after *Swierkiewicz. See, e.g., Johnson v. U.S.,* No. 03-6054, 2003 WL 22849896, at *1 (2d Cir. Dec.2, 2003) (relying on pre-*Swierkiewicz* decision by the Second Circuit applying Rule 8[a] and Rule 12[b][6] ); *Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.24, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Second Circuit Local Rule § 0.23, I cite them because they clearly acknowledge the continued precedential effect, after *Swierkiewicz,* of cases from within the Second Circuit interpreting Rules 12(b)(6) and 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]. "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Hernandez,* 18 F.3d at 136 [citation omitted].[FN26] Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).[FN27]

FN26. *See also Vital v. Interfaith Med. Ctr.,* 168

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

F.3d 615, 619 (2d Cir.1999) (affirming dismissal under Rule 12[b][6] ) ] [internal quotations and citation omitted].

FN27. Of course, the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended." *Stinson v. Sheriff's Dep't of Sullivan Cty., 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980)* [citations omitted], *accord, Gil v. Vogilano, 131 F.Supp.2d 486, 491 (S.D.N.Y.2001).*

Finally, when addressing a *pro se* complaint, a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir.2000)* (internal quotation and citation omitted).[FN28] Of course, an opportunity to replead should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco, 222 F.3d at 112* (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991)* ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]. Moreover, granting a *pro se* plaintiff an opportunity to amend his complaint is not required where the plaintiff has already been given an opportunity to amend his complaint (and has taken advantage of that opportunity).

FN28. *See also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

**C. Revocation of Plaintiff's Special Status as *Pro Se* Civil Rights Litigant**

**\*7** Imposed over the aforementioned burden-shifting framework is the generous perspective with which the Court *generally* views a *pro se* civil rights plaintiff's papers.[FN29] For example, where a civil rights plaintiff is proceeding *pro se*, and the defendant has filed a dispositive motion, *generally* the Court must construe the

plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest.[FN30] Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment."[FN31]

FN29. *See Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)* (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta, 867 F.2d 146, 148 (2d Cir.1989)* (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 467 (S.D.N.Y.1998)* (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

FN30. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

FN31. *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec.5, 1994).

In addition, "there are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or status that is normally afforded *pro se* litigants.[FN32] The rationale for this revocation of special status (at least in the Second Circuit) is not that the *pro se* litigant should be punished but that his excessive litigiousness demonstrates his *experience,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

the lack of which is the reason for conferring the special status upon *pro se* litigants in the first place.[FN33] Moreover, permitting experienced *pro se* litigants to retain their special status (despite their litigation experience) would tilt the scales of justice unfairly in favor of the *pro se* litigant and against his opponents.[FN34]

FN32. *Smith v. Burge,* 03-CV-0955, 2006 WL 2805242, at *3 & n. 3 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.) [citations omitted].

FN33. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, *2 (2d Cir.1999)* (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *Gill v. Pidylpchak,* 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec.19, 2006) (Scullin, J., adopting report-recommendation of Treece, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 (N.D.N.Y. Oct.18, 2006) (Hurd, M.J., adopting Report-Recommendation of Lowe, M.J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept.29, 2004); *Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct.11, 1991).

FN34. *See, e.g., Hussein,* 1991 WL 221033, at *4 (concluding that experienced *pro se* litigant should no longer be afforded special leniency because continuing to afford him such leniency would be unfair to "numerous attorneys," whose time and energy had already been consumed by plaintiff); *see also* Jessica Case, "Pro se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 *Ky. L.J.* 701, 735-740 (Spring 2001) (discussing how extending special leniency to *pro se* litigants in some circumstances "distorts the adversarial system and the role of trial judges") [citing cases]; Julie M. Bradlow, "Procedural Due Process Rights of *Pro se* Civil Litigants," 55 *U. Chi. L.Rev.* 659, 672 (Spring 1988) (discussing how "extending too much procedural leniency to a *pro se* litigant risks undermining the impartial role of the judge in the adversary system") [citations omitted].

Courts relying on the "experience" rationale for revoking a *pro se* litigant's special status look at a variety of factors in assessing whether or not the *pro se* litigant is experienced. Most often, these factors include (1) the number of previous federal court actions filed, (2) the number of previous federal court appeals filed, (3) the number of previous state court actions filed, (4) the number of previous state court appeals filed, and (5) the recency or simultaneity of the actions and/or appeals.[FN35]

FN35. *See, e.g., Eggersdorf,* 8 F. App'x at 143; *Gummerson,* 201 F.3d at *2; *Flynn,* 32 F.3d at 31; *Frawley,* 2006 WL 1742738, at *3 & n. 2; *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10; *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3; *Dean,* 204 F.R.D. at 257; *Santiago,* 91 F.Supp.2d at 670; *McGann,* 1999 WL 173596, at *2, 8-10; *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3; *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

There is, of course, no formula for determining "How many is too many?" However, *generally,* if a *pro se* litigant has filed a dozen or more actions and/or appeals before the date of the decision in question, it is quite possible that he will be deemed to be "experienced."[FN36] Granted, there are some cases revoking the special status of a *pro se* litigant who has filed *fewer* than a dozen cases.[FN37] However, there appear to be *more* cases refusing to revoke the special status of a *pro se* litigant who has filed fewer than a dozen cases.[FN38]

FN36. *See, e.g., Eggersdorf,* 8 F. App'x at 143 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had *twelve* simultaneously pending lawsuits in Northern District alone); *Gummerson,* 201 F.3d at *2 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had *twelve* simultaneously pending lawsuits in Northern District alone); *Talbot,* 2005 U.S. Dist. LEXIS 39576, at * 18-20 & n. 10 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed *twenty* lawsuits in Northern District alone); *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed *twenty* lawsuits in Northern District alone).

FN37. *See, e.g., Santiago,* 91 F.Supp.2d at 670 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had *ten* lawsuits pending in Southern District); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (denying leniency to *pro se* civil rights inmate who had previously filed *eight* federal court actions or appeals); *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that inmate had filed *seven* previous lawsuits against prison officials); *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had *seven* lawsuits pending in Western District).

FN38. *See, e.g., McEachin v. Faruki,* 03-CV-1442, 2006 WL 721570, at *2 n. 3 (N.D.N.Y. March 20, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed *eleven* other federal lawsuits since 2000); *Pritchett v. Portoundo,* 03-CV-0378, 2005 WL 2179398, at *2 n. 3 (N.D.N.Y. Sept.9, 2005) (refusing to deny leniency to *pro se* civil rights inmate who had filed *eight* other federal lawsuits since 1996); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *2 n. 5 (N.D.N.Y. Feb.13, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed *six* other federal lawsuits in previous nine years); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *3 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (refusing to deny leniency to *pro se* civil rights inmate who had previously filed *five* actions or appeals in federal or state court); *Smith,* 2006 WL 2805242, at *3 & n. 4 (refusing to deny leniency to *pro se* civil rights inmate based on his filing of *five* other lawsuits); *Abbas v. Senkowski,* 03-CV-0476, 2005 WL 2179426, at *2 n. 4 (N.D.N.Y. Sept.9, 2005) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed *three* other federal actions since 1997); *Loren v. Feerick,* 97-CV-3975, 1997 WL 441939, at *1 & n. 9 (S.D.N.Y. Aug.6, 1997) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed *three* previous actions in state court regarding current matter, and two previous actions in district court regarding current matter).

One reason for this array of cases is that, in determining whether or not a *pro se* litigant is "experienced," courts sometimes consider additional factors, such as the quality of the *pro se* litigant's submissions to the Court (e.g., whether they are typed, cogent, supported by applicable affidavits, exhibits, and/or memoranda of law, etc),[FN39] and whether or not the *pro se* litigant has been victorious (or partially victorious) in any of his previous actions or appeals.[FN40]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

FN39. *See, e.g., Saunders,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that, among other things, "with regard to the current action, ... the motion papers that [p]laintiff has submitted over the past several years have often been fairly good-being typed, being accompanied by affidavits, and containing legal memoranda, exhibits, etc.").

FN40. *See, e.g., Saudners,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had settled two of his previous six federal court actions, receiving $25,000 in exchange for his agreement to voluntarily dismiss the actions, and the fact that some of plaintiff's motions in his many actions have been granted); *Ab v. Sekendur,* 03-CV-4723, 2004 WL 2434220, at *5 (N.D.Ill. Oct.28, 2004) (considering, during decision of whether *pro se* plaintiff should be denied leniency normally afforded inexperienced *pro se* litigants, fact that "[plaintiff's] has successfully applied for and received ... [a] patent, and as the record in this case indicates, he engaged in lengthy business negotiations with Anoto and various other corporations").

**\*8** Here, Plaintiff has filed at least *sixteen* federal or state court actions or appeals other than the current action. Specifically, he has filed at least *five* other federal court actions,[FN41] at least *one* federal court appeal,[FN42] at least *seven* state court actions,[FN43] and at least *three* state court appeals.[FN44] Plaintiff was victorious or partially victorious in at least *four* of these actions or appeals.[FN45] This last fact is of little surprise to me since, generally, Plaintiff's papers in the aforementioned actions-as well as the current action-have been exceptionally good, almost always being typed, coherent, organized, and accompanied by affidavits, exhibits and memoranda of law, etc.

FN41. *See Standley v. Lazerson,* 91-CV-6078 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Artuz,* 93-CV-3528 (E.D.N.Y.) (habeas corpus action); *Standley v. Stewart,*

97-CV-6552 (S.D.N.Y.) (civil rights action); *Standley v. Lyder,* 99-CV-4711 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Wilcox,* 02-CV-6230 (S.D.N.Y.) (prisoner civil rights action).

FN42. *See Standley v. Artuz,* No. 95-2755 (2d Cir.) (habeas corpus action).

FN43. *See Standley v. Stewart,* Index No. 402210/1999 (N.Y.S. Sup.Ct., New York County) (professional malpractice action); *Standley v. Goord,* Index No. 002763/2000 (N.Y.S. Sup.Ct., Dutchess County) (Article 78 proceeding); *Standley v. Goord,* Index No. 000120/2001 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 000149/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Goord,* Index No. 002828/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 000971/2005 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 001989/2006 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding).

FN44. *See Standley v. N.Y.S. Div. of Parole,* 34 A.D.3d 1169, 825 N.Y.S.2d 568 (N.Y.App.Div., 3d Dept.2006) (Article 78 proceeding); *Standley v. Stewart,* 305 A.D.2d 332, 759 N.Y.S.2d 327 (N.Y.App.Div., 3d Dept.2003) (professional malpractice action); *Standley v. Goord,* 293 A.D.2d 922, 742 N.Y.S.2d 406 (N.Y.App.Div., 3d Dept.2002) (Article 78 proceeding); *see also Standley v. N.Y.S. Div. of Parole,* 823 N.Y.S.2d 922 (N.Y.App.Div., 3d Dept.2006) (Article 78 proceeding); *Standley v. N.Y.S. Div. of Parole,* 30 A.D.3d 730, 815 N.Y.S.2d 492 (N.Y.App.Div., 3d Dept.2006) (Article 78 proceeding).

FN45. *See Standley v. N.Y.S. Div. of Parole,* 34 A.D.3d 1169, 825 N.Y.S.2d 568 (N.Y.App. Div., 3d Dept.2006) (reversing and remanding trial court decision against Plaintiff); *Standley v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

*N.Y.S. Div. of Parole,* 823 N.Y.S.2d 922 (N.Y.App.Div., 3d Dept.2006) (granting Plaintiff's motion for re-argument and motion to proceed as a poor person); *Standley v. Wilcox,* 02-CV-6230, Stipulation and Order of Settlement (S.D.N.Y. filed May 13, 2004) (entering order dismissing action upon settlement by parties). (*See also* Dkt. No. 4, ¶ 17-19 [Plf.'s Am. Compl., alleging that Plaintiff's case entitled *Standley v. New York State Division of Parole,* Index No. 149-04, which was pending in Supreme Court, Albany County, resulted in a judgment on June 18, 2003, in Plaintiff's favor, "vacat[ing] and annull[ing] the defendants' determination to deny parole release and order[ing] that plaintiff be brought before a *de novo* hearing"].).

As a result, I find that the circumstances warrant revoking Plaintiff's special status as a *pro se* litigant for the remainder of this action. Again, continuing to afford him such special status would be unnecessary (and unfairly prejudicial to Defendants).

**III. ANALYSIS**

**A. Defendants' Cross-Motion for Summary Judgment**

In support of their cross-motion for summary judgment, Defendants essentially assert three arguments: (1) Plaintiff has failed to state a due process claim because (a) Plaintiff had no "protected liberty interest" in parole in New York State, (b) a violation of New York State law does not in and of itself give rise to a due process violation, and (c) the parole board's actions were not sufficiently irrational and improper to give rise to a due process violation; (2) Plaintiff has failed to state an equal protection claim because he does not allege any facts indicating, or adduce any evidence establishing, any "discriminatory purpose or conduct"; and (3) three of Plaintiff's six causes of action are barred by the doctrine of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (Dkt. No. 30, Part 8 [Defs.' Mem. of Law].)

**1. Plaintiff's Due Process Claim**

This action is brought pursuant to 42 U.S.C. § 1983, which provides, in pertinent part, as follows: "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983.[FN46] Thus, the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws" is an "essential element[ ]" of a Section 1983 claim.[FN47] The term "the Constitution and laws" refers to the United States Constitution and *federal* laws.[FN48] A violation of a state law or regulation, *in and of itself,* does not give rise to a violation of the United States Constitution or a federal law, for purposes of 42 U.S.C. § 1983.[FN49]

FN46. "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) [citation omitted].

FN47. *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994) [emphasis added; citation omitted].

FN48. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) [emphasis added], *accord, Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Pitchell,* 13 F.3d at 547 ("In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws *of the United States."* ) [emphasis added], *accord, Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") [citation omitted; emphasis added].

FN49. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") [citation omitted]; *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") [citation omitted]; *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") [citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ].

Having said that, it is true that a state may, *under certain circumstances,* create a liberty interest protected by the Fourteenth Amendment's Due Process Clause through its enactment of certain statutory or regulatory measures. At one point, the Supreme Court held that a state created such a liberty interest if it has repeatedly used, in a statute or regulation, explicit language of an "unmistakably mandatory character" (e.g., the words "shall," "will," or "must," etc.) with regard to specific procedures. *Hewitt v. Helms,* 459 U.S. 460, 466-472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). However, that rule created a perverse incentive (1) for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory language in state regulations, and to involve themselves in the day-to-day management

of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion." *Sandlin v. Connor,* 515 U.S. 472, 481-482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As a result, the Supreme Court changed the rule, shifting the courts' focus from the *language* of a particular state law or regulation to the *nature of the deprivation.* *Sandlin,* 515 U.S. at 477-484 (describing history of due process analysis in modern Supreme Court precedents).[FN50]

FN50. *See also Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord, Watson v. City of N.Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*9** The practical effect of this rule change is that, in cases involving due process challenges to parole hearings, "[i]n order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have *a legitimate expectancy of release* that is grounded in the state's statutory scheme." *Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) [emphasis added; citations omitted].[FN51] "Neither the mere possibility of release ... nor a statistical probability of release ... gives rise to a legitimate expectancy of release on parole." *Barna,* 239 F.3d at 171 [citations omitted]. Moreover, the Second Circuit has repeatedly recognized that "[t]he New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna,* 239 F.3d at 171.[FN52] As a result, alleged violations of procedural requirements of the New York parole scheme "are matters for consideration by the state courts." *Boothe v. Hammock,* 605 F.2d 661, 665 (2d Cir.1979), *accord, Borcsok v. Pataki,* 05-CV-1542, 2006 WL 839545, at \*2, n. 1 (N.D.N.Y. March 29, 2006) (Sharpe, J.).

FN51. *See also Greenholz v. Inmates of the Neb. Penal & Corr. Complex,* 442 U.S. 1, 7-16, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," and

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

finding that Nebraska's parole scheme did create due process right but only because the parole scheme "mandat[ed]" that prisoners be released unless certain conditions existed), *accord, Board of Pardons v. Allen,* 482 U.S. 369, 373-381, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (holding that Montana parole statute created "a liberty interest protected by the Due Process Clause" only because the statute specifically provided that the Parole Board "shall" release the inmate when certain findings prerequisite to release are made).

FN52. *See also Davis v. Dennison,* No. 06-2723, 2007 WL 678331, at *1 (2d Cir. March 2, 2007) (summary order, cited for "persuasive value" in accordance with the *Advisory Committee Notes* to *Fed. R.App. P. 32.1 [a],* and cited to "acknowledge[ ] the continued precedential effect" of *Barna v. Travis,* 239 F.3d 161 [2d Cir.2001] in accordance with Second Circuit Local Rule § 0.23 as applied by the Second Circuit in *Khan v. Ashcroft,* 352 F.3d 521, 525 [2d Cir.2003] ) ("New York State's parole scheme does not create a liberty interest protected by the Due Process Clause. *See Barna v. Travis,* 239 F.3d 161, 171 (2d Cir.2001)."); *Marvin v. Goord,* 255 F.3d 40, 44 (2d Cir.2001) ("[T]he New York State parole scheme does not create a protectable liberty interest [under the Due Process Clause of the Fourteenth Amendment]."); *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979) ("It is apparent that New York's parole provisions ... do not establish a scheme whereby parole shall be ordered unless specific conditions are found to exist.... While guidelines are used to structure the exercise of discretion ... no entitlement to release is created.").

Rather, to the extent that a New York State inmate has any liberty interest in parole that is protected by the Due Process Clause of the Fourteenth Amendment, that interest extends only to not being denied a parole release "arbitrarily" or "capriciously," for example, based on an inappropriate consideration of a protected classification (such as race, religion, gender, economic status, etc.) or an

"irrational distinction." FN53 This often-repeated recitation of the law is based on firmly established precedents from the highest court in the United States and the highest court in the State of New York. FN54

FN53. *See Romer v. Travis,* 03-CV-1670, 2003 WL 21744079, at *6 (S.D.N.Y. July 29, 2003) ("[Plaintiff] can claim a due process violation only if the Parole Board has denied his relief 'arbitrarily or capriciously.' "); *Morel v. Thomas,* 02-CV-9622, 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003) ("[Plaintiff's] due process rights extend only to a refusal by the Parole Board to deny release arbitrarily or capriciously, based on inappropriate consideration of a protected classification or on an irrational distinction, or on any other constitutional grounds."), *accord, Manley v. Thomas,* 255 F.Supp.2d 263, 266 (S.D.N.Y.2003); *Defino v. Thomas,* 02-CV-7413, 2003 WL 40502, at *3-4 (S.D.N.Y. Jan.2, 2003) ("[Petitioner's] only interest in parole is in not being denied parole for arbitrary or constitutionally impermissible reasons.").

FN54. *See, e.g., Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) ("The touchstone of due process is protection of the individual against *arbitrary* action of government.... The liberty interest protected in *Wolff [v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ] had its roots in state law, and the *minimum* procedures appropriated under the circumstances were held required by the Due Process Clause 'to ensure that the state-created right is not *arbitrarily* abrogated.' ") [internal quotation marks and citations omitted; emphasis added]; *Silmon v. Travis,* 95 N.Y.2d 470, 718 N.Y.S.2d 704, 707, 741 N.E.2d 501 (N.Y.2000) ("Our jurisprudence ... is well settled as to the authority of the Parole Board. Judicial intervention is warranted only when there is a showing of irrationality bordering on impropriety.") [internal quotation marks and citations omitted]; *Russo v. New York State Bd. of Parole,* 50 N.Y.2d 69, 427 N.Y.S.2d 982,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

986, 405 N.E.2d 225 (N.Y.1980) ("In light of the board's expertise and the fact that responsibility for a difficult and complex function has been committed to it, there would have to be a showing of irrationality bordering on impropriety before intervention would be warranted.").

Here, Plaintiff's Amended Complaint alleges various violations of procedural requirements set forth in N.Y. Exec. Law § 259-i, most notably, the requirement that the recommendation of the sentencing court be considered during his parole hearing. (*See, supra,* Part I of this Report-Recommendation.) Defendants may or may not have violated N.Y. Exec. Law § 259-i during one or more of Plaintiff's four parole hearings. For the sake of argument, I will assume that one or more Defendants did commit one or more such violations. [FN55] The problem is that, as stated above, any such violations do not, in and of themselves, give rise to a violation of the Due Process Clause of the Fourteenth Amendment. Rather, again, to state a due process claim under the Fourteenth Amendment, Plaintiff needs to allege facts indicating that he was denied parole release *arbitrarily* or *capriciously,* for example, based on an inappropriate consideration of a *protected classification* (such as race, religion, gender, economic status, etc.) or an *irrational distinction.*

FN55. I assume this fact even though it is of some uncertainty. Section 259-i(2)(c)(A) of the New York Executive Law (the particular section that governs parole release decisions) does not always require the Parole Board, during a parole release hearing, to consider "the recommendations of the sentencing court." Specifically, Section 259-i(2)(c)(A) provides, in pertinent part, as follows:

Discretionary release on parole shall not be granted merely as a reward for good conduct ... while confined but after considering if there is a reasonable probability that ... his release ... will not so deprecate the seriousness of his crime as to undermine respect for law. In making the parole release decision ... the following [shall] be considered: (i) the institutional record including program goals

and accomplishments, academic achievements, vocational education, training or work assignments ...; (iii) release plans including community resources, employment, education and training and support services available to the inmate .... Notwithstanding the provisions of this section, in making the parole release decision for persons whose minimum period of imprisonment was not fixed pursuant to the provisions of subsection one of this section, in addition to the factors listed in this paragraph the board shall consider the factors listed in paragraph (a) of subdivision one of this section.

N.Y. Exec. Law § 259-i(2)(c)(A). Rather, the only circumstance under which the Parole Board must, during a parole release hearing, consider the recommendations of the sentencing court is when the parole release hearing concerns a "person[ ] whose minimum period of imprisonment was *not* fixed pursuant to the provisions of [Section 259-i(1) ]." *Id* [emphasis added]. Specifically, Section 259-i(1)(a), provides, in pertinent part, as follows,

In any case where a person is received in an institution ... with an indeterminate sentence, and the court has not fixed a minimum period of imprisonment, the board shall cause to be brought before one or more members ... all information with regard to such person[ ] ... [and] shall study the same and shall personally interview the sentenced person. Upon conclusion of the interview, [the members] shall determine the minimum period of imprisonment to be served prior to parole consideration in accord with the guidelines ... [which] shall include (i) the seriousness of the offense with due consideration of the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

aggravating factors ... and (ii) prior criminal record, including ... adjustment to ... institutional confinement....

N.Y. Exec. Law § 259-i(1)(a). Here, I have trouble construing Plaintiff's Amended Complaint as alleging facts indicating that the sentencing court did *not* fix a "minimum period of confinement." (*See* Dkt. No. 4, ¶ 24 [Plf.'s Am. Compl., alleging that the sentencing court "imposed an indeterminate sentence of twenty years to life"].)

Plaintiff does not allege facts indicating that Defendants were acting out of an inappropriate consideration of a *protected classification,* but that, at most, they were acting, in part, out of a consideration of Plaintiff's status as convicted murderer (which is not a classification protected by the United States Constitution). (*See, infra,* Part III.A.2. of this Report-Recommendation.) Moreover, Plaintiff does not allege facts indicating that Defendants were acting *irrationally,* but that they were basing their decision too much, or perhaps solely, on the nature and seriousness of his offense (rather than also considering the recommendation of the sentencing judge). (*See, e.g.,* Dkt. No. 4, ¶¶ 56, 57, 70, 95 [Plf.'s Am. Compl., alleging that Defendants found Plaintiff unsuitable for parole release solely due to the seriousness of Plaintiff's offense].) More specifically, Plaintiff alleges facts indicating that Defendants, after acknowledging some factors weighing in favor of Plaintiff's release (such as his "institutional adjustment" and "release plan"), repeatedly concluded that Plaintiff's release, at that time, would so deprecate the seriousness of his crime (i.e., which involved, during the course of an attempted robbery, Plaintiff's, without being under the influence of alcohol or drugs, fatally stabbing a man 15 times, pouring a half-gallon of cleaning solvent on his body, and then lighting him afire) as to undermine respect for the law. (Dkt. No. 4, ¶¶ 33, 47, 62, 84 [Plf.'s Am. Compl.].) [FN56] Again, while such decision-making by Defendants might violate N.Y. Exec. Law § 259-i, it is not "irrational." Under the circumstances, Plaintiff's remedy for any violation of N.Y. Exec. Law § 259-i lies in state court. [FN57]

FN56. It is worth noting that Plaintiff does not

even allege facts indicating that Defendants were *arbitrarily* failing to consider the (alleged) recommendation of the sentencing judge but that they were doing so for a variety of stated reasons: (1) that they did not have possession of the recommendation; (2) that they were laboring under the (allegedly) mistaken belief that they had a duty to consider the "sentencing minutes" *only* if Plaintiff could show that the "sentencing minutes" were relevant to Plaintiff's parole release; (3) that they were laboring under the (allegedly) mistaken belief that it was Plaintiff's duty to provide a copy of the recommendation; and (4) that they were laboring under the (allegedly) mistaken belief that Plaintiff could choose to waive his statutory right to require Defendants to consider such a recommendation. (Dkt. No. 4, ¶¶ 37, 42-43, 74-79 [Plf.'s Am. Compl.].)

FN57. *See Boothe,* 605 F.2d at 665 (alleged violations of procedural requirements of New York parole scheme "are matters for consideration by the state courts"), *accord, Borcsok,* 2006 WL 839545, at *2, n. 1 (Sharpe, J.). (*See, e.g.,* Dkt. No. 39, Ex. A [attaching state court decision dated 11/30/2006, addressing Plaintiff's statutory claim and ordering new parole hearing], Ex. B [attaching Parole Board Decision regarding such hearing on 1/23/07].)

**\*10** In opposition to Defendants' argument, Plaintiff places much reliance on *Graziano v. Pataki,* in which, last July, the Southern District of New York denied a Rule 12(b)(6) motion to dismiss, *inter alia,* the due process claims asserted by a class action of prisoners alleging that the New York State Division of Parole was carrying out a policy (or agenda of then-Governor George Pataki) for eliminating parole for practically all felons serving sentences for of class "A-1" violent felony offenses such as murder, rather than considering the factors required by N.Y. Exec. Law § 259-i. *Graziano v. Pataki,* 06-CV-0480, 2006 WL 2023082, at *6 (S.D.N.Y. July 17, 2006). However, instrumental in reaching that decision was the Southern District's finding that the plaintiffs' complaint asserted "a claim that there is in fact a *policy* [to deny

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

parole to A-1 violent felons], and under the *policy,* each Plaintiff's status as an A-1 violent offender predetermines the outcome of the parole decision, notwithstanding any positive factors ...." *Graziano,* 2006 WL 2023082, at *6 [emphasis added]. Plainly stated, the Southern District found that the plaintiffs' due process allegations stated a claim under Rule 12(b)(6) because the plaintiffs had alleged facts indicating the existence of a system-wide "policy" to make parole decisions for a certain class of offenders not on a case-by-case basis but on a basis that was "arbitrary" or "capricious" and thus in excess of the Parole Board's discretionary authority. *Id.* at *6-8.

The same cannot be said of Plaintiff's Amended Complaint in this action. The closest Plaintiff comes to premising his due process claim on such a "policy" is when he alleges, "[A]n argument could be made that these prejudices probably stem from a gubernatorial policy against parole for murders ...." (Dkt. No. 4, ¶ 87 [Plf.'s Am. Compl.].) However, in that same paragraph, Plaintiff makes clear that he is not in fact premising his due process claim on such a speculative "policy" but on his allegation that Defendants' treatment of him (personally) has been so arbitrary that it violates due process. (*Id.*) Furthermore, elsewhere in his Amended Complaint, Plaintiff alleges facts indicating that, during the four hearings, Defendants considered Plaintiff's case on an individual basis. Specifically, those allegations indicate that Defendants considered factors such as (1) Plaintiff's satisfactory "institutional adjustment" (i.e., the fact that Plaintiff "complet[ed] numerous programs, receiving [his] GED, and approximately 129 credits from Marist College ...." and the fact that Plaintiff has developed "commendable" artistic skills), and (2) his "release plan" (which involved "pursuing a vocation in Buddhism at Zen Mountain Monastery [in] Mt. Tremper, New York"), but that Defendants found that those two factors were outweighed by (3) Plaintiff's criminal record while in prison (i.e., the fact that "while incarcerated you have incurred two Tier III disciplinary sanctions," although he had committed no such infractions in the previous four years), and most importantly (4) the particular nature of his crime (i.e., the fact that, during the course of an attempted robbery, Plaintiff, without being under the influence of alcohol or drugs, stabbed a man 15 times, poured a half-gallon of cleaning solvent on his body, and then lighting him afire).

(*Id.* at ¶¶ 29, 33, 47, 62, 84.)

**\*11** Indeed, setting aside the way Defendants explicitly weighed the above-stated factors, I find that this last factual allegation (i.e., that Defendants repeatedly noted the particular nature of the facts giving rise to Plaintiff's conviction for murder) is, standing alone, sufficient to distinguish the current case from *Graziano.* In *Graziano,* the plaintiffs alleged that "there is nothing unique or particularly telling about most of the facts and circumstances that these decisions describe and are based on.... [T]he Board is denying parole ... just because [the] prisoner[s] committed murder and for no other reason." *Graziano,* 2006 WL 2023082, at *6. Here, Plaintiff has alleged facts indicating that Defendants *did* find that there was something unique or telling about the facts and circumstances giving rise to Plaintiff's crime (i.e., again, the fact that, during the course of an attempted robbery, Plaintiff, without being under the influence of alcohol or drugs, stabbed a man 15 times, poured a half-gallon of cleaning solvent on his body, and then set him afire). As a result, according to Plaintiff's Amended Complaint, Defendants denied Plaintiff parole not simply because he committed murder but (largely) because of the *way* he committed the murder *and what he did with the body afterward*-which actions Defendants characterized as "brutal[ ]," "[in] utter disregard for the life of another," "a significant escalation of your criminal behavior," "violent," "extreme[ly] serious[ ]," and a crime of such "sheer brutality ... [as to be] breathtaking in scope." (Dkt. No. 4, ¶¶ 33, 47, 62, 84 [Plf.'s Am. Compl.].)

Finally, to the extent that Plaintiff relies on *Graziano* for its statement "while there is no due process right to being granted parole, there is a due process right to have the decision made only in accordance with the statutory criteria" (Dkt. No. 36, Part 2, ¶ 15 [Plf.'s Mem. of Law in Opp. to Defs.' Cross-Motion] ), two points deserve mentioning. First, such a proposition (which implies that a convicted felon serving a sentence in New York has a federal due process right to have *all* New York-statutory factors considered during a parole-release decision) is dictum since it is unnecessary to the court's holding that the *policy* at issue was "arbitrary and capricious" in that it involved a failure to consider *any* statutory factors other than the violent nature of the offense. [FN58] Second, in any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

event, the decision cites no authority for such a proposition.[FN59]

> FN58. *See, e.g., Graziano,* 2006 WL 2023082, at *1, 8, 9 ("Plaintiffs allege that since 1995, the 'Board of Parole has been issuing parole determinations pursuant to an unofficial policy of denying parole release to prisoners convicted of A-1 violent felony offenses, *solely* on the basis of the violent nature of such offenses and thus without proper consideration of *any* other relevant or statutorily mandated factor.' ... Plaintiffs ... contend that 'the Board is not exercising its discretion *at all.* ' ... The allegation that there exists a policy or practice to deny parole based *solely* on the nature of the violent offense[ ] enables the Complaint in this case to transcend what all previous Court decisions have addressed ....") [internal record citations removed; emphasis added].

> FN59. *See Graziano,* 2006 WL 2023082, at *6-9 (repeating this proposition several times but citing no case law supporting it, citing only *Barna v. Travis,* 239 F.3d 169 [2d Cir.2001], which undermines such a proposition, and *King v. N.Y. State Div. of Parole,* 190 A.D.2d 423, 598 N.Y.S.2d 245 [N.Y.App. Div., 1st Dept., 1993], which did not involve a due process claim).

This lack of authoritative support is not surprising since the proposition appears to be a significant departure from firmly established legal precedents from both the United States Supreme Court and the New York State Court of Appeals, as described above. The proposition creates a distinction between what the decision calls "a due process right to being granted parole" and what it calls "a due process right to have the decision made only in accordance with the statutory criteria." With respect, I do not perceive any such distinction. [FN60] In my view, any federal due process right a convicted felon has to a parole decision made only in accordance with a state's statutory criteria exists only if he possesses a "protected liberty interest" in parole.[FN61] If he possesses no such protected liberty interest, then he possesses only a *minimal* due

process right with regard to that decision-making process (e.g., a right to have the decision made in a *non-arbitrary* way).[FN62] And New York State's parole scheme (unlike the parole schemes of various other states) creates no such protected liberty interest.[FN63]

> FN60. Indeed, I note that the decision itself calls the distinction "theor[etical]." *Graziano,* 2006 WL 2023082, at *9.

> FN61. *See, e.g., Greenholz,* 442 U.S. at 4, 5-9 (whether or not convicted felons possessed a "procedural due process" right in the manner in which their parole-release decisions were made by the Nebraska Board of Parole-other than the right to be free from arbitrary decision-making-depended on whether they had a "liberty interest" that was protected under the Fourteenth Amendment's Due Process Clause).

> FN62. *See, supra,* cases cited in notes 53 and 54 of this Report-Recommendation; *see also Meacham v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (referring to the right to non-arbitrary decision-making as "minimum" procedures required by the Due Process Clause).

> FN63. *See Davis,* 2007 WL 678331, at *1; *Marvin,* 255 F.3d at 44; *Barna,* 239 F.3d at 171; *Boothe,* 605 F.2d at 664.

**\*12** Furthermore, by placing so much emphasis on New York statutory criteria, the *Graziano* decision demonstrates a lack of appreciation for the significance of the Supreme Court's decision in *Sandlin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which declared a shift in focus (in a due process analysis) from the *language* of a particular state law or regulation to the *nature of the deprivation at issue,* as discussed above. Indeed, the Supreme Court in *Sandlin* specifically criticized the practice of, when determining the existence of a due process right, merely focusing on the existence of "mandatory" language in a state's parole statutes (e.g., language requiring release unless certain conditions exist), referring to such a practice as "mechanical." *Sandlin,* 515

Page 21

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

U.S. at 479 (referring to the Court's earlier decision in *Greenholz v. Inmates of the Neb. Penal & Corr. Complex,* 442 U.S. 1 [1979], which analyzed Nebraska's parole scheme, and stating, "The time has come to return to the due process principles ... established [before the mandatory-discretionary dichotomy took hold].").

In the alternative, even assuming that Plaintiff has stated a due process claim, I recommend dismissal of that claim under a Rule 56 analysis. Based on the current record, Plaintiff has failed to adduce any evidence in support of a claim that Defendants were acting "arbitrarily" or "capriciously" in denying his parole.[FN64] For example, with respect to Plaintiff's claim that his due process rights were violated to the extent that Defendants based their four decisions on Plaintiff's (allegedly) expunged and sealed driving convictions, to the extent that the Second Circuit recognizes any such due process right, Plaintiff has adduced no evidence either that (1) Defendants were *responsible* for the presence of that information in his parole file during the first parole hearing or (2) a *likelihood* exists that, in reaching his subsequent three parole decisions, Defendants actually relied on that information in a constitutionally significant manner.[FN65] *See Antonucci v. David,* 03-CV-0653, 2006 WL 2265028, at *4-6 (N.D.N.Y. Aug.7, 2006) (Scullin, J.) (setting forth exact same analysis of similar due process challenge to parole board decision).

> **FN64.** (*Compare* Dkt. No. 30, Part 2, ¶¶ 20-59 [Defs.' Rule 7.1 Statement, containing factual assertions regarding precisely what occurred at each hearing, followed by accurate citations to record evidence] *with* Dkt. No. 36, Part 1, ¶¶ 20-59 [Plf.'s Rule 7.1 Response, admitting the vast majority of Defendants' factual assertions except a few of those assertions which Plaintiff denies or partially denies, e.g., in Paragraphs 42, 45, 48-53, 55, 59, which denials are either immaterial to the due process issues at hand or are unsupported by specific citations to record evidence].)

> **FN65.** (*Compare* Dkt. No. 30, Part 2, ¶¶ 57-59 [Defs.' Rule 7.1 Statement, containing factual assertions regarding precisely what occurred at

each hearing, followed by accurate citations to record evidence] *with* Dkt. No. 36, Part 1, ¶¶ 57-59 [Plf.'s Rule 7.1 Response, admitting Defendants' factual assertions in Paragraphs 57 and 58, and denying factual assertions in Paragraph 59, but citing no record evidence in support of that denial except Plaintiff's "Ex. R," located at Dkt. No. 36, Part 4, which is simply a partial copy of N.Y. Exec. Law § 259-i].)

For all of these reasons, I recommend that Plaintiff's due process claim be dismissed.

**2. Plaintiff's Equal Protection Claim**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. In other words, "[t]he Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 [1985] ).

Liberally construed, Plaintiff's Amended Complaint, and his memorandum in opposition to Defendants' motion,[FN66] allege that, with respect to parole, he was treated differently than (2) non-violent felony offenders, or perhaps violent felony offenders who did not kill their victims in a particularly heinous manner (e.g., repeated stabbing followed by ignition of the body), and/or (2) convicted felons who do not have in their parole file sentencing minutes containing a recommendation regarding parole, or perhaps convicted felons who do have their sentencing minutes in their parole file but whose minutes do not contain a recommendation from the sentencing court. (Dkt. No. 4, ¶¶ 89-95 [Plf.'s Am. Compl.]; Dkt. No. 36, Part 2, ¶¶ 38-43 [Plf.'s Mem. of Law in Opp. to Defs.' Motion].)

> **FN66.** When deciding a motion to dismiss for failure to state a claim, the court may, without converting the motion to dismiss into a motion for summary judgment, consider, *inter alia,* any documents provided by the plaintiff in opposition to defendants' motion, to the extent those documents are consistent with the allegations in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

the complaint. *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 & n. 41 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.) (citing cases).

**\*13** The problem is that, even if these allegations are true, Plaintiff has failed to state an equal protection claim because neither of those two classes of persons is a "protected class" for purposes of the Equal Protection Clause of the Fourteenth Amendment. For example, several courts have specifically held that, for purposes of an equal protection analysis, (1) violent felony offenders are not actually "similarly situated" to non-violent offenders, and (2) in any event, discrimination against violent felony offenders in terms of parole release is "entirely appropriate." *See Bottom v. Pataki,* 03-CV-0835, 2006 WL 2265408, at *6-7 & n. 5 (N.D.N.Y. Aug.7, 2006) (Scullin, J.), *accord, Larocco v. N.Y.S. Div. of Parole,* 05-CV-1602, 2006 WL 1313341, at *3 (N.D.N.Y. May 12, 2006) (McAvoy, J.), *Borscok v. Pataki,* 05-CV-1542, 2006 WL 839545, at *2, n. 2 (N.D.N.Y. March 29, 2006) (Sharpe, J.); *Parks v. Edwards,* 03-CV-5588, 2004 WL 377658, *4 (E.D.N.Y. Mar.1, 2004).

In the alternative, even assuming that Plaintiff has stated an equal protection claim, I recommend dismissal of that claim under a Rule 56 analysis. Based on the current record, Plaintiff has failed to adduce any evidence in support of such a claim.[FN67]

FN67. (*Compare* Dkt. No. 30, Part 2, ¶¶ 60-61 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 36, Part 1, ¶¶ 60-61 [Plf.'s Rule 7.1 Response, denying both of Defendants' factual assertions, but citing only Plaintiff's Complaint generally, and Plaintiff's Exs. J, K, and L, found at Dkt. No. 36, Part 3, which consist of only (1) a Board of Parole appellate decision with regard to one of Plaintiff's parole hearings, (2) a July 28, 2006, letter from Marco Ricci, an Agency Program Aide at the Division of Parole, to Inmate Hector Pena-Martinez regarding Mr. Pena-Martinez's request for early conditional parole for deportation, and (3) a January 4, 2005, letter

from Plaintiff to Defendant Tracy regarding his parole hearing scheduled for January 18, 2005].)

For all of these reasons, I recommend that Plaintiff's due process claim be dismissed.

**3. The Doctrine of** *Heck v. Humphrey,* **512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)**

Because I find that sufficient grounds exist upon which to base a dismissal of Plaintiff's Amended Complaint, I need not, and do not, reach the merits of this alternative argument advanced by Defendants. (Dkt. No. 30, Part 8, at 5-8 [Defs.' Mem. of Law].)

**B. Dismissal on Alternative Grounds**

Under the "Three Strikes Rule" set forth in the federal statute governing *in forma pauperis* proceedings,

[i]n no event shall a prisoner bring a civil action ... under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it ... fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The power of a federal district court to invoke this rule is not limited to the outset of a litigation but extends all throughout the pendency of the proceeding. In other words, specifically, federal district courts have the authority to rescind or revoke the *in forma pauperis* status that it has previously bestowed upon a plaintiff, where it discovers that the status was improvidently granted, even if the courts exercise that authority well into the pendency of the proceedings.[FN68]

FN68. *See Gill v. Pidlypchak,* 02-CV-1460, 2006 WL 3751340, at *5 (N.D.N.Y. Dec.19, 2006) (Scullin, J., adopting Report-Recommendation by Treece, M.J.); *Polanco v. Burge,* 05-CV-0651, 2006 WL 2806574, at *2 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting Report-Recommendation by Homer, M.J.); *Demos v. John Doe,* 118 F.Supp.2d 172, 174 (D.Conn.2000); *McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998); *see also*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

*Rolle v. Nassau County Correctional Facility,* 01-CV-2414, Order, at 2 (E.D.N.Y. filed Nov. 17, 2004) ("A court may revoke the *in forma pauperis* status it previously bestowed upon a [plaintiff], where that status is later determined to be 'improvident' ") [citation omitted], *accord, Rolle v. Kurtzrock,* 03-CV-1789 Order (E.D.N.Y. filed June 17, 2004).

Here, I granted Plaintiff's request to proceed *in forma pauperis* on October 5, 2005. (Dkt. No. 5 at 3.) However, when I granted this request, I was relying on (among other things) Plaintiff's sworn allegation in his Amended Complaint that, as of August 16, 2005 (the date of signing of the Amended Complaint), his "prior court proceedings" consisted of only *three* such proceedings: (1) *Standley v. Wilcox,* 02-CV-6230 (S.D.N.Y.); (2) *Standley v. N.Y.S. Div. of Parole,* Index No. 000149/04 (N.Y.S. Sup.Ct., Albany County); and (3) *Standley v. N.Y.S. Div. of Parole,* Index No. 000971/05 (N.Y.S. Sup.Ct., Albany County). (Dkt. No. 4, ¶¶ 15-21 [Plf.'s Am. Compl.].) This sworn assertion was not accurate. As of August 16, 2005, Plaintiff had filed at least *sixteen* actions or appeals in state or federal court (other than the current action), as explained above in Part II.B. of this Report-Recommendation. Even if Plaintiff had intended to mean that he had previously filed only three *actions relating to his imprisonment,* his sworn assertion would not have been accurate. By August 16, 2005, Plaintiff had filed at least *eleven* such actions [FN69]—*twelve* if one counts the legal malpractice action he filed against his former counsel on a criminal appeal.[FN70]

FN69. *See Standley v. Lazeron,* 91-CV-6078 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Artuz,* 93-CV-3528 (E.D.N.Y.) (habeas corpus action); *Standley v. Stewart,* 97-CV-6552 (S.D.N.Y.) (civil rights action); *Standley v. Lyder,* 99-CV-4711 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Wilcox,* 02-CV-6230 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Goord,* Index No. 002763/2000 (N.Y.S. Sup.Ct., Dutchess County) (Article 78 proceeding); *Standley v. Goord,* Index No. 000120/2001 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v.*

*Parole,* Index No. 000149/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Goord,* Index No. 002828/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 000971/2005 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 001989/2006 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding).

FN70. *See Standley v. Stewart,* Index No. 402210/1999 (N.Y.S. Sup.Ct., New York County).

**\*14** Plaintiff's lack of candor was material in that, had I known of these other actions, I would have reviewed the docket sheets of these matters, and learned of Plaintiff's considerable litigation experience and his accumulation of strikes. Specifically, as of the date of October 5, 2005 (the date on which I granted Plaintiff's request to proceed *in forma pauperis* ), Plaintiff had received at least *three* "strikes" for purposes of 28 U.S.C. § 1915(g).[FN71] I note that I find nothing on the face of the Amended Complaint indicating that Plaintiff is in "imminent danger of serious physical injury."[FN72]

FN71. *See Standley v. Stewart,* 97-CV-6552, Order of Dismissal (S.D.N.Y. filed Sept. 5, 1997) (dismissing prisoner civil rights action for failure to state a claim under Rule 12[b][6] ); *Standley v. Lyder,* 99-CV-4711, 2001 WL 225035 (S.D.N.Y. March 7, 2001) (granting defendants' motion to dismiss Plaintiff's prisoner civil rights action for failure to state a claim under Rule 12[b][6] ); *Standley v. Artuz,* No. 95-2755, Order of Dismissal (2d Cir. filed May 31, 1996) (habeas corpus action; docket sheet noting that, on 6/11/96, Plaintiff's was specifically informed that his "appeal was dismissed as frivolous").

FN72. 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 561 (2d Cir.2002) (examining plaintiff's allegations in order to determine if plaintiff's case fell within the exception to the three strike's rule for prisoners

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

in "imminent danger of serious physical injury").

As a result, I recommend that, in the alternative, the Court revoke Plaintiff's *in forma pauperis* status and dismiss Plaintiff's Amended Complaint without prejudice to refiling through a paid complaint. I base this recommendation not only on the "three strikes rule" but on the Court's inherent ability to manage its docket through sanctioning abusive litigation practices such as making material misrepresentations or omissions to the Court.

**C. Plaintiff's Motion for Summary Judgment**

Because I have concluded that the Court should dismiss Plaintiff's Amended Complaint, I conclude that the Court should deny Plaintiff's motion for summary judgment as moot.

In the alternative, I conclude that the Court should deny Plaintiff's motion for summary judgment because that motion violates Local Rule 7.1 of the Local Rules of Practice for this Court by failing to provide a valid Statement of Material Facts as required. Specifically, Plaintiff has failed to provide record citations in support of the factual assertions contained in his Rule 7.1 Statement, as Defendants point out. (Dkt. No. 24, Part 2 [Plf.'s Rule 7.1 Statement]; Dkt. No. 30, Part 8, at 5 [Defs.' Mem. of Law].) Plaintiff's response to this argument is that his failure to provide such record citations should not result in dismissal because (1) Plaintiff's failure was the result of his mistaken reliance on the Northern District's "*Pro Se* Handbook," which does not clearly state that such record citations were required, and (2) Plaintiff's failure should be excused in light of his special status as a *pro se* litigant. (Dkt. No. 36, ¶¶ 41-45 [Plf.'s Reply].)

I reject Plaintiff's argument. First, the version of the *Pro Se Handbook* on which Plaintiff allegedly relied in preparing his motion makes quite clear that the *Handbook* is only a guide, intended for use along with the Local Rules of Practice for this Court and the Federal Rules of Civil Procedure; and the *Handbook* also makes quite clear that Plaintiff should read and become familiar with all of Local Rule 7.1 before he begins writing a motion.[FN73] As a result, it was far from reasonable for him to rely on one excerpt from the Manual in filing the dispositive motion at issue. The unreasonableness of Plaintiff's reliance on an excerpt from the *Pro Se Handbook* is magnified by the

fact that the law library at the New York State correctional facility in which Plaintiff was incarcerated when he prepared his motion had on file, along with a copy of the *Pro Se Handbook,* a copy of the Local Rules of Practice for the Northern District of New York, since the Clerk of the Court provides an updated copy of such Local Rules to all such institutions.

> [FN73.] *See, e.g., Pro Se Handbook: The Manual for the Litigant Filing a Lawsuit Without Counsel,* at 1, 34 (U.S.Dist.Ct.N.D.N.Y.2005) ("This handbook should not be considered the last word, nor should it be your only resource. Rather, this handbook should be considered simply as a procedural aid in helping you file and litigate your lawsuit.... Local Rule 7.1 sets forth the procedure for filing a motion in the Northern District; *motions must be filed in conformity with Local Rule 7.1 or else they will be denied.* Please read and become familiar with all of Local Rule 7.1 before you begin writing a motion.").

**\*15** Second, the special leniency that is normally afforded to *pro se* civil rights litigants does not require that such litigants be excused from complying with Local Rule 7.1.[FN74] In any event, as I explained above in Part II.B. of this Report-Recommendation, I have already found that the circumstances warrant revoking Plaintiff's special status as a *pro se* litigant for the remainder of this action. As a result, he may not use the Court's special leniency to save his procedurally deficient motion for summary judgment.

> [FN74.] *See Bussa,* 2004 WL 1637014, at *4 ("Proceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment.") [citations omitted], *accord, Durran,* 251 F.Supp.2d at 1211 [citations omitted].

Finally, even if I were to reach the merits of Plaintiff's motion, I would deny it for the reasons stated above in Part III.A. of this Report-Recommendation. This is because the two main legal issues raised in Plaintiff's motion are also raised in Defendants' cross-motion which,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)

(Cite as: 2007 WL 2406909 (N.D.N.Y.))

again, I have addressed above. (*Compare* Dkt. No. 24, Part 4, ¶¶ 1-44 [Plf.'s Mem. of Law in Support of His Motion] *with* Dkt. No. 30, Part 8, at 9-21 [Defs.' Mem. of Law in Support of His Cross-Motion].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' cross-motion for summary judgment (Dkt. No. 30) be *GRANTED;* and it is further

**RECOMMENDED** that, in the alternative, Plaintiff's *in forma pauperis* status be revoked as having been improvidently granted due to Plaintiff's lack of candor with the Court, and that his Amended Complaint be *DISMISSED* without prejudice to refiling through a paid complaint; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 24) be *DENIED* as moot, procedurally deficient, and/or without merit.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.

Standley v. Dennison
Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Prince PILGRIM, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional Facility, Defendants.

Civ. No. 9:07-CV-1001 (GLS/RFT).

March 18, 2010.

Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Prince Pilgrim has filed this civil rights action, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.,* alleging that Defendant Dale Artus, Superintendent of Clinton Correctional Facility, violated his constitutional and statutory rights to freely exercise his religious beliefs. Dkt. No. 1, Compl. The crux of Plaintiff's religious expression claim is that he was repeatedly punished for exercising his sincerely held religious beliefs, which require him to wear dreadlocks, because he is a member of the Nation of Islam ("NOI") and Department of Correctional Services' ("DOCS") policy allows only those of the Rastafarian faith to wear dreadlocks. *See generally id.*

In addition, Plaintiff alleges that Artus failed to protect him from unconstitutional retaliation, his due process rights were violated during the course of several disciplinary hearings, and the penalties imposed as a result of his disciplinary convictions constituted "cruel and unusual punishment" in violation of the Eighth Amendment. *Id.*

Presently before the Court for a Report-Recommendation is Defendant's Motion for Summary Judgment. Dkt. No. 36. Since the filing of Defendant's Motion, the Court has granted Plaintiff four separate extensions of time to file a response in opposition to the Motion. *See* Dkt. No. 46, Order, dated Aug. 20, 2009, at p. 1 (cataloguing prior extensions). The final extension granted Plaintiff until September 4, 2009, to file a response, and warned Plaintiff that *"failure to oppose Defendant's Motion will result in this Court accepting the facts set forth by Defendant as true." Id.* at p. 3 (emphasis in original) (citing N.D.N.Y.L.R. 7.1(a)(3)). Despite this Court's leniency and warnings, Plaintiff's Response [FN1] was not received until September 10, 2009, six days after the deadline passed. Dkt. No. 47, Pl.'s Resp. in Opp'n to Def.'s Mot. Notwithstanding Plaintiff's failure to meet the extended deadline, because he is proceeding *pro se,* we will nonetheless consider his Response and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

Exhibits attached thereto in issuing a recommendation on Defendant's Motion.

> FN1. Plaintiff's Response consists of (1) an Affidavit, dated August 31, 2009, which is in sum and substance a concise memorandum of law, and (2) a Declaration, dated August 31, 2009, which is in sum and substance a statement of material facts, with attached Exhibits. *See* Dkt. No. 47.

For the reasons that follow, we recommend that Defendant's Motion be **granted** in part and **denied** in part.

## I. FACTS NOT IN DISPUTE

The following facts were derived mainly from the Defendant's Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional and statutory violations.

**\*2** Plaintiff was received into DOCS' custody on or about November 4, 1992. Dkt. No. 36-2, Def.'s 7.1 Statement, at ¶ 1. At all times relevant to the Complaint, and continuing until the present, Defendant Dale Artus has been the Superintendent of Clinton Correctional Facility ("Clinton"), where Plaintiff was confined from April 1, 2005 through February 5, 2009. *Id.* at ¶ 2. Plaintiff is currently incarcerated at Attica Correctional Facility. *Id.*

On November 18, 2006, Plaintiff was given a direct order by Corrections Officer ("C.O.") A. Appleby to remove his dreadlocks as per DOCS' policy, which allows only inmates of the Rastafarian faith to wear dreadlocks. *Id.* at ¶ 18; Dkt. No. 47-1, Prince Pilgrim Decl., dated Aug. 31, 2009 (hereinafter "Pl.'s Decl."), at ¶ 14. DOCS' hair policy is based on DOCS Directive # 4914, entitled "Inmate Grooming Standards," and relevant decisions from the Central Office Review Committee ("CORC"), which is the final appellate body for inmate grievances and whose decisions have the same effect as directives. Dkt. No. 36-6, Mark Leonard Decl., dated Apr. 30, 2009, at ¶ 59. DOCS Directive # 4914 allows inmates to wear long hair [FN2] provided they tie it back in a ponytail at all times, but does not specifically permit nor disallow dreadlocks. *Id.,* Ex. B, DOCS Directive # 4914(III)(B)(2)(a)-(d). However, relevant CORC decisions have made clear that "[o]nly inmates of the Rastafarian faith may have dreadlocks." *Id.,* Ex. C, CORC Decision, dated May 8, 2003.

> FN2. DOCS Directive # 4914 defines "long" as "below shoulder length." Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2) (b).

On December 19, 2006, C.O. C. Strong observed Plaintiff, who was on his way to an NOI meeting, with his hair in dreadlocks that extended down to the middle of his back. *Id.* at ¶ 17; Pilgrim Decl. at ¶¶ 17-18. C.O. Strong issued Plaintiff a Misbehavior Report (hereinafter "First MR"), charging him with Refusal to Obey a Direct Order (Rule 106.10). Def.'s 7.1 Statement at ¶ 19. At a Tier II Hearing that concluded on December 27, 2006, Lieutenant ("Lt.") Boyle found Plaintiff guilty of the charge and assessed him a penalty of thirty (30) days keeplock, [FN3] with loss of commissary, package and phone privileges. *Id.* at ¶ 20. During that hearing, Boyle refused Plaintiff's request to call Defendant Superintendent Artus as a witness, reasoning that because Artus was not present nor otherwise involved in the incident, his testimony would not be germane to the charge at issue. *Id.* at ¶¶ 40-41. However, Plaintiff was allowed to call other witnesses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

including two C.O.'s and another inmate. *Id.* at ¶ 42. Plaintiff's appeal, dated December 27, 2006, was delegated by Defendant Artus to Captain J. Bell, who affirmed Boyle's decision. *Id.* at ¶ 21.

> FN3. Generally speaking, inmates placed on keeplock are restricted to their cells for twenty-three (23) hours a day, given one hour for exercise, and are denied participation in normal prison activities that occur outside of their cells. *Parker v. Peek-Co,* 2009 WL 211371, at *4 n. 6 (N.D.N.Y. Jan. 27, 2009) (citing cases).

On February 20, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Second MR") by C.O. Appleby for again failing to cut his dreadlocks and thereby refusing to comply with both a direct order and a prior hearing disposition. *Id.* at ¶¶ 22-23; Pl.'s Decl. at ¶ 21. A Tier II Hearing was conducted by Lt. Lucia, who found Plaintiff guilty of Refusal to Obey a Direct Order (Rule 106.10) and Noncompliance with a Hearing Disposition (Rule 181 .10), and assessed Plaintiff thirty (30) days keeplock, with corresponding loss of recreation, commissary, package and phone privileges, and an additional fifteen (15) days keeplock and loss of privileges invoked from a previous disciplinary hearing determination. Def.'s 7.1 Statement at ¶¶ 23-24; Pl.'s Decl. at ¶ 25. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision on March 5, 2007. Def.'s 7.1 Statement at ¶ 25; Pl.'s Decl. at ¶ 26. By letters dated March 14, 2007, and March 21, 2007, Plaintiff requested a discretionary review of the March 1, 2007 Tier II Hearing disposition, raising issues as to whether or not he should have been credited for time spent in pre-hearing confinement. Def.'s 7.1 Statement at ¶ 26. Artus delegated that petition to G. Haponik, First Deputy Superintendent, who denied the requested relief. *Id.* at ¶ 27.

**\*3** Also on February 20, 2007, Plaintiff filed a

grievance with the Inmate Grievance Program ("IGP") at Clinton, alleging harassment and unlawful discrimination on the part of C.O. Appleby, and taking issue with DOCS' policy regarding dreadlocks. *Id.* at ¶¶ 43-44; Pl.'s Decl. at ¶ 22. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance on the grounds that there was a pending misbehavior report against Plaintiff, making the issue non-grievable. Def.'s 7.1 Statement at ¶ 45. Plaintiff's appeal to the Superintendent was referred to the IGP Supervisor, who agreed with the IGRC's determination and issued a memorandum to Plaintiff denying his appeal. *Id.* at ¶¶ 46-47.

On August 1, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Third MR") by C.O. J. Way for failure to comply with a prior direct order to cut his hair. *Id.* at ¶ 28. Along with Refusal to Obey a Direct Order (Rule 106.10), Plaintiff was charged with Harassment (Rule 107.11) for using obscene language during his confrontation with C.O. Way, and Inmate Grooming (Rule 110.33) for failure to tie back his long hair. *Id.* at ¶ 31. Lt. Miller conducted a Tier II Hearing on August 1, 2007, at which time Plaintiff was found guilty of refusing a direct order and having unfastened long hair, but not guilty of harassment. *Id.* at ¶ 32. Plaintiff was penalized with thirty (30) days keeplock and loss of commissary, package, and phone privileges for the same amount of time. *Id.* at ¶ 33. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision. *Id.* at ¶ 34.

On September 12, 2007, C.O. Edwards issued Plaintiff a fourth Misbehavior Report (hereinafter "Fourth MR") concerning his dreadlocks. *Id.* at ¶¶ 35-36. The Fourth MR charged Plaintiff with Refusal to Obey a Direct Order (Rule 106.10) and making a False Statement (Rule 107.20), the latter charge owing to Plaintiff's alleged statement that he was a Rastafarian when, in fact, he was registered as an NOI member. *Id.* at ¶¶ 36-37; Pl.'s Decl. at ¶ 34. A Tier II Hearing was held on September 17, 2007, before Lt. Miller, who found Plaintiff guilty on both charges and sentenced him to thirty (30) days keeplock

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

with concurrent loss of commissary, package, and phone privileges. Def.'s 7.1 Statement at ¶ 38.

On or about November 26, 2007, Plaintiff filed another grievance with the IGP, dated November 17, 2007, complaining that DOCS' policy regarding dreadlocks did not comply with DOCS Directive # 4914 and violated his First Amendment rights. *Id.* at ¶ 48. That grievance was consolidated with similar grievances filed by other inmates at Clinton who were given similar orders and/or warnings regarding their hair. *Id.* at ¶ 49; Pl.'s Decl. at ¶ 36. After conducting an investigation, First Deputy Superintendent W.F. Hulihan issued a determination, dated December 19, 2007, stating that "DOCS policy is that registered Rastafarian religion inmates are the only inmates allowed to have dreadlock hairstyles .... This issue has been addressed in numerous CORC decisions .... Based on DOCS established policy and CORC decisions, no compelling evidence has been submitted to support a change in policy." Def.'s 7.1 Statement at ¶ 52. Plaintiff and the other grievants appealed Hulihan's determination to CORC, which upheld the decision. *Id.* at ¶ 53.

**\*4** Plaintiff wrote Defendant Artus many times during his incarceration at Clinton, the issue of his sanctions for wearing dreadlocks being the predominant topic of such correspondences. *Id.* at ¶ 54; Compl. at ¶ 4. On each occasion that he received a letter of complaint, request for an investigation, appeal, etc., from Plaintiff, Artus referred the matter to a deputy superintendent or other staff member for review, response, or other necessary action. Def.'s 7.1 Statement at ¶ 56.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party

bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Personal Involvement**

1. *Due Process, Retaliation, and Cruel and Unusual Punishment*

**\*5** Plaintiff alleges that Defendant Artus violated his First, Eighth, and Fourteenth Amendment rights by failing to overturn disciplinary sanctions, thereby subjecting him to punishments that were cruel and unusual, and by allowing others to retaliate against him. Defendant asserts he was not personally involved in any of those alleged constitutional violations.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948 (2009).

Nonetheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff does not allege that Defendant Artus directly participated in any of the alleged harassment, retaliation, due process violations, nor disciplinary actions that were taken against him. Rather, Plaintiff hangs his hat on the second of the five aforementioned ways in which supervisory liability may attach: "failure to remedy a wrong after being informed through a report or appeal." *Id.* at 145. Plaintiff asserts that he sent several grievances, complaint letters, and appeals of his disciplinary convictions to Artus, who was thereby made aware of the allegedly unconstitutional policy regarding dreadlocks and the harassments and retaliatory misbehavior reports that were being filed against Plaintiff, but that Artus nonetheless failed to intervene on Plaintiff's behalf. The record establishes that Plaintiff appealed to Artus at least three of the four Tier II Hearing dispositions that are relevant to this lawsuit, and that he filed several grievances and complaint letters with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

Artus.[FN4] *See* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Exs. A-U, Docs. related to Pl.'s Misbehavior Reps. & Grievances.

> FN4. Defendant contends that Plaintiff did not appeal the disposition rendered at the fourth Disciplinary Hearing held on September 17, 2007. As opposed to his appeals on the first three Tier II Disciplinary Hearing dispositions, there is no record evidence of any appeal taken as to the fourth. *See generally,* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Ex. E, Fourth MR Docs. Plaintiff has not presented any evidence in opposition to Defendant's claim that he did not exhaust the administrative remedies available to him with respect to the fourth hearing. *See also* Compl. at ¶ 1 (stating that Plaintiff filed *"three appeals to Tier II Disciplinary Hearings to Superintendent Dale Artus"* (emphasis added)).

**\*6** However, while personal involvement may be found where a supervisory official personally reviews and denies a grievance, the mere referral of an inmate's complaint by a supervisory official to the appropriate staff for investigation is not sufficient to establish personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009) (quoting *Harnett v. Barr,* 538 F.Supp.2d 511, 524-25 (N.D.N.Y.2008)); *cf. Charles v. New York State Dep't of Corr. Servs.,* 2009 WL 890548, at \*6 (N.D.N.Y. Mar. 31, 2009) (noting that "courts in this circuit have held that when a supervisory official **receives and acts on** a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated" (emphasis in original) (citation omitted)). Moreover, "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks and citation omitted). Even "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Flemming v.*

*Wurzberger,* 2006 WL 1285627, at \*2 (W.D.N.Y. May 10, 2006) (internal quotation marks and citations omitted).

In this case, Artus asserts that he referred each and every one of Plaintiff's appeals and grievances to subordinate staff members for review, investigation, and appropriate action. Artus Decl. at ¶ 13. The documentary record confirms that contention. Artus referred Plaintiff's appeals of his convictions on the First, Second, and Third MRs to Captain Bell, who reviewed and affirmed the dispositions rendered at the corresponding Tier II Hearings. *Id.,* Exs. B-D, Interdep't Comm'ns, dated Jan. 3, 2006, Mar. 5, 2007, & Aug. 16, 2007. In addition, all of the grievances, complaints, and appeals of grievances mentioned in Plaintiff's Response to Defendant's Motion were forwarded by Artus to staff members in order to investigate, render a decision, and take appropriate actions. Artus Decl. at ¶ 13; Dkt. No. 47, Prince Pilgrim Aff., dated Aug. 31, 2009 (hereinafter "Pl.'s Aff.") at p. 5. Namely, Plaintiff's grievances dated November 9, 2006, November 21, 2006, November 28, 2006, February 20, 2007, July 1, 2007, August 1, 2007, and October 5, 2007,[FN5] were all responded to by Artus's subordinate staff members. Pl.'s Aff., Ex. F, Interdep't Mem., dated Nov. 13, 2006; Ex. H, Interdep't Mem., dated Nov. 13, 2006 (referring 11/9/06 grievance to Deputy Sup't for Sec. J. Tedford); Ex. I, Interdep't Mem., dated Nov. 29, 2006 (referring 11/21/06 grievance to Deputy Sup't of Programs L. Turner); Ex. J, Interdep't Mem., dated Nov. 29, 2006 (referring 11/28/06 grievance to Tedford); Ex. N, Interdep't Comm'n, dated Feb. 23, 2007 (forwarding 2/20/07 grievance to Deputy Sup't of Security Servs. S. Racette); Exs. Q-S, Interdep't Comm'ns, dated July 5, Aug. 7 & Oct. 10, 2007 (referring grievances dated 7/1/07, 8/1/07, and 10/5/07 to IGP Supervisor T. Brousseau).

> FN5. Plaintiff also mentions complaints/grievances filed on October 22, 2006, and August 30, 2007. Pl.'s Aff. at p. 5. The only correspondences on the record with those corresponding dates are a letter Plaintiff wrote to Assistant Deputy Superintendent S. Garman on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

October 22, 2006, regarding his self-nomination for Inmate Liaison Committee Representative, and a letter to IGP Supervisor T. Brousseau dated August 30, 2007, in which Plaintiff enclosed two previously filed grievances that allegedly had not been acknowledged at that point. Pl.'s Decl., Ex. E & H, Lts. dated Oct. 22, 2006, & Aug. 30, 2007. Neither of these letters was sent to Artus, nor did they implicate Plaintiff's issues regarding his dreadlocks.

**\*7** Because Plaintiff has failed to rebut Defendant's documentary case that his involvement was limited to forwarding Plaintiff's disciplinary appeals, complaints, grievances, and appeals of grievances to other staff members, we recommend that all of Plaintiff's claims, with the exception of his RLUIPA and First Amendment religious expression claims,[FN6] be **dismissed** for lack of personal involvement. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the referral of appeals down the chain of command does not create personal involvement on the part of the referee); *see also Brown v. Goord,* 2007 WL 607396, at \* 10 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read and respond to ... complaints by prisoners" without becoming personally involved); *Cruz v. Edwards,* 1985 WL 467, at \*4 (S.D.N.Y. Mar. 25, 1985) (finding defendant superintendent was not personally involved when he referred the appeal to the deputy superintendent).

FN6. We discuss the personal involvement issues related to Plaintiff's RLUIPA and First Amendment religious expression claims below in Part II.C.2.

Moreover, even if we were to look past Plaintiff's failure to demonstrate Artus's personal involvement, we would still find all of his constitutional claims (again with

the notable exception of his First Amendment religious expression claim) to be without merit.

a. *Due Process*

In his Complaint, Plaintiff appears to make a due process claim based on "prejudicial" hearings and other unspecified procedural violations that occurred during those Hearings. Compl. at ¶ 10; Pl.'s Aff. at ¶ 15; *see also* Pl.'s Decl. at ¶ 24 (stating that the proceedings were "hollow"). This claim is wholly conclusory. Plaintiff does not identify which of the four Tier II Disciplinary Hearings was conducted in a prejudicial manner, nor does he describe any of the alleged procedural violations that occurred. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In short, Plaintiff has not stated a plausible due process claim.

Even if we were to look past the conclusory nature of Plaintiff's due process claim, we would still recommend dismissal of such claim. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Here, Plaintiff alleges that he was sentenced to and served three separate thirty (30) day and one forty-five (45) day period of keeplock with reduced privileges, but alleges no additional aggravating circumstances present during that confinement. Courts in this Circuit have held that such periods of keeplock, absent additional egregious

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

circumstances, are not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant), *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest). Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed.**

b. *Retaliation*

**\*8** Plaintiff claims that the disciplinary actions taken against him by DOCS staff members constituted retribution for grievances he filed and that Artus failed to protect him from such reprisals. Compl. at ¶¶ 4 & 8; Pl.'s Aff. at ¶¶ 11 & 19.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)

(citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

**\*9** In this case, Plaintiff alleges that the disciplinary actions taken against him were done in retaliation for grievances he filed. Pl.'s Aff. at ¶ 19. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original). Thus, Plaintiff has met his burden of showing he was engaged in constitutionally protected conduct.

However, the record is clear that all of the disciplinary actions taken against Plaintiff were due to his failure to abide by orders directing his compliance with DOCS' hair policy. *See* Artus Decl ., Exs. B-E, Disciplinary Packets for MR's 1-4. Therefore, even assuming Plaintiff could show that such disciplinary actions were motivated by retaliatory animus (an assumption that finds no basis in the record), Plaintiff's retaliation claims would fail because it is undisputed that his dreadlocks violated DOCS' policy, and thus, the DOCS employees who disciplined Plaintiff can easily show that they would have taken the same disciplinary actions even in the absence of his protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a

valid basis alone, defendants should prevail."). Although Plaintiff has challenged DOCS' hair policy in this lawsuit, there is no suggestion that at the time he was disciplined, that policy was not valid. Thus, because there is unrefuted evidence that Plaintiff was disciplined pursuant to a valid DOCS' policy, his retaliation claims must fail.

c. *Cruel and Unusual Punishment*

Although unclear, it appears that Plaintiff asserts an Eighth Amendment claim based on the conditions of his confinement while he served his disciplinary sanctions, which included serving three thirty (30) day and one forty-five (45) day periods in keeplock, loss of phone and commissary privileges, no regular visits, twenty-three (23) hour confinement, and only three showers a week. Compl. at ¶ 6.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)). Here, Plaintiff does not allege that he was denied the "minimal civilized measure of life's necessities," rather, he states that he was placed on keeplock and denied various privileges for three thirty (30) day and one forty-five (45) day periods.[FN7] These conditions are not so severe as to violate the Eighth Amendment's ban on cruel and unusual punishment. *See Parker v. Peek-Co,* 2009 WL 211371, at \*4 (N.D.N.Y. Jan. 27, 2009) ("It is well established ... that placement in keeplock confinement under the conditions normally associated with that status does not violate an inmate's Eighth Amendment rights.") (citation omitted); *see also Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (citing cases). Therefore, it is recommended that this claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

be **dismissed** as a matter of law.

> FN7. Plaintiff also alleges, in conclusory fashion, that he was denied access to the law library during his periods in keeplock confinement. Compl. at ¶ 6. To the extent Plaintiff attempts to raise an access to the courts claim under the First Amendment, any such claim would fail for want of personal involvement and because Plaintiff has not alleged any injury resulting from his alleged denial of access to the law library. *See* *Lewis v. Casey,* 518 U.S. 343, 353 (1996).

**C. RLUIPA and First Amendment Claims**

*1. Merits of Plaintiff's Claims*

**\*10** RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of exercise of their religion." [FN8] *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). RLUIPA provides that

> FN8. RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores,* 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under Section 5 of the Fourteenth Amendment. "RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord,* 2007 WL 4560597, at \*5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the prison regulations constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means.* As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v.. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests. 482 U.S. 78, 89 (1987).

The first issue is whether Plaintiff's freedom of religious expression has been substantially burdened. Plaintiff is a registered NOI member. The NOI does not require him to wear dreadlocks, however, Plaintiff asserts that he wears dreadlocks pursuant to his own personal faith and interpretations of the Qu'ran and Bible. Pl.'s Decl. at ¶ 43. As Plaintiff explains, his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

refusal to cut his hair is rooted in the spiritual understanding that he is *"one"* with the Original Man, Blackman, who is Allah, as Plaintiff is a Blackman thus claiming the Holy Qu'ran and Bible as his blueprint of his lifestyle and hair:

A. Holy Qu'ran provision, surah (Chapter) 2, verse 196: "And accomplish the pilgrimage and the visit for ALLAH. But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches its destination."

B. Holy Bible, Numbers, Chapter 6, verse 5, commonly referred to as the Nazarite Vow 8[:] "All the days of the vow of his Naziriteship no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow."

*Id.* at ¶ 43 (emphasis in original).

Defendant contends that because Plaintiff's desire to wear dreadlocks is "merely a personal choice and is not based upon NOI tenant or dogma," DOCS' policy does not substantially burden his sincerely held religious beliefs. Dkt. No. 36, Def.'s Mem. of Law at p. 31; *see also* Leonard Decl. at ¶ 65. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S .C. § 2000cc-5(7)(A). Thus, the question of whether Plaintiff's personal religious beliefs are founded in any particular established religion is inapposite. However, RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson,* 544 U.S. at 725 n. 13. On that subject, the record shows that Plaintiff has been growing dreadlocks for religious reasons since approximately 1993. Dkt. No.

36-3, Pl.'s Dep. at p. 12. In addition, Plaintiff's continued refusal to cut his hair despite the successive punishments he received arguably supports his professed sincerity. Simply put, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs.

**\*11** RLUIPA does not define "substantial burden," however, the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 717-718 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck* ). In this case, there can be little doubt that the DOCS' policy in question substantially burdens Plaintiff's religious exercise by forcing him to choose between cutting his hair and being subjected to disciplinary punishment. In *Amaker v. Goord,* 2007 WL 4560596 (W.D.N.Y. Mar. 9, 2007), the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, addressed a motion for a preliminary injunction on facts nearly identical to those established here, and concluded that "forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliations with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice." 2007 WL 4560596, at *6; [FN9] *see also Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (noting that "demonstrating a substantial burden is not an onerous task for the plaintiff").

FN9. The district court adopted Judge Schroeder's recommendation that the preliminary injunction be granted because the prisoners had shown a likelihood of success on the merits of their claim that DOCS' policy precluding NOI

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

members from wearing dreadlocks violated RLUIPA. *Amaker v. Goord et al.,* 2007 WL 4560595 (W.D.N.Y. Dec. 18, 2007).

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc-2(b). On the first point, Defendant has asserted an interest in maintaining prison security, which he alleges could be undermined if more prisoners are allowed to wear dreadlocks, which can be used to conceal weapons. Def.'s Mem. of Law at pp. 32-33; Dkt. No. 36-8, Lucien J. LeClaire, Jr., Decl., dated Apr. 30, 2009, at ¶¶ 7-21; Leonard Decl. at ¶¶ 48-57 & 68. Without question, DOCS' interest in safety and security is a compelling governmental interest. *See Cutter v. Wilkinson,* 544 U.S. at 725 n. 13.

But, in order to defeat Plaintiff's RLUIPA claim, Defendant must also show that DOCS' policy is the least restrictive means of furthering its compelling interest in security. We believe there are questions of material fact on that issue. Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Leonard Decl. at ¶ 63. Also, Directive # 4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a "Afro-natural" style. Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(a),(d). Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners. Plaintiff asserts that the least restrictive means of ensuring security is already provided in DOCS Directive # 4914(III)(B)(2)(e), which states that

**\*12** [a]n inmate may be subjected to a hair search when

there is reason to believe that contraband may be discovered by such a search. An inmate may be subjected to such search at any time that a pat frisk, strip search, or strip frisk is being conducted. Consistent with Directive # 4910, during a pat frisk, an inmate will be required to run fingers through [his] hair. During a strip search, an inmate may be subjected to an inspection of his or her hair. During a strip frisk, an inmate will run his or her hands through the hair.

*Id.*

DOCS Deputy Commissioner for Correctional Facility Security Lucien J. LeClaire, Jr., responds to that argument in his Declaration, asserting that "[l]arge, long dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein." LeClaire Decl. at ¶ 18. LeClaire further argues that if an inmate need only declare a personally held religious belief in growing dreadlocks in order to be given permission to do so, DOCS will have no ability to restrict the number of inmates wearing dreadlocks. *Id.* at ¶ 19. The Court does not overlook the weight of these arguments nor the deference courts must accord prison officials when analyzing their policies. However, we question the assumption that permitting dreadlocks to be worn by inmates whose sincerely held religious beliefs require them would open the proverbial floodgates. Under DOCS' current policy, any nefariously motivated inmate need only register himself as a Rastafarian in order to be given permission to wear dreadlocks, and there is no evidence presented to the Court that such policy has resulted in a substantial increase in the Rastafarian/dreadlock-wearing inmate population. Leonard Decl. at ¶ 63; *see also* Artus Decl., Ex. D, Misbehavior Rep., dated Aug. 1, 2007 (stating "[i]nmate Pilgrim was given a direct order on July 1st 2007 to cut his dreadlocks or become a registered Rastafarian") & Leonard Decl., Ex. C, CORC Decision, dated Feb. 9, 2005 (ruling that "staff have correctly directed the grievant to remove his dreadlocks, or change

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

his religious designation"). Moreover, because DOCS has deemed its current policy adequate to protect its safety interests with respect to all of the other permitted hairstyles as well as for Rastafarian inmates with dreadlocks, a material question of fact exists as to why that policy would not also suffice for inmates in Plaintiff's position. *See Amaker v. Goord et al., 2007 WL 4560595.*

Even under a First Amendment analysis, questions of fact remain. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith, 850 F.2d 917, 926 (2d Cir.1988)* (citations omitted).

**\*13** The first two prongs have been met in this case. As discussed above, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs, nor any suggestion that Plaintiff is personally motivated by fraud or is otherwise attempting to deceive DOCS officials. And, on the second prong, Plaintiff has shown that DOCS' policy substantially burdens his religious beliefs. *See Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir.2006).*[FN10] As to the third prong, the Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley, 482 U.S. at 89.* Courts look to the following four factors in determining the reasonableness of a prison regulation: 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id. at 89-91* (citations omitted).

FN10. In *Salahuddin,* the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been "substantially burdened." *Salahuddin v. Goord, 467 F.3d 263, 274-75 n. 5 (2d Cir.2006). See also Pugh v. Goord, 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008)* (noting that the Second Circuit has twice declined to answer the question). To the extent that heightened standard applies to all free exercise claims, Plaintiff has met it by showing that DOCS' policy substantially burdens his religious beliefs.

DOCS has a compelling and legitimate penological interest in maintaining prison security. The policy in question, which seeks to limit the number of prisoners who are allowed to wear dreadlocks, which can be used to hide small weapons, is rationally related to that interest. The other remaining three factors, however, weigh against Defendant. On the second *Turner* factor, the Court is not aware of any other means of exercising this particular religious belief other than physically growing dreadlocks. As to the third factor, as previously discussed, questions of fact exist as to what effect the accommodation of Plaintiff's beliefs would have on the entire prison system, especially considering the fact that DOCS' current policy allows any inmate who self-identifies as Rastafarian to wear dreadlocks. For the same reasons, we believe a question of fact exists as to whether there are ready alternatives to DOCS' current policy, including the procedures already applied to those whom DOCS currently allows to wear dreadlocks and other long hair styles. Overall, there are material questions of fact as to the reasonableness of DOCS' policy Plaintiff has challenged. *See Benjamin v. Coughlin, 905 F.2d 571, 576-77 (2d Cir.), cert. denied, 498 U.S. 951 (1990)* (affirming district court's finding that DOCS' policy requiring Rastafarian inmates to cut their dreadlocks upon arrival into DOCS' custody was not reasonably related to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

the asserted penological interests when defendants did not demonstrate that the religious accommodation sought by prisoners would have "more than a de minimis effect on valid penological interests"); *see also Francis v. Keane,* 888 F.Supp. 568, 577 (S.D.N.Y.1995) (denying summary judgment where two Rastafarian C.O.'s challenged DOCS' grooming regulation prohibiting dreadlocks for officers); *Amaker v. Goord,* 2007 WL 4560595.

### 2. *Personal Involvement*

**\*14** Although neither party addresses the issue in their respective submissions to the Court, there is a question as to whether Plaintiff has sufficiently alleged personal involvement with respect to his RLUIPA claim. Neither the Supreme Court nor the Second Circuit have directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims.[FN11] *See Joseph v. Fischer,* 2009 WL 3321011, at \*18 (S.D.N.Y. Oct. 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith,* 2009 WL 3199520, at \*9 (N.D.N.Y. Sept. 30, 2009) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at \*2 (S.D.Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* 2009 WL 890521, at \*3 (S.D.Ohio Mar. 31, 2009); *Alderson v. Burnett,* 2008 WL 4185945, at \*3 (W.D.Mich. Sept. 8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc-1(a), and defines "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of the State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law,"

42 U.S.C. § 2000cc-5(4)(A). Thus, RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.

FN11. The Court's research uncovered no ruling that a plaintiff need *not* show personal involvement in order to bring a valid RLUIPA claim.

In this case, the uncontroverted record shows that Artus took no actions relevant to Plaintiff's claims beyond referring Plaintiff's complaints, grievances, and appeals to his subordinates. Artus Decl. at ¶ 13. Moreover, the record does not show, and it is not alleged, that Artus was the creator of the DOCS' policy Plaintiff is challenging. *Id.* at ¶ 8 (noting that the policy is based on DOCS Directive # 4914 and relevant CORC determinations, which have the effect of Directives). Plaintiff has not sued DOCS, nor any DOCS employee responsible for creating and/or enforcing the challenged policy.

However, considering Plaintiff's *pro se* status, the lack of finality in this Circuit on the issue of personal involvement in RLUIPA claims, and judicial economy, the Court recommends that DOCS and DOCS Commissioner Brian Fischer be substituted as proper Defendants to this action solely as to Plaintiff's RLUIPA and First Amendment free exercise claims.[FN12] *See Zuk v. Gonzalez,* 2007 WL 2163186, at \*2 (N.D.N.Y. July 26, 2007) (adding a proper defendant, *sua sponte,* in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* FED. R. CIV. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker,* 2006 WL 5893295, at \*7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a defendant in a FTCA claim

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

brought by a *pro se* plaintiff); *Ciancio v. Gorski,* 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999)* (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").

FN12. Defendant asserts that Plaintiff's claims are moot because he has been transferred from Clinton Correctional Facility, where Artus is the Superintendent, to Southport Correctional Facility. Def.'s Mem. of Law at p. 38 (quoting *Salahuddin v. Goord* for the proposition that "an inmate's transfer from a prison facility generally renders moot any claims for declaratory judgment and injunctive relief against the officials of that facility."). However, because we recommend that DOCS and Commissioner Fischer be added to the case as Defendants, this mootness argument is without merit.

### 3. *Monetary Damages under RLUIPA*

**\*15** Defendant argues that Plaintiff is barred from seeking monetary damages for the alleged RLUIPA violation. Def.'s Mem. of Law at p. 29. RLUIPA allows for "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), but does not specify what types of relief it makes available. The Second Circuit has not yet ruled on the issue, and there appears to be a divide amongst the other circuit courts that have addressed it. *See Bock v. Gold,* 2008 WL 345890, at *5-7 (D.Vt. Feb. 7, 2008) & *Pugh v. Goord,* 571 F.Supp.2d 477, 506-08 (S.D.N.Y.2008) (both noting the split among circuit and district courts).

However, the district courts in this Circuit have held that monetary damages are not available under RLUIPA against state defendants in either their official or individual capacities.FN13 Looking to the Eleventh Amendment's protection of the states' sovereign immunity,

courts have held that because RLUIPA does not make an unequivocal waiver of sovereign immunity with respect to monetary damages against state defendants in their official capacities, such relief is not available. *See Pugh v. Goord,* 571 F.Supp.2d at 509 (" 'To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.' "(quoting *Lane v. Pena,* 518 U.S. 187, 192 (1996)); *see also Bock v. Gold,* 2008 WL 345890, at *6; *El Badrawi v. Dept. of Homeland Sec.,* 579 F.Supp.2d 249, 258-63 (D.Conn.2008). In addition, courts in this Circuit have held that to allow claims against defendants in their individual capacities would raise serious constitutional questions about whether RLUIPA exceeds Congress's powers under the Spending Clause (Article 1, Section 9, Clause 1) of the Constitution.FN14 *See Pugh v. Goord,* 571 F.Supp.2d at 506-07; *Vega v. Lantz,* 2009 WL 3157586, at *4 (D.Conn. Sept. 25, 2009) (holding that RLUIPA does not allow damages against defendants in their individual capacities and citing cases). Essentially, courts have found that because Congress enacted RLUIPA pursuant to the Spending Clause, not its power to enforce the provisions of the Fourteenth Amendment under Section 5 of the same, there is no constitutional basis for Congress to enforce RLUIPA as to individual defendants, who are not parties to the "contract" between the federal government and the states pursuant to which, as a normal practice, the former provides funding to the latter in exchange for compliance with certain conditions. *See Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 328 (5th Cir.2009) (holding that "individual RLUIPA defendants are not parties to the contract in their individual capacities") (cited in *Vega v. Lantz,* 2009 WL 3157586, at *4); *see also Pugh v. Goord,* 571 F.Supp.2d at 506-07 (citing *Smith v. Allen,* 502 F.3d 1255, 1275 (11th Cir.2007) for the same proposition). Because interpreting RLUIPA to allow suits against individuals would call into question the constitutionality of the statute itself, courts have applied the canon of constitutional avoidanceFN15 in concluding that RLUIPA does not permit such causes of action. *See Bock v. Gold,* 2008 WL 345890, at *6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

**FN13.** Research has not revealed any district court in this Circuit that has concluded otherwise.

**FN14.** Both the Eleventh and the Fifth Circuits have explicitly held that Congress enacted RLUIPA pursuant to its power under the Spending Clause, not the Commerce Clause. *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 329 n. 34 (5th Cir.2009); *Smith v. Allen,* 502 F.3d 1255, 1274 n. 9 (11th Cir.2007). We agree with those courts that because "there is no evidence concerning the effect of the substantial burden" on interstate commerce, RLUIPA must necessarily be Spending Clause legislation. *See Sossamon v. Lone Star State of Texas,* 560 F.3d at 329 n. 34.

**FN15.** "The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted." *Bock v. Gold,* 2008 WL 345890, at *6.

**\*16** Based on the above reasoning, we agree with the other district courts in this Circuit that RLUIPA does not allow monetary damages against individual defendants in their individual or official capacities. *See Pugh v. Goord,* 571 F.Supp.2d at 507 (citing cases); *see also Sweeper v. Taylor,* 2009 WL 815911, at *9 (N.D.N .Y. Mar. 27, 2009) (holding that no monetary damages are available under RLUIPA). Therefore, we recommend that Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA be **dismissed.** However, because Plaintiff has requested both declaratory and injunctive relief, our finding that RLUIPA does not allow monetary damages does not totally moot his claims.

**D. Qualified Immunity**

Defendant asserts the affirmative defense of qualified immunity. Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citation omitted).

Should the district court adopt this Court's recommendations, Plaintiff's RLUIPA and First Amendment religious expression claims against DOCS and Commissioner Fischer are all that will remain in this case. Qualified immunity does not apply to suits against individuals in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). We have already held that, with respect to Plaintiff's RLUIPA claim, monetary damages are not available against defendants in their individual or official capacities. As such, Plaintiff's RLUIPA claims will be limited to injunctive and declaratory relief against DOCS employees in their official capacities. Therefore, qualified immunity has no bearing on Plaintiff's RLUIPA claim. *See, e.g., Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir.1995) ( "[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities ... and it protects only against claims for damages, not against claims for equitable relief."); *see also Rodriguez v. Phillips,* 66 F.3d 470, 481 (2d Cir.1995) (noting that qualified immunity does not apply to claims for injunctive and declaratory relief against a defendant in his official capacity).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

**\*17** Plaintiff's claim for damages under the First Amendment, however, is subject to a qualified immunity analysis. On that issue, we find that it is not clearly established law that DOCS' hair policy, which allows only Rastafarians to wear dreadlocks, violates the Free Exercise Clause of the First Amendment. Although the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, *Benjamin v. Coughlin,* 905 F.2d at 576-77, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protection. *See Redd v. Wright,* 597 F.3d 532, 2010 WL 774304, at *4 (2d Cir.2010) (citing cases for the proposition that constitutional rights should be defined with "reasonable specificity" for qualified immunity purposes and granting qualified immunity because a DOCS policy had not been held unconstitutional at the time it was enforced against the plaintiff). As such, under preexisting law a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was unlawful. *See Dean v. Blumenthal,* 577 F.3d 60, 68 (2d Cir.2009) (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)).

Because we find that DOCS' policy did not violate clearly established law, qualified immunity would apply to all those who participated in its creation and enforcement. As such, should the District Court adopt our recommendation that Commissioner Fischer be substituted as a Defendant, Plaintiff's only potential relief against Fischer in his individual capacity could be non-monetary. *See Rodriguez v. Phillips,* 66 F.3d at 481. Likewise, the Eleventh Amendment's protection of the States' sovereign immunity would preclude any monetary damages Plaintiff would seek against Fischer in his official capacity. *See Farid v. Smith,* 850 F.2d at 921.

As such, should the District Court adopt our recommendations, DOCS and Commissioner Fischer will be substituted as Defendants and Plaintiff will be limited to non-monetary relief against those Defendants under both RLUIPA and § 1983.

**III. CONCLUSION**

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED in part** and **DENIED in part** in accordance with the above Report-Recommendation; and it is further

**RECOMMENDED,** that DOCS and Commissioner Brian Fischer be substituted as Defendants pursuant to FED. R. CIV. P. 21; and it is further

**RECOMMENDED,** that Defendant Artus be **dismissed** from this action; and it is further

**RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants *sua sponte* by the Court, that the Clerk of the Court shall add the "New York State Department of Correctional Services" and "Commissioner Brian Fischer" as Defendants to the Docket of this action; and it is further

**\*18 RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants, that the Clerk shall issue Summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the substituted Defendants; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

it is further

**RECOMMENDED,** that should DOCS and Fischer be substituted as Defendants, that those substituted Defendants shall file a response to Plaintiff's Complaint as provided for in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED,** that should DOCS and Fischer be substituted as Defendants, that upon the filing of their response to the Complaint, the Clerk shall notify Chambers so that a status conference may be scheduled; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.

Pilgrim v. Artus

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 895843 (D.S.D.)

(Cite as: 2008 WL 895843 (D.S.D.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

D. South Dakota,
Southern Division.
Aaron L. SCHNITZLER, Plaintiff,
v.
Tim REISCH, Cabinet Secretary, SD Department of
Corrections; Bob Dooley, Warden, Mike Durfee State
Prison; Mike Storgaard, Stop Treatment Director, Mike
Durfee State Prison, Defendants.
No. CIV 06-4064.

March 31, 2008.
Aaron L. Schnitzler, Springfield, SD, pro se.

James Ellis Moore, Jeffrey L. Bratkiewicz, Woods, Fuller,
Shultz & Smith, PC, Sioux Falls, SD, for Defendants.

MEMORANDUM OPINION AND ORDER

LAWRENCE L. PIERSOL, District Judge.

*1 The background of this § 1983 case has been set
forth in this Court's Memorandum Opinion and Order of
September 28, 2007 (Doc. 70). One fact that should be
added is that Mr. Schnitzler was denied parole on
February 21, 2007. The Court takes judicial notice of that
fact.

**DISCUSSION**

Defendants argue that the state parole board for at
least these purposes should be treated the same as a state
court and that therefore the RLUIPA claim should be
dismissed under the *Rooker-Feldman* doctrine. The state
parole board is not a part of the same branch of
government as the state courts. The parole board is a part
of the Executive Branch of South Dakota state
government, not the Judicial Branch. SDCL 1-15-1.4. The
*Rooker-Feldman* doctrine is not applicable to this
Religious Land Use and Institutionalized Persons Act
(RLUIPA) claim of Mr. Schnitzler.

The doctrine from *Heck v. Humphrey,* 312 U.S. 477
(1994) presents a different issue and could arguably
warrant dismissal of Mr. Schnitzler's remaining claim. Mr.
Schnitzler's claim really is about his confinement and
whether that confinement should immediately end with
parole. The claim really is that parole should have been
granted despite Mr. Schnitzler's refusal to fully participate
in group sex offender treatment. Despite the serious
jurisdictional issue presented by the *Heck v. Humphrey*
doctrine, the Defendants request that the Court consider
and dismiss this action on the merits of the RLUIPA
claim instead of dismissing on jurisdictional grounds.

**THE RLUIPA CLAIM**

Defendants challenge the constitutionality of
RLUIPA. This Court has held RLUIPA to be
constitutional in *Sisney v. Reisch, et al.,* CIV. 03-4260
(February 6, 2008).

The Defendants also request that in the interest of
finality, this Court rule on the merits of the RLUIPA
claim. This Court will assume for the purpose of this
motion that the challenged policy imposes a substantial
burden on Mr. Schnitzler's religious practices or beliefs.
RLUIPA "does not preclude inquiry into the sincerity of
a prisoners professed religiosity.... The truth of a belief is
not open to question; rather, the question is whether the
objector's beliefs are truly held." *Cutter v. Wilkinson,* 544
U .S. 709, 725, 125 S.Ct. 2113 (2005) (internal citations
omitted). For the purpose of this motion, the Court will
assume that Mr. Schnitzler's beliefs are truly held. The
state must then demonstrate

"that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental
interest; and

(2) is the least restrictive means of furthering that
compelling governmental interest."

42 U.S.C.2000cc-1(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 895843 (D.S.D.)

(Cite as: 2008 WL 895843 (D.S.D.))

There is clearly a compelling governmental interest in the treatment of sex offenders before they rejoin the general public so that the incidence of recidivism can be reduced for the benefit of the public as well as the offenders. See *McKune v. Lile,* 536 U.S. 24, 33, 48, 122 S.Ct. 2017 (2002). The present case presents no exception to that compelling governmental interest.

**\*2** The state must next demonstrate that the burden caused by the group sex offender treatment program in question upon Mr. Schnitzler's religious practices or beliefs "is the least restrictive means of furthering that compelling governmental interest." As the Court observed in the previous Memorandum Opinion and Order in this case, and as was observed by Magistrate Judge Simko in his Report and Recommendation, the record was scant on bases for the opinions of the Defendants' experts on the type and necessity of sex offender treatment. Defendants' position was subsequently substantially strengthened by the Affidavit of Dr. Dave Kauffman, a psychologist who is the Clinical Supervisor for the South Dakota Department of Corrections' sex offender treatment program. Dr. Kauffman opines that any one of Mr. Schnitzler's requested modifications would make the current group program ineffective. The Court has no basis from the record to dispute that expert opinion. Even though we as federal judges regularly sentence sex offenders, that does not make us experts on sex offender treatment. The group sex offender treatment program now offered by the South Dakota Department of Corrections does, on the basis of the record before this Court, appear to be the least restrictive means of furthering the compelling governmental interest of providing sex offender treatment to Mr. Schnitzler while he is incarcerated.

As for Mr. Schnitzler's RLUIPA claims, the Defendants have met their burdens, and summary judgment is granted in favor of the Defendants on the RLUIPA claims.

The Court recognizes that addressing the RLUIPA claims on the merits could be dicta. Even if so it is desirable to bring finality to these claims so that the parties can proceed ahead to make decisions for their benefit with knowledge of their respective rights. Mr. Schnitzler

should, despite his reservations, meaningfully and fully participate in the group sex offender treatment program. Accordingly,

IT IS ORDERED:

1. That the Defendants' Objections, Doc. 52, are granted and the Magistrate Judge's Report and Recommendation, Doc. 48, is not adopted, and Defendants' Motion to Dismiss, Doc. 44, is granted, and Defendants Motion for Summary Judgment, Doc. 25, is granted.

2. That the Plaintiff's Motion to Appoint Counsel and for Copies, Doc. 50, is denied.

3. That the Plaintiff's Motion for Permanent Injunction, Preliminary Injunction, and for Case Update, Doc. 51, is denied.

4. That Plaintiff's Motion to Substitute Party, Doc. 60, is denied.

5. That Plaintiff's Motion to Add Party, Doc. 64, is denied.

6. That Plaintiff's Motion to Fasttrack 8th Amendment Claim, Doc. 89, is denied.

D.S.D.,2008.

Schnitzler v. Reisch
Not Reported in F.Supp.2d, 2008 WL 895843 (D.S.D.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Keith BUSH and Anthony Bennett, Plaintiffs,
v.
D.O.C. Commissioner Glen GOORD, Michael
Giambruno, Gerald Elmore, Tom Brunette, and Jeff
Weber, Defendants.
No. 03-CV-759S.

March 25, 2009.
West KeySummary**Constitutional Law 92** ⇌ 1426

92 Constitutional Law

92XIII Freedom of Religion and Conscience
92XIII(B) Particular Issues and Applications
92k1421 Prisons and Pretrial Detention
92k1426 k. Rehabilitation and Treatment
Programs. Most Cited Cases
**Mental Health 257A** ⇌ 465(3)

257A Mental Health

257AIV Disabilities and Privileges of Mentally
Disordered Persons
257AIV(E) Crimes
257Ak452 Sex Offenders
257Ak465 Disposition; Commitment
257Ak465(3) k. Treatment. Most Cited
Cases

A sex offender counseling and treatment program that
required a sex offender to admit responsibility for his
actions did not violate the sex offender's right to the free
exercise of religion. Although the sex offender's Wiccan
faith prevented him from admitting to guilt for his actions,
the program's acknowledgement of guilt requirement was
reasonably related to the department of correction's
legitimate penological interests. The program's goal was
to rehabilitate sex offenders, and without the sex offender

admitting to his guilt, officials would be unable to assist
the sex offender in the development of tools necessary to
self-regulate and to avoid future offensive behavior. Thus,
even though the sex offender would not gain certain
good-time-credits for failing to complete the program, the
offender's participation in the program was not mandatory
and did not violate his First Amendment rights. U.S.C.A.
Const.Amend. 1; 42 U.S.C.A. § 1983.
Scott Michael Lupiani, Scott M. Lupiani, Attorney at Law,
Buffalo, NY, for Plaintiffs.

David Joseph State, Peter B. Sullivan, New York State
Attorney General, Buffalo, NY, for Defendants.

**ORDER**

WILLIAM M. SKRETNY, District Judge.
*1 1. On October 9, 2003, Plaintiffs commenced this
civil rights action against Defendants under 42 U.S.C. §
1983. On October 9 and December 30, 2003, Plaintiffs
moved to proceed *in forma pauperis.* (Docket Nos. 2, 8.)
On May 27, 2004, this Court referred this matter to the
Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B).
(Docket No. 27.) On April 27, 2007, Defendants filed a
Motion for Summary Judgment. (Docket No. 119.)

2. On January 7, 2008, the Honorable Jeremiah J.
McCarthy, United States Magistrate Judge, filed a Report
and Recommendation, in which he recommended (1) that
Plaintiffs' Motions for Leave to Proceed *In Forma
Pauperis* be granted *nunc pro tunc,* and (2) that
Defendants' Motion for Summary Judgment be granted.
(Docket No. 135 .)

3. On April 29, 2008, this Court accepted in part and
recommitted in part Judge McCarthy's Report and
Recommendation. (Docket No. 139 .) This Court accepted
Judge McCarthy's recommendation to grant Plaintiffs'
Motions to Proceed *In Forma Pauperis,* but recommitted
Defendants' Motion for Summary Judgment for "further
factual development and discussion." (Docket No. 139, ¶
5.)

4. After additional discovery and receiving

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

supplemental briefing and oral argument, Judge McCarthy filed a Supplemental Report and Recommendation on February 23, 2009, in which he again recommends that Defendants' Motion for Summary Judgment be granted, and also recommends that Plaintiff Bush be terminated as a plaintiff because he is no longer incarcerated, which Plaintiffs do not oppose. (Docket No. 164.)

5. No objections to Judge McCarthy's Supplemental Report and Recommendation were received from either party within ten days of the date of its service, in accordance with 28 U.S.C. § 636(b)(1) (C) and Local Rule 72.3(a)(3). This Court has carefully reviewed the Supplemental Report and Recommendation and is now satisfied that the record is complete and fully supports Judge McCarthy's recommendation that Defendants' motion be granted. Accordingly, this Court will accept that recommendation and grant Defendants' motion.

IT HEREBY IS ORDERED, that this Court accepts Judge McCarthy's Supplemental Report and Recommendation (Docket No. 164) in its entirety, including the authorities cited and the reasons given therein.

FURTHER, that upon consent of Plaintiffs' counsel, the Clerk of the Court is directed to TERMINATE Plaintiff Keith Bush as a Plaintiff in this action.

FURTHER, that Defendants' Motion for Summary Judgment (Docket No. 119) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

### SUPPLEMENTAL REPORT AND RECOMMENDATION

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This case was referred to me by Hon. William M. Skretny to hear and report in accordance with 28 U.S.C. 636(b)(1) (Dkt.# 118). Before me is defendants' motion for summary judgment (Dkt.# 119). Following oral argument and supplemental briefing, on January 7, 2008

I issued a Report and Recommendation in which I recommended that defendants' motion be granted (Dkt.# 135).

**\*2** Defendants filed objections to my Report and Recommendation (Dkt.# 136). By Decision and Order dated April 29, 2008 (Dkt.# 139), Judge Skretny accepted my recommendation that plaintiffs' *in forma pauperis* applications be granted (Dkt.# 139, ¶ 7), but stated that with respect to the summary judgment motion, "further factual development and discussion is necessary to appropriately weigh the relevant [*Turner* ] factors and reach a supportable legal conclusion." *Id.* at ¶ 5. Therefore, he returned the case to me for further proceedings and the issuance of a Supplemental Report and Recommendation. *Id.* at ¶ 7.

The parties thereafter conducted further discovery [FN1] and filed supplemental submissions. Oral argument was again held before me on February 13, 2009. Following oral argument, I requested defendants to clarify whether or not plaintiff Bennett lost previously earned good-time credits as a result of his failure to participate in the SOCP, and they did so (Dkt.162 and 163). For the following reasons, I again recommend that defendant's motion for summary judgment (Dkt.# 119) be GRANTED.

> FN1. The parties have conducted the depositions of plaintiff Bennett and defendants Tom Brunette and Jeffrey Weber. "Th[ese] depositions were the extent of the additional factual discovery conducted by the parties." Plaintiffs' Response (Dkt.# 154), p. 4.

### DISCUSSION AND ANALYSIS

**A. Status of Plaintiff Bush**

During oral argument on February 13, 2009, I inquired as to the status of plaintiff Bush. Plaintiffs' attorney stated that he would not oppose a motion to dismiss the complaint as to plaintiff Bush, as he is no longer incarcerated. Defendants then orally moved to dismiss the complaint, with prejudice, as to plaintiff Bush, and the motion was unopposed. Accordingly, I recommend that the complaint be dismissed as to plaintiff Bush.

**B. Does The SOCP's Acknowledgment of Responsibility Requirement Violate Plaintiffs' First**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

**Amendment Rights to Free Exercise of Religion?**[FN2]

> **FN2.** Because Judge Skretny remanded the case to me for a more complete factual discussion of the *Turner* factors, I have not expanded upon the other aspects of my initial Report and Recommendation, including whether plaintiffs' claims are subsumed by the class certified in *Donhauser v. Goord,* 01-CV-1535 (N.D.N.Y.) (settled October 2008). January 7, 2008 Report and Recommendation (Dkt.# 135), pp. 5-6.

"Prisoners retain their right to religious freedom even when incarcerated." *Ochoa v. Connell,* 2007 WL 3049889, *6 (N.D.N.Y.2007).* However, this right must be "balanced against the 'interests of prison officials charged with complex duties arising from administration of the penal system.' " *Id.* Therefore, a prison inmate retains only " 'those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system' ". *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). "The governing standard is one of reasonableness.' " *Id.*

The parties agree that I "must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (*citing Turner v. Safley.* 482 U.S. 78, 90-91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

**\*3** Plaintiff Bennett "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin. supra.* 467 F.3d at 274-75.[FN3] Plaintiff Bennett has given conflicting accounts for why he did not participate in the SOCP. For example, in a June 6, 2003 Time Allowance Form he indicated that he "previously refused SOP ... due to concern over information regarding crime being disseminated to employees-security and other inmates." Declaration of

David State, Esq. (Dkt.# 149), Ex. B. He also explained during his deposition that "if I give a statement of guilt then this automatically destroys my chances of being exonerated of the case ... I asked her: what's more important? Me getting the treatment or me giving you a guilty plea?" August 29, 2008 Deposition Transcript of Anthony Bennett (Dkt. # 149), Ex. A, p. 17.

> **FN3.** This point was not addressed in my initial Report and Recommendation because it was not raised by defendants. Based upon the newly conducted discovery, defendants now raise this argument (Defendants' Memorandum of Law (Dkt.# 151), Point II), and plaintiffs do not challenge defendants' ability to raise this argument at this stage of the case. Plaintiffs' Response (Dkt.# 154), pp. 8-11. Therefore, I will address it.

However, at other points in his deposition, he indicated that his refusal to participate in the SOCP was because of the admission of guilt requirement, which would require him to violate his Wiccan faith: "When I presented myself before the court ... and I took an oath that my word is my bond and my bond is my life according to Wiccan.... [I]f you violate that, then you forfeit your life in this world and the next." *Id.* at pp. 29-30; *see also* p. 28.

Based upon the record before me, I cannot conclude, as a matter of law, that the SOCP's admission of guilt requirement does not substantially burden plaintiff Bennett's sincerely held religious beliefs. Therefore, I will consider each of the four *Turner* factors:

**1. "Whether the challenged regulation has a valid, rational connection to a legitimate governmental objective"**[FN4]

> **FN4.** Although plaintiff Bennett does not challenge the first and second *Turner* factors, I have analyzed them in light of the newly presented evidence, since Judge Skretny remanded the case to me for further factual development and analysis of all of the factors. Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), ¶¶ 5-6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

"The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin, supra,* 467 F.3d at 274 (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Because "a court need not weigh each factor equally", this factor has been called the "controlling factor". *Mayfield v. Texas Department of Criminal Justice,* 529 F.3d 599, 607 (5th Cir.2008).

According to Edwin H. Elfeldt, the Guidance and Counseling Coordinator for DOCS, "the primary purpose of the [DOCS'] sex offender counseling program is to reduce the likelihood that convicted sex offenders and other inmates with histories of sexual offending behavior will reoffend, by helping them to gain control of the chain of behaviors that leads to sexual offending." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 3. "The SOCTP is fully consistent with the standards, guidelines, and best practices in the field, which require participants in counseling to openly and honestly discuss the behavior that resulted in their incarceration and referral to SOCTP, demonstrate acceptance of responsibility for their conduct, and demonstrate an understanding of his or her sexual offending behavior and cycle of abuse. If an inmate lies or is untruthful, he will not benefit from the treatment." FN5 *Id.* at ¶ 7.

FN5. The SOCP was superseded by the Sex Offender Counseling and Treatment Program ("SOCTP") in November 2007. Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 1. However, at oral argument on February 13 the parties confirmed that the SOCTP also contains an admission of guilt requirement.

**\*4** Based upon Mr. Elfeldt's uncontested representations, I conclude that there is a rational connection between the SOCP, including its requirement that prisoners take responsibility for their crimes or face the loss of good time credits for non-participation, and DOCS' interest in rehabilitating prisoners. *See Donhauser v. Goord,* 314 F.Supp.2d, 119, 135 (N.D.N.Y.2004) ("there does exist a valid, rational connection between the SOCP, along with its requirements, including the threat

faced for non-participation, and the State's interest in requiring program participants to divulge their sexual histories as part of the larger interest in rehabilitating prisoners for safe return to society"). *See also Searcy v. Simmons,* 299 F.3d 1220, 1228 (10th Cir.2002) ( "Even were we to assume the admission of responsibility impinges upon Mr. Searcy's right to freely exercise his religious beliefs, we would agree with the district court that the requirement is 'reasonably related' to the [the government's] penological interests.").

**2. "Whether prisoners have alternative means of exercising the burdened right"**

Plaintiff Bennett is currently serving a sentence as a result of a conviction for a sexual offense in 1984. At his trial he denied, under oath, that he committed the crime. Plaintiff Bennett's August 29, 2008 Deposition Transcript (Dkt.# 149-2), pp. 28-30. He has been a practicing Wiccan since 1984, and according to him, "my word is my bond and my bond is my life according to Wiccan.... If you violate that, then you forfeit your life in this world and the next." *Id.* at p. 30.

Therefore, it is evident that plaintiff Bennett could not maintain his tenet against recanting his sworn testimony and, at the same time, abide by the SOCP's admission of guilt requirement. "Though it would not be conclusive, it would be some evidence that the regulations were unreasonable." *Overton v. Bazzetta,* 539 U.S. 126, 135, 123 S.Ct. 2162, 156 L.Ed.2d 162(2003).

**3. "The impact on guards, inmates, and prison resources of accommodating the right"**

**and**

**4. "The existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests"**

"The third factor and fourth factors are related: whether an accommodation would have a 'significant ripple effect' on the guards, other inmates, and prison resources and whether there is an alternative that fully accommodates the prisoner at *de minimis* cost to valid penological interests. 'This is not a 'least restrictive alternative' test, prison officials do not have to set up and

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.' ... But if the inmate can point to an alternative that fully accommodates his rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship test." *Schnitzler v. Reisch,* 518 F.Supp.2d 1098, 1118 (D.S.D.2007).

**\*5** In remanding the case back to me of further proceedings, Judge Skretny noted that "it is unclear whether Plaintiffs voluntarily want to participate in the SOCP but believe that they cannot do so because of their religious convictions, or whether DOCS requires that the Plaintiffs participate in this particular program or face the loss of good-time credits. This distinction is important on at least the third and fourth Turner factors, particularly because it appears that programs similar to the SOCP exist that do not include the admission of guilt requirement (Plaintiffs, in fact, completed one)." Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), ¶ 6.

According to Mr. Elfeldt, "allowing an inmate to complete the SOCTP without accepting responsibility for his behavior would wreak havoc with DOCS's rehabilitation goals. In other words, allowing Bennett to participate in the SOCTP without accepting responsibility for his behavior would give him credit for completion of a program where staff were prevented from exploring his assessed dynamic risks. If treatment staff cannot discuss with a participant his individual risks, they cannot assist that participant in the development of tools necessary to self-regulate and avoid future offensive behavior." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 14. Moreover, DOCS' "treatment staff are not trained to treat an offender who will not discuss his or her offending behavior." *Id* . Based upon this undisputed testimony, I conclude that accommodating plaintiff Bennett "would undermine the precept of the entire [program], that admission of responsibility and overcoming denial are integral to the rehabilitation of sex offenders." *Searcy, supra,* 299 F.3d at 1228.

"The court in *Turner* ... expressed concern for situations where an accommodation would have a 'ripple effect' throughout the prison, thereby possibly straining the facility's ability to cope with change." *Donhauser, supra,* 314 F.Supp.2d at 136. "Allowing one participant in the program to avoid discussion of his behavior could result in all other inmates doing the same which would prevent the entire group from receiving the benefits of program participation." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 15; *see also* ¶ 12 ("if the Department were to permit an offender to attend the SOCTP without engaging in such discussion, it would likely impair the ability of other inmates in the group to benefit from the program. I would expect that other inmates in the group would believe that they were being treated unfairly and this would make it much more difficult for those participants to engage in the very difficult process of discussing their behavior cycle").

Plaintiff Bennett argues that "the existence of other means of rehabilitating inmates was present prior to the current SOCP and those programs did not require an admission of guilt." Plaintiffs' Response (Dkt.154), p. 14. By "allowing ... previously acceptable religious based programs [such as this] as alternatives to the secular SOCP would accommodate those inmates with sincerely held religious beliefs that prevent those inmates from violating their sworn oath and relieving them of the threat of eternal punishment." *Id.* In 1989 plaintiff Bennett completed an Innovative Therapeutic Program ("ITP").[FN6] *See* Plaintiff Bennett's Deposition Transcript (Dkt.# 154-2), p. 12; Plaintiffs' Response (Dkt.# 126), Ex. A, ITP Manual. Other than the ITP, plaintiff Bennett concedes that he completed no sex offense counseling program. Plaintiff Bennett's Deposition Transcript (Dkt.# 154-2), pp. 14-15.

> [FN6.] It also appears to be referred as the "Islamic Therapeutic Program". Deposition of Thomas Brunette (Dkt.# 154-2), p. 77.

**\*6** However, the ITP is a religious based program, which is not sanctioned by DOCS. *See* Deposition of Thomas Brunette (Dkt.# 154-2), p. 78.[FN7] Although plaintiff Bennett received a certificate from DOCS for completing the ITP, DOCS "stopped giving out certificates at least 18 years ago.... We stopped doing that because the Department started developing their programs that were more staff run, more ... patented, consistent ... the sex offender program we now have is the result of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

years of research". Deposition of Thomas Brunette (Dkt.# 154-2), p. 87.

> FN7. In fact, plaintiff Bennett made a similar argument regarding his referral to a DOCS' sanctioned substance abuse treatment and was advised by DOCS that the ITP did not satisfy his substance abuse treatment requirement. Declaration of David State, Esq. (Dkt.# 149), Ex. D.

It remains DOCS' responsibility to "assign[ ] each inmate to a program of treatment that is most likely to be useful in assisting the inmate to refrain from future violations of the law." Affidavit of Edwin H. Elfeldt (Dkt.# 150), 116. "The individual inmate's assigned Correction Counselor, evaluates each inmate to identify his or her assessed program needs." *Id.*

In this case, plaintiff Bennett was assigned to the SOCP. While he may have completed other non-sanctioned programs, these do not function as substitutes for the SOCP. The goal of the SOCP "is habilitative, and not punitive". *Id.* at ¶ 3. "The ultimate benefit of [SOCP] participation is enhancing the likelihood that the inmate will be able to lead a postsocial, law abiding life upon release from custody." *Id.* at ¶ 17.

While plaintiff Bennett may not agree with the necessity to complete the SOCP, "it is not the function of this court to micromanage the New York prison system or to second guess officials, including those regarding programming." *Sumpter v. Skiff,* 2008 WL 4518996, *12 (N.D.N.Y.2008).*

Alternatively, plaintiff Bennett argues that "the lost of earned good-time-credits and the inability to earn good-time-credits acts as a *de facto* compulsion towards participation." Plaintiffs' Response (Dkt.# 154), p. 5. Therefore, "if inmates could refuse to enter the program by making a voluntary and informed decision, and not one based on the fear that they may lose years of good-time-credits thereby extending their term of incarceration substantially, then there would be very little impact on guards, inmates, and prison resources." *Id.* at p. 14. In response, defendants argue that the SOCP is not

mandatory. Defendants' Memorandum of Law (Dkt.# 151), Point I; Defendants' Reply Memorandum of Law (Dkt.# 155), Point IV.

Although plaintiff Bennett's maximum sentence expires on July 14, 2013, by 2003 he had earned 9 years, 10 months and zero days of good-time credits, which gave him a conditional release date of September 14, 2003. Declaration of David State, Esq. (Dkt.# 163), ¶¶ 3 and 4, Ex. A. Based upon his impending conditional release date, the Time Allowance Committee began reviewing plaintiff Bennett's case in or about June 2003. *Id.* at ¶ 4. After reviewing the matter, the Time Allowance Committee recommended that all of plaintiff Bennett's previously earned good-time credits be withheld because he "needs to successfully complete S/O program and reapply to the committee" and "has a very poor disciplinary [*sic* ], with improvements noted, recently. Mr. Bennett should continue to work on this aspect of his incarceration." *Id.* at Ex. A. This recommendation was adopted by DOCS' Commissioner on July 1, 2003. *Id.*

**\*7** In addition to all of plaintiff Bennett's previously earned good-time credits being withheld, the parties agreed at the February 13, 2009 oral argument that he also lost the right to earn good-time credits going forward as a result of his failure to successfully complete the SOCP.

The SOCP Policy and Procedure Manual, effective October 2001 ("SOCP Manual"), provides that "an offender may chose to refuse participation in the.... Program." Affidavit of Edwin H. Elfeldt (Dkt.# 150), Ex. A, p. 15. "As a result, participation in the SOCP is voluntary." Affidavit of Edwin H. Elfeldt (Dkt.# 150), Ex. A, p. ¶¶ 4 and 16 ("The Department's sex offender programming is and has been a voluntary program").

According to the SOCP Manual, "an offender who refuses the Program should be made aware of the negative impact his/her decision may have on the Earned Eligibility process, NYS Board of Parole decisions, Time Allowance Committee decisions, the Board of Examiners of Sex Offenders assessment, and other DOCS programs he/she may wish to participate in, such as the Family Reunion Program.... An offender who refuses the ... Program may be given one second and final opportunity to participate,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

after one year from his/her initial refusal but not within one year of his/her Conditional Release Date or thereafter, unless specified by a Time Allowance Committee that *may withhold the earning of 'good time' until the offender successfully completes the ... Program." Id .* (emphasis added).

Good behavior allowances "may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and *may be withheld, forfeited or canceled* in whole or in part for bad behavior, violation of institutional rules or *failure to perform properly in the duties or program assigned."* N.Y. Correction Law § 803(1)(a) (emphasis added). "Good behavior allowances *are in the nature of a privilege* to be earned by the inmate and no inmate has the right to demand or to require that any good behavior allowance be granted to him." 7 N.Y.C.R.R. § 260.2 (emphasis added). *See also* N.Y. Correction Law § 804(3) ("No person shall have the right to demand or require the allowances authorized by this section ."); N.Y. Correction Law § 803(4) (same).

An inmate does not receive the good-time allowance until there is a final order of the commissioner. *See* 7 N.Y.C.R.R. § 262.1(d). However, "the grant of the good behavior allowance *shall be contingent* on the inmate's continued good behavior, efficient and willing performance of duties assigned, and progress and achievement in an assigned treatment program." *Id.* (emphasis added).

Although there is some contrary authority as to whether the loss of good time credits makes the SOCP a compulsory program,[FN8] I believe that it does not. The "granting or withholding of good time is a discretionary matter subject to the prisoner meeting and maintaining the requirements for eligibility. Thus, the inescapable conclusion is that ... the wholly discretionary good time allowance scheme does not 'create a legitimate expectancy' of obtaining an earlier release". *Edwards v. Ladlair,* 2008 WL 3156214, *4 (N.D.N.Y.2008) (habeas petition). Thus, "the right to a good time allowance is a discretionary privilege". *Id.* at *6; *see also* *Brooks v. DiFasi,* 1997 WL 436750, *4 (W.D.N.Y.1997) (Elfvin, J.) ("Under New York law and its prison regulations, there is

no right to good behavior allowances.... 'Good behavior allowances are in the nature of a privilege to be earned by the inmate' and there is no entitlement to them.").

> FN8. *See* Donhauser, supra, 314 F.Supp.2d at 134. ("In light of the severe nature of the loss of good time credits, the automatic imposition of such loss, and the casual connection between the imposition of such loss and plaintiff's invocation of his Fifth Amendment right, the fact that participation in the SOCP was labeled 'recommended' or 'voluntary' is not dispositive of the issue of whether plaintiff truly had a choice in the matter. Such facts precipitate a finding that plaintiff was 'ordered,' not recommended, to participate in the program.").

**\*8** "It is beyond doubt, of course, that respondent would prefer not to choose between losing prison privileges and accepting responsibility for his past crimes. It is a choice, nonetheless, that does not amount to compulsion, and therefore one [the state] may require respondent to make." McKune v. Lile, 536 U.S. 24, 45, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002).[FN9] Therefore, I conclude that participation in the SOCP is voluntary, not mandatory.

> FN9. In my initial Report and Recommendation I did not reach the question of whether the SOCP infringed on plaintiffs' First Amendment rights because this was not argued by defendants who instead concentrated their arguments on whether the admission of guilt requirement was reasonably related to the DOCS' penological interests. However, because I have now found that the SOCP is not a compulsory program, I also find that plaintiffs' First Amendment claim fails on this basis alone without reaching the *Turner* factors: "Mr. Searcy is free to adhere to his religious proscription against lying. In doing so, however, he losses certain privileges he would have received had he complied fully with the requirements for the SATP. This does not present an infringement of Mr. Searcy's constitutional right to free exercise of religion. This is especially so because the requirement of

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

admission of responsibility is generally applicable to all inmates in the SATP and is not pointed at any particular religion or religious belief." _Searcy, supra,_ 299 F.3d at 1228.

However, even if participation in the SOCP _could be_ considered mandatory, based upon my consideration of all of the _Turner_ factors, including the first and "controlling" factor ( _Mayfield, supra,_ 529 F.3d at 607), which weighs heavily in favor of defendants, I would find that the admission of guilt requirement is reasonably related to DOCS' penological interests.

Once defendants satisfy "the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct[,] 'the burden remains with the prisoner to show that these articulated concerns were irrational.' " _Salahuddin, supra,_ 467 F.3d at 275. I conclude that defendants have satisfied their burden, whereas plaintiff Bennett has failed to meet his.

Accordingly, I conclude that the SOCP's "acknowledgment of guilt" requirement is reasonably related DOCS' legitimate penological interests, and recommend that plaintiff Bennett's First Amendment claim be dismissed. _See Schnitzler, supra,_ 518 F.Supp.2d at 1104-1107 (holding that a sex offender treatment program, the completion of which was necessary to be eligible for non-discretionary parole, which required inmates to participate in sexually explicit group discussions did not violate the right to the free exercise of religion under the First Amendment).

**B. Are Defendants Entitled to Qualified Immunity?**

Even if the SOCP's acknowledgment of responsibility requirement violates plaintiffs' First Amendment rights to free exercise of religion, defendants argue that they are entitled to qualified immunity. Defendants' Memorandum of Law (Dkt.# 151), Point VI. Plaintiffs argue that this argument should be disregarded as it is not consistent with my order or the order of Judge Skretny, which limited the supplemental briefing to the applicability of the Turner factors. Plaintiffs' Response (Dkt.# 154), Point III.

Qualified immunity was argued by defendants in their initial motion for summary judgment. _See_ Defendants' Memorandum of Law (Dkt.# 122), Point VI. However,

because I found that the SOCP did not violate plaintiffs' First Amendment rights, I concluded in my initial Report and Recommendation that "I need not reach defendants' qualified immunity arguments (Dkt. # 122, Point VI)." Report and Recommendation (Dkt.# 135), 9 n. 7. Although it was not addressed in my initial Report and Recommendation, I see no reason not to address it now as an alternative basis to recommend granting defendants' motion for summary judgment.[FN10]

> [FN10.](#) Because plaintiffs are not barred from raising objections to the Supplemental Report and Recommendation, I find that they are not prejudiced by my analysis of this issue herein. _See_ Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), p. 4.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " " _Pearson v. Callahan,_ --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, *6 (2009). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." _Harlow v. Fitzgerald,_ 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

***9** As evidenced by the absence of case law on the issue, it is not "clearly" established, either in the Second Circuit or elsewhere, that the admission of guilt requirement of the SOCP violates plaintiffs' rights to free exercise of religion. Other circuits have granted defendants summary judgment on the basis of qualified immunity for similar First Amendment challenges to inmate sexual offender treatment programs. _See Hydrick v. Hunter,_ 500 F.3d 978, 992 (9th Cir.2007), _petition for certiorari filed,_ 76 USLW 3410 (Jan 17, 2008) ("To the extent that the claim relies on a First Amendment right not to participate in treatment sessions, the Defendants have qualified immunity, because the law on this point is not clearly established."); _Aruanno v. Spagnuolo,_ 292 Fed.Appx. 184, 187, 2008 WL 2746229, *2 (3d Cir.2008)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

("even if we were to conclude that Aruanno had a right to refrain from disclosing his past sexual history and we have not so concluded, we could not hold that the right is clearly established under the First Amendment [right to refrain from speaking], and that it was one of which defendants should have been aware.").

Plaintiff Bennett concedes that *"this issue currently presented may be of first impression".* Plaintiffs' Memorandum of Law (Dkt.# 126), p. 13 (emphasis added). However, he argues that it is well established that prison conditions do not give rise to a due process violation unless those conditions constitute a "atypical and significant hardship" as set forth in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). *Id.* While the plurality in *McKune, supra,* 536 U.S. at 37-38, applied the atypical and hardship standard to the plaintiff's Fifth Amendment challenge to an inmate sex offender treatment program, plaintiff Bennett is not asserting a due process or self-incrimination challenge to the SOCP's admission of guilt requirement.[FN11]

> **FN11.** Moreover, it is questionable whether the plurality's finding that compulsion under the Fifth Amendment should be measured by reference to *Sandin's* atypical and significant hardship standard (which Justice O'Connor disagreed with in her concurrence) can be considered the holding of the Supreme Court in *McKune, supra:* "Because Justice O'Connor based her conclusion on the narrower ground that KDOC's policy was not compulsion under the Fifth Amendment, we view her concurrence as the holding of the Court in *McKune," Searcy, supra,* 299 F.3d at 1225.

Therefore, even if defendants *had* violated plaintiff Bennett's First Amendment rights, I would recommend that defendants' motion for summary judgment be granted to the extent that he seeks an award of damages, based on their entitlement to qualified immunity.[FN12]

> **FN12.** However, the qualified immunity defense would not bar plaintiff Bennett's claim for injunctive relief, since "qualified immunity is not a defense when such relief is sought". *African*

*Trade & Information Center. Inc. v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002).

**C. Defendants' Newly Raised Arguments**

Defendants raise additional arguments not previously raised before me, including that plaintiffs' claim is barred by the favorable termination rule of *Heck v. Humphrey.* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and application of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See* Defendants' Memorandum of Law, Points IV and V. Plaintiffs object to my consideration of these arguments. Plaintiffs' Response (Dkt.# 154), Point III. Because these arguments were not previously raised by defendants in their initial motion or based on the newly conducted discovery, I will disregard them.

**CONCLUSION**

For these reasons, I again recommend that defendants' motion (Dkt.# 119) be GRANTED. Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**\*10** ORDERED, that this Supplemental Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Supplemental Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Supplemental Report and Recommendation in accordance with the above statute, Rule 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3). or with similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judges refusal to consider the objection.*

**SO ORDERED.**

W.D.N.Y.,2009.

Bush v. Goord
Slip Copy, 2009 WL 790358 (W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.

Navdeep SINGH, Plaintiff,

v.

Glenn S. GOORD, et al., Defendants.

No. 05 Civ. 9680(SCR)(LMS).

March 9, 2010.

*REPORT & RECOMMENDATION*

LISA MARGARET SMITH, United States Magistrate Judge.

**\*1 TO: THE HONORABLE STEPHEN C. ROBINSON, UNITED STATES DISTRICT JUDGE**

Plaintiff Navdeep Singh (herein, "Plaintiff"), brings the above captioned civil rights action against Defendants William Mazzuca (herein, "Defendant Mazzuca"), Paul Annetts (herein, "Defendant Annetts"), Wohlrab (herein, "Defendant Wohlrab"), Commia (herein, "Defendant Commia"), Lynch (herein, "Defendant Lynch"), Stewart (herein, "Defendant Stewart"), Tabor (herein, "Defendant Tabor"), Michelle Stone (herein, "Defendant Stone"), Officer John Doe # 2 (herein, "Defendant # 2), John Doe # 6 (herein, "Defendant # 6"), Brian Fisher (herein, "Defendant Fisher"), and William Connolly (herein, "Defendant Connolly"), and asserts various violations of his constitutional rights under the Religious Land Use and Institutionalized Person Act (herein, "RLUIPA"), 42 U.S.C. § 2000c *et seq.* 42 U.S.C. § 1983, and the 1st, 8th, and 14th Amendments to the Constitution. *See generally* Plaintiff's Complaint (herein, "Pl.'s Compl.). In addition, Plaintiff asserts a pendent state law claim. *Id.* Plaintiff seeks both injunctive and declaratory relief, as well as monetary damages. *Id.* Familiarity with the facts and procedural history of this case is presumed. See Judge Robinson's Memorandum Decision and Order, Oct. 9, 2007, Docket # 55. The only development of note is Plaintiff's release from prison on April 17, 2009. Defendants' Supplemental Memorandum of Law (herein "Defts.' Supp. Mem."), p. 2.

B. *Defendants' Motion for Summary Judgment*

Defendants initially filed a motion for partial summary judgment prior to Plaintiff's conditional release from prison. Defendants' Motion for Partial Summary Judgment (herein, "Defts.' Mot."), Docket # 70. At my suggestion, Defendants have since filed a supplemental memorandum of law to discuss the impact of Plaintiff's release on his remaining claims. Defendants' Supplemental Memorandum of Law In Support of Motion for Partial Summary Judgment (herein, "Defts.' Supp. Mem."), Docket # 104. In Defendants' supplemental memorandum, Defendants argue that because Plaintiff is no longer incarcerated, Count 1, which solely seeks declaratory relief, should be dismissed in its entirety as moot, and that the aspects of Counts 2, 3, and 4 that seek injunctive relief should also be dismissed as moot. *See generally* Defts.'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

Supp. Mem.

Turning to the Defendants' primary motion for partial summary judgment, Defendants first argue that Plaintiff has failed to exhaust his administrative remedies. Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment (herein, "Defts.' Mem."), pp. 3-10. Defendants also argue that money damages for violations of RLUIPA are barred by the 11th Amendment. *Id.,* pp. 10-11. In addition, Defendants argue that they are entitled to qualified immunity on the claims involving the behavior reports, and that there was not a constitutional injury. *Id.,* pp. 12-15. Fourth, Defendants argue that the claims against the Defendants who remain unnamed and unserved, including Defendant Commia, Defendant # 2, and Defendant # 6, should be dismissed from this action. *Id.,* pp. 15-16. Fifth, regarding the claim against Defendant Stewart for damage to Plaintiff's Karrah, Defendants argue that Plaintiff has failed to put forth sufficient evidence to maintain the claim. *Id.,* pp. 16-17. Sixth, Defendants assert that the claims against Defendants Annetts and Mazzuca should be dismissed from this action because Plaintiff has failed to allege that they had any personal involvement in the alleged deprivation of rights. *Id.,* p. 17. Seventh, as Defendant Stone has been sued only in her official capacity, any claim for money damages against her should be dismissed as barred by the 11th Amendment. *Id.,* pp. 20-21. Last, Defendants assert that Plaintiff has failed to proffer anything aside from conclusory allegations that Defendants retaliated against Plaintiff for exercising his religion. *Id.,* p. 22. As such, any claims of retaliation should be dismissed. *Id.*

C. *Plaintiff's Opposition*

**\*2** In response to Defendants' supplemental motion for summary judgment, Plaintiff argues that he should be excepted from the mootness doctrine, and that his claims for declaratory and injunctive relief should be maintained. *See generally* Plaintiff's Supplemental Opposition (herein, "Pl.'s Supp. Opp."). Specifically, Plaintiff asserts that his requests to amend DOCS Directive 4202 to cover Sikh

practices "are assertions of his intention to represent other incarcerated Sikhs in a representative capacity." Pl.'s Supp. Opp., p. 4. While Plaintiff is no longer incarcerated, other incarcerated Sikhs still maintain an interest in Plaintiff's requests for declaratory and injunctive relief, and therefore Plaintiff's claims for declaratory and injunctive relief are not moot and should not be dismissed as such. Pl.'s Supp. Opp., pp. 4-5.

In addition, in opposition to Defendants' motion for partial summary judgment, Plaintiff asserts that the State of New York waived its sovereign immunity protection under the 11th Amendment by accepting federal funds following the enactment of RLUIPA, and therefore individual and official capacity damages are available for violations of RLUIPA. Plaintiff's Opposition (herein, "Pl.'s Opp."), pp. 2-11. Plaintiff also argues that with regard to the claim against Defendant Stewart for damage to Plaintiff's Karrah, there are sufficient issues of material fact that the claim should not be dismissed. *Id.,* pp. 11-15. Third, Plaintiff argues that Defendant Wohlrab is not entitled to qualified immunity. *Id.,* pp. 15-20. Last, Plaintiff counters Defendants' assertions that Plaintiff did not exhaust his administrative remedies with regard to Plaintiff's claim against Defendant Lynch for violations of his 8th Amendment rights. *Id.,* pp. 20-23.

## DISCUSSION

A. *Summary Judgment Standard*

Pursuant to the Federal Rules of Civil Procedure, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 320-23 (1986). A fact is "material" when it may affect the outcome of a case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. *Id.* at 250. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved by a finder of fact. *Id.*

Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex,* 477 U.S. at 323) (alteration in original). "The nonmoving party must have 'had the opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (quoting *Anderson,* 477 U.S. at 250 n. 5). Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.,* 277 F.3d 232, 236 (2d Cir.2002); *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 97 (2d Cir.2001); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764 (2d Cir.1998); *see also Anderson,* 477 U.S. at 261 n. 2. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989)).

**B.** *Injunctive and Declaratory Relief Claims*

**\*3** In the interest of judicial efficiency, I will begin by addressing whether Plaintiff's claims for declaratory and injunctive relief have been mooted as a result of Plaintiff's release from prison.

The United States Constitution, Article III, Section 2, clause 1, limits federal jurisdiction to cases and controversies. U.S. Const., art. III, § 2, cl. 1. In order to maintain jurisdiction over a particular case or controversy, parties to a suit must be able to demonstrate "a legally cognizable interest in the outcome" of the case or controversy. *Muhammad v. City of New York Dept. Of Corrections,* 126 F.3d 119, 122-23 (2d Cir.1997). In other words, "litigants are required to demonstrate a personal stake ... in the outcome of their case." *Cook v. Colgate University,* 992 F.2d 17, 19 (2d Cir.1993) (citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 395 (1980)) (internal quotation marks omitted). If a party cannot demonstrate such a personal interest in the case, the case is rendered moot. *Muhammad,* 126 F.3d at 122-23. The determination of whether such an interest exists is to be made at the initiation of litigation, but is also meant to "ensure[ ] that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit." *Id.* A case that begins as ripe may become moot during the pendency of the litigation, stripping the court of its jurisdiction and rendering the court without power to "redress the injury." *Id.*

An exception to the "mootness doctrine" exists in cases where the particular circumstances which give rise to the injury are "capable of repetition, yet evading review." However, this exception is to be reserved for exceptional circumstances. *Muhammad,* 126 F.3d at 123. These exceptional circumstances generally only exist in instances of class actions. *Id.* If the case does not involve a class action, the "capable of repetition, yet evading review" standard is met only if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Cook,* 992 F.2d at 19 (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975)) (internal quotation marks omitted).

In this case, Plaintiff is not entitled to the benefit of the mootness doctrine. First, Plaintiff's action is not pled

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

as, nor is it argued to be, a class action. Second, Plaintiff concedes that there is not a reasonable expectation that Plaintiff will find himself in jail again such that he would be subject to the same allegedly discriminatory conduct. Pl.'s Supp. Opp., p. 1. Rather, Plaintiff attempts to argue that the second prong of the "capable of repetition, yet evading review" test-that the same complaining party would be subjected to the same action again-is satisfied because Plaintiff brought this action in a representative capacity on behalf of all incarcerated Sikhs. *Id.* Therefore, the "same complaining party", *i.e.,* still-incarcerated Sikhs, could be subjected to the same discriminatory conduct again. *Id.* To support this contention, Plaintiff points to the portion of his complaint that requests that DOCS Directive 4202 be amended to cover Sikh religious practices as evidence of his intent to bring this suit on behalf of all incarcerated Sikhs. Pl.'s Supp. Opp., p. 7. However, Your Honor previously determined that Plaintiff sought the amendment of Directive 4202 to protect his own interests should he be transferred to another correctional facility. Decision and Order, p. 16, Docket # 55. Your Honor did not find that Plaintiff sought such an amendment to protect the rights of similarly situated Sikhs.

**\*4** Moreover, Plaintiff's complaint is completely devoid of any facts or allegations that would allow this Court to conclude that Plaintiff intended to bring this cause of action on behalf of all incarcerated Sikhs. Plaintiff did not file for class certification, nor did his complaint request relief for himself and others similarly situated. On the contrary, Plaintiff's complaint refers solely to himself and his individual right to observe his religious practices. *See generally* Pl.'s Compl. Furthermore, under Plaintiff's prayer for relief, Plaintiff discusses amending DOCS Directive 4202 so that DOCS personnel will be prohibited from "restricting Navdeep's religious practices", "denying Navdeep the right to have six turbans", "denying Navdeep the right to wear turbans", "denying Navdeep the right to possess more than three Kaccheras", and so on. Pl.'s Compl., p. 30. Plaintiff does not once refer to other incarcerated Sikhs.

Plaintiff's reliance on *Trachtman v. Anker,* 563 F.3d 512 (2d Cir.1977), *Kempner v. Town of Greenwich,* No. 06-CV-1393, 2007 WL 2154178 (D.Conn.2007), and *Brandon v. Bd. of Educ.,* 635 F.2d 971 (2d Cir.1980), is misplaced. In *Trachtman,* the Second Circuit found that the plaintiff brought his suit in a representative capacity because the plaintiff's complaint specifically requested relief on behalf of himself and others similarly situated. *Trachtman,* 563 F.2d at 514 n. 1. Likewise, in *Brandon,* the Second Circuit again held that plaintiff's case had not become moot as a result of the plaintiff's graduation because the plaintiffs' complaint sought relief on behalf of themselves and other similarly situated students. *Brandon,* 635 F.2d at 973. The plaintiff in *Kempner* filed a motion to certify a class action in state court before the case was removed to federal court, evincing the plaintiff's intent to act in a representative capacity. *Kempner,* 2007 WL 2154178, at*3 n. 2.

Plaintiff has failed to establish the second prong of the "capable of repetition, yet evading review" exception to the mootness doctrine: that there is a reasonable expectation that the same complaining party would be subject to the same discriminatory conduct again. Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that because Plaintiff is no longer incarcerated, and cannot establish that he is exempt from the mootness doctrine, all claims for declaratory and injunctive relief should be dismissed as moot.

C. *Plaintiff's Claims for Monetary Damages*

As a preliminary matter, Defendants correctly point out that Plaintiff does not oppose their motion for partial summary judgment as to the claims against Defendant Annetts, Defendant John Doe # 2, Defendant Lynch for writing a misbehavior report, Defendant Mazzuca, Defendant Stone, Count 4's cause of action for First Amendment retaliation, Defendant Commia, and Defendant John Doe # 6. Defendants' Reply Memorandum of Law, p. 1-2. As such, I conclude, and respectfully recommend that Your Honor should conclude, that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

Plaintiff has abandoned these claims and that they should be dismissed. *See Lipton v. County of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004).

1. *Eighth Amendment Claim*

**\*5** Plaintiff claims that Defendant Lynch used excessive force against him on June 6, 2005. Pl.'s Compl., ¶ 124. Defendants argue that Plaintiff has failed to exhaust his administrative remedies with regard to this claim as none of Plaintiff's grievances against Defendant Lynch refer to an instance of excessive force or a physical assault of any kind. Defts.' Mem., p. 4. Plaintiff counters that the information contained in the June 21, 2005, grievance was sufficient to put the prison officials on notice of his claim against Defendant Lynch. Pl.'s Opp., p. 20-22. Accordingly, Plaintiff asserts that he has exhausted his administrative remedies for this claim and it should not be dismissed.[FN1] *Id.*

FN1. Defendants also assert that Plaintiff's grievance regarding Defendant Lynch and his claim of excessive force was neither timely filed nor fully appealed. Defts.' Mem., p. 6-7. Because this claim can be resolved based on the substance of the grievance, I will not address these additional grounds.

The only grievance filed by Plaintiff that can be construed as pertaining to the alleged conduct by Defendant Lynch is the grievance filed on June 21, 2005.[FN2] Marden Decl., Ex. 3, Bates 2-10-06 104-105. This grievance contains various allegations against Defendant Lynch including forcing Plaintiff to work in areas where he should not work due to a medical condition, preventing Plaintiff from seeing his visitors, and speaking to Plaintiff in a derogatory manner. *Id.* As Plaintiff points out in his opposition, at the end of the grievance, Plaintiff states that "there is a whole lot more that if I discussed, let alone put on paper, I would be jepardizing[sic] my safty[sic] here at

fishkill[sic]." *Id.* It is this language which Plaintiff relies on as putting DOCS personnel on notice that Defendant Lynch had physically assaulted Plaintiff, thereby exhausting Plaintiff's administrative remedies and preserving the claim for this Court. Pl.'s Opp., p. 22-23.

FN2. Plaintiff concedes that this is the only relevant grievance. Pl.'s Opp., p. 20.

The Court is willing to accept that the above-mentioned language indicates that Plaintiff fears that he may be physically retaliated against for filing these complaints. The Court is, of course, sensitive to Plaintiff's concerns. However, Plaintiff blurs a line that warrants distinguishing. There is a significant difference between being fearful of physical retaliation as a result of filing grievances, as compared to providing notice that the Plaintiff has previously been physically assaulted. Plaintiff states that he is afraid to detail the alleged misconduct he has experienced because he fears that he will be retaliated against in the future. Plaintiff does not say that he is afraid for his physical safety because of some prior instance of excessive force. On the contrary, it is possible that Plaintiff fears he will be physically harmed for making any grievance, alleging any sort of misconduct, against any prison official. The fact that Plaintiff fears he will be physically harmed if he reports misconduct in no way provides notice that he was, in fact, physically assaulted.

While Plaintiff is correct that "uncounselled inmates cannot be expected to satisfy a standard more stringent than that of a notice pleading" Pl.'s Opp., p. 23 (quoting *Boddie v. Bradley,* 129 Fed .Appx. 658, 660 (2d Cir.2005)) (internal quotation marks omitted), they still must satisfy the requirements of notice pleading. This means that the grievance "must contain allegations sufficient to alert the Defendants to the nature of the claim." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234 (2d Cir.2004)) (internal quotation marks

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

omitted). In other words, prisoners "must provide enough information about the conduct of which they complain to allow prison officials to take responsive measures." *Id.*

**\*6** Plaintiff's grievance does not meet this standard. Plaintiff's grievance does not contain any mention of excessive force by Defendant Lynch on June 6, 2005, or any other allegation that would in any way indicate to DOCS personnel that they should investigate a claim of physical assault or excessive force by Defendant Lynch against Plaintiff. *But see Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514 (2002)* (complaint satisfied notice pleading standard in employment discrimination case because complaint "detailed events leading to termination, provided relevant dates, and included ages and nationalities ... of relevant persons involved with [plaintiff's] termination"). Furthermore, Plaintiff did not mention a claim of excessive force by Defendant Lynch when interviewed by prison officials for the other claims contained within his June 21, 2005, grievance.

Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff did not adequately exhaust his administrative remedies with regard to his claim of excessive force against Defendant Lynch and that claim should be dismissed.

**2. *Religious Land Use and Institutionalized Person Act Claims***

The Religious Land Use and Institutionalized Person Act prohibits the government from burdening a prisoner's freedom to exercise his or her religion unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc1(a). The primary issue in this case, and one of some contention across jurisdictions, is whether Congress intended to include money damages as an available remedy under

RLUIPA. *See Pugh v. Goord, 571 F.Supp.2d 477, 506 (S.D.N.Y.2008)* (listing cases discussing the dispute over the availability of money damages under RLUIPA).

*a. Individual Capacity*

RLUIPA was enacted by Congress pursuant to their authority under the Spending Clause of the Constitution. *Pugh, 571 F.Supp.2d at 506* (citing *Smith v. Allen, 502 F.3d 1255, 1274 (11th Cir.2007)*). Through RLUIPA, Congress conditioned the receipt of federal funds on prisons' compliance with RLUIPA's provisions. *Id.; 42 U.S.C. § 2000cc-1(a).* As previously mentioned, courts across the country are divided on whether money damages may be imposed on individuals who violate RLUIPA's dictates. Neither the Supreme Court, nor the Second Circuit have rendered decisions clarifying the issue. However, three district courts within the Second Circuit have rendered decisions on this issue and have unanimously held that money damages are unavailable under RLUIPA. *Pugh, 571 F.Supp.2d 477; El Badrawi v. Dept. of Homeland Security, 579 F.Supp.2d 249 (D.Conn.2008); Bock v. Gold, No. 05-CV-151, 2008 WL 345890 (D.Vt. Feb. 7, 2008).* In *Pugh,* Judge Sullivan adopted the 11th Circuit's finding that because prison officials, in their individual capacities, were not "contracting" parties who themselves received federal funds, they could not be held individually liable for money damages for violating RLUIPA. *Pugh, 571 F.Supp.2d at 506* (citing *Smith, 502 F.3d at 1275.* Prison officials, in their individual capacities, did not have the authority to accept or reject federal funds. To nevertheless hold the prison workers individually liable for violations of RLUIPA and impose money damages would "raise[ ] substantial constitutional concerns and would be incongruent with the reach of Congress' spending power." *Pugh, 571 F.Supp.2d at 506* (quoting *Smith, 502 F.3d at 1275*) (internal quotation marks omitted). As such, Judge Sullivan concluded that the "appropriate relief" remedy provided by RLUIPA did not allow for money damages against prison officials sued in their individual capacities. This Court is likewise persuaded by the analysis in *Smith,* adopted in *Pugh,* and concludes, and respectfully recommends that Your Honor should conclude, that all

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

claims for money damages against Defendants in their individual capacities under RLUIPA should be dismissed.

b. *Official Capacity*

**\*7** Jurisdictions are likewise divided as to whether prison officials sued in their official capacity may have money damages imposed on them for violations of RLUIPA. *Pugh,* 571 F.Supp.2d at 507. To impose money damages on individuals sued in their official capacity, a court must find that the subject state has waived its sovereign immunity under the 11th Amendment through its acceptance of federal funds. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 (1985). The Supreme Court has previously held that a state's sovereign immunity will only be waived when "(1) Congress evince[s] a clear and unequivocal intent to hold the States liable in federal court; and then (2) a state voluntarily engage[s] in that particular activity." *Pugh, 571 F.Supp.2d at 509.* Specifically, in cases involving the imposition of money damages, the waiver of sovereign immunity must be unambiguous. *Id.* (citing *Lane v. Pena,* 518 U.S. 187, 192 (1996)).

In *Pugh,* Judge Sullivan held that the remedy section of RLUIPA that refers to "appropriate relief against a government" did not satisfy the "unequivocal textual expression necessary to waive [s]tate immunity from suits for damages." *Pugh, 571 F.Supp.2d at 508-509* (citing *Madison v. Commonwealth of Virginia,* 474 F.3d 118, 122-23 (4th Cir.2006)). Most notably, RLUIPA is devoid of any language, such as "compensatory", or other damages language that would put a state on notice that by accepting federal funds, it is absolutely waiving its sovereign immunity. *Pugh, 571 F.Supp.2d at 509.* The term "appropriate relief" is simply too ambiguous to encompass money damages and trigger the waiver of sovereign immunity. *Id.*

Likewise, in *El Badrawi v. Dept. of Homeland*

*Security,* Judge Hall discussed the high standard that must be met in order to overcome a state's sovereign immunity. *El Badrawi,* 579 F.Supp.2d at 259 ("[t]he Supreme Court has held that Congress may only abrogate the states' sovereign immunity by making its intention unmistakably clear in the language of the statute.") (quoting *Atascadero State Hosp., 473 U.S. at 242*) (internal quotation marks omitted). As in *Pugh,* the court in *El Badrawi* focused on the fact that RLUIPA was enacted under the Spending Clause, and therefore it was incumbent upon the courts to "ensure that Congress ha[d] unambiguously spelled out the conditions that attach[ed] to the receipt of federal funds." *Id.* (citing *Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy,* 548 U.S. 291, 295-96 (2006)). Ultimately, the Court in *El Badrawi* concluded that because the phrase "appropriate relief" was open to several different interpretations, it could not be said that Congress' intent was unambiguous such that a waiver of the state's sovereign immunity was appropriate. *Id.* at 260-261.

Similarly, in *Bock v. Gold,* the District Court in Vermont adopted Magistrate Judge Niedermeier's recommendation to dismiss the plaintiff's RLUIPA claims because there was not a legal basis for a money damages claim under RLUIPA. Bock, 2008 WL 345890, at *1. In holding that RLUIPA did not provide money damages, Judge Niedermeier also relied on the fact that the language "appropriate relief" was not a clear and unambiguous expression of Congress' intent to make money damages available under RLUIPA. *Id.* at *6.

**\*8** Plaintiff mistakenly relies on *Hankins* to support his contention that RLUIPA does provide money damages. Pl.'s Opp., p. 4. In *Hankins,* Magistrate Judge Lowe recommended, and Judge Scullin adopted, that plaintiff's RLUIPA claim be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. *Hankins v. NYS Dept. Of Correctional Serv.,* No. 07CV408, 2008 WL 2019655, at *6 (N.D.N.Y. March 10, 2008); Order Adopting Report and Recommendation, May 6, 2008, Docket # 17. Judge Lowe's report and recommendation stated that if Judge Scullin disagreed with this conclusion, the plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

RLUIPA claims should not be dismissed because of the unavailability of money damages. *Id.* at \*7. Judge Lowe stated that by accepting federal funds after the passage of RLUIPA, New York effectively waived its sovereign immunity. *Id.* Judge Lowe did not discuss either the origins of RLUIPA, or the constitutional implications of such a holding. More importantly, Judge Lowe did not base his ultimate recommendation upon the issue of whether RLUIPA provides for money damages. Rather, Judge Lowe's discussion of the money damages issue was more appropriately considered dicta. Furthermore, Judge Scullin, in adopting Judge Lowe's recommendation, did not specifically refer to any of Judge Lowe's findings or reasonings. Therefore, this Court is more persuaded by the rulings in *Pugh, El Badrawi,* and *Bock* and finds that RLUIPA did not explicitly and unambiguously condition the receipt of federal funds on waiving a state's sovereign immunity.

As such, I conclude, and respectfully recommend that Your Honor should conclude, that RLUIPA does not provide money damages against prison officials sued in their official capacity, and therefore, all claims against Defendants in their official capacity for money damages for alleged violations of RLUIPA should be dismissed.[FN3]

> FN3. Because I so conclude, and because Plaintiff's RLUIPA claim was the only remaining claim against Defendant Wolhrab, I conclude, and recommend that Your Honor should conclude, that there are no remaining claims against Defendant Wolhrab. Therefore, assuming that Your Honor agrees with this recommendation, analysis of Defendants' argument that Defendant Wolhrab is entitled to qualified immunity would be rendered moot.

3. *Damage to Plaintiff's Karrah*

As a preliminary matter, Plaintiff's current allegations regarding damage to his Karrah occurring in August of 2005 should be dismissed. Plaintiff's complaint does not contain any allegation of damage to Plaintiff's Karrah in August of 2005. Pl.'s Compl., ¶ 64-72. The first mention of any damage occurring in August of 2005 is contained in Plaintiff's opposition to Defendants' motion for summary judgment. Pl.'s Opp., p. 12; Singh's Decl. In Opp., ¶ 40-41. As Defendants correctly point out, claims raised for the first time in opposition to summary judgement motions are improperly pled. *Jones v. Goord,* 435 F.Supp.2d 221, 261 (S.D.N.Y.2006). Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's claim of damage to his Karrah occurring in August of 2005 should be dismissed.

Next, Defendants argue that Plaintiff's claims that Defendant Stewart damaged his Karrah in April and July of 2005 should be dismissed for lack of sufficient evidence. Defts.' Mem. Of Law, p. 16. Plaintiff proffers that he has put forth sufficient evidence to create a fact question for a jury. Pl.'s Mem. Of Law, p. 12-15. The allegations that Plaintiff's Karrah was burned are somewhat inconsistent. In Plaintiff's complaint, he alleges that DOCS personnel burned his Karrah in April of 2005. However, Plaintiff's Declaration does not contain any allegations regarding a burning of his Karrah. Nor does Plaintiff's 56.1 Statement contain any allegations regarding a corrections officer burning Plaintiff's Karrah. *See generally* Plaintiff's 56.1 Statement. Plaintiff makes a vague reference to his Karrah being burnt in his memorandum of law in opposition, without specifying who he believes burned the Karrah or when the alleged burning occurred. Pl.'s Mem., p. 12. Ultimately, there is no evidence in the record which would be sufficient, if believed, to support Plaintiff's claims that his Karrah was damaged in April of 2005, that his Karrah was ever burned, or that Defendant Stewart burned or otherwise damaged Plaintiff's Karrah in April of 2005. Therefore, I conclude, and respectfully recommend that Your Honor should conclude that all claims against Defendant Stewart based on a burning of Plaintiff's Karrah or any damage caused to Plaintiff's Karrah in April of 2005 should be dismissed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

**\*9** There is likewise insufficient evidence to maintain Plaintiff's claim that Defendant Stewart damaged Plaintiff's Karrah in July of 2005. The grievance filed by Plaintiff regarding the events of July 10, 2005, discusses two officers, one of them presumably being Defendant Stewart, failing to provide Plaintiff an envelope in which to place his Karrah, as requested. However, there are no allegations within this grievance that either of the officers bent or damaged Plaintiff's Karrah in any way. *See* Marden's Decl., Ex. 4, Bates 2-10-06 334. Furthermore, the case history and record from grievance 7-13-05 states that it was only when Plaintiff's Karrah was brought to him before breakfast, on July 11, 2005, that it was bent out of shape. Marden's Decl., Ex. 5, Bates 2-10-06 351. Plaintiff references a conversation that he had with the officer who brought him the bent Karrah that morning and refers to "she", indicating that the officer returning the damaged Karrah was female. *Id.* Defendant Stewart is a male, and thus he could not have been the delivering officer. Later on in that same record, the Plaintiff's appeal to CORC states that Officer "Stewart w[as] never accused of damaging [Plaintiff's] Karrah." 2-10-06 352. Again, Plaintiff references the female officer that returned Plaintiff's Karrah to him in a damaged state. *Id.* In addition, Plaintiff's declaration in opposition to Defendants' motion for partial summary judgment alleges that Defendant Stewart came to Plaintiff's cell on July 10, 2005, but does not allege that Defendnat Stewart, or any other DOCS personnel, damaged Plaintiff's Karrah on that day. Pl.'s Decl. In Opp., ¶¶ 42-44. Plaintiff again asserts that on July 11, 2005, an unnamed female officer brought Plaintiff his Karrah, and at that point, it was bent. Pl.'s Decl. In Opp., ¶ 45.[FN4] There is no evidence in the record, aside from Plaintiff's completely conclusory and unsupported allegations, to support Plaintiff's assertions that Defendant Stewart damaged Plaintiff's Karrah in July of 2005. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's claim against Defendant Stewart for damaging Plaintiff's Karrah in July of 2005 should be dismissed.

FN4. While there is a grievance dated sometime

in August referencing Plaintiff's Karrah being returned to him damaged, as previously discussed, any claims for damage to Plaintiff's Karrah occurring in August were not pled in Plaintiff's complaint and will not be considered by this Court.

*CONCLUSION*

For the aforementioned reasons, I conclude, and respectfully recommend that Your Honor should conclude, that Defendants' Motion for Partial Summary Judgment and Supplemental Motion for Summary Judgment should be granted in their entirety, and that Plaintiff's corresponding claims should be dismissed With prejudice.

*NOTICE*

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and FED. R. CIV . P. 72(b)(2), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to FED. R. CIV. P. 6(d), or a total of seventeen (17) working days, *see* FED. R. CIV. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Stephen C. Robinson at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

**\*10** Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Robinson.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

S.D.N.Y.,2010.

Singh v. Goord

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Bruce SWEEPER, Plaintiff,
v.
J. TAYLOR, Superintendent, Gouverneur Correctional
Facility; Officer McCoy; Officer McBride, Defendants.
No. 906-CV-379 (NAM/GJD).

March 27, 2009.
Bruce Sweeper Auburn, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Steven H. Schwartz, Assistant Attorney General, of
Counsel, Albany, NY, for Defendants.

**MEMORANDUM DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**\*1** In this amended civil rights complaint, plaintiff
alleges that defendants violated plaintiff's First
Amendment right to practice his religion. (Dkt. No. 11).
Plaintiff seeks monetary as well as injunctive relief.
Presently before the court [FN1] is defendants' motion for
summary judgment pursuant to FED. R. CIV. P. 56. (Dkt.
No. 37). Plaintiff has responded in opposition to the
motion. (Dkt. No. 42). For the following reasons, this
court agrees with defendants and will order dismissal of
the amended complaint in its entirety.

> FN1. The parties are advised that the referral to
> a Magistrate Judge as provided for under Local
> Rule 72.3 has been rescinded for purposes of this
> motion, and as such, any appeal taken from this
> order, if appropriate, will be to the Court of
> Appeals for the Second Circuit.

**DISCUSSION**

**1. *Summary Judgment***
Summary judgment may be granted when the moving

party carries its burden of showing the absence of a
genuine issue of material fact. FED. R. CIV. P. 56;
*Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990)
(citations omitted). "Ambiguities or inferences to be
drawn from the facts must be viewed in the light most
favorable to the party opposing the summary judgment
motion." *Id.* However, when the moving party has met its
burden, the nonmoving party must do more than "simply
show that there is some metaphysical doubt as to the
material facts." *Matsushita Electric Industrial Co., Ltd. v.
Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct.
1348, 89 L.Ed.2d 538 (1986); *see also Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986).

At that point, the nonmoving party must move
forward with specific facts showing that there is a genuine
issue for trial. *Id.* A dispute about a genuine issue of
material fact exists if the evidence is such that "a
reasonable [factfinder] could return a verdict for the
nonmoving party." *Anderson,* 477 U.S. at 248. In
determining whether there is a genuine issue of material
fact, a court must resolve all ambiguities, and draw all
inferences, against the movant. *See United States v.
Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d
176 (1962).

**2. *Facts***

**A. Amended Complaint**

Plaintiff alleges that on October 17, 2005, he was an
inmate of the Department of Correctional Services
(DOCS), incarcerated at the Gouverneur Correctional
Facility (Gouverneur). (Dkt. No. 11). Plaintiff states that
at approximately 2:00 p.m., he was working in the mess
hall when defendant Corrections Officer (CO) McCoy
walked by plaintiff as he was praying. Plaintiff is a
Muslim, and October 17, 2005 was during Ramadan, a
Muslim holiday. Defendant McCoy told plaintiff to stop
praying and gave plaintiff a misbehavior report when
plaintiff did not comply with defendant McCoy's order. In
the amended complaint, plaintiff claims that defendant
McCoy put plaintiff in the Special Housing Unit (SHU)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

for praying, and that plaintiff spent thirty days in SHU as a result. Amended Complaint (AC) at 2(a).[FN2]

> [FN2.] Plaintiff has inserted unnumbered pages in between the pages of the form complaint. The court has simply numbered the pages following a form-page as the same form number plus a letter. Thus, this page follows page 2, but is before page 3.

Plaintiff alleges that defendant CO McBride's name appears on the "statement of the evidence" from plaintiff's disciplinary hearing, however, plaintiff claims that defendant McBride was not working on October 17, 2005, making the disciplinary determination invalid. *Id.* Plaintiff has also named Superintendent J. Taylor as a defendant. Plaintiff claims that defendant Taylor failed to implement a proper policy that would allow inmates to pray at work. Defendant Taylor's failure to do so allowed plaintiff to be improperly placed in SHU for praying in the mess hall.

**B. Additional Facts**

**\*2** In support of their summary judgment motion, defendants have submitted the plaintiff's disciplinary records regarding this incident, together with the declaration of Captain Clement Croyer, the hearing officer for plaintiff's disciplinary hearing. Croyer Decl. & Exs. A, B (Dkt. No. 37(8)-37(10)). Defendants have also submitted the plaintiff's "grievance packet," including all the documents submitted in conjunction with the grievance filed by plaintiff subsequent to this incident. Statement of Material Facts & Ex. A-D (Dkt. No. 37(3)-37(7)).

The Croyer Declaration states that Captain Croyer conducted a Tier III disciplinary hearing against plaintiff on October 19, 2005. Croyer Decl. ¶ 2. The hearing was based on a misbehavior report written by defendant McCoy. *Id.* The misbehavior report shows that it was written by defendant McCoy, who stated that on October 17, 2005, he walked in the back of the mess hall and observed "inmates" praying in the hot box room where supplies for the mess hall were kept. Croyer Decl. Ex. A at p. 3. Defendant McCoy further stated that plaintiff was praying "with 6 other inmates." *Id.* Defendant McCoy alerted Sergeant King and gave the inmates a direct order to stop praying. *Id.* The inmates ignored defendant

McCoy's order and continued to pray for approximately ten minutes until Sergeant King arrived. *Id.* Plaintiff was escorted to SHU as a result, and defendant McCoy wrote the misbehavior report, charging plaintiff with a violation of Rules 104 .13 (creating a disturbance); 105.10 (unauthorized assembly); 105.11 (religious services); and 106.10 (violating a direct order). The misbehavior report also lists the other inmates who were involved. *Id.*

A transcript of the disciplinary hearing has been submitted in support of the summary judgment motion. Croyer Decl. Ex. B (Transcript) (T). At the beginning of the disciplinary hearing, Captain Croyer read plaintiff the charges and asked how plaintiff pled to the individual rule violations. (T. at 2). Captain Croyer also read the names of the other inmates involved, one of whom was an individual named "McBride." *Id.* Plaintiff pled "not guilty" to all of the charges except "refusing a direct order." *Id.* Although plaintiff did not make a specific statement, Captain Croyer asked plaintiff if he and the other inmates "were under the impression that it was ok for you to pray in your group back there. [sic]" *Id.* Plaintiff told Captain Croyer that plaintiff believed that he was allowed to pray in that location, and that the inmates had been praying there "since beginning of (inaudible)." *Id.* Captain Croyer repeated the question and plaintiff stated that the inmates "were in the kitchen at the time of our prayers." *Id.*

At that time, Captain Croyer adjourned the hearing to make his decision. (T. at 2-3). When Captain Croyer went back on the record, he began his oral disposition by stating that he relied upon "the written report of Officer McBride, which indicates that you refused his orders." (T. at 3). Captain Croyer then stated that

**\*3** [y]ou guys were praying in a group, but it appears to me that you were under the impression that is [sic] was ok to pray in a group down there in the mess hall. However, by your own admission, you did disobey the officers [sic] orders to stop which is the reason I found you guilty of a direct order.

*Id.* Captain Croyer states in his declaration that plaintiff pled guilty to refusing the order, and Captain Croyer thus, found him guilty of the charge and sentenced

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

plaintiff to forty five days in SHU, together with a loss of privileges. Croyer Decl. ¶ 3. Plaintiff was found "not guilty" of all the other charges.

Captain Croyer also states that when he set forth his disposition on the record at the hearing and when he wrote his "Superintendent Hearing Disposition Rendered" FN3 form, he "inadvertently and incorrectly, stated that the evidence [he] relied upon was 'the written report of Officer McBride ...,' when [he] meant to say Officer McCoy." Croyer Decl. ¶ 5. Captain Croyer states that based on a review of all the records, it is clear that the misbehavior report was written by, and the decision was based upon evidence provided by, Officer McCoy, not Officer McBride. *Id.* ¶ 6. The disposition was based solely upon the McCoy misbehavior report and plaintiff's own guilty plea to that particular charge. *Id.* By his own admission, FN4 plaintiff served only thirty of the forty five day penalty. AC at p. 2(a); Def. Rule 7.1(a)(3) Statement ¶ 5 & Ex. C at p. 1.

FN3. A copy of this report is attached to the Croyer Decl. Ex. A at p. 2.

FN4. The amended complaint is incorrect with respect to the penalty originally imposed. In the amended complaint, plaintiff alleges that the penalty was originally "90 days," but he only served "30 days." AC at p. 2(a). It is clear, however, from all the evidence that Captain Croyer only imposed a forty five day penalty. This discrepancy does not affect this court's decision.

On November 21, 2005, plaintiff filed Grievance No. GOV-11061/05 regarding this incident. Def. Rule 7.1(a)(3) Statement Ex. A at p. 3-4. Plaintiff complained that he was not able to pray at the appropriate religiously mandated times. He stated that he wanted "to be able to pray when my prayer comes at its set [ ] time, at work, or be able to go back to my cube to pray." *Id.* Plaintiff also requested that the misbehavior report be expunged from his records because the name of the officer on the statement of evidence relied upon was not the officer who actually witnessed the misbehavior and who signed the misbehavior report. *Id.*

The Inmate Grievance Resolution Committee (IGRC) denied plaintiff's grievance. First, the IGRC found that it could not expunge plaintiff's misbehavior report because misbehavior reports are not "grievable," and plaintiff would have to use his available disciplinary appeal remedy. *Id.* Ex. A at pp. 7 (summary of case history of grievance), 11. The IGRC also found that according to a previous decision of the Central Office Review Committee (CORC), praying must be done in an inmate's living quarters or in designated religious areas. *Id.* The Superintendent affirmed the findings of the IGRC. *Id.* Ex. A at pp. 2, 7. The Superintendent also noted that the issue of praying at work or program was previously addressed by the CORC and "is clearly outlined in Directive # 4202. There is no provision for an inmate to pray while at program, or in your case, in the Mess Hall." *Id.*

*4 Plaintiff appealed the Superintendent's decision, and the CORC affirmed. *Id.* Ex. A at pp. 1, 7. Plaintiff argued that his religious practices could be accommodated without negative effect on prison security or rehabilitation. *Id.* at p. 7. Plaintiff also argued that he had a First Amendment right to engage in his prayer at work. *Id.* The CORC affirmed the Superintendent and quoted the pertinent section of Directive # 4202, relating to "individual demonstrative prayer" and "congregate or group prayer." *Id.* A copy of the relevant portion of Directive # 4202 has been attached to the grievance materials. *Id.* Ex. A at p. 5 (DOCS Directive # 4202(K)(1) & (2).

Defendants have also included as an exhibit, a memorandum from the Muslim Chaplain, Yahya Abdur Rahim. Def. Rule 7.1(a)(3) Statement Ex. D. This memorandum is addressed to the Watch Commander, is dated August 31, 2005, and relates to the 2005 Ramadan holiday. The memorandum discusses fasting, meals, and prayers during the Ramadan holiday. *Id.* There is no discussion about inmates being authorized to pray at their assigned program or work area.

**3. *Misbehavior Report***

Plaintiff does not appear to challenge the process that he received at his disciplinary hearing. He does not name

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

Captain Croyer as a defendant and does not complain about the disciplinary hearing itself. Plaintiff argues that the misbehavior report should be expunged because defendant McBride "lied" about witnessing the incident, and was not even at work on October 17, 2005. Plaintiff seems to think that the misbehavior report is "false" because Captain Croyer allegedly relied upon evidence submitted by defendant McBride. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

First, the misbehavior report was not false.[FN5] Plaintiff admits what he was doing and admitted at the disciplinary hearing that he refused to obey defendant McCoy's order to stop praying. Plaintiff claims that he was justified in doing so because he was entitled to pray in the mess hall. Second, it is clear that defendant McBride was not involved in any part of plaintiff's claim. Plaintiff states that Officer McBride was *not working* on October 17, 2005. Captain Croyer states in his declaration that he mis-spoke when he stated that he relied on the evidence provided by "Officer McBride." Croyer Decl. ¶ 5. All the evidence in the records supports this assertion by Captain Croyer. The court notes that one of the inmates involved in the prayer incident with plaintiff was named "McBride." *See* Croyer Decl. Ex. A at p. 3. In any event, plaintiff pled guilty to the refusal to obey a direct order, thus, Captain Croyer relied, not only on the misbehavior report statement, but on plaintiff's guilty plea. Thus, defendant McBride was not personally involved with plaintiff at all, and the amended complaint may be dismissed as against defendant McBride.

FN5. In any event, a "false" misbehavior report on its own does not rise to the level of a constitutional violation as long as the subsequent disciplinary hearing affords the inmate due process. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), cert. denied, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

*5 Although plaintiff does not really challenge the disciplinary determination in itself, the court must point out that plaintiff has no due process right in connection with this disciplinary determination. In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In *Sandin,* the court rejected a claim that *thirty days* in segregated confinement was "atypical and significant." *Id.* at 486.

The Second Circuit discussed the duration element of the *Sandin* analysis in *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000). The court in *Colon* noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner,* 197 F.3d 578, 589-90(2d Cir.1999)). While often the issue is a question of fact in which the court must analyze the conditions of the confinement as well as the duration of the confinement, it is well-settled that a duration as short as the one involved in this case, the same time period rejected by court in *Sandin,* without more, does not create a liberty interest that is protected by due process.

**4. *First Amendment***

Plaintiff argues that defendant McCoy violated plaintiff's First Amendment rights by giving him a misbehavior report for "praying." Actually, defendant McCoy gave plaintiff a misbehavior report for a variety of rule violations, including failure to obey an order, creating a disturbance, unauthorized assembly, and unauthorized address. Plaintiff, however, was not disciplined for "praying." Plaintiff pled guilty to refusal to obey defendant McCoy's order to stop praying. Thus, the disciplinary finding was that plaintiff *failed to obey an order,* regardless of the content of that order. Plaintiff cannot and does not dispute that he did not stop praying, and in fact, the records show that plaintiff and the other inmates continued to pray for ten minutes until the Sergeant arrived.

In fact, Captain Croyer did *not find plaintiff guilty of*

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

*any of the other rule violations,* stating that the inmates believed that they were allowed to pray in the mess hall as they were doing. Plaintiff testified at the hearing that he and the other inmates had been praying in that manner before. (T. at 2). The court would also point out that plaintiff did not initially make a statement in his defense at the disciplinary hearing. It was Captain Croyer [FN6] who *three times* brought up the fact that plaintiff and the other inmates "were under the impression that it was ok for you to pray in your group back there." *Id.* at 2-3). Captain Croyer ultimately stated that it appeared to him that "it was some misunderstanding where you were under the impression that it was ok to pray in a group down there in the messhall [sic]." (T. at 3). Captain Croyer found plaintiff "not guilty" of the "unauthorized assembly" and the "religious services" violation.

> FN6. The court understands that Captain Croyer is not a defendant in this case, however, this analysis is relevant because plaintiff was not disciplined for "praying," and in fact, Captain Croyer dismissed all the rule violations that were actually related to "praying" because he believed plaintiff's statement that the inmates believed that it was proper to pray in that location.

**\*6** In his response to defendants' motion, plaintiff states that Officer McCoy could have waited until plaintiff was finished praying. (Dkt. No. 42-2 at p. 1). Plaintiff also states that he could not stop praying, and that he should have been allowed to continue because there was no "security issue" involved. *Id.* In another of plaintiff's response documents, plaintiff states that he missed the Ramadan feast because he was in SHU, and that the Superintendent let plaintiff out of SHU because there was no rule stating that plaintiff could not pray in the mess hall. (Dkt. No. 42-5 at p. 5). Plaintiff states that he was given his job back and "was allowed to return to his cube at all of the rest of his prayer's time of prayer." *Id.*

Rather than arguing that plaintiff's First Amendment rights have not been violated, defendants argue in their motion that they are entitled to assert qualified immunity. The doctrine of qualified immunity shields officials from liability from civil damages if their actions did not violate "clearly established statutory or constitutional rights of

which a reasonable person would have known." *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In *Pearson,* the Supreme Court overruled its decision in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), to the extent that the Court in *Saucier* required a specific two-step sequence for deciding qualified immunity claims. *Pearson,* 129 S.Ct. at 815-22.

Under *Saucier,* when confronted with defendants' claim of qualified immunity, the court was mandated to use a two-step procedure. 533 U.S. at 201. The first step required the court to determine whether plaintiff's facts established the violation of a constitutional right. *Id.* If so, the court would then decide whether the right at issue was "clearly established" at the time of the defendants' alleged conduct. *Id.* Decisions prior to *Saucier* had "suggested" that the better approach was to determine whether a constitutional right was violated at all, but *Saucier* turned that suggestion into a requirement. *Pearson,* 129 S.Ct. at 816 (citing *Saucier,* 533 U.S. at 201; *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (stating that resolution of the constitutional issue first was the "better approach").

In *Pearson,* the Supreme Court rejected what it referred to as *Saucier's* " 'rigid order of battle,' " in favor of allowing the courts to exercise their sound discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first. *See* 129 S.Ct. at 817-818 (citing *Purtell v. Mason,* 527 F.3d 615, 622 (7th Cir.2008) (referring to the *Saucier* standard as a "rigid order of battle")). The court in *Pearson* stated that the unnecessary litigation of constitutional issues is to be avoided, and there are cases in which it is "plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." 129 S. St. at 818. This case is just such a case. Thus, the court will first address whether a right was "clearly established."

**\*7** In *Shabazz v. Coughlin,* 852 F.2d 697, 700-702 (2d Cir.1988), the Second Circuit held that while an inmate's right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not well-established for purposes of qualified

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

immunity. In *Chatin v. Coombe,* 186 F.3d 82 (2d Cir.1999), the court held that Disciplinary Rule 105.11, prohibiting the conduct of "religious services" could not be used to discipline an individual for silent demonstrative prayer in the prison yard. However, the court simply found that the rule was unconstitutionally vague for due process purposes. *Id.* Because the district court decided the case on the due process claim, the court did not reach the plaintiff's First Amendment claim. *See Chatlin v. New York,* 96 Civ. 420, 1998 U.S. Dist. LEXIS 5671, *26-27 (S.D.N.Y. April 23, 1998).

The court in *Chatin* specifically stated, however, that it was *not* deciding the issue of whether such conduct could be prevented by using a rule that gave inmates the required notice of what was prohibited. *Id.* at 89-90. The court also stated that it was not suggesting that prison officials were prevented from preventing such conduct by utilizing already existing rules that prevented disturbances or interference with others when the circumstances warranted it. *Id.* Thus, it still does not appear well established that an inmate has the right to pray at one's work assignment as plaintiff was attempting to do.[FN7] This court is not aware of any case at or before the time of the incident that would "clearly establish" that plaintiff had a right to pray together with six other inmates in a work area during his working hours.[FN8]

> FN7. Plaintiff omits to mention that there were six other inmates praying with plaintiff at the time that defendant McCoy walked by them.

> FN8. The DOCS Directive regarding this issue allowed "individual demonstrative prayer" only in living quarters and designated religious areas whenever feasible as determined by the Superintendent. DOCS Directive 4202(K)(1). Directive 4202(K)(2) provides that congregate or group prayer could only occur in a designated religious area, during a religious service or at other times as authorized by the Superintendent. The Central Office Review Committee cited this Directive in its final denial of plaintiff's grievance.

In *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004), the plaintiff had been disciplined for failure to obey a corrections officer's order to return his tray and cup, an order plaintiff claims was "expressly given to him by a corrections officer who knew that completion of the task would require plaintiff to abandon religious prayers in which he was then engaged." *Id.* at 204-05. As a result of the disciplinary hearing, plaintiff was subjected to a week-long restricted diet, resulting in his inability to break his Ramadan fast with the appropriate food. *Id.* at 199. District Court *sua sponte* dismissed the complaint; the Second Circuit reversed, stating:

> When McEachin's complaint is liberally construed, two First Amendment concerns arise. First, McEachin asserts that the seven-day restrictive diet imposed upon him as discipline by the defendants impinged upon his observance of Ramadan by depriving him of properly blessed food with which to break his daily fast. In addition, McEachin alleges that this discipline was itself a product of religious discrimination by a corrections officer who intentionally ordered McEachin to return his tray and cup during McEachin's prayer, knowing that the plaintiff's beliefs would not permit him to respond to the command before he had finished making *salat.* If these allegations are true, an unconstitutional burden may have been placed on McEachin's free exercise rights.

**8** *Id.* at 201 (footnote omitted). The McEachin court thus emphasized the allegation that the corrections officer intentionally ordered plaintiff to perform the task, knowing that obeying the order would require plaintiff to violate his religious beliefs. *Id.* at 204. The court observed that "[p]recedent suggests that inmates have a right not to be disciplined for refusing to perform tasks that violate their religious beliefs." *Id.* at 205 (citing *Hayes v. Long,* 72 F.3d 70 (8th Cir.1995) (inmate disciplined for refusing to handle pork while performing kitchen duties)). The court in McEachin ultimately did not rule on this issue because it remanded the case to the district court for consideration of the First Amendment claims. McEachin does not clearly establish the right asserted by plaintiff in the case at bar.

In *Withrow v. Bartlett,* 15 F.Supp.2d 292 (W.D.N.Y.1998), the court granted summary judgment in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

a case in which plaintiff was disciplined for engaging in group demonstrative prayer in the prison yard and violating an officer's order to stop. *Withrow* and the case at bar may be distinguished from *McEachin* on the ground that in this case and *Withrow* the prohibited activity resulting in the officer's order was the method of prayer, that is, a group prayer in an area of the prison where it was not authorized by the existing rules. The officers issuing the orders believed that the plaintiffs' religious conduct was not permitted, a belief that was supported by the DOCS Directive.

In this case, as stated above, plaintiff pled guilty [FN9] without question to the charge of failure to obey an order. Additionally, it is clear that other inmates were involved, and thus, plaintiff was not simply conducting an individual prayer. [FN10] Apparently, defendant McCoy had no way of knowing what the inmates were doing, since it is clear that no one responded when he ordered the inmates to stop. The DOCS Directive regarding prayer supported defendant McCoy's actions [FN11]; he could not reasonably have believed that his actions were in violation of plaintiff's constitutional rights. Plaintiff acknowledges that after he was released from confinement, he was given his job back and allowed to go back to his "cube" at all the appropriate times to pray. Thus, based on the facts in this case, any claim for damages would be barred by the doctrine of qualified immunity even if ultimately plaintiff's First Amendment rights had been infringed.

FN9. The court also notes that plaintiff pled guilty to this charge at the beginning of the hearing without discussion. (T. at 2). Plaintiff never gave the hearing officer an opportunity to find plaintiff "not guilty" of the charge. Plaintiff had also requested the Imam as a witness, but plaintiff decided at the beginning of the hearing that he did not wish the Imam to testify. (T. at 1). Given the later conduct of the hearing officer in emphasizing that the entire incident was a "misunderstanding," it is possible that plaintiff might not have been found guilty had he not pled guilty. As stated above, the hearing officer brought the misunderstanding up himself. It appeared that plaintiff was not planning on making any statements in his defense.

FN10. In one of the documents in response to defendants' motion, plaintiff disputes that he was praying in a "group," although he does not dispute that there were six other inmates with plaintiff. (Dkt. No. 42-1 at p. 4). It is unclear how defendant McCoy could have known what plaintiff and the other inmates were thinking and whether they meant to be in a "group" or not.

FN11. The issue of plaintiff missing the Ramadan feast because he was in SHU is not a part of this action, and McCoy was not responsible for things that may have happened to plaintiff after McCoy's conduct.

Qualified immunity would not, however, bar any claim for equitable relief. *See Pearson,* 129 S.Ct. at 822 (no qualified immunity in cases in which injunctive relief is sought instead of or in addition to damages); *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (qualified immunity is an affirmative defense to monetary liability). Plaintiff requests only equitable relief from the Superintendent for his conduct. Plaintiff alleges that defendant Taylor allowed the officer to put plaintiff in SHU when there was no "rule" against praying in the mess hall. Plaintiff requests that defendant Taylor "implement policies and procedures" allowing Muslims to pray at "set" times even if they work in the mess hall. AC at p. 5(a).

**\*9** However, plaintiff is no longer incarcerated at Gouverneur. An inmate's transfer from a facility generally renders moot any claims for declaratory and injunctive relief against officials of that facility. *Salahuddin,* 467 F.2d at 272 (citing *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (*per curiam); Young v. Coughlin,* 886 F.2d 567, 568 n. 1 (2d Cir.1989); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976)). Because this plaintiff is no longer incarcerated at Gouverneur, his claims for declaratory and injunctive relief must be dismissed as moot.

The court notes that in one of the five documents that plaintiff filed in opposition to defendants' motion, he appears to be raising a claim under the Religious Land

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq. (Dkt. No. 42-5 at p. 4). RLUIPA prohibits the government from imposing substantial burdens on religion, even when the burden results from a neutral law of general applicability. Pugh v. Goord, 571 F.Supp.2d 477, 503 (S.D.N.Y.2008) (citation omitted). If the government substantially burdens an inmate's religious exercise, the government must demonstrate that the imposition of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. Id. (quoting 42 U.S.C. § 2000cc-1(a)). The burden on defendants in a RLUIPA case is higher than the burden articulated by the Supreme Court in Turner v. Safely, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) for claims under the constitution. The constitutional analysis under Turner requires only that the burden on the inmate's religious rights be "reasonably related to legitimate penological interests." Id. at 89.

Plaintiff in this case never raised this issue until his response to defendants' motion for summary judgment. The court must treat pro se submissions with particular liberality and would be required to construe his pleading to include a claim under RLUIPA even though the complaint did not request such relief. McEachin v. McGuinnis 357 F.3d 197, 200 (2d Cir.2004). However, in this case, plaintiff's attempt to raise a RLUIPA claim would not be able to succeed. The qualified immunity would apply to plaintiff's RLUIPA claim. See Orafan v. Goord, 411 F.Supp.2d 153, 158 (N.D.N.Y.2006), vacated and remanded on other grounds sub nom. Orafan v. Rashid, 249 Fed. Appx. 217 (2d Cir.2007). In any event, it has been held that a RLUIPA plaintiff may not obtain monetary damages under the statute either from defendants in their individual or official capacities. Pugh, 571 F.Supp.2d at 506-509.[FN12] Thus, plaintiff in this case would not be able to obtain money damages from defendants.

> FN12. The Fifth Circuit has recently held that RLUIPA affords inmates the ability to obtain declaratory and injunctive relief against a "government," but does not provide for damages against either a defendant in his individual capacity or the state, including defendants in their "official capacities." Sossamon v. Lone Star

State of Texas, 2009 U.S.App. LEXIS 3701, *19-34, 2009 WL 382260 (5th Cir. Feb. 17, 2009) (discussing cases, including those circuits that have allowed such actions, however, noting that where such a claim is allowed individually, the qualified immunity analysis would apply).

As stated above, plaintiff has been transferred out of Gouverneur, and can no longer obtain declaratory or injunctive relief from defendants at that facility. Thus, to the extent that plaintiff's response to defendants' motion purports to raise a new claim under RLUIPA against the existing defendants, it must also be dismissed.

*10 WHEREFORE, based on the findings above, it is

ORDERED, that defendants' motion for summary judgment (Dkt. No. 37) is GRANTED and the amended complaint is DISMISSED IN ITS ENTIRETY.

N.D.N.Y.,2009.

Sweeper v. Taylor
Slip Copy, 2009 WL 815911 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Jill JONES-SODERMAN, Plaintiff,
v.
EXECUTIVE SECRETARY OF THE STATE BOARD
FOR PSYCHOLOGY OF THE STATE EDUCATION
DEPARTMENT OF THE UNIVERSITY OF THE
STATE OF NEW YORK; Morris Schrager, State Board
of Social Work; George Ding, Director of Prosecutions;
Wayne Keyes, Esq., Prosecuting Attorney; Louis J.
Catone, Professional Conduct Officer; Commissioner of
Education of the State of New York; Assistant
Commissioner for the State Education Department of
the State of New York, Defendants.
No. 08 CV 4716(SJF)(LB).

May 21, 2010.
Jill Jones-Soderman, Nyack, NY, pro se.

Ralph Pernick, New York State Attorney General,
Mineola, NY, for Defendants.

**REPORT AND RECOMMENDATION**

BLOOM, United States Magistrate Judge.

*1 Plaintiff, Jill Jones-Soderman, brings this *pro se*
action pursuant to 42 U.S.C. § 1983 (" § 1983") alleging
that defendants violated her constitutional rights under the
Fourteenth Amendment during the course of a licensing
proceeding that is still pending against her in the State of
New York. Plaintiff seeks declaratory and injunctive
relief. Defendants move to dismiss the complaint pursuant
to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of
Civil Procedure. The Honorable Sandra J. Feuerstein
referred defendants' motion to me for a Report and
Recommendation in accordance with 28 U.S.C. § 626(b).
It is respectfully recommended that defendants' motion
should be granted, and plaintiff's complaint should be
dismissed.

**BACKGROUND**

Plaintiff commenced her lawsuit in this Court by
filing a *pro se* civil rights complaint on November 24,
2008. She filed an amended complaint on January 26,
2009. According to the Amended Complaint, plaintiff was
licensed to practice social work in both New Jersey and
New York. On March 15, 2002, the New Jersey State
Licensing Board ("New Jersey Board") commenced a
proceeding against her as a result of a telephone
communication plaintiff made to a trial judge about a case.
(Amend.Compl.¶ 10.) The New Jersey Board levied a
$30,000 fine and suspended plaintiff's license to practice
social work in the state of New Jersey for five years. (*Id.*
¶ 11.) Plaintiff informed the State Board of Social Work
of the University of the State of New York ("New York
Board") of her New Jersey suspension and retained her
New York license and continued to practice in New York.
(*Id.* ¶ 12.) Plaintiff was subsequently accused of practicing
social work in New Jersey without a license, and, on
January 7, 2004, the New Jersey Board held a second
hearing, at which plaintiff's New Jersey license was
revoked. (*Id.* ¶ 15.) In that proceeding, plaintiff entered
into a consent agreement in which she agreed to pay a
$45,000 fine and to tender her late book date book. Moreover, she
was required to inform all of her clients that her New
Jersey license had been revoked. (*Id.* ¶ 16.) Plaintiff
continued to inform the New York Board of the New
Jersey proceedings. (*Id.* ¶¶ 17-21.)

In 2003, plaintiff made an error on her renewal form
for her New York license, in which she incorrectly
checked a box indicating no previous disciplinary action.
(*Id.* ¶¶ 22, 26.) Plaintiff entered into a settlement with
Walter Ramos, an official in the Office of Professional
Discipline, in which she agreed to pay a $500 fine and
accept a six-month suspension of her New York license,
which was stayed. (*Id.* ¶ 22.) Defendant Wayne Keyes
subsequently replaced Walter Ramos and requested a
meeting with plaintiff to discuss the 2003 renewal form.
(*Id.* ¶ 25.) On September 19, 2008, plaintiff met with
Keyes. During this conference, "Keyes had a social
worker named 'Schrager' [FN1] informally assess Plaintiff as
to her mental status without her permission and without

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

her knowledge." (*Id.* ¶ 27.) Thereafter, "Keyes offered Plaintiff the choice of either accepting a psychological evaluation now or face a full board hearing to revoke her license." (*Id.* ¶ 28.) The Amended Complaint does not describe any further actions or proceedings.

> FN1. Defendants' Motion to Dismiss identifies this defendant as "Morris Schrajer." Assistant Attorney General Ralph Pernick undertook representation of all defendants, including Schrager/Schrajer. *See* Docket Entry 9.

**\*2** Plaintiff filed a prior federal lawsuit in this Court, alleging that various New Jersey officials violated her constitutional rights in connection with the New Jersey licensing proceedings. That case was transferred to the United States District Court for the District of New Jersey. Plaintiff's claims were dismissed against all but one of the defendants in that case. *Jones-Soderman v. McVeigh, et al.,* Civil Action No. 08-1887(PGS), slip op. (D.N.J. June 17, 2009).FN2

> FN2. The case against one defendant is still pending. On May 18, 2010, the court directed plaintiff to file a submission by June 4, 2010, or else the case would be dismissed for failure to prosecute. *See* https:// ecf.njd.usc ourts.gov/cgi-bin/DktRpt.pl?6913842057265-L _942_0-1 (viewed May 21, 2010).

In the instant action, plaintiff alleges that defendants Schrager and Keyes violated her due process rights when they "lured Plaintiff into a conference and without her knowledge and permission conducted an informal assessment of her mental status." (Amended Compl. ¶ 30.) "Plaintiff's injuries may include, but are not limited, to the following: loss of her ability to earn a living, be free from investigations and administrative proceedings." (*Id.* ¶ 38.) Plaintiff seeks a declaratory judgment that defendants violated her constitutional rights and an injunction "suspending any further prosecution of the New York licensing action." (*Id.* ¶ 39.)

In lieu of an answer, defendants move to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that (1)

the claims against the state agencies and state defendants named in their official capacities are barred by the Eleventh Amendment; (2) the state agencies may not be sued under 42 U.S.C. § 1983, because they are not "persons" within the meaning of the statute; (3) this Court must abstain from hearing the action, under *Younger v. Harris,* because the state disciplinary proceedings are still ongoing; (4) some of the individual defendants are entitled to absolute judicial or prosecutorial immunity; (5) plaintiff fails to allege the supervisory defendants' personal involvement; and (6) plaintiff fails to allege any acts by defendants Ding and Catone.

Defendants attach to their motion a copy of the December 16, 2008 Statement of Charges In the Matter of the Disciplinary Proceeding against Jill G. Jones-Soderman.FN3 This statement charged plaintiff with committing unprofessional conduct by willfully filing a false report and having been found guilty of improper professional practice or professional misconduct by the state of Arizona, with the result that her Arizona license was revoked, conduct which would constitute professional misconduct if committed in New York State. (Def's. Mot. Dismiss, Exhibit 1.) The charge recommended an unspecified disciplinary penalty and was signed by Wayne Keyes, Prosecuting Attorney, on behalf of Louis J. Catone, Professional Conduct Officer, and George M. Ding, Director of Prosecutions for the Office of Professional Discipline with the New York State Education Department. (*Id.* at 14.)

> FN3. Defendants gave the required Notice to a Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, by filing a copy of Local Rule 12.1 along with their Notice of Motion to Dismiss. Plaintiff has also submitted materials outside of the pleadings. The Court need not reach these matters, except to take judicial notice of the decisions of the state administrative bodies. Accordingly, the Court need not convert the motion to one for summary judgment pursuant to Rule 56.

Plaintiff opposes defendants' motion on the grounds that (1) *Younger v. Harris* should not apply, because defendants brought the state proceeding in "bad faith;" (2)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

the State waived Sovereign Immunity by accepting federal funding for education; and (3) the defendants are not entitled to absolute immunity because they acted in their administrative, rather than prosecutorial capacity. Plaintiff's lengthy Affidavit describes the ongoing proceedings before the New York Board, including a March 25, 2009 hearing.[FN4] Plaintiff attaches a transcript of that proceeding as Exhibit 8. Plaintiff's counsel moved at the March 2009 hearing to dismiss the disciplinary proceeding, and the hearing officer reserved decision. (Pl.'s Aff., Exhibit 8.) Defendants reply to plaintiff's opposition.

> FN4. Although plaintiff's opposition to the motion details the initiation of the disciplinary proceeding and license revocation proceeding in New Jersey, these materials were not presented in the Amended Complaint, and thus are not properly before the Court. In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), "a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 192 (2d Cir.2006) (quotations and citations omitted). The Court may also take judicial notice of records of state administrative bodies without converting a motion to dismiss to one for summary judgment. *Johnson v. County of Nassau,* 411 F.Supp.2d 171, 178 (E.D.N.Y.2006).

**\*3** Thereafter, and without leave of Court, plaintiff filed a further Response to Defendants' Reply. The Court has since received several additional submissions from the parties. By letter dated June 18, 2009, Defense Counsel informed the Court that the Office of Professional Discipline had withdrawn its initial Specification of Charges and moved to submit an Amended Statement of Charges, attaching a copy. The Amended Statement withdraws one of the allegations of professional misconduct against plaintiff, the charge that she willfully filed a false statement on her license renewal; but adds a further specification of professional misconduct, that she continued to practice social work in New Jersey after her

license to practice was suspended. Neither party has informed the Court of any further developments in the state licensing proceeding since June, 2009.

## DISCUSSION

### I. LEGAL STANDARDS
#### A. Motion to Dismiss

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)); *Koppel v. 4987 Corp.,* 167 F.3d 125, 130 (2d Cir.1999). To survive a motion to dismiss, however, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 569. If a plaintiff does not "nudge [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

#### B. Pro Se Litigants

"A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). *See also Bertin v. U.S.,* 478 F.3d 489, 491 (2d Cir.2007) ("We liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions 'to raise the strongest arguments they suggest.' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)) (other citations omitted).

### II. *YOUNGER V. HARRIS* ABSTENTION

Defendants argue that the Court must abstain from hearing plaintiff's claims on the basis of the *Younger* abstention doctrine. In *Younger v. Harris,* 401 U.S. 37

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

(1971), the Supreme Court held that, absent extraordinary circumstances, a federal court may not enjoin an ongoing state criminal proceeding. *"Younger generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings.... This doctrine of federal abstention rests foursquare on the notion that, in the ordinary course, a state proceeding provides an adequate forum for the vindication of federal constitutional rights."* Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir.2002) (internal quotations marks and citations omitted). The doctrine also applies to state administrative proceedings. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) . It likewise applies to demands for injunctive and declaratory relief. *Kirschner v. Klemons,* 225 F.3d 227, 235 (2d Cir.2000) (citing *Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)).

**\*4** "'*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims. *Diamond "D" Constr. Corp.,* 282 F.3d at 198. The only exceptions to the abstention requirement are where a plaintiff can demonstrate "bad faith, harassment or any other unusual circumstance that would call for equitable relief." *Id.,* 282 F.3d at 198 (quoting *Younger,* 401 U.S. at 54). A plaintiff challenging the application of *Younger* abstention bears the burden of showing one of these exceptions. *Id.*

Defendants argue that the Court must abstain from hearing this case under *Younger,* as the state licensing revocation proceeding is pending.[FN5] New York State has an important state interest in licensing and regulating the practice of social work in the state. Plaintiff is free to raise her constitutional claims during the administrative proceeding before the New York Board and, should she be unhappy with the outcome of the proceeding, through the avenues for review.

FN5. The state licensing proceeding was pending as of June 18, 2009, the date of defendants' last communication with the Court. Plaintiff does not

allege that the New York Board proceeding has concluded, or if it has and she was not vindicated, that she has exhausted all available avenues of appeal.

In her Opposition to the Motion to Dismiss, plaintiff does not challenge the three conditions requiring abstention. Instead, she argues that an exception to *Younger* abstention applies in this case, because the proceedings were brought in "bad faith." (Pl.'s Opp'n Mot. at 11.) "Mere conclusory allegations of bias are insufficient to overcome *Younger*-a plaintiff seeking to avoid *Younger* must affirmatively demonstrate the justification for application of an exception." *Kirschner, 225 F.3d at 236.* In order to invoke the bad faith exception, a litigant must show that "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome," or that the proceeding was brought with the purpose of retaliation or harassment. *Cullen v. Fleigner, 18 F.3d 96, 103 (2d Cir.1994).* "A state proceeding that is legitimate in its purposes, but unconstitutional in its execution-even when the violations of constitutional rights are egregious-will not warrant the application of the bad faith exception." *Diamond " D" Const. Corp., 282 F.3d at 199.*

Plaintiff fails to meet her burden to demonstrate bias or bad faith. Plaintiff's Opposition states that the prosecuting attorney, Wayne Keyes, "was on a personal vendetta against Plaintiff," and suggests that the New York Board initiated the review out of "a malicious and vexatious intent." (Opp'n at 11.) However, these conclusory statements are not supported by factual allegations demonstrating defendants' bias or bad faith. Plaintiff also argues that the proceeding was brought in bad faith "because documentary evidence was presented to prove Plaintiff was innocent and that the State had brought the action out of time, and admitted it destroyed key documents for the defense." (Opp'n at 11). Whatever documentary evidence plaintiff presented to prove her innocence, her Amended Complaint fails to demonstrate that defendants initiated the licensing proceeding in bad faith.[FN6]

FN6. Plaintiff apparently submitted evidence at the March 25, 2009 hearing which prompted the

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

Office of Professional Discipline to revise its Statement of Charges. Those new charges are still pending before the New York Board.

**\*5** As plaintiff fails to demonstrate a basis for the bad faith or bias exception to the application of the *Younger* abstention doctrine, the Court should abstain from hearing plaintiff's instant claims.

### III. 42 U.S.C. § 1983

Even if the Court did not abstain from hearing plaintiff's claims on the basis of *Younger v. Harris,* plaintiff's claims would be dismissed for failure to state a claim pursuant to Rule 12(b)(6). In order to maintain an action pursuant to § 1983, a plaintiff must allege two essential elements. First, "the conduct complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994) (citing *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds* by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Second, "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id.* "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *City of Oklahoma City v. Turtle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

Plaintiff asserts that defendants Keyes and Schrager deprived her of her "due process rights" by giving her "an informal psychological diagnostic interpretation on the pretense of talking with Plaintiff to work out an agreement on a licensing complaint." (Amend.Compl.¶ 5.) She alleges that defendant Schrager acted "with the purpose of not only suspending Plaintiff's license but also putting a psychological cloud over Plaintiff which she could never get out of." (*Id.* ¶ 34.) She further alleges that "Plaintiff's injuries may include, but are not limited to, the following: Loss of her ability to earn a living, be free from investigations and administrative proceedings." (*Id.* ¶¶ 38.)

In order to prevail on a due process claim under the Fourteenth Amendment, a plaintiff must identify a constitutionally protected liberty or property interest and then show that she was deprived of that interest without due process of law. *See Narumanchi v. Board of Trustees,* 850 F.2d 70, 72 (2d Cir.1988) (describing the two-step process of first identifying the property or liberty interest at stake and then asking what process was due to the plaintiff and whether that constitutional minimum was provided). Plaintiff fails to identify any protected liberty or property interest that defendants deprived her of without due process. "[The Supreme] Court has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." *Conn v. Gabbert.* 526 U.S. 286,291-92(1999).

[T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted. Otherwise the application would amount to a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment. To create an entitlement out of the mere existence of procedural due process created by the state would put the federal cart before the state horse and open a Pandora's Box of unnecessary federal-state conflict.

**\*6** *Yale Auto Parts. Inc. v. Johnson,* 758 F.2d 54, 59 (2d Cir.1985).

A person may have a stronger property interest in retaining, rather than obtaining, a state license that has already been granted. "[O]nce the government has granted a business license to an individual, the government cannot deprive the individual of such an interest without ... appropriate procedural safeguards." *Spinelli v. City of New York,* 579 F.3d 160, 169 (2d Cir.2009) (quoting *Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part)). Where state-issued licenses are subject to renewal according to state regulations and are subject to revocation only for a

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

showing of misconduct, the licensee may have a property interest in the license that requires the protections of the Due Process Clause. *Id,* 579 F.3d at 169 (quoting *Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), and citing *Richardson v. Town of Eastover,* 922 F.2d 1152, 1157 (4th Cir.1991) ("[A] state-issued license for the continued pursuit of the licensee's livelihood, renewable periodically on the payment of a fee and revocable only for cause, creates a property interest in the licensee.")).

However, plaintiff fails to state a claim that she has been deprived of a protected liberty or property right in her social work license or the opportunity to practice her profession, because she has not shown that her license has been revoked; indeed, her license is the subject of the current administrative proceedings. Moreover, she has not alleged that defendants' actions that she challenges herein, the "informal psychological diagnostic interpretation," (Amend.Compl.¶ 5) deprived her of any liberty or property right.

Nor does plaintiff state a substantive due process claim, which requires a plaintiff to demonstrate "governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Brown v. Baldwin Union Free School Dist.,* 603 F.Supp.2d 509, 515 (E.D.N.Y.2009) (quoting *Velez v. Levy,* 401 F.3d 75, 93 (2d Cir.2005). Plaintiff's allegation that she "walked away with a mental status exam" (Amend.Compl.¶ 31) does not rise to the level of egregious conduct that shocks the conscience. Even if plaintiff could show that defendants Keyes and Schrager surreptitiously assessed her mental status under the guise of investigating the error in her renewal form, plaintiff's allegations fail to state a claim that defendants violated her constitutional rights.

As plaintiff fails to allege sufficient facts to state a claim to relief that is plausible, defendants' motion to dismiss plaintiff's claims under § 1983 should be granted.

## IV. DEFENDANTS' ADDITIONAL CLAIMS

If the Court abstains from hearing this case on the basis of *Younger v. Harris* or for failure to state a claim under 42 U.S.C. § 1983, the Court need not reach the

following additional bases for dismissal urged by defendants.

**A. Claims against Ding and Catone**

*7 Plaintiff's claims against defendants George Ding and Louis Catone should be dismissed, as plaintiff only names these individuals in the caption; she makes no mention of them in the body of the Amended Complaint. The only reference to these individuals appears in the December 16, 2008 Statement of Charges that is attached to defendants' Motion to Dismiss. As plaintiff fails to allege any act or omission by these individuals, plaintiff's claims against Ding and Catone should be dismissed.

**B. Supervisory Liability**

Defendants seek dismissal of the Amended Complaint on the additional ground that there is no *respondeat superior* liability under § 1983. Indeed, generally a plaintiff seeking to recover under § 1983 must establish that the named defendants were personally involved in the deprivation of her constitutional rights. However, district courts in this Circuit have not required personal involvement where a plaintiff seeks only declaratory or injunctive relief against defendants in their official capacity. *Hall v. Marshall,* 479 F.Supp.2d 304, 318 (E.D.N.Y.2007); *Marinaccio v. Boardman,* No. 02 CV 831, 2005 WL 928631, at *9 (N.D.N.Y Apr. 19, 2005) (collecting cases). "[A]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Davidson v. Scully,* 148 F.Supp.2d 249, 254 (S.D.N.Y.2001) (quotation and citations omitted).

Had plaintiff established that defendants had violated her constitutional rights, she would only need to establish the supervisory officials' "direct connection to, or responsibility for" the alleged violation. However, since plaintiff's Amended Complaint fails to state a claim that defendants violated her constitutional rights, the Court should not consider her claim for prospective declaratory or injunctive relief.

**C. Sovereign Immunity**

Defendants argue that plaintiff's claims are precluded by the Eleventh Amendment, which bars suits for damages against states, state agencies, and state officials acting in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

their official capacity, absent the state's consent to suit or an express or statutory waiver of immunity. *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)* ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (citations omitted)). However, again, since plaintiff seeks injunctive and declaratory relief only, the Eleventh Amendment's proscription would not apply.

**8** In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court identified an exception to state sovereign immunity where plaintiff "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Dairy Mart Convenience Stores, Inc. v. Nickel,* 411 F.3d 367, 372 (2d Cir.2005). This exception applies when a plaintiff sues a state official in his or her official capacity for prospective injunctive or declaratory relief. *In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir.2007). Moreover, a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Will,* 491 U.S. at 71 n. 10 (citations omitted).

Plaintiff names six individual defendants, four of them by name and two by their offices. All six are state officials.[FN7] Plaintiff does not seek damages, but limits her request to declaratory and injunctive relief. Accordingly, if abstention did not preclude the instant action, the named defendants would be considered persons for § 1983 analysis and sovereign immunity would not apply. Had plaintiff alleged an ongoing constitutional violation that was not otherwise precluded by the *Younger* abstention doctrine, her request for prospective relief would fall within the *Ex parte Young* exception to sovereign immunity.[FN8]

FN7. Plaintiff does not specify whether she is

suing defendants in their individual or official capacities. However, as plaintiff is proceeding *pro se,* the Court should liberally construe her complaint against defendants to allege both individual and official capacity claims. *See McCloud v. Kane,* 491 F.Supp.2d 312, 316 (E.D.N.Y.2007).

FN8. Contrary to plaintiff's arguments, the state has not waived sovereign immunity by accepting federal funding for various educational purposes. "Although Congress may, pursuant to its spending power, extract a constructive waiver of Eleventh Amendment immunity by placing conditions on the grant of funds to states, waiver based on participation in a federal program will be found only if stated in express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction. That is to say, mere participation by a state in a federal program providing financial assistance does not establish the state's consent to be sued in federal court." *McGinty v. New York,* 251 F.3d 84, 95 (2d Cir.2001) (citations and quotations omitted).

**D. Absolute Immunity**

Defendants also argue that any claims for damages must be dismissed because the prosecutorial defendants are protected by absolute immunity from suits for damages. "Absolute immunity is accorded to judges and prosecutors functioning in their official capacities, and under certain circumstances, is also extended to officials of government agencies performing certain functions analogous to those of a prosecutor or a judge." *DiBlasio v. Novello,* 344 F.3d 292, 297-98 (2d Cir.2003). To the extent that defendant Keyes and others performed functions analogous to a prosecutor's when initiating the New York Board proceedings against plaintiff, these defendants would likely be entitled to absolute immunity to any suit for damages. *See Butz v. Economou,* 438 U.S. 478, 516, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) ("We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment.... [W]e hold that those officials who are responsible for the decision to initiate or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.); *White v. Martin,* 26 F.Supp.2d 385, 388 (D.Conn.1998) ("Officials who carry out special functions, principally judges and prosecutors, are generally protected against personal liability under section 1983 by absolute immunity. Officials who carry out administrative and executive functions are protected by qualified immunity.") However, as previously stated, plaintiff seeks only injunctive relief. "An official's entitlement to absolute immunity from a claim for damages ... does not bar the granting of injunctive relief, or of other equitable relief." *Shmueli v. City of New York,* 424 F.3d 231, 239 (2d Cir.2005) (quotations and citations omitted).[FN9] While sovereign immunity would not bar plaintiff's claims here, the Court should grant defendants motion to dismiss plaintiff's Amended Complaint on the other grounds, as set forth above.

> FN9. Although the Federal Courts Improvement Act of 1996 extends judicial immunity to most actions seeking prospective injunctive relief, it has not been extended to prosecutorial officials. *See* Federal Courts Improvement Act of 1996, § 309(c), Pub.L. No. 104-317, 110 Stat. 3847, 3853 (1996) (amending 42 U.S.C. § 1983); *see e.g., Huminski v. Corsones,* 396 F.3d 53, 74 (2d Cir.2005).

## CONCLUSION

**\*9** Accordingly, defendants' motion should be granted and plaintiff's action should be dismissed, without leave to replead, as amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ( "[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.")

## FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure

to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.,* 293 F.3d 42, 46 (2d Cir.2002); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

SO ORDERED.

E.D.N.Y.,2010.

Jones-Soderman v. Executive Secretary of the State Board for Psychology of the State Educ. Dept. of the University of the State of N.Y.
Slip Copy, 2010 WL 3800908 (E.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Paul MARINACCIO, Sr., Accadia Site Contracting,
Inc., and Midway Enterprises, Inc., Plaintiffs,
v.
Joseph H. BOARDMAN, in his official capacity; James
B. Cantwell, Steven F. Lewis, James F. Tynan and
Robert E. O'Connor, in their official and individual
capacities, as employees of the State of New York, by
and through, The New York State Department of
Transportation, Defendants.
No. 1:02 CV 00831 NPM.

April 19, 2005.
Gresens & Gillen, LLP, Buffalo, New York, for Plaintiffs,
Joseph J. Manna, James W. Gresens, of counsel.

Office of the New York State Attorney General, The
Capitol, Albany, New York, for Defendants, Michael G.
McCartin, of counsel.

*MEMORANDUM-DECISION and ORDER*

MCCURN, Senior J.
I. Introduction
   *1 Plaintiff Paul Marinaccio, Sr. ("Marinaccio") is a
contractor and the president and sole owner of Plaintiffs
Midway Enterprises, Inc. ("Midway") and Accadia Site
Contracting, Inc. ("Accadia Site"), both highway and
bridge construction companies (hereinafter referred to
collectively as "Plaintiffs"). Marinaccio is also the
president and sole owner of Accadia Enterprises, Inc.
("Accadia"), another highway and bridge construction
company, which is not a party to this action. Marinaccio
originally filed this civil rights action in October 2001
against defendants, Joseph H. Boardman ("Boardman"),
Commissioner of the New York State Department of
Transportation ("DOT"), Robert E. O'Connor, Regional
Construction Engineer for DOT Region 5, James B.

Cantwell, Chairperson of DOT's Contract Review Unit
("CRU"), and CRU members Steven F. Lewis and James
F. Tynan (hereinafter referred to collectively as
"Defendants"). In March 2004, an amended complaint was
filed, with leave of the court, wherein Midway and Acadia
Site were named as additional plaintiffs.

   Presently before the court are a motion for summary
judgment by Defendants and a cross motion for partial
summary judgment by Plaintiffs. Oral argument was heard
regarding the pending motions on January 11, 2005 in
Syracuse, New York. Decision was reserved.

II. Factual Background

A. The Mateer Incident

   On September 14, 1999, Marinaccio and DOT
inspector, Dwight Mateer ("Mateer") were involved in an
automobile collision at a DOT work site (DOT contract #
D257706). Thereafter, Mateer claimed that Marinaccio
intentionally slammed the front of his truck into Mateer's
truck. Mateer advised DOT Regional Engineer, Robert
O'Connor ("O'Connor") of same. Marinaccio was charged
with a felony-third degree criminal mischief-regarding the
collision. He eventually pleaded guilty to disorderly
conduct, a violation.

   One week after the collision, O'Connor banned
Marinaccio from being present at all DOT project sites
"until further notice", which included the project sites of
four contracts previously awarded to Accadia (DOT
Contract Nos. D257706, D257298, D252811 and
D257521). *See* Decl. of Janice A McLachlan, Nov. 10,
2004, Ex. D, Dkt. No.84. On October 19, 1999, after
notice was given to Marinaccio, a meeting was held to
allow him an opportunity to address the reasons for this
ban and determine if it should continue. Marinaccio
appeared at the meeting with his counsel and was given an
opportunity to be heard. Thereafter, Marinaccio's counsel
submitted documents in support of Marinaccio's position.
On January 21, 2000, CRU member James Tynan
("Tynan") issued a letter sustaining the ban on all four
contracts. The letter stated,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Marinaccio will be banned from all current [DOT] contracts with Accadia Enterprises, Inc.... This ban shall expire with the acceptance of Contracts D257298, D257521, D257706, and D252811. However, should Accadia Enterprises, Inc. be the apparent low bidder on future [DOT] construction contracts, then Mr. Marinaccio will be requested to appear in front of the [CRU] for a determination as to whether Accadia is a responsible contractor. Should an award be made, Mr. Marinaccio's conduct on subsequent projects will be monitored and reviewed.

**\*2** McLachlan Decl. at Ex. H. The ban was to extend over the duration of said contracts and applied to Marinaccio personally, not Accadia. Accadia was paid in full on each of those contracts.

B. The Williams Road Contract

In March 2001, Midway was the low bidder on a DOT project involving Williams Road in the City of Niagara Falls (Contract No. D258702). On May 14, 2001, DOT Attorney Marie Corrado ("Corrado") issued a letter to Paul Marinaccio, Jr., then president of Midway, informing him that a meeting was scheduled for May 21, 2001 to address the following issues that CRU had with Midway's bid: Midway's lack of experience with DOT work, the size and nature of the contract, Midway's connection with Accadia, and the past performance of Accadia and Paul Marinaccio, Sr. *See* Decl. of Marie A. Corrado, Nov. 11, 2004, Ex. D, Dkt. No. 84.

The CRU meeting was held on May 21, 2001 as scheduled. Corrado was present, as well as, among others, O'Connor, CRU Chairperson James Cantwell ("Cantwell"), and CRU members Tynan and Steven Lewis ("Lewis"). *See* id. at Ex. E. Although at the time of the meeting, Marinaccio was not yet the owner of Midway, he was also present at the meeting along with his attorney, James Gresens. Marinaccio admits that Plaintiffs were given notice of the concerns to be addressed at the May 21, 2001 meeting and that he and his counsel were given an opportunity to address DOT's concerns about Midway at said meeting. Gresens assured the CRU that Marinaccio would be acting only as an advisor or consultant on the project. Marinaccio explained that he spent most of his time taking car of his wife, who sustained a brain injury in a bad car accident three years prior, and further stated that "I have no intention of going back into the construction business." Then, after an extended discussion between Marinaccio and O'Connor about Marinaccio's history and his behavior on DOT sites, Gresens stated, "If you want something in writing that Paul will not go on the job or talk to an inspector, we'll give that to you." Further, as for the ban in effect for the four previous contracts, Gresens stated, "If you want to continue that, that's not a problem, for this job. He does want to make a livelihood someday. He's not interested in going into business at the moment. So if you want him off this job, I don't think that would be a problem." Id. At this same meeting, Marinaccio claimed that he had a briefcase full of documents that could prove that certain DOT officials were involved in some kind of improper or possibly illegal activity. Defendants thereafter encouraged Marinaccio to cooperate with the DOT Inspector General to expose any type of DOT wrongdoing. Although Defendants claim that Marinaccio refused to cooperate, Marinaccio argues that he offered to show the contents of the briefcase to the CRU members at the meeting but they declined to review same. *See* id.

On June 5, 2001, the DOT, through the CRU, denied Midway the Williams Road contract (No. D258702) citing the owners' lack of experience. The CRU acknowledged Marinaccio's assurances that he, with his 35 years of experience, would be available as an advisor to the owners. However, the CRU noted its concern that Marinaccio's wife's illness was taking a great deal of his time, and that, nonetheless, even if he were available, Marinaccio's prior history of unprofessional behavior concerned them.

**\*3** On June 22, 2001, John S. Samaniuk, Director of the Officer of Internal Audit and Investigations for the DOT sent Marinaccio a letter requesting copies of documents or other information which Marinaccio believed supported the claims he made at the May 21, 2001 CRU meeting. *See* id., Ex. R. Marinaccio issued a letter to Samaniuk on July 3, 2001 explaining that because he was seriously considering a lawsuit against the DOT and O'Connor, the documents and information referred to in Samaniuk's June 22 letter would not be released. *See* id., Ex. S.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Midway unsuccessfully challenged the decision denying them the Williams Road Contract in New York State Supreme Court in Albany County via an Article 78 petition on July 10, 2001. Marinaccio submitted an affidavit in support of the petition. That Court found that DOT had a rational basis for denying the contract, citing the owners' lack of experience and/or availability, and DOT records which indicate that Marinaccio "has been uncooperative, aggressive, verbally abusive and violent and was actually banned from his company's active [DOT] work sites due to such conduct." Id. at Ex. H. Plaintiffs did not bring a due process challenge to the Article 78 proceeding in State Court, nor did they appeal the Supreme Court's decision.

C. The Military Road Contract

In August 2001, the DOT terminated its contract with another construction company for a project at Military Road in Niagara Falls. The surety company for the project, Kemper Surety ("Kemper"), was left with the obligation of finishing the work for the Military Road contract (No. D258333). Midway submitted the low bid to Kemper for completion of the work. Kemper gave DOT an ultimatum by telling it that Midway would be the completing contractor, or Kemper would go to its next lowest bidder, and DOT would pay the difference. See Dep. of Nancy E. Jones, July 16, 2004, 31:14-18, at Ex. T. to Aff. of Joseph J. Manna (hereinafter "Manna Aff. II"), Dec. 23, 2004, Dkt. No. 92.

On September 14, 2001, O'Connor issued an email to Tynan, and Corrado, among others, to notify them of Marinaccio's intent to hold a public meeting to let the Town of Niagara know how Midway will complete the Military Road Project. See Dep. of Robert E. O'Connor, July 14, 2004, 167 at Ex. E to Aff. of Joseph J. Manna (hereinafter "Manna Aff. I"), Nov. 15, 2004, Dkt. No. 85. See also Ex. H to Manna Aff. I, Dkt. No. 85. The remaining text of O'Connor's email message is as follows:

This is outrageous and typical for Mr. Marinaccio. I called Midway's project engineer and informed him that Midway HAS NOT been approved as a subcontractor for Military Road. I further explained that contractors do not call public meetings. That is our job. In years past, Mr. Marinaccio would meet with local officials and propose his own project phasing. We put a stop to that practice. He clearly has learned nothing. I am again reminded of why we here in Region 5 don't want to work with this thug.

**\*4** Id.

On September 17, 2001, a CRU meeting was held in order to, according to Defendants, determine whether Midway was a responsible bidder. See Corrado Decl. at ¶ 28. However, Lisa Bevilacqua, the DOT Engineer-in-Charge of the Military Road Contract, testified that a meeting was held prior to the CRU meeting, wherein she and O'Connor were present, as well as others, and where it was decided that Midway would be awarded the contract on the condition that Marinaccio be banned from the site. See Dep. of Lisa Bevilacqua, Aug. 31, 2004, 24-30 at Ex. L to Manna Aff. II, Dkt. No. 91.

Marinaccio, who by this time had replaced his son as the President of Midway, was present at the CRU meeting along with his and Midway's attorney, James Manna. Also present at the meeting were DOT attorney Marie Corrado as well as Defendants O'Connor, Tynan and Lewis, among others. See Corrado Decl. at Exs. K & L. The meeting commenced with a discussion of the manner in which the job would be completed, including confirmation that Marinaccio proposed to serve as superintendent.

Earlier in the meeting, Manna stated that Midway did some preliminary planning and spoke with residents concerning the Military Road project. See id. at 5. In response to Cantwell's inquiry regarding same, Marinaccio stated that he has always met with residents on previous jobs, and that he met with Ms. Bevilacqua when he was at the Military Road site and mentioned his intent to hold a meeting with residents "if nobody has any problem." Id. at 19-20. Marinaccio went on to state that "we weren't trying to do anything behind anybody (sic)" and that he "wasn't trying to ... step on anybody's toes." Id. at 21. Marinaccio also stated " if that is okay with everybody in this room, I still intend to have a meeting." Id. at 22. In response to Cantwell's invitation for comment regarding such a meeting, O'Connor stated that "contractors don't set up meetings, we do," id. at 23, and "[t]here is no other

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

contractor, at least in my experience, has (sic) ever on his own set in motion a public meeting" id. at 24. In reference to the comments from Marinaccio and O'Connor, Corrado noted the DOT's concern that some confusion may exist as to who is in charge and it should be clear to Marinaccio that the Engineer in Charge, in other words, the DOT, is in charge of the project. *See* id. Addressing this concern, Manna stated,

> We understand the point you are making. We agree with it. If you decide that that's a meeting that you want to have, we'll be happy to organize it. Or not organize it, to be there. However you folks want to do it, if you want to do it. We understand you are in charge and we understand you're calling the shots and if you want us there, great. If you don't, hey, that's okay too. The point that you are trying to make is well taken. We understand that you are in control.

Id. at 25.

Although DOT notified Kemper and Marinaccio's son that the meeting was to be held and that DOT had certain concerns about Midway, Marinaccio did not have notice that Defendants objected to his holding public meetings. *See* Corrado Decl. at Ex. J. Marinaccio did testify, however, that he had an opportunity to speak at the meeting and present his side of the story uninterrupted. *See* Dep. of Paul Marinaccio, Sr., 237, at Ex. A to Decl. of Michael McCartin, Nov. 12, 2004, Dkt. No. 84.

**\*5** On September 25, 2001, an attachment to the completion contract between Kemper and Midway, referred to as "Attachment A", was executed by Corrado for the DOT, Kimberly Steele ("Steele"), attorney for Kemper, and Richard Reinhold ("Reinhold"), Vice President of Midway. Reinhold signed the attachment, with Marinaccio's consent, above the words "signed under protest and with a full reservation of all rights." Am. Compl., Ex. A. The attachment provides, in relevant part, that DOT consents to Kemper contracting with Midway for completion of the Military Road Contract with certain conditions, as follows: First, Reinhold is the sole superintendent of the project. Second, "Midway, its employees and officers will not conduct any public forums concerning this project." Id. Third, Midway agrees to

restrict the actions of Marinaccio for the duration of the project, and agrees that Marinaccio will refrain from visiting the job site, contacting DOT employees, contacting DOT consultants or inspectors working on the project, or making any threats, gestures, trespasses or other verbal or non-verbal communication with, or menacing or following any DOT employee, contractor or inspector. *See* id.

According to Tynan, the CRU members agreed to allow Kemper to contract with Midway as long as Marinaccio was kept away from the site due to his past behavior. *See* Tynan Decl. at ¶ 36. Tynan also testified that the CRU discussed some of the conditions in Attachment A, including Reinhold's appointment as superintendent and the restriction against public forums. *See* Dep. of James F. Tynan, July 13, 2004, 80, at Ex. O to Manna Aff. II, Dkt. No. 92. However, DOT attorney Corrado stated that the terms of Attachment A were negotiated by herself as well as the attorneys for Kemper and Midway, and that none of the defendants to this action were involved in same. *See* Corrado Decl. at ¶ 38. Plaintiffs deny that there was any negotiation, citing Gresens' testimony that Corrado told him the conditions were inflexible and there would be no negotiating regarding same. *See* Dep. of James W. Gresens, July 29, 2004, 40-49, at Ex. E to McCartin Decl., Dkt. No. 84. Plaintiffs admit that during negotiation of the terms of Attachment A, neither Marinaccio, his attorneys nor any representative of Midway told any DOT representative that Marinaccio's First Amendment rights would be infringed by execution of same. *See* Ex. F to McCartin Aff. at ¶ 55.

On October 9, 2001, Marinaccio commenced the present suit in the United States District Court for the Western District of New York. Ten days later, Marinaccio moved for a preliminary injunction to enjoin Defendants from continuing restrictions upon him and seeking an order requiring Defendants to provide him with due process. Within one week of Marinaccio's motion, Defendants moved for change of venue to this court. Before deciding the motion to change venue, the District Court in the Western District of New York denied Marinaccio's motion for a preliminary injunction for failure to make the necessary showing of irreparable harm.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

**\*6** On January 11, 2002, Midway filed an Article 78 petition in New York State Supreme Court, Ulster County, seeking declaration that DOT's restrictions upon plaintiff were in violation of state law and enjoining DOT from continuing said restrictions. The DOT filed a motion to dismiss said petition, which was denied based on the State court's finding that, among other things, (1) pursuant to N.Y. Highway Law § 38, the DOT cannot impose restrictions on a corporate officer or debar him from working on DOT projects where, as here, the corporate entity has been found to be a responsible bidder, and (2) the DOT acted arbitrarily and capriciously by concluding simultaneously that Midway was a responsible bidder but its most significant employee was unfit to work on the project at issue. The DPT thereafter appealed to the Appellate Division, Third Department.

In May 2002, Marinaccio went to work on the Military Road project. Later that month, Defendants' motion to transfer venue to this court was granted. On March 13, 2003, the New York Appellate Division, Third Department dismissed DOT's appeal as moot because both the Military Road and Quay Street projects had been completed in full and because the Supreme Court's decision did not hold that DOT had instituted an improper de facto *prospective* debarment. That court also granted DOT's motion to vacate the Supreme Court's judgment below "in light of the fact that [it] ruled on the petition without affording [DOT] an opportunity to file an answer when it was not clear that there were neither factual disputes nor prejudice to respondents in charting such a procedural course [.]" *Marinaccio v. Boardman,* 303 A.D.2d 896, 897, 755 N.Y.S.2d 346 (App. Div. 3rd Dep't 2003).

D. Master's Edge Subcontract-Quay Street Contract

On October 10, 2001, O'Connor informed DOT attorney Nancy Jones that Marinaccio had contacted several people in Region 5, alleging that Master's Edge, a contractor on DOT's Quay Street project (Contract No. D258267), wanted to use Midway as its subcontractor on said project. *See* Jones Dep., 71-72, at Ex. T. to Manna Aff. II, Dkt. No. 92. On October 12, 2001, Steele, counsel for Kemper, and Gresens, counsel for Midway, notified

Jones that Midway wanted to be the subcontractor on the Quay Street project. *See* Decl. of Nancy E. Jones, Nov. 11, 2004, ¶ 8, Dkt. No. 84. On this same day, Jones issued a letter to Gresens inquiring as to why it was necessary to have Marinaccio on the site as a supervisor. *See id.* at ¶ 11; Ex. A. The letter, which asked for an immediate response, was sent to Gresens by facsimile at 3:30 p.m. that day. *See* Ex. I to Manna Aff. II., Dkt. No. 91. Jones states that she sent the letter because she believed that Marinaccio's presence on the site would require approval by the CRU since the same issue had been addressed less than one month earlier regarding the Military Road project. *See* Jones Decl. at ¶ 10. Although Gresens sent Marinaccio's reply to Jones by facsimile at 5:10 p.m. on October 12, 2001, a Friday, Jones had already left for the day and did not receive same until the following Monday morning. The letter stated Marinaccio's intent to move equipment into place over the weekend in order to begin work on Monday morning, October 15, 2001. Jones received word from DOT officials that Midway employees, including Marinaccio and his son, had arrived at the Quay Street site but, instead of working for Midway as a subcontractor, they were working directly for Master's Edge. *See* Jones Decl. at ¶ 13. Marinaccio testified that only four or five individuals who were directly associated with Midway prior to working for Master's Edge were working at the site that morning. *See* Marinaccio Dep., 228, at Ex. A to McCartin Decl. However, Marinaccio's son testified that there were at least seven of them, all receiving the going union rate for their work. *See* Dep. of Paul Marinaccio, Jr., July 27, 2004, 56-57, at Ex. B to McCartin Decl. Midway also received about $30,000 in rental fees from Master's Edge for the use of its paving equipment. However, according to Marinaccio, Midway also lost about $70,000 because it was not awarded the contract. *See* Marinaccio Dep., 233, at Ex. A to McCartin Decl.

**\*7** Ostensibly because Midway's employees were already on the site working directly for the contractor, (a practice which Jones describes as an "end run" around DOT's lawful procedures and section 112 of the State Finance Law), and because Gresens told Jones on October 12, 2001 that the project needed to be completed by October, 20, 2001, Jones considered Midway's request to be the subcontractor for the project moot, and therefore, no CRU meeting was scheduled regarding same. *See* Jones

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Decl. at ¶¶ 16-18, Dkt. No. 84. Moreover, DOT never received any further requests from Midway to be the subcontractor for Master's Edge, *see* id. at ¶ 17, nor did Midway ever seek any further relief in an Article 78 proceeding, although it could have done so, *see* id. at ¶ 18. However, Plaintiffs deny making an "end run" around DOT's lawful procedures or State law and submit that because they responded to Jones' inquiry immediately as she requested, and were waiting for a response to same, they had no reason to make any further inquiries or file an Article 78 petition, although same would have been moot as the project completion deadline was October 20, 2001. *See* Jones Decl., Ex. A.

E. Route 33 Contract

On March 27, 2003, Plaintiff, Accadia Site, was the low bidder on a DOT road construction project involving Route 33 in the Buffalo region (Contract No. D259306). On May 15, 2003, DOT issued a letter to Marinaccio giving him notice of its concerns regarding Accadia Site working on this project, including its lack of experience with DOT projects or with large projects, as well as DOT's concern regarding Marinaccio's ability to conduct himself in a professional manner, specifically due to the Mateer incident. *See* Corrado Decl., Ex. N. Dkt. No. 84. The letter also notified Marinaccio that a CRU meeting would be held to address these concerns on May 28, 2003. The CRU meeting was held as scheduled, and present were Marinaccio, his attorney, Gresens, and, among others, Defendants Lewis and Tynan. One issue raised at the meeting regarding Marinaccio's behavior dealt with an apparent altercation between Marinaccio and his nephew-in-law, which occurred across the street from the project limits of the Military Road site, after which the nephew-in-law reported to the police that he was afraid and that Marinaccio had guns in his possession. *See* Corrado Decl., Ex. O, 7-9. According to Marinaccio, his nephew-in-law, who is a drug addict, was fired after Marinaccio discovered that he stole several pieces of equipment for sale to another contractor. *See* id. Although Reinhold, Midway's Vice President, testified that Marinaccio threatened to kill his nephew-in-law during this altercation near the Military Road site, *see* Dep. of Richard C. Reinhold, July 27, 2004, 23-24, at Ex. C to McCartin Decl., Marinaccio claims he never threatened to

kill anyone, *see* Aff. of Paul Marinaccio, Sr., Dec. 22, 2004, ¶ 3, Dkt. No. 93. Marinaccio also states that his nephew-in-law is now in jail for other crimes. *See* Marinaccio Aff. at ¶ 10.

**\*8** Also addressed at the CRU meeting was Marinaccio's recent conviction on a gun related charge. *See* Corrado Decl. at Ex. O, 6, 8-9, Dkt. No. 84. In response, Marinaccio claims that someone else admitted to owning the gun, his conviction is currently on appeal, and the judge in that case issued him a "certificate of relief from disabilities" which ensures that he is eligible for all types of employment without exception. *See* Marinaccio Aff. at ¶ 6, Dkt. No. 93. A copy of the certificate is part of the record here and reflects that New York State Supreme Court Judge Mario Rossetti issued same to Marinaccio on February 26, 2004. *See* Manna Aff. II, Ex. W, Dkt. No. 92.

On March 3, 2004, Plaintiffs filed an Amended Complaint in this court, alleging as a basis for their claims, among other things, the refusal by Defendants to award Accadia Site the Route 33 Contract. On April 8, 2004, almost one year after the CRU meeting was held on the Route 33 contract, CRU members Tynan and Lewis, as well as one member who is not a party to this action, issued a letter denying Accadia Site this contract based on, among other things, the aforementioned issues regarding Marinaccio's prior behavior on work sites and his criminal conviction. *See* Corrado Decl., Ex. Q, Dkt. No. 84. The letter indicates that because Marinaccio stated that he would be on that project 95% of the time, the CRU members found that Accadia Site was not a responsible bidder pursuant to Highway Law § 38, and therefore rejected the contract bid. *See* id. Plaintiffs challenge the fairness of said determination, noting Tynan's testimony that he did not know whether it was fair that he was a member of the CRU, which denied a contract to Accadia Site, while he was simultaneously being sued for his failure to award said contract. *See* Tynan Dep., 128, at Manna Aff. II, Ex. O, Dkt. No. 92.

Plaintiffs never instituted an Article 78 mandamus proceeding in State court to attempt to force the DOT to issue a decision on the Route 33 Contract, although they could have done so. Pursuant to State Finance Law § 140, Plaintiffs could have withdrawn their bid within 45 days

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

and had their bid bond returned. However, if Plaintiffs wished to have their contract bid approved, they could not have withdrawn same. On May 25, 2004, Plaintiffs made their first request for return of their bid bond in accordance with State Finance Law § 140.

### III. Procedural Background

The Amended Complaint sets forth six causes of action as predicates to a civil rights claim pursuant to 42 U.S.C. § 1983, as well as pursuant to the New York State Constitution, and five causes of action pursuant to New York State tort law. In Count I, Plaintiffs allege that Defendants violated their procedural due process rights under the United States Constitution and the New York State Constitution by unlawfully debarring them for working on DOT Contracts, numbered D257706, D257298, D252811, D257521, D258702, D258333, D2582677 and D259306, without affording them a hearing. *See* Am. Compl. ¶¶ 46-51, Dkt. No. 59. In Count II, Plaintiffs allege that Defendants' defacto debarment was intentional and malicious and interfered with their freedom of speech and association rights and their right to work and/or earn a living in violation of their substantive due process rights pursuant to the United States Constitution and the New York State Constitution. *See* Am. Compl. ¶¶ 52-56. In Count III, Plaintiffs set forth a "stigma plus" claim, alleging that Defendants violated their procedural due process rights under the United States Constitution and the New York State Constitution, when Defendants published false statements about Plaintiffs, thereby stigmatizing them and foreclosing their liberty interests. *See* Am. Compl. at ¶¶ 57-63. In Count IV, Plaintiffs allege that Defendants violated their right to equal protection pursuant to the United States Constitution and the New York State Constitution by intentionally treating them differently from those similarly situated in retaliation for Plaintiffs' exercise of their First Amendment rights. *See* Am. Compl. ¶¶ 64-68. In Count V, Plaintiffs "as independent [ ]DOT contractors" allege that Defendants debarred Plaintiffs from publicly speaking about the Military Road project in violation of Plaintiffs' First Amendment rights to free speech under the United States Constitution and the New York State Constitution. *See* Am. Com pl. ¶¶ 69-79. In Count VI, Plaintiffs "as private citizens" allege that Defendants unlawfully

conditioned the award of a government contract on Plaintiffs' silence about matters of public concern in violation of their First Amendment rights to free speech under the United States Constitution and the New York State Constitution. *See* Am. Compl. ¶¶ 80-85.

**\*9** In Count VII, Plaintiffs Marinaccio and Midway allege a claim against all Defendants for tortious interference with business relations pursuant to New York law. *See* Am. Compl. ¶¶ 86-90. Marinaccio and Midway also allege a claim against all Defendants for tortious interference with prospective advantage pursuant to New York law, in Count VIII of the Amended Complaint. *See* Am. Compl. ¶¶ 91-96. In Count IX, Plaintiffs Marinaccio and Accadia Site allege a claim against all Defendants for tortious interference with prospective advantage pursuant to New York law. *See* Am. Compl. ¶¶ 97-102. In Count X all Plaintiffs allege a claim against all Defendants for prima facie tort pursuant to New York law. *See* Am. Compl. ¶¶ 103-107. Finally, in Count XI, Marinaccio alleges a claim against all Defendants for defamation pursuant to New York Law. *See* Am. Compl. ¶¶ 108-113.

Defendants now move for summary judgment on the entire Amended Complaint. Plaintiffs move for partial summary judgment on Count V of the Amended Complaint, as well as dismissal of Defendants' waiver and accord and satisfaction defenses to that claim. At oral argument, Defendants consented to a dismissal of the accord and satisfaction defense.

### IV. Discussion

### A. Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Peck v. Public Serv. Mut. Ins. Co.,* 326 F.3d 330, 337 (2d Cir.2003), *cert. denied,* 124 S.Ct. 540 (2003). When deciding whether to grant a motion for summary judgment, "a court must construe the facts in the light most favorable to the non-moving party and must resolve

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

all ambiguities and draw all reasonable inferences against the movant." *See Baisch v. Gallina,* 346 F.3d 366, 372 (2d Cir.2003), *citing Anderson V. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," *see Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 165 (2d Cir.2002), *citing* Fed.R.Civ.P. 56(c), by a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial. *See Peck,* 326 F.3d at 337.

**B. Dismissal of Claims Against Boardman**

Defendants argue that Boardman should be dismissed from this action because he lacks the requisite level of involvement for liability on claims pursuant to 42 U.S.C. § 1983. Boardman is named as a defendant to this action solely in his official capacity as DOT Commissioner. As such, only injunctive, not monetary, relief may be awarded to Plaintiffs on their § 1983 claims against him. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358 (1991); *Quern v. Jordan,* 440 U.S. 332, 341, 99 S.Ct. 1139, 1145 (1979); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441 (1908). In their moving papers, Defendants cite well known precedent of the Court of Appeals for the Second Circuit which holds that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of *damages* under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (internal citations omitted) (emphasis added). District courts in the Second Circuit have interpreted said language to mean that the personal involvement requirement does *not* apply to bar actions such as the one here, pursuant to § 1983 for injunctive relief against a state official. *See, e.g., Shabazz v. Cuomo,* No. 93-CIV-7692, 1996 WL 445363, at *1 (S.D.N.Y. Aug. 7, 1996); *Ramirez v. Coughlin,* 919 F.Supp. 617, 623 (N.D.N.Y.1996); *Marshall v. Switzer,* 900 F.Supp. 604, 615 (N.D.N.Y.1995); *Tarafa v. Manigo,* 897 F.Supp. 172, 173, n. 4 (S.D.N.Y.1995); *DeBerry v. Griefinger,* No. 94-Civ.-6898, 1995 WL 514765, at *2 (S.D.N.Y.1995); *Santiago v. Miles,* 774 F.Supp. 775, 792 (W.D.N.Y.1991); *Brooks v. Taylor,* No. 90-Civ.-2312, 1991 WL 67166, at

*2 (S.D.N.Y. Apr. 18, 1991).

**\*10** In a § 1983 action against a state employee in his official capacity, such as the one against Boardman here, the relevant standard for liability is whether he was a "moving force" behind the alleged constitutional violations. *See Shabazz,* 1996 WL 445363, at *5, *citing Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom, must have played a part in the violation of federal law." *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361-362, *quoting Graham,* 473 U.S. at 166, 105 S .Ct. at 3105. Therefore, the personal involvement standard cited by Defendants is not applicable here in deciding their summary judgment motion on behalf of Boardman. The court must determine instead whether there is any evidence in the record before it which would create a question of fact as to whether the alleged constitutional violations here occurred due to an official policy or custom of the DOT.

Notably absent from Plaintiffs' opposition papers is any mention of Defendants' motion as it relates to Boardman. In fact, Plaintiffs refer to Boardman in their papers only insofar as they allege that he was aware of Plaintiffs' objection to the public forums language in Attachment A by virtue of its inclusion in the pleadings. At oral argument, counsel for Plaintiffs expanded on this statement, contending that based on the allegations in the Complaint and Amended Complaint in this action, Boardman was aware that a policy or custom existed in the DOT which amounted to a constitutional violation against Plaintiffs, but nonetheless allowed the policy or custom to continue, and failed to act on the information in said pleadings which indicated that an unconstitutional act was occurring. Plaintiffs' allegations alone are not enough to create a question of fact regarding the existence of a DOT policy or custom pursuant to which constitutional violations occurred, much less Boardman's role as a "moving force" behind such violations. For this reason, Plaintiffs' § 1983 claims against defendant Boardman must fail.

Further, Plaintiffs' State law claims must also fail insofar as they purport to allege causes of action against defendant Boardman, or any of the other Defendants in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

their official capacities. "Whereas a federal court may award injunctive relief against a state official in an official capacity action based on the Ex Parte Young 'exception,' the Eleventh Amendment bars even prospective injunctive relief based on violations of state law." *Chinn v. City Univ. of New York Sch. of Law at Queens Coll., 963 F.Supp. 218, 227 (E.D.N.Y.1997), citing Penhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911 (1984).*

For the aforementioned reasons, the motion for summary judgment is granted as to all claims against defendant Boardman, and as to all state law claims against the remaining Defendants in their official capacities.

C. Collateral Estoppel-Marinaccio's Criminal Conviction

**\*11** Defendants contend that Plaintiffs are collaterally estopped from relitigating the issue of whether Marinaccio intentionally collided his vehicle into Mateer's truck because said issue was conclusively determined in a criminal proceeding. This affirmative defense was set forth by Defendants in Paragraph 31 of the Answer to the Amended Complaint.

In order to determine whether to give preclusive effect to a state court judgment, a federal court must apply the preclusion law of said state. *See Lennon v. Seaman, No. 99-Civ.-2664, 2002 WL 109525, at \*2 (S.D.N.Y.Jan. 28, 2002).* In New York, "[c]ollateral estoppel occurs if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Simpson v. New York State Dept. of Civil Service, No. 02-CV-1216, 2005 WL 545349, at \*7 (N.D.N.Y. Mar. 1, 2005), citing Vargas v. City of New York, 377 F.3d 200, 205-206 (2d Cir.2004)* (internal quotation marks and emphasis omitted). Also in New York, "a guilty plea precludes relitigation in a subsequent civil action of all issues necessarily determined by the conviction." *Lennon, 2002 WL 109525, at \*3, quoting Merchants Mut. Inc. Co. v. Arzillo, 98 A.D.2d 495, 504 (1984).* Thus, for collateral estoppel purposes, "a guilty plea is equivalent to a conviction after trial[.]" *Lennon, 2002 WL 109525, at \*3.*

Here, Plaintiffs contend that Marinaccio never

admitted to intentionally causing the automobile collision with Mateer, and therefore they are not estopped from arguing that the collision was an accident. It is undisputed that Marinaccio pleaded guilty to disorderly conduct regarding the Mateer incident. According to the New York Penal Law,

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

1. He engages in fighting or in violent, tumultuous or threatening behavior; or

2. He makes unreasonable noise; or

3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or

4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

5. He obstructs vehicular or pedestrian traffic; or

6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N.Y. Penal Law § 240.20 (McKinney 2004). By the very terms of the statute defining disorderly conduct, said conduct is intentional, or at the very least, reckless. Therefore, the state court judgment of conviction based on Marinaccio's plea of guilty to such a violation actually and necessarily decided that his actions during the Mateer incident were intentional or reckless.

**\*12** As the party against whom preclusion is sought, Plaintiffs have the burden of establishing that Marinaccio did not have a full and fair opportunity to litigate the issue of whether he acted intentionally in state court. *See Simpson,* WL 545349, at \*8. Because Plaintiffs make no argument regarding this second element, the court

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

concludes that Marinaccio did have a full and fair opportunity to litigate the present issue in state court.[FN1] Therefore, the state court judgment of conviction against Marinaccio on the charge of disorderly conduct precludes any further litigation regarding whether he acted intentionally or recklessly during the Mateer incident, necessarily precluding Marinaccio from claiming that said collision was an accident.

> FN1. Plaintiffs only argument against preclusion is that because the parties to this action are not identical with the parties to the state court judgment, the collateral estoppel doctrine does not apply. *See Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir.1999) ("[c]ollateral estoppel ... means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."). However, Plaintiffs misconstrue the caselaw on this topic. It is clear that the important requirement is that the party against whom preclusion is sought had a full and fair opportunity to litigate the issue in the prior action, and that whether the party seeking preclusion was a party in the prior action is not relevant. *See Carino v. Town of Deerfield (Oneida County, N.Y.),* 750 F.Supp. 1156, 1170 (N.D.N.Y.1990), citing *Blonder-Tongue Labs., Inc. v. University of Illinois Found.,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788, 799-800 (1971). ("A requirement of complete identity of parties serves no purpose as long as the person against whom the findings are asserted or his privity has had a full and fair opportunity to litigate the identical issue in the prior action.")

D. First Amendment Claims-Counts V and VI

Counts V and VI of the Amended Complaint set forth § 1983 claims as predicates to claims for the violation of Plaintiffs' First Amendment rights under the United States Constitution as well as the New York State Constitution.[FN2] Count V is set forth on behalf of Plaintiffs "as independent [ ]DOT contractors" and Count VI is set forth on behalf of Plaintiffs "as private citizens". Although Defendants purport to seek summary judgment on the entire Amended Complaint, at oral argument, counsel for Plaintiffs conceded that they seek summary judgment only as to Count V, and that Count V is alleged only on behalf of plaintiffs Marinaccio and Midway.

> FN2. Free speech claims pursuant to Art. I § 8 of the New York State Constitution are subject to the same standard as their counterpart in the First Amendment to the United States Constitution. *See Sanchez v. Turner,* No. 00-cv-1674, 2002 WL 1343754, at *4, n. 4 (S.D.N.Y. June 19, 2002). The right to freedom of assembly guaranteed under the New York State Constitution, *see* Art. I § 9, is broader than that right under the First Amendment, but only insofar as the New York Constitution also protects the rights of political parties. *See Golden v. Clark,* 76 N.Y.2d 618, 634, 564 N.E.2d 611, 621, 563 N.Y.S.2d 1, 11 (N.Y.1990). Therefore, Plaintiffs claims here will be analyzed under the First Amendment.

Under Count V of the Amended Complaint, Plaintiffs contend that Defendants violated their First Amendment rights to free speech, association and assembly when, as of September 25, 2001, they barred Marinaccio and Midway from conducting any public forums concerning the Military Road project. Under Count VI, Plaintiffs set forth another First Amendment claim, and allege that *"[i]f no ongoing or commercial relationship existed between Marinaccio, Midway and/or Accadia Site and NYSDOT,* defendants unlawfully conditioned the awarding of public and/or government contracts to plaintiffs on plaintiffs' public silence concerning matters of public concern and by interfering with plaintiffs' right to free assembly and association." Amended Compl. ¶ 81 (emphasis added). It appears, therefore, that Count VI is asserted in the alternative, such that if the court is to determine that no commercial relationship existed between Plaintiffs and the DOT, Plaintiffs allege they are still entitled to relief for violation of their First Amendment rights as private citizens.

Defendants' sole argument in support of their motion for summary judgment as to Count V, and in opposition to

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Plaintiffs' cross motion for summary judgment, is that they are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). In deciding whether Defendants here should be granted qualified immunity, the court must consider whether the facts alleged, when taken in the light most favorable to Plaintiffs, show that the Defendants' conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). If that question is answered in the affirmative, the next step is to determine whether the right was clearly established, in other words, "whether it would be clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. at 2156. A court may, in cases where it determines that a right was not clearly established at the relevant time, decline to address whether such a right exists. *See African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002), citing *Horne v. Coughlin,* 178 F.3d 603, 606-607 (2d Cir.1999).

**\*13** In determining whether a right was clearly established at the time a § 1983 defendant acted, three factors are to be considered:

(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*African Trade,* 294 F.3d at 360, citing *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996) (internal citations and quotations omitted).

Plaintiffs contend that by executing Attachment A, which by its terms conditioned the award of the Military Road subcontract to Midway on, among other things, an agreement that Midway, its employees and officers would not conduct any public forums relating to said subcontract,

Defendants violated Plaintiffs First Amendment rights. According to Defendants, the execution of Attachment A did not violate Plaintiffs' First Amendment rights for several reasons. First, Defendants argue, the agreement did not create an adverse employment action against Plaintiffs, as by its very terms Midway was awarded the Military Road subcontract. Second, Defendants claim that it was Kemper who contracted with Midway, not DOT.[FN3] Third, Defendants contend, Midway was a mere bidder for a DOT contract, and as such can not claim that an adverse employment action took place. Finally, according to Defendants, Plaintiffs waived any First Amendment rights they may have had.

> FN3. The court need not devote much time to this argument, as it is clear that a representative of DOT executed Attachment A along with representatives of Midway and Kemper.

In order to establish a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988). To establish a First Amendment retaliation claim under § 1983, a plaintiff

> must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.

*Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999), citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283-87, 97 S.Ct. 568 (1977). Once such a showing is made, in order to determine "the extent to which a state may regulate the speech of its employees, [the court] must balance 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Morris,* 196 F.3d at 109 -110, quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

88 S.Ct. 1731 (1968). Finally, a defendant will have a valid defense if it can show, by a preponderance of the evidence, that it would have taken the action it did regardless of plaintiff's speech, *see Mt. Healthy City,* 429 U.S. at 287, 97 S.Ct. 568, or if it can persuade the court that its legitimate interests outweigh the free speech interests at stake, *see Pickering,* 391 U.S. at 568, 88 S.Ct. 1731.

**\*14** Here, Plaintiffs argue, and Defendants do not appear to dispute, that the speech at issue-by Midway and Marinaccio regarding the Military Road subcontract-touched upon a matter of public concern, and is therefore, protected speech. *See Connick v. Myers,* 461 U.S. 138, 147-148, 103 S.Ct. 1684, 1690-91 (1981).

Regarding the third element set forth in *Mount Healthy City,* Plaintiffs note that the terms of Attachment A are clear proof of Defendants' motivation to suppress speech. Plaintiffs further argue that, although they were not terminated in retaliation for their speech, an adverse employment action nonetheless occurred, satisfying the second element of their First Amendment claim. In support of this argument, Plaintiffs cite caselaw which describes this Circuit's broad definition of an adverse employment action to include a refusal to hire as well as discharge from employment. *See, e.g., Morris,* 196 F.3d at 110. Nonetheless, Defendants argue, Plaintiffs were not DOT employees, but were instead applicants or bidders for a DOT contract, and as such, were not entitled to First Amendment protection.

The Supreme Court, in *Board of County Commissioners v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342 (1996), extended its analysis in First Amendment retaliation cases involving government employees to hold that independent contractors who have a pre-existing commercial relationship with a government entity enjoy First Amendment protection from termination by that entity in retaliation for the exercise of free speech. *See id.* at 685, 116 S.Ct. at 2352. The Court specifically left undecided the issue of whether independent contractors who are mere bidders or applicants for government contracts enjoy the same protection. *Id.* It is clear that on September 25, 2001, the date Attachment A was executed, a contractual relationship was created between Midway,

including Marinaccio as the President of Midway, and DOT. The character of the parties' relationship to one another prior to the execution of Attachment A, however, is not clear. Prior to September 2001, Marinaccio was awarded other DOT contracts, unrelated to the Military Road project. *See* Pls.' Statement of Material Fact in Supp. of Cross Mot. at ¶ 4 (admitted). On the other hand, the Military Road subcontract was the first DOT contract awarded to Midway. *See* Marinaccio Dep., 23, at Ex. A to McCartin Decl.

In order to determine whether Plaintiffs' First Amendment rights were clearly established as of the date Attachment A was executed, the court must determine whether, at that time, Plaintiffs may have been characterized as applicants or bidders for the Military Road subcontract, or as independent contractors with a pre-existing commercial relationship with DOT. Such an inquiry must be conducted based solely the decisional law of Supreme Court and the Court of Appeals for the Second Circuit as of September 25, 2001. *See African Trade,* 294 F.3d at 360. By that time, *Umbehr* had been decided but the only Court of Appeals to address the issue left open after *Umbehr* was the Third Circuit, who declined to extend First Amendment protection to applicants for new contracts. *See McClintock v. Eichelberger,* 169 F.3d 812, 817 (3d Cir.1999).

**\*15** Following *Umbehr* alone, as it must, Defendants would have this court conclude, as did the Second Circuit in *African Trade,* that qualified immunity is appropriate here because, as of the date Attachment A was executed, the law did not provide for extension of First Amendment protection to mere bidders for government contracts. *See African Trade,* 294 F.3d at 360-362. In *African Trade,* however, unlike here, the question of whether the plaintiffs there could be characterized as having a prior commercial relationship with the defendant was not before that court. *See id.,* 294 F.3d at 358-359. The court here must decide whether, based on the relevant decisional law as of September 25, 2001, it was clearly established that Plaintiffs were independent contractors that had a preexisting commercial relationship with DOT.

The *Umbehr* Court, in deciding that a preexisting commercial relationship existed, considered the length of

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

the relationship as well as the number and quality of agreements between the parties. In *Umbehr,* a preexisting commercial relationship was deemed to exist where the respondent had a six-year contract with petitioner County for the provision of trash removal services, which continued uninterrupted and exclusive for the entire six years before the County elected not to renew same in accordance with the terms of the contract. *See Umbehr, 518 U.S. at 671, 116 S.Ct. 2342.* In *McClintock,* however, no preexisting commercial relationship was found to have existed where plaintiff and defendants entered into three separate, distinct and unrelated agreements prior to the denial of the contract at issue there. *See McClintock, 169 F .3d at 816.* In so finding, the court in McClintock distinguished the ongoing nature of the contract involved in *Umbehr. See id.* At least one district court in the Second Circuit has held, contrary to the Third Circuit Court of Appeals in *McClintock,* that an independent contractor who is denied a government contract bid in retaliation for its exercise of free speech may state a viable First Amendment claim based on same, *see A.F.C. Enterprises, Inc. v. New York City Sch. Constr. Auth.,* No. 98CV4534, 2001 WL 1335010, at *17 (E.D.N.Y. Sept. 6, 2001). However, that decision was issued only 19 days prior to the execution of Attachment A, and in any event, does not represent the clearly established decisional law of the Court of Appeals for the Second Circuit.

Here, although neither party delineates each and every DOT contract awarded to Marinaccio prior to September 2001, it is clear that those most temporally related to the Military Road contract were not at all substantively related. Unlike in *Umbehr,* where the contract at issue involved the provision of a particular type of service to a governmental entity for a long period of time, i.e., trash hauling, here Marinaccio and his companies contracted with the DOT to complete separate and distinct road construction projects, which were wholly unrelated to one another. The facts of this case are more similar to those in *McClintock* where the contracts at issue were awarded sporadically, and dealt with separate and distinct projects. The court is mindful that, as the decisional law of another Circuit Court of Appeal, *McClintock* may not be considered in determining whether Plaintiffs had a clearly established right at the time Attachment A was executed. Nonetheless, that case illustrates just how obscure the law

was at that time regarding the distinction between a mere applicant or bidder for a government contract and a contractor with a preexisting commercial relationship with a particular government entity.

**\*16** The court finds that no clearly established First Amendment right existed for Plaintiffs at the time that Attachment A was executed. Accordingly, Defendants are entitled to qualified immunity on Count V of the Amended Complaint. Defendants' motion for summary judgment as to Count V is granted and Plaintiffs' motion for partial summary judgment is denied.

Regarding Count VI, the court acknowledges the absence of argument on Defendants' behalf as to the merits of said claim. Defendants do contend, however, that Plaintiffs waived their First Amendment rights. Because this defense may be considered in the context of either Count V or Count VI, the court will address it now.

The Supreme Court has held that constitutional rights way be waived in a civil context. *See D.H. Overmyer Co. v. Frick Co., 405 U.S. 174, 187, 92 S.Ct. 775, 783 (1972); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983 (1972).* However, after analyzing *Overmyer* and *Fuentes,* the Court of Appeals for the Third Circuit held that constitutional rights

may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and engaged in other contract negotiations.

*Erie Telecommunications, Inc. v. City of Erie, Pennsylvania,* 853 F.2d 1084, 1096 (3d Cir.1988). More recently, a district court in this Circuit has decided an issue regarding contractual waivers of constitutional rights in accordance with *Overmyer, Fuentes* and *Erie. See Legal Aid Society v. City of New York,* 114 F.Supp.2d 204 (S.D.N.Y.2004). There the court noted that any such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

waiver must be made voluntarily, knowingly and intelligently and must be established by clear and convincing evidence. *Id.* at 226-227. Moreover, a waiver of a fundamental right, as here, cannot be presumed or lightly inferred, and courts must indulge every reasonable presumption against waiver. *Id.* at 227. Finally, the court concluded, waiver of constitutional rights is disfavored and must at the very least be clear. *Id.*

Here, Plaintiffs cite evidence that their attorney objected to the language in Attachment A before it was executed, and note that their representative signed Attachment A under protest and with reservation of all rights. Defendants argue that the deferential statements made by Marinaccio and his attorney at the September 2001 CRU meeting support a finding that Plaintiffs waived their First Amendment rights. Further, Defendants contend that any objections made by Marinaccio's attorney to DOT attorney Corrado are irrelevant because she is not a defendant to this action.

**\*17** Clearly, statements made to a DOT attorney who represents and can legally bind Defendants must be considered in deciding whether Plaintiffs waived their free speech rights here. In any event, considering the policy that waiver of a fundamental right is disfavored, cannot lightly be inferred, and must be very clear, the fact that Attachment A was signed by Plaintiffs' representative under protest and with a reservation of all rights weighs against a finding of waiver here. Accordingly, Defendants' waiver defense must be dismissed.

Defendants have failed to meet their burden of proving that there is no question of fact to be decided at trial regarding Count VI. Moreover, because Defendants consent to dismissal of their accord and satisfaction defense, and because their waiver defense is dismissed regarding the First Amendment claims, Defendants' motion for summary judgment as to Count VI of the Amended Complaint must be denied.

E. Counts I, II & III-Due Process Claims

Counts I, II and III of the Amended Complaint set forth § 1983 claims as predicates to claims for the violation of Plaintiffs' Fourteenth Amendment due process

rights: procedural due process, substantive due process, and "stigma plus" claims, respectively. *See* Am. Compl. ¶¶ 46-63. Plaintiffs also allege violations of the New York State Constitution. *See* id.[FN4] The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law". U.S. Const. amend. XIV, § 1. Thus, in order to prevail on each due process cause of action, Plaintiffs must establish that they were deprived of some tangible property or liberty interest. *See Patterson v. City of Utica,* 370 F.3d 322, 329-30 (2d Cir.2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); *DeMuria v. Hawkes,* 328 F.3d 704, 705 (2d Cir.2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite conscious-shocking behavior on the part of the government); *McMenemy v. City of Rochester,* 241 F.3d 279, 285 -286 (2d Cir.2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

FN4. Because the due process rights afforded under the New York State Constitution are broader than those under the Fourteenth Amendment to the United States Constitution, only insofar as the definition of state action is implicated, and because there is no question before the court regarding same, Plaintiffs' due process claims will be analyzed under the federal constitutional standards. *See McGovern v. Local 456, Int'l Bhd. of Teamsters, Chauffeurs & Warehousemen & Helpers of Am., AFL-CIO,* 107 F.Supp.2d 311, 317-318 (S.D.N.Y.2000); *Rohan v. Am. Bar Ass'n,* No. 93-CV-1338, 1995 WL 347035, at \*9 (E.D.N.Y. May 31, 1995).

1. Property Interest

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Terminate Control Corp. v.. Horowitz,* 28 F.3d 1335, 1351 (2d Cir.1994), *quoting Bd. of Regents of State Colls.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

*v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972). Such an entitlement is not created by the Constitution, but may exist pursuant to a contract or state statute. *See Velez v. Levy*, 401 F.3d 75, 85 (2d Cir.2005), *citing Roth*, 408 U.S. at 577, 92 S.Ct. 2701.

*18 In the Amended Complaint and in their papers, Plaintiffs identify several DOT contracts regarding which they purport to have suffered the deprivation of a protected property or liberty interest. As an initial matter, the court declines to conclude that a deprivation of a property interest may be found regarding the four DOT contracts which were already awarded to Marinaccio and/or his company, Accadia Enterprises, Inc., when Marinaccio was barred from those worksites in relation to the Mateer incident. The record does not reflect any evidence that Plaintiffs suffered a deprivation in relation thereto, as said contracts were already awarded to Accadia Enterprises, Inc., and were paid in full by DOT. The same analysis pertains to the Military Road subcontract, which was actually awarded to Midway, and regarding which Plaintiffs claim no monetary loss.

Moreover, Plaintiffs cannot establish that they suffered the deprivation of a property interest regarding either the Williams Road or Route 33 contracts, or the Master's Edge subcontract. It is clear that New York law does not recognize a vested property interest in the low bid on a public contract. *See A.F.C. Enterprises*, 2001 WL 1335010, at *13, *citing Terminate Control*, 28 F.3d at 1343; *Stride Contracting Corp. v. Bd. of Contract and Supply*, 181 A.D.2d 876, 879, 581 N.Y.S.2d 446, 448 (App. Div.2d Dep't 1992). Here, it is undisputed that although Plaintiffs were the low bidders on the Williams Road and Route 33 contracts, their bids were rejected by DOT on the grounds that they were not "responsible bidders" pursuant to New York Highway Law § 38. Regarding the Master's Edge subcontract, Defendants admit that no decision was ever made in response to Midway's request that it be awarded same. Therefore, Plaintiffs cannot prevail on a claim for the deprivation of a property interest relating to either the Williams Road or Route 33 contract or the Master's Edge subcontract.

2. Liberty Interest

Plaintiffs contend that a liberty interest was

implicated when they were denied DOT contracts and when Marinaccio was debarred from work on DOT contract sites because Marinaccio's reputation was injured as a result of same. Specifically, Plaintiffs contend that due to defamatory statements made by O'Connor, Marinaccio was debarred from the Military Road contract site, Midway was not awarded the Master's Edge subcontract, and Accadia Site's bid for the Route 33 contract was rejected.

Injury to one's reputation, without more, does not amount to the deprivation of a protectible liberty interest under the Fourteenth Amendment. *See Walentas v. Lipper*, 862 F.2d 414, 420 (2d Dir.1988), *citing Paul v. Davis*, 424 U.S. 693, 701-702, 96 S.Ct. 1155, 1160-61 (1976). However, where the damage to one's reputation accompanies the deprivation of a "legal right or status", a liberty interest may be implicated. *See Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir.2004), quoting *Abramson v. Pataki*, 278 F.3d 93, 103 (2d Cir.2002). Therefore, in order to establish a § 1983 liberty interest claim, also known as a "stigma plus" claim, a plaintiff must bring forth evidence of

*19 (1) the utterance of a statement about [him] that is injurious to [his] reputation, "that is capable of being proved false, and that he or she claims is false," and (2) "some tangible and material state-imposed burden ... in addition to the stigmatizing statement."

*Velez*, 401 F.3d at 87, quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds, Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003).

Additionally, the alleged utterance must have been made public. *See Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 44 (2d Cir.1987), *citing Roth*, 408 U.S. at 575, 92 S.Ct. at 2708. The Second Circuit has said that the purpose of this "public disclosure" requirement

is to limit a constitutional claim to those instances where the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities. In determining the degree of dissemination that satisfies

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

the "public disclosure" requirement, we must look to the potential effect of dissemination on the employee's standing in the community and the foreclosure of job opportunities. As a result, what is sufficient to constitute "public disclosure" will vary with the circumstances of each case.

*Brandt,* 820 F.2d at 44. Thus, in *Brandt,* where there were questions of fact as to whether statements included in plaintiff's personnel file were likely to be disclosed to prospective employers, the lower court's ruling of summary judgment on plaintiff's stigma plus claim was reversed. *Id.* at 46. Likewise, where plaintiff's presence on a list of child abusers would necessarily be viewed by her prospective child care employers, as was required by law, the stigma element of her liberty interest claim was deemed to have been satisfied. *See Valmonte v. Bane,* 18 F.3d 992, 100 (2d Cir.1994). However, where there was no evidence that an allegedly stigmatizing remark was communicated to anyone other than plaintiff's administrator, the court, albeit under a qualified immunity analysis, declined to find that plaintiff's rights were violated. *See Vega v. Miller,* 273 F.3d 460, 461 (2d Cir.2001).

Regarding the stigma element of this claim, Plaintiffs allege that O'Connor made false statements about Marinaccio to members of the CRU. *See* Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G to McCartin Decl., Dkt. No. 84. First, Plaintiffs claim that at the May 21, 2001 CRU meeting, O'Connor told those present that Marinaccio threatened to shoot and kill DOT employee, Terrence Bender. The transcript of that meeting reflects that O'Connor first stated that he was reading "notes from engineers' diaries which are official documents[ ]" before making the following statement: "Terry Bender was threatened. Mr. Marinaccio has said, 'I'll go to my gun and I'll get my truck, and I'll shoot you (sic).' I documented that." *See* Ex. E to Corrado Decl., at 23, Dkt. No. 84. By affidavit, Marinaccio stated, "I deny that I ... threaten to shoot or kill people. Those allegations are not true." Aff. of Paul Marinaccio, Sr., Dec. 22, 2004, at ¶ 3, Dkt. No. 93. Plaintiffs also allege that on May 28, 2003, just prior to the CRU meeting regarding Accadia Site's bid for the Route 33 contract, O'Connor told members of the CRU and others that Marinaccio engaged in "sex harassment"

of an owner. *See* Ex. G to McCartin Aff. at Response 1, Dkt. No. 84. Although no documentation of same is part of the record now before the court, the transcript of the referenced CRU meeting reveals that O'Connor stated, in response to an inquiry from Marinaccio regarding the number of concerned citizen letters he received, "What comes to mind is the woman you sexually harassed in Fredonia who called the police. That one comes to mind." *See* Ex. O to Corrado Decl., at 25, Dkt. No. 84. Plaintiffs also claim this statement is false. *See* Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G to McCartin Decl., Dkt. No. 84. While both of these statements may call into question Marinaccio's "good name, reputation, honor, or integrity", *see Roth,* 408 U.S. at 573, 92 S.Ct. at 2707, and while Marinaccio denies the truth of each statement, it is doubtful that these communications may be deemed public within the bounds set forth by *Brandt* because there is no evidence that they were communicated to anyone outside of those who were present at each meeting. Nor do Plaintiffs allege, or cite to any evidence in the record which would suggest, as did the plaintiff in *Brandt,* that there is a likelihood of public disclosure in order to warrant a denial of summary judgment on this point. *See Brandt,* 820 F.2d at 44, 45-46.

**\*20** Plaintiffs also contend that O'Connor made stigmatizing utterances regarding Marinaccio to CRU members via email. In the first email, dated May 24, 2001, which was addressed to Tynan and Brian Browback, DOT Regional Director, O'Connor referred to Marinaccio as "an incorrigible liar" and "a bully." *See* Ex. B to Manna Aff. II, Dkt. No. 91. In the second email, dated September 14, 2001, which was addressed to Tynan and Corrado, among others, O'Connor stated, regarding Marinaccio, "I am again reminded of why we here in Region 5 don't want to work with this thug." *See* Ex. H to Manna Aff. I, Dkt. No. 85. Again, Plaintiffs have alleged the falsity of these statements. While no evidence of public disclosure exists regarding the May 24, 2001 email, it is not ascertainable from the record whether the September 14, 2001 email message was communicated to anyone other than those involved in the CRU decision making process, as neither party has identified the relationship of the other recipients of said message to Plaintiffs or the CRU.[FN5] Therefore, questions of fact exist as to whether the latter email was publicly disclosed.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

FN5. In addition to Tynan and Corrado, Lisa Sakalian, Richard Springer, and Charlie Stone are listed as recipients of this message, along with Brian Rowback, who appears to have been sent a copy of same. The record does not identify the relationship of these additional recipients to Plaintiffs or DOT.

Finally, Plaintiffs ostensibly contend that certain statements regarding Marinaccio, which were included in a letter addressed by Corrado to the attorney for Kemper Surety, were also stigmatizing. The contents of said letter, dated September 14, 2001, referred to DOT's concerns relating to the possible award of the Military Road subcontract to Midway. *See* Ex. J to Corrado Decl., Dkt. No. 84. In one paragraph, Corrado wrote, "According to our records, Mr. Marinaccio, Sr. was uncooperative, aggressive, verbally abusive and violent at times. His behavior was completely unacceptable and highly unusual, culminating in a decision to ban him from all NYSDOT work sites in January 2000." Id. To the extent Plaintiffs claim the language regarding Marinaccio's ban is stigmatizing, same cannot be the basis for their liberty interest claim because its truth is not disputed. Also, to the extent Plaintiffs claim the statement that Marinaccio is "uncooperative, aggressive, verbally abusive and violent at times" is sufficiently stigmatizing, they nonetheless fail to cite any evidence in the record that same was published to anyone other than Kemper. Because it is undisputed that Midway was actually awarded the Military Road subcontract, Plaintiffs cannot base their liberty interest claim on the aforementioned statement.

Regarding the second element of Plaintiffs' "stigma plus" claim, it is unclear what exactly constitutes the "plus", other than termination from government employment or deprivation of property. *See Giovanniello v. Goord,* No. 04-CV-6129, 2004 WL 2315090, at *3 (W.D.N.Y. Oct. 14, 2004), *citing Patterson v. City of Utica,* 370 F.3d 322, 330 (2d Cir.2004); *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). However, it is clear that the typical consequences of a bad reputation, including the negative impact of same on one's job prospects, does not rise to the level of deprivation of a "legal right or status" required for a "stigma plus" claim. *See Giovanniello,* 2004

WL 2315090, at *3, *citing Valmonte,* 18 F.3d at 1001. Where, as in *Valmonte,* a plaintiff was added to a government generated list of child abusers, which all child care agencies were required to review prior to hiring employees, the court found the "plus" element to have been satisfied, "not merely because of the defamatory aspect of [said list] but because that defamation occur[ed] in conjunction with a statutory impediment to employment." *Valmonte,* 18 F.3d at 1002. On the other hand, where, as in *Sadallah,* plaintiffs complained that defamatory comments by a government official about the condition of plaintiffs' business caused harm to the good will in their business, the court held that the "plus" element had not been satisfied as such harm did not occur "in addition to" the defamation, but instead was a "deleterious effect[ ]" of same. *See Sadallah,* 383 F.3d at 38-39, *citing Doe,* 271 F.3d at 47; *Valmonte,* 18 F.3d at 1001.

*21 Initially, it is clear that Marinaccio's debarment from contract sites, unaccompanied by any property deprivation, cannot sustain the "plus" element of his liberty interest claim. The relevant question, therefore, is whether DOT's rejection of Plaintiffs' bids for either the Williams Road or Rte 33 contracts, or the failure to award Midway the Master's Edge subcontract may satisfy the second element of Plaintiffs' stigma plus claim. The court has already determined that Plaintiffs did not have a protectible property interest in either of the aforementioned contracts or subcontract. Moreover, there is evidence in the record that Plaintiffs did not suffer any business loss as a result of not being awarded the contracts and subcontract at issue. In a signed affidavit, Marinaccio admitted that as of December 2004, his companies "continue to perform millions of dollars in work for public owners throughout Western New York." *See* Marinaccio Aff., ¶ 7, Dkt. No. 93. Clearly, therefore, Plaintiffs have not suffered the requisite harm to their reputation as is required for success on a liberty interest claim.

Because it is clear that Plaintiffs have not suffered the deprivation of a protectible property or liberty interest in order to prevail on any of their § 1983 due process claims, the court need not address the issue of adequacy of process. Accordingly, Defendants are entitled to summary judgment on Counts I, II and III of the Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Complaint.

F. Count IV-Equal Protection

Count IV of the Amended Complaint sets forth a § 1983 claim as a predicate to a claim for the violation of Plaintiffs' right to equal protection under the Fourteenth Amendment to the United States Constitution as well as pursuant to the New York State Constitution.[FN6] In the Amended Complaint, Plaintiffs allege that Defendants selectively and intentionally treated them differently as compared to other similarly situated independent contractors, their owners and employees in contravention of their right to equal protection under the Fourteenth Amendment, and did so with intent to injure Plaintiffs and to punish them for the exercise of their First Amendment rights. *See* Am. Compl. ¶¶ 65-66. Pursuant to the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Essentially, the Equal Protection Clause directs "that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Cent.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985).

> FN6. Because an equal protection claim under § 1983 mirrors that of its counterpart in the New York State Constitution, *see* N.Y. Const. art. I § 11, the court will analyze Plaintiffs' equal protection claim under the federal constitutional standards. *See Hayut v. State Univ. of New York,* 352 F.3d 733, 754 (2d Cir.2003).

In order to prevail on a § 1983 claim for violation of his right to equal protection of the laws, a plaintiff must establish that the defendant treated him differently compared with others similarly situated. *See Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005). In addition, a plaintiff must also establish that there was no rational basis for the selective treatment. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073 (2000). Such a claim is commonly known as a "class of one" equal protection claim. *See id.* Alternatively, a plaintiff prevail on his equal protection claim by showing that "[the] selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or

bad faith intent to injure a person." *Bizzarro,* 394 F.3d at 86, *quoting LeClair v. Saunders,* 627 F.2d 606, 609-610 (2d Cir.1980).

**\*22** Defendants argue, ostensibly because they would have the court analyze Plaintiffs' equal protection claim under *Olech,* that no jury could reasonably find that they lacked a rational basis for their treatment of Plaintiffs, citing Marinaccio's criminal conviction relating to the Mateer incident. Plaintiffs, on the other hand, cite evidence of the bitter relationship between Marinaccio and O'Connor, and Defendants awareness of same, ostensibly in support of an equal protection claim based on "malicious or bad faith intent to injure" under *LeClair. See* 627 F.2d at 609-610. However, before the court addresses the second prong of the equal protection analysis, Defendants must first establish a lack of evidence in the record, which would support a finding that they treated Plaintiffs differently than others similarly situated.

The Second Circuit has held that in order to establish treatment different from others similarly situated, a "plaintiff must show [he] was 'similarly situated in all material respects' to the individuals with whom [he] seeks to compare [himself]." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000), *quoting Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997).[FN7] This standard will be met where a plaintiff can show that "his comparators were subject to the same evaluation and discipline standards and that these comparators who went undisciplined engaged in comparable conduct." *Rossi v. West Haven Bd. of Educ.,*-F.Supp.2d-, No. 3:03CV1247, 2005 WL 578615 (D.Conn. Mar. 7, 2005), *citing Graham,* 230 F.3d at 40.

> FN7. To be sure, *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) and *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997) are both cases involving Title VII claims. However, "[t]he elements of an Equal Protection claim and a Title VII claim "are generally the same[ ]", *see Simpson v. New York State Dept. of Civil Service,* No. 02-CV-1216, 2005 WL 545349, at *22 (N.D.N.Y. Mar. 1, 2005), *citing Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) (citations omitted). As

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

other district courts have followed the Second Circuit's "others similarly situated" analysis in Title VII cases when deciding a § 1983 equal protection claim, this court will as well. *See, e.g., Rossi v. West Haven Bd. of Educ.,*-F.Supp.2d-, No. 3:03CV1247, 2005 WL 578655 (D.Conn. Mar. 7, 2005); *Payne v. Huntington Union Free Sch. Dist.,* 219 F.Supp.2d 273, 279 (E.D.N.Y.2002).

Here, Plaintiffs argue that DOT treated them differently than other independent contractors, citing evidence that it never imposed conditions on other contractors seeking DOT contracts similar to those it imposed upon Marinaccio and Midway in Attachment A to the Military Road subcontract. *See* Tynan Dep., 80:11-81:2, at Manna Aff. II, Ex. O, Dkt. No. 92; Dep. of Steven F. Lewis, July 15, 2004, 42:9-43:3, at Ex. S. to Manna Aff. II, Dkt. No. 92. Defendants contend that this argument fails because of Marinaccio's criminal conviction related to the Mateer incident, and therefore, Defendants apparently argue, Plaintiffs are more properly compared to other independent contractors with documented criminal convictions, who sought DOT contracts. In support of their argument, Defendants cite a case from the Second Circuit, where the court rejected a Title VII plaintiff's pretext argument because she erroneously compared herself to other employees who were not disciplined by the defendant but had only engaged in verbally offensive behavior, while the plaintiff engaged in a physical fight. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 568 (2d Cir.2000). This argument might carry weight if the Plaintiffs' equal protection claim were based on Defendants' rejection of Plaintiffs' bids for DOT contracts. In such a case, Marinaccio's criminal conviction relating to events which occurred on a DOT contract site would be material to the CRU's determination regarding Plaintiffs' bids for future DOT contracts. *See* Ex. B to Corrado Decl., Dkt. No. 84. In fact, consideration of a bidder's relevant criminal history is required under DOT's policy for determining whether a contractor is the lowest responsible bidder within the bounds of New York Highway Law § 38. *See* 9 N.Y.C.R.R. § 4.170 (2004). Defendants fail to explain, much less identify evidence which would support a conclusion that, Marinaccio's conviction is material to a decision regarding whether to

ban him from speaking publicly about a DOT contract, as provided in Attachment A to the Military Road subcontract. To be sure, Marinaccio's conviction might properly be deemed material to a decision regarding whether he should be banned from the Military Road site, a provision which also exists in Attachment A. However, at the very least, Plaintiffs have identified a question of fact regarding whether they were similarly situated to others who were not subject to a ban on holding public forums. The Second Circuit has noted that "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to a jury." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499, n. 2 (2d Cir.2001), *citing Graham,* 230 F.3d at 39. While the court also noted that "[t]his rule is not absolute, [ ], and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met[ ]", such is not the case here as a reasonable jury could find, based on the evidence cited by Plaintiffs, that Defendants never treated another independent contractor similar to Marinaccio when it banned him from speaking publicly about a DOT contract, and that Marinaccio's prior criminal conviction is not relevant to same.

**\*23** Returning to the second prong of the equal protection analysis, the court notes that questions of fact remain on either the showing required by *LeClair* or *Olech.* Questions remain as to whether Defendants had a rational basis for their treatment of Plaintiffs, for the same reasons as outlined under the similarly situated analysis. While Defendants contend there is no question that Marinaccio's conviction provided a rational basis for their actions, they do not explain the relevance of said conviction to Marinaccio's ability to speak publicly about the Military Road contract. Notably, it is unclear whether the rational basis issue here is one of fact for a jury to decide or a legal issue for the court to decide. *See Bizzarro v. Miranda,* 394 F.3d 82, 89 (2d Cir2005) (finding that an equal protection claim would lie "[i]f a jury could reasonably find that there was no rational basis" for the defendants' action). *But see NYC C.L.A.S.H., Inc. v. City of New York,* 315 F.Supp.2d 461, 471 (S.D.N.Y.2004), *citing Myers v. County of Orange,* 157 F.3d 66, 75, n. 3 (2d Cir.1998) (issue of whether, under the Equal Protection Clause, defendants had a rational basis for their different treatment of plaintiffs is one of law for the court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

to decide, and is not a fact issue for a jury). However, because the grounds for Defendants' rational basis argument is so closely related to the remaining fact issues regarding Plaintiffs' similarly situated argument, the court concludes that that rational basis issue here should also be decided by a jury.

As for the *LeClair* standard under the second prong of the equal protection analysis, Plaintiffs have also identified questions of fact. Pursuant to *LeClair*, Plaintiffs can establish an equal protection claim where "[the] selective treatment was based on ... [among other things, a] malicious or bad faith intent to injure a person." *Bizzarro*, 394 F.3d at 86, *quoting LeClair*, 627 F.2d at 609-610. Here, Plaintiffs cite evidence in the record which shows that Defendants were aware of a bitter relationship between Marinaccio and O'Connor, *see* Tynan Dep., 101:11-24, at Manna Aff. II, Ex. O, Dkt. No. 92; Dep. of James B. Cantwell, July 15, 2004, 67:2-68:11, at Ex. R to Manna Aff. II, Dkt. No. 92, that they were also aware that O'Connor had bitter feelings toward Marinaccio, *see* Tynan Dep., 102:1-10, at Manna Aff. II, Ex. O, Dkt. No. 92, and that the relationship between the two had deteriorated, *see* Cantwell Dep., 65:24-66:23, at Manna Aff. II, Ex. R, Dkt. No. 92. Also, Plaintiffs note Marinaccio's allegation that he complained to O'Connor after the engineer in charge at a project site called Marinaccio a "little dago" but O'Connor never took any steps to investigate same. *See* Corrado Decl., Ex. E, at 26, Dkt. No. 84. Moreover, Plaintiffs again note that O'Connor referred to Marinaccio as a "thug" in his September 14, 2001 email to Tynan and Corrado. *See* Ex. H to Manna Aff. I, Dkt. No. 85. Based on this evidence, Plaintiffs have identified a question of fact regarding whether they were treated differently due to a malicious or bad faith intent to injure. *Cf. Harlen Assocs.*, 273 F.3d at 502.

**\*24** Material questions of fact remain regarding each element of Plaintiffs' § 1983 equal protection claim. Therefore Defendants' motion for summary judgment is denied regarding said claim, set forth in Count IV of the Amended Complaint.

G. New York State Tort Claims-Counts VII through XI

1. Counts VII, VIII and IX-Tortious Interference With Business Relations

The first three of Plaintiffs state law claims are as follows: tortious interference with business relations by Marinaccio and Midway (Count VII), tortious interference with prospective advantage by Marinaccio and Midway (Count VIII), and tortious interference with prospective advantage by Marinaccio and Accadia Site (Count IX). *See* Am. Compl. ¶¶ 86-102. Because in New York, claims for tortious interference with business relations and prospective advantage are identical, the court will conduct its analysis of Counts VII, VIII and IX together. *See Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir.2002); *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108 -109 (2d Cir.1997). *See also El Greco Leather Prods. Co. v. Shoe World, Inc.*, 623 F.Supp. 1038, 1044 (E.D.N.Y.1985). The elements for this cause of action are "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Lombard*, 280 F.3d at 214. See also *Goldhirsh Group*, 107 F.3d at 108 -109; *El Greco Leather Prods.*, 623 F.Supp. at 1044.

In Count VII of the Amended Complaint, Plaintiffs allege that Defendants interfered with Marinaccio's and Midway's business relationships with Kemper and the DOT. In Count VIII, Plaintiffs allege that Defendants interfered with Marinaccio's and Midway's business relationship with Master's Edge, insofar as they prevented the award of the Master's Edge subcontract to Midway, resulting in damage to said relationship and a $70,000 loss to Midway. At oral argument, counsel for Plaintiffs further argued that, insofar as the claim for tortious interference with business relations is maintained by Marinaccio, Defendants interfered with his business relations with Midway, and insofar as the claim is maintained by Midway, Defendants interfered with its business relations with Marinaccio. In Count IX of the Amended Complaint, Plaintiffs argue that Defendants interfered with Marinaccio's and Accadia Site's relationship with the DOT by not awarding them the Route 33 contract. Finally, Plaintiffs argue in their memorandum of law, ostensibly as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

to Counts VII and IX, that Defendants interfered with their business relationship with the DOT, based on Marinaccio's history of performing $85 million in road construction for DOT.

Defendants argue that the only third parties involved in this action are Kemper Surety and Master's Edge, and neither suffered an injury to their respective relationships with Plaintiffs. Moreover, Defendants argue that it had a reasonable and legitimate purpose for its actions based on Marinaccio's prior behavior, and therefore, Plaintiffs cannot establish that Defendants acted improperly.

*25 Initially, the court notes that neither Marinaccio, Midway, nor, to the extent Plaintiffs argue same, Accadia Site, may be considered a third party under Plaintiffs' tortious interference claims as Marinaccio is the owner and/or president of each. Because each entity has identity of interests with Marinaccio, he therefore cannot claim that either is a third-party to prospective contracts or business relations with others. The DOT, however, may be considered a third party for purposes of Plaintiffs' tortious interference claims because Plaintiffs' state law claims are only properly brought against Defendants in their individual capacities. As such, Defendants are necessarily only liable on said claims if they acted outside the authority of the DOT, and therefore, were capable of interfering with Plaintiffs' relationship with the DOT.

Regarding Count VII, there is no evidence in the record that Marinaccio's or Midway's relationship with Kemper or the DOT was injured as a result of Defendants' actions relating to the Military Road subcontract. Defendants are correct that Plaintiffs' award of said subcontract contradicts Plaintiffs' claims that their relationship with Kemper or the DOT was damaged. Therefore, Defendants are entitled to summary judgment on Count VII of the Amended Complaint.

The court concludes, nonetheless, that questions of fact exist regarding the claims set forth in Counts VIII and IX of the Amended Complaint. Plaintiffs have submitted evidence that their relationship with Master's Edge was harmed as a result of Defendants' failure to award them the subcontract at issue, in that Plaintiffs suffered a monetary loss in relation thereto. *See* Marinaccio Dep.,

232:22-233:19, at Ex. A to McCartin Decl., Dkt. No. 84. Moreover, Plaintiffs have also submitted evidence that their relationship with the DOT has suffered as a result of Defendants' actions, insofar as its bids for DOT contracts have been rejected. Regarding the propriety of Defendants actions regarding the Master's Edge subcontract and the Route 33 contract, questions of fact remain for the same reasons as previously outlined in the discussion of Plaintiffs' equal protection claim. Therefore, Defendants' motion for summary judgment as to Counts VIII and IX of the Amended Complaint is denied.

Accordingly, the court grants Defendants' motion for summary judgment as to Count VII of the Amended Complaint and denies the motion as to Counts VIII and IX.

2. Count X-Prima Facie Tort

As their tenth cause of action, Plaintiffs claim that Defendants intentionally and maliciously, with the sole purpose of causing them harm, interfered with their business relationships and/or contracts with DOT, Kemper, and Master's Edge, thereby resulting in "special damages" to Plaintiffs in the form of "loss of income, loss of profits, loss of productivity, loss of future earnings and loss of goodwill in the business community." Am. Compl. ¶¶ 103-107.

In New York, the elements of a claim for prima facie tort are "(1) intentional infliction of harm, (2) causing special damages (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Discover Group, Inc. v. Lexmark Int'l, Inc.,* 333 F.Supp.2d 78, 87 (E.D.N.Y.2004) (citation and quotation omitted). A key feature of a prima facie tort claim is "disinterested malevolence, meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990) (citation and quotation omitted). "Motives other than disinterested malevolence, such as profit, self-interest, or business advantage will defeat a prima facie tort claim." *Id.* Also, in order to prevail on a claim for prima facie tort in New York, a plaintiff must establish special damages "with sufficient particularity to identify actual losses" and "round sums without any attempt at

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

itemization are insufficient." *Discover Group, 333 F.Supp.2d at 87.*

**\*26** Here, to the extent Plaintiffs' claim is based upon the rejection of their bids for either the Williams Road or Route 33 contracts, Defendants have submitted evidence that their actions regarding same were motivated by workplace and public safety in accordance with DOT regulations, and that their decisions were based upon Marinaccio's criminal conviction relating to the Mateer incident as well as Midway's and Accadia Site's lack of experience. Because Defendants have supplied evidence of a motive other than "disinterested malevolence," their rejections of Plaintiffs' bids for the Williams Road and Route 33 contracts cannot be the basis of Plaintiffs' prima facie tort claim. Also, to the extent Plaintiffs base their claim upon Defendants' actions regarding the Military Road subcontract, the claim must fail because said subcontract was, in fact, actually awarded to Midway, and therefore, no damages may be found. Finally, although Plaintiffs submit evidence that they "probably lost somewhere in the neighborhood of sixty, seventy thousand dollars" due to their not being awarded the Master's Edge subcontract, Marinaccio Dep., 233:10-11, Ex. A to McCartin Decl., Dkt. No. 84, such rounded estimates are not enough to meet the standard required to establish "special damages." For these reasons, Plaintiffs cannot establish a claim for prima facie tort, and accordingly, Defendants' motion for summary judgment as to Count X of the Amended Complaint is granted.

### 3. Count XI-Defamation

Plaintiffs' final cause of action is a claim for defamation under New York law. Although the Amended Complaint purports to set forth a defamation claim by Marinaccio against all Defendants, at oral argument Plaintiffs conceded that O'Connor is the sole defendant against whom this claim is alleged. Therefore, initially the court notes that Count XI of the Amended Complaint is dismissed against all defendants except O'Connor.

In New York, in order to prevail on a claim for defamation, a plaintiff must establish the following elements: "(1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff."

*Mills v. Unisource Worldwide, Inc.,* No. 04-CV-6324, 2005 WL 578167, at \*5 (W.D.N.Y. Mar. 9, 2005) (citation and quotation omitted). During discovery, Plaintiffs identified four separate instances of statements made by O'Connor about Marinaccio, which they allege form the basis of his claim for defamation. *See* Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G. to McCartin Decl., Dkt. No. 84. These statements include O'Connor's references to Marinaccio as "an incorrigible liar," "a bully" and a "thug" in his email messages of May 24, 2001 and September 14, 2001, respectively. *See* Ex. B to Manna Aff. II, Dkt. No. 91.; *See* Ex. H to Manna Aff. I, Dkt. No. 85. Also included are the statements made by O'Connor at the CRU meetings held on May 21, 2001 (regarding the engineer's notes which alleged that Marinaccio threatened to shoot a DOT employee) and May 28, 2003 (regarding Marinaccio having sexually harassed a woman in Fredonia who called the police). *See* Ex. E to Corrado Decl., at 23, Dkt. No. 84; Ex. O to Corrado Decl., at 25, Dkt. No. 84.

**\*27** Defendants argue that Marinaccio cannot establish his defamation claim against O'Connor because the proffered statements are not false and defamatory, and because Marinaccio was not injured by them. First, Defendants argue that Plaintiffs cannot establish the falsity of O'Connor's statement that Marinaccio is a "thug" and "a bully," because said statements were made after the Mateer incident, and Marinaccio was convicted of criminal conduct based on same. Even if the court were to credit this argument, there are clearly questions of fact regarding the truth of the remaining statements, as Marinaccio has asserted they are false.

Regarding the element of damages, in New York, in order to prevail on a claim for defamation, a plaintiff must prove "special damages," which consist of "the loss of something having economic or pecuniary value which must flow directly from the injury to the reputation by defamation; not from the effects of defamation." *Idema v. Wager,* 120 F.Supp.2d 361, 368 (S.D.N.Y.2000), *quoting Matheson v. Marchello,* 100 A.D.2d 233, 234, 473 N.Y .S.2d 998, 1001 (App. Div. 2nd Dep't 1984). Defendants contend that Marinaccio cannot establish that he was injured by the May 2001 email and CRU statements because Defendants have submitted evidence that Midway

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

was denied the Williams Road contract based on its inexperience, not Marinaccio's behavior. Defendants make a similar argument regarding O'Connor's statements at the May 2003 CRU, noting that there is evidence that Accadia Site was denied the Route 33 contract due to its inexperience. Finally, regarding the September 2001 email, Defendants contend that no injury may be shown because Midway was awarded the Military Road subcontract. However, the court need not address these arguments as Marinaccio's defamation claim fails on separate grounds. The "special damages" requirement in New York demands that a plaintiff fully and accurately define his damages "with sufficient particularity to identify actual losses." *Idema*, 120 F.Supp.2d at 368. As with the "special damages" element of a prima facie tort claim, in order to prove special damages for a defamation claim, the submission of estimates or round figures will not suffice. *See* id.; *Discover Group*, 333 F.Supp.2d at 87. Because Marinaccio has failed to submit specific evidence of his alleged losses relating to O'Connor's statements, he cannot establish defamation claim, and therefore, Defendants' motion for summary judgment as to Count XI of the Amended Complaint is granted.

V. Conclusion

In accordance with the above, it is hereby ORDERED that:

the motion for summary judgment on behalf of defendant, Joseph H. Boardman, as to all claims against him is GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Counts I, II and III of the Amended Complaint is GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Count IV of the Amended Complaint is hereby DENIED;

**\*28** defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, are entitled to qualified immunity as to Count V of the Amended Complaint, and therefore, said defendants' motion for

summary judgment as to said claim is accordingly GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Count VI of the Amended Complaint is hereby DENIED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Counts VII, X and XI of the Amended Complaint is hereby GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their official capacities, as to Counts VIII and IX of the Amended Complaint is hereby GRANTED; and

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their individual capacities, as to Counts VIII and IX of the Amended Complaint is hereby DENIED.

Accordingly, the following claims remain for consideration at trial:

Plaintiffs' claims against defendants James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their official and individual capacities, pursuant to 42 U.S.C. § 1983 as predicates to claims for the violation of Plaintiffs' right to equal protection under the Fourteenth Amendment (Count IV of the Amended Complaint) and their rights to free speech and assembly under the First Amendment (Count VI of the Amended Complaint); and

claims for tortious interference with prospective advantage, pursuant to New York law, against defendants James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their individual capacities, by plaintiffs, Paul Marinaccio, Sr. and Midway Enterprises, Inc. (Count VIII of the Amended Complaint), and by plaintiffs, Paul Marinaccio, Sr. and Accadia Site Contracting, Inc. (Count IX of the Amended Complaint).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

     IT IS SO ORDERED.

N.D.N.Y.,2005.

Marinaccio v. Boardman
Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln
Work-Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe # 1,
Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.
No. Civ.A. 95CV1641RSPDS.

Sept. 22, 1997.
Kenneth Brown, State Court Institute-Greene,
Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman
Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M.
Dvorin, Assistant Attorney General, Carl N. Lundberg,
Chief Legal Counsel, South Carolina Department of
Probation, Columbia, SC, for defendants Bishop, Magee,
Barton, McMahan, and Stanford, Carl N. Lundberg, of
Counsel.

DECISION AND ORDER

POOLER, J.
　**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Daniel
Scanlon, Jr., duly filed on April 17, 1997. Following ten
days from the service thereof, the Clerk has sent me the
entire file, including any and all objections filed by the
parties herein.

　Plaintiff Kenneth Brown commenced this Section

1983 civil rights action on November 17, 1995. On
February 12, 1996, Magistrate Judge Scanlon ordered
Brown to submit an amended complaint alleging the
specific acts committed by the individuals named as
defendants which Brown claimed violated his
constitutional rights. Brown filed an amended complaint
on March 21, 1996. In his amended complaint, Brown
alleged that defendants violated his rights under the Eighth
and Fourteenth Amendments by failing to process properly
his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact he
had never violated the conditions of his parole. For a more
complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

　On August 5, 1996, defendants Peters and Williams
made a motion to dismiss for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No.
14, at 2. On August 19, 1996, defendants Bishop, Magee,
Barton, and McMahan made a motion to dismiss the
complaint against them or, in the alternative, for summary
judgment. Dkt. No. 20. On October 17, 1996, defendants
Herman, Stewart, and Stanford made a motion to dismiss
for failure to state a claim. Dkt. No 34. On April 17, 1996,
Magistrate Judge Scanlon recommended that all
defendants' motions to dismiss be granted and that the
complaint be dismissed. Dkt. No. 50.

　On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave
to file a second amended complaint and a copy of his
proposed amended complaint. Dkt. No. 53. I turn first to
the last motion filed, Brown's motion for leave to amend
his complaint a second time.

　Brown seeks to file a second amended complaint
"setting forth in detail the personal involvement of each
defendant and how their acts of commission and omission
served to deprive plaintiff of Constitutionally secured
rights." Dkt. No. 53. The district court has discretion
whether to grant leave to amend. *Ruffolo v. Oppenheimer*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

& Co., 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss-the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

**2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to

allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a de novo determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for pro se pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. See Camardo v. General Motors Hourly-Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); Chambrier v. Leonardo, 1991 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); _Schoolfield v. Dep't of Correction,_ 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); _Vargas v. Keane,_ 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), _aff'd,_ 86 F.3d 1273 (2d Cir.), _cert. denied,_ 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). _See also Scipio v. Keane,_ 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[FN1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

> FN1. I note, however, that the report-recommendation would survive even _de novo_ review.

### CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

### ORDER and REPORT-RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues _seriatim._

### BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1-2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5-7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8-10.

In February, 1993, plaintiff was arrested on robbery

charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11-14; Exs. C-J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15-17; Exs. F-I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

**DISCUSSION**

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their]] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.
E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

### CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby
ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart

and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

N.D.N.Y.,1997.

Brown v. Peters
Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.